1   Robert P. Doty (SBN 148069)
     rdoty@coxcastle.com
2   Peter M. Morrisette (SBN 209190)
     pmorrisette@coxcastle.com
3   Christopher W. Gribble (SBN 285337)
     cgribble@coxcastle.com
4   COX, CASTLE & NICHOLSON LLP
     50 California Street, Suite 3200
5   San Francisco, CA  94111
     Telephone:  (415) 262-5100
6   Facsimile:   (415) 262-5199

7   Attorneys for plaintiffs
     The Successor Agency to the former Emeryville Redevelopment
8   Agency and The City of Emeryville

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE SUCCESSOR AGENCY TO THE FORMER EMERYVILLE REDEVELOPMENT AGENCY AND THE CITY OF EMERYVILLE,<br><br>         Plaintiffs,<br><br>         vs.<br><br>SWAGELOK COMPANY, an Ohio corporation; WHITNEY RESEARCH TOOL CO., a dissolved California corporation; HANSON, a British Corporation; CATHERINE LENNON LOZICK, an individual residing in Ohio; EDWARD A. LOZICK, or his successor(s)-in-interest, as Trustee of the Catherine Lennon Lozick Trust (an Ohio trust); and ARTHUR F. ANTON, DAVID B. CATHCART, and/or WILLIAM R. COSGROVE (or their/his successors-in-interest), as Trustee(s) of the Revocable Trust Agreement #3 f/b/o Catherine L. Lozick (also known or sometimes referred to as the Inter Vivos Revocable Trust Agreement #3 f/b/o Catherine L. Lozick u/a dated 10/1/86) (an Ohio trust);<br><br>         Defendants. | Case No.<br><br>**COMPLAINT UNDER CERCLA, 42 U.S.C. SECTION 9601 *ET SEQ*., RCRA, 42 U.S.C. SECTION 6901 *ET SEQ*., AND STATE LAW TO RECOVER ENVIRONMENTAL CLEANUP COSTS AND RELATED RELIEF** |

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5

COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

Plaintiffs, Successor Agency to the former Emeryville Redevelopment Agency ("Successor Agency") and the City of Emeryville ("City"), hereby allege against: Hanson; Swagelok Company; Whitney Research Tool Co.; Catherine Lennon Lozick; Edward A. Lozick, or his successor(s)-in-interest, as Trustee of the Catherine Lennon Lozick Trust; and Arthur F. Anton, David B. Cathcart, and/or William R. Cosgrove (or their/his successors-in-interest), as Trustee(s) of the Revocable Trust Agreement #3 f/b/o Catherine L. Lozick (also known or sometimes referred to as the Inter Vivos Revocable Trust Agreement #3 f/b/o Catherine L. Lozick u/a dated 10/1/86) (collectively "Defendants") as follows and based on Plaintiffs' investigation thus far of publicly available documents, knowledgeable individuals, and other information and belief:

## NATURE OF THIS ACTION

1.     This is an action to recover environmental cleanup costs and damages caused by, and to obtain injunctive and declaratory relief against, Defendants.

2.     The action arises out of polluted groundwater and real property located on Horton Street in the City of Emeryville, Alameda County, California (the "Property"). The impacted groundwater is beneath and down gradient from (i.e., to the west of) the Property. The contamination was caused by industrial activities that occurred at the Property in the 1900s, and it is continuing and spreading to this day. Defendants are legally responsible for the contamination under federal statutes, California statutes that were derived from and largely mirror those federal statutes, and California common law.

3.     The industrial operations in question occurred from approximately 1910 until the late 1990s. From approximately 1910 to approximately 1959, the Property was owned by the Marchant Calculating Machine Company, a California corporation ("Marchant"), which used the site to manufacture mechanical calculating machines. In the late 1950s, Marchant merged with and into a company incorporated in the state of New York and famous, primarily, for typewriters—Smith-Corona. Smith-Corona was the surviving corporation in that merger. After the merger, Smith-Corona changed its name to Smith-Corona-Marchant, and the mechanical calculator business operating as the Marchant Division. Smith-Corona-Marchant subsequently shortened its name to SCM (hereafter, "SCM-NY"). SCM-NY owned and operated the Property for a time and eventually conveyed it to a

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                          - 1 -                COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
                                                              ENV. CLEANUP COSTS AND RELATED RELIEF

third party by grant deed recorded in approximately 1959 as part of shifting the Marchant calculator division operations to a different but nearby location straddling the Emeryville-Berkeley border. SCM-NY's operations at the new property also contaminated that property with various hazardous substances. Both before and after its merger with Marchant, SCM-NY regularly conducted business in California, including but not limited to acquiring the Marchant Corporation in a merger transaction, and operating the Marchant mechanical calculator business as a division within SCM-NY.

4.      From approximately the mid-1960s to the late 1990s, the Property was owned by affiliates of Defendant Swagelok Company ("Swagelok") and operated, nominally, by Whitney Research and Tool Company ("Whitney")—an entity controlled and dominated by Swagelok to such an extent that it had no true separateness from Swagelok and was instead merely an agent, instrumentality, and alter ego through which Swagelok conducted its own integrated business. At Swagelok's behest, Whitney produced machine valves and/or parts for such valves at the Property. Swagelok continues to have a presence in California and conducts business in California.

5.      Marchant, as an independent company, SCM-NY through its Marchant Division, and Swagelok through its control and management of Whitney used chlorinated solvent compounds and petroleum-based compounds, among other chemicals, in their operations. The soil and soil vapor at the Property, and the groundwater at and down gradient from the Property, are contaminated primarily with chlorinated solvents (all such chemicals being commonly, and hereafter, referred to as "CVOCs"). The Property is also contaminated with petroleum-based compounds. The list of "contaminants of concern" also includes certain metals. The "contaminants of concern" are intermingled, in varying combinations at various locations at and down gradient from the Property. All of the contaminants of concern are traceable to the operations of Marchant, SCM-NY's Marchant division, and Whitney/Swagelok, but on account of their intermingled nature they cannot be allocated or apportioned among the historic owners or operators of the Property, except by arbitrary means.

6.      In addition to the severe impact on groundwater at and down gradient from the Property, the contamination has rendered the approximately 47,000 square foot building located on the Property unsafe for use by the City employees who worked in the building until 2012. The

LAW OFFICES OF
**COX, CASTLE &
NICHOLSON LLP**
SAN FRANCISCO

070431\8259950v5

- 2 -

COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

1  contamination is thus causing ongoing loss of use damage to the City.  Those damages are similarly

2  incapable of apportionment, except by arbitrary means.

3         7.      Plaintiffs therefore seek the imposition of joint and several liability among the

4  defendants.

5         8.      Consistent with federal guidance documents followed by the State of California,

6  the cost of the cleanup work needed to meet applicable state and federal standards has been estimated

7  in a range from $35 million to $65 million, with $42 million listed on Plaintiff Successor Agency's

8  most recent accounting of anticipated expenditures.  Approximately $7.6 million of site investigation

9  and remedial evaluation work has been conducted through the end of 2016.  The Successor Agency, in

10  cooperation with the City, is currently implementing the necessary investigation and remedial

11  planning work under regulatory oversight provided by the California Environmental Protection

12  Agency's Department of Toxic Substances Control ("DTSC").  Notices pursuant to various statutes

13  have been sent to the Defendants advising them that they could take responsibility for the remediation.

14  None of the defendants has indicated a willingness to conduct the necessary cleanup work.

15  **SUBJECT MATTER JURISDICTION**

16         9.      This Court has subject matter jurisdiction over this action and the parties

17  pursuant to section 113(b) of the Comprehensive Environmental Response, Compensation, and

18  Liability Act ("CERCLA"), 42 U.S.C. § 9613(b); 42 U.S.C. § 6972(a) (a portion of the Solid Waste

19  Disposal Act commonly referred to as the Resource Conservation and Recovery Act ("RCRA")); and

20  28 U.S.C. § 1331 (federal question jurisdiction). This Court has jurisdiction over the related state law

21  claims pursuant to 28 U.S.C. § 1367(a) (supplemental jurisdiction).

22  **VENUE**

23        10.     Venue is appropriate in this District under CERCLA because the release of

24  hazardous substances which gives rise to this action occurred within the District, and venue is

25  appropriate under RCRA because the endangerment to health and the environment alleged here is

26  occurring within the District.

27

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5

- 3 -

COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

## THE PARTIES

11.    Plaintiff Successor Agency is a public entity, located and operating in Alameda County, possessing its own name and legal capacity, authorized to sue and be sued in its own name, and created by the State of California to serve as the successor to the former Emeryville Redevelopment Agency, which was a public entity created pursuant to California's Community Redevelopment Law, section 33000 *et seq.* of the California Health and Safety Code. The former Redevelopment Agency was authorized, among other things, to undertake certain environmental cleanup projects such as the one ongoing at the Property and to recover its cleanup costs and attorneys' fees from those parties made liable for the cleanup by CERCLA and its California analogues.  All of the former Redevelopment Agency's rights, powers, duties and obligations are, by statute, now vested in the Successor Agency. Among its other duties, Plaintiff Successor Agency is responsible for enforcing all of the former Redevelopment Agency's rights that may benefit public agencies within California that share in property tax revenues.

12.    Plaintiff City is a municipal corporation and a public body, corporate and politic, located in Alameda County, California.  The City brings this action on its own behalf, as a land owner, and on behalf of the People of the State of California as authorized by § 731 of the California Code of Civil Procedure.

13.    Defendant Swagelok Company is an Ohio Corporation, with its principal place of business in Solon, Ohio. Swagelok manufactures, distributes, and sells precision valves and other components of gas and fluid control systems.

14.    Defendant Whitney Research Tool Co., which for a time used the name Whitey Research Tool Company is a dissolved California Corporation, and its principal place of business was in Emeryville, California.

15.    Defendant Hanson is a British Corporation with its principal place of business in Maidenheard, Berkshire, United Kingdom.

16.    Defendant  Catherine Lennon Lozick ("Lozick") is an individual who resides in Ohio, and she is the sole beneficiary of the Catherine Lennon Lozick Trust, which is a former owner of the Property.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                        - 4 -                        COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

17.     Defendant Edward A. Lozick, or his successor(s)-in-interest, as Trustee of the Catherine Lennon Lozick Trust, which is an Ohio trust ("CLL Trust").

18.     Defendant Arthur F. Anton, David B. Cathcart, and/or William R. Cosgrove (or their/his successors-in-interest), as Trustee(s) of the Revocable Trust Agreement #3 f/b/o Catherine L. Lozick (also known or sometimes referred to as the Inter Vivos Revocable Trust Agreement #3 f/b/o Catherine L. Lozick u/a dated 10/1/86), which is an Ohio trust ("CLL Revocable Trust #3").

## THE PROPERTY AND THE CONTAMINATION

19.     The Property is located at 5679 Horton Street, Emeryville, Alameda County, California, and it is identified by Alameda County Assessor's Parcel Numbers 49-1552-1 and 49-1319-1-20. The Property is approximately 1.75 acres in size and is generally bounded by Union Pacific railroad tracks to the west, commercial/industrial properties to the north, Horton Street to the east, and Stanford Avenue and a former rail spur to the southeast/south.  A map generally depicting the Property, its location in Emeryville, and the plume of contaminated groundwater emanating from it is attached to this Complaint as Exhibit A.  The former Emeryville Redevelopment Agency acquired the Property in 1999 and later conveyed it to the City.

20.     Samples of soil, soil gas, and indoor air at the Property, and groundwater at and down gradient from the Property, confirm that the soil, soil gas, and indoor air at the Property are polluted with varying combinations of CVOCs including trichloroethene ("TCE"), tetrachloroethene ("PCE"), cis-1,2-dichloroethene ("cDCE"), trans-1,2-dichloroethene ("1,2-DCE"), vinyl chloride, 1,1- dichloroethane ("1,1-DCA"), 1,2- dichloroethane ("1,2-DCA"), 1,1,2-trichloroethane ("1,1,2-TCA"), chloroform, bromomethane, chlorobenzene, and methylene chloride.  Each of the those chemicals is a "hazardous substance" within the meaning of federal law (i.e., CERCLA Section 101(14)) and within the corresponding definitions in the California statutes that are modeled after CERCLA and designed to enable local government to bring about the cleanup of contaminated properties—e.g., Health and Safety Section 33459(c) (the definition of "hazardous substance" applicable to the Successor Agency's claim under the Polanco Act) and Health and Safety Code Section 25403(i) (the definition of "hazardous material" applicable to the City's claim under the Gatto Act, which extended cleanup authority similar to the

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                - 5 -                COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

1    Polanco Act to cities and other public agencies within California). Other hazardous chemicals

2    meeting one or more of the foregoing statutory definitions have also been identified in the sampling

3    data, including cadmium, lead, and various petroleum hydrocarbons. The various chemicals are

4    intermixed to varying degrees in varying locations.

5          21.    The contamination at the Property has been evaluated using protocols approved

6    by federal and state regulatory agencies, and the results of that analysis have been presented in, among

7    other things, a Remedial Investigation and a Health Risk Assessment submitted to and approved by

8    the State of California's DTSC, the lead regulatory agency for the site. The analysis presented in the

9    risk assessment demonstrates unacceptable levels of ongoing risk to human health and the

10   environment from material that is "solid waste" within the meaning of 42 U.S.C. § 6903(27), thus

11   establishing that conditions at the Property present an "imminent and substantial endangerment to

12   health or the environment" within the meaning of RCRA, i.e., 42 U.S.C. § 6972(a)(1)(B).

13         22.    The investigation and cleanup work at the Property is being carried out in the

14   public interest to reduce blight and alleviate nuisance conditions at and in the vicinity of the Property.

15         **<u>HANSON'S CONNECTION TO THE CONTAMINATION</u>**

16         23.    Documentary and other evidence link hazardous substances at the Property to,

17   among other things, the production of Marchant calculating machines. That operation included, but

18   was not limited to, nickel-plating and enameling operations; grinding, hardening, and assembly

19   operations; and associated functions. Marchant used various oils, chlorinated solvents, and other

20   chemicals in its manufacturing operations at the Property; generated a variety of wastes in the course

21   of its operations; and through those operations and waste-generating activities contributed to the

22   CVOC and other contamination at the Property.

23         24.    Responsibility for the Marchant's operations and contamination at and near the

24   Property flowed first to SCM-NY, via the merger referenced above in Paragraph 3, and subsequently

25   to Defendant Hanson through later transactions, beginning in the mid-1980s. As of the mid-1980s,

26   Hanson (then formally known as Hanson Plc because it was publicly traded) was, among other things,

27   one of the foremost corporate raiders of the era.

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5    - 6 -    COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

25.     Using hostile takeover tactics, including one or more tender offers to SCM-NY shareholders, some of whom were California residents, Hanson acquired control over SCM-NY, and SCM-NY became an indirect subsidiary of Hanson.  Hanson acquired control over SCM-NY with the intention of dissecting SCM-NY and transferring the resulting pieces of SCM-NY into various Hanson-controlled subsidiaries, which Hanson would then liquidate at opportune times. Hanson anticipated earning huge profits as the raider that captured the so-called break-up premium inherent in conglomerates like SCM-NY.

26.     Consistent with Hanson's plan, and in the summer of 1985 as Hanson was commencing a tender offer for SCM-NY, Hanson caused approximately 23 new Delaware corporations to be formed as indirect Hanson subsidiaries.  The vast majority were given names beginning with "HSCM," "H" corresponding to Hanson and "SCM" corresponding to the target to be dissected.  As a group they have been referred to as the "fan" companies."

27.     Shortly after winning its hostile tender offer battle for control over SCM-NY, Hanson orchestrated a series of transactions among SCM-NY and Hanson's fan companies.  This "plan of liquidation" represented a single, unified business purpose—maximizing the benefit to Hanson from dismembering or de-conglomerating SCM-NY.

28.     Pursuant to Hanson's plan of liquidation for SCM-NY, Hanson caused specific assets and liabilities corresponding to specific business units within SCM-NY to be parceled out among HSCM-1 through HSCM-19.   In each case the "fan" company obtained the assets identified by Hanson by relinquishing SCM-NY shares that Hanson had caused to be allocated to the fan company.  The fan companies then went on, as direct by Hanson, to liquidate SCM-NY in pieces. HSCM-6, for example, became the vehicle by which Hanson caused SCM-NY's Glidden paint business to be sold to a third party. HSCM-10, which would be renamed "Smith Corona Corporation," and another subsidiary dominated and controlled by Hanson, HM Holdings, Inc., were the conduits through which Hanson liquidated a majority stake in SCM-NY's historic typewriter/word processor business.

29.     As part of its unsuccessful takeover defense against Hanson, SCM-NY had created a subsidiary into which SCM-NY placed its chemical business. Hanson decided that chemical

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                    - 7 -                    COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

1   business would reside in HSCM-20, and Hanson accomplished that transition by causing SCM-NY to

2   merge into HSCM-20 in late 1986, with HSCM-20 as the surviving entity.  By employing a statutory

3   merger of SCM-NY into HSCM-20 for this element of its dissection of SCM-NY, Hanson caused the

4   Marchant contamination liability at the Property to flow into HSCM-20 from SCM-NY (where it had

5   been located since the late 1950s when the Marchant entity was merged into the pre-Hanson SCM-NY).

6         30.    The merger of SCM-NY into HSCM-20 also caused Marchant's jurisdictional

7   contacts with California to pass into HSCM-20. That merger similarly caused SCM-NY's contacts

8   with California, which arose from SCM-NY's operation of its Marchant Division at the Property, and

9   at other locations in California, to flow into HSCM-20.

10        31.    In 1988, Hanson caused HSCM-20 to merge into yet another indirect, wholly

11   owned, and Hanson-dominated subsidiary, HSCM Holdings Inc.  Hanson then caused HSCM

12   Holdings Inc. to merge into yet another indirect, wholly owned, and Hanson-dominated subsidiary,

13   HM Holdings, Inc. The surviving entity at the end of that series of mergers was HM Holdings, Inc.

14   ("HM Holdings").  HM Holdings thus inherited Marchant's liability for contamination at the Property,

15   and SCM-NY's liability for contamination at the Property, as a result of being a tool and

16   instrumentality by which Hanson accomplished Hanson's goal of de-conglomerating SCM-NY.

17        32.    The transactions referred to in Paragraphs 26 to 31 above, and by which Hanson

18   shifted SCM-NY's business units into to various Hanson subsidiaries, and caused Marchant liabilities

19   to flow into HM Holdings, were not conducted at arms' length.  The nature, forms, and terms of the

20   transactions entered into by the various Hanson subsidiaries, through which Hanson implemented its

21   plan to dismantle and selectively liquidate SCM-NY's businesses, were completely controlled by

22   Hanson, to serve Hanson's interests.  None of the Hanson subsidiaries participating in these

23   transactions exercised any separate corporate minds, wills, agency, or existence in connection with

24   these transactions.  None of them was governed by a board of directors independent of Hanson.  None

25   of them was guided by a subset of board members independent of Hanson.  None of them was advised

26   by accountants, investment bankers, attorneys, and/or other professionals independent of Hanson.

27   Instead, through overlapping boards of directors and officers as well as other means, each and all of

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5

- 8 -

COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

1  them functioned simply as the agents, instrumentalities, conduits and alter egos by which Hanson

2  pursued Hanson's business—the dismemberment and gradual liquidation of SCM-NY.

3       33.    There was at all relevant times a complete unity of interests among Hanson and

4  the subsidiaries it used in pursuing the dismemberment of SCM-NY as evidenced by Hanson's

5  domination of the subsidiaries' pertinent policies, processes, and finances with the subsidiaries' cash

6  accounts managed on a centralized basis such that Hanson could and did shift hundreds of millions of

7  dollars back and forth without the negotiations and documentation that would have occurred if the

8  involved entities had actually been separate corporations exercising their own separate corporate

9  minds, wills, existence, and agency with their own professional advisors and agents.

10      34.    Hanson's plenary control over the dissection and selective liquidation of SCM-

11  NY is well demonstrated by, among other things, Hanson's actions with respect to SCM-NY's well

12  known typewriter and word processor business, which Hanson monetized via a 1989 initial public

13  stock offering (the " Typewriter IPO") that was marketed in California, among other places.

14      35.    Prior to and throughout the Typewriter IPO, Hanson dominated the entity that

15  would be sold off in the public offering, HSCM-10. For example, Hanson caused HSCM-10 to change

16  its name to Smith Corona Corporation so that the subsidiary could take advantage of that well-known

17  name. According to public records prepared in connection with the Typewriter IPO, Hanson extracted

18  $121 million of net cash payments from Smith Corona before the offering commenced. The Typewriter

19  IPO prospectus indicates that sum was in addition to "approximately $386 million in dividend and other

20  net payments to be made to Hanson in connection with the Reorganization and the Offerings."

21      36.    The transfers of those funds occurred without the negotiations and

22  documentation that would have occurred if Smith Corona or its nominal parent entity (HM Holdings)

23  had actually been corporations exercising corporate minds, wills, agency, or existence separate from

24  Hanson's.

25      37.    Hanson also caused Smith Corona Corporation, HM Holdings (another wholly

26  owned, indirect Hanson subsidiary as noted in Paragraph 31), and various other entities controlled by

27  Hanson to enter into a series of transactions referred to (in the 1989 prospectus for the Typewriter

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                    - 9 -         COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
                                                  ENV. CLEANUP COSTS AND RELATED RELIEF

IPO) as the "Reorganization." The 1989 prospectus explains that the Reorganization transactions were not conducted at arms' length.

38.     In the Reorganization and preparation for the Typewriter IPO, Hanson addressed, among other things, SCM-NY's legacy liabilities—i.e., liabilities associated with SCM-NY's past businesses, operations, and properties such as the Marchant mechanical calculator business and the Property.  To facilitate the IPO, so that Hanson could profit from it, Hanson caused two of its subsidiaries (Smith Corona Corporation and HM Holdings) to enter into a "Cross Indemnity Agreement."  Through that agreement, Hanson assured prospective buyers of the Typewriter IOP shares that the company they would be investing in was protected from all "Hanson Liabilities." Hanson caused that term to be defined to include any and all liabilities associated with any and all of SCM-NY's non-typewriter businesses including their (1) past use of property for manufacturing or industrial purposes; (2) releases of hazardous substances; and (3) "nuisances of whatever kind" arising from those past, non-typewriter operations and/or properties.

39.     Hanson thus explicitly and implicitly adopted as its own, assumed, and inherited Marchant's environmental liability at the Property, Marchant's contacts as a California corporation with its headquarters in California, and SCM-NY's liabilities and contacts associated with the mechanical calculator business conducted at the Property.

40.     Hanson reaped hundreds of millions of dollars of benefits from this process as follows.  The assets and liabilities placed in Smith Corona prior to the IPO were valued by Hanson at approximately $82 million. The IPO generated net "proceeds" on the order of $290 million, and the 1989 prospectus explained that Hanson was the sole beneficiary of those net proceeds.

41.     Neither Smith Corona Corporation, the issuing company, nor HM Holdings, the ostensible parent of Smith Corona, obtained any substantial proceeds from the Typewriter IPO according to the prospectus issued in connection with that offering.

42.     In connection with the Reorganization, the Cross-Indemnity Agreement, and the Typewriter IPO, neither Smith Corona Corporation nor its nominal parent, HM Holdings, had or exercised any separate corporate mind, will, agency, or existence.  Neither had independent director vet the terms of the transactions instigated by Hanson.  Neither of them engaged financial advisors,

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                - 10 -            COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
                                                  ENV. CLEANUP COSTS AND RELATED RELIEF

1    accountants or lawyers independent of Hanson to advise them on the transactions instigated by

2    Hanson. Instead, throughout the process culminating in the sale of Typewriter IPO shares to the

3    public, and through overlapping boards of directors and officers and other means, Smith Corona and

4    HM Holdings functioned as mere agents, instrumentalities, conduits, and alter egos of Hanson by and

5    through which Hanson continued to pursue its business objective—the systematic dismantling and

6    liquidation of SCM-NY. There was at all relevant times a complete unity of interests among Hanson,

7    Smith Corona and HM Holdings as evidenced by Hanson's domination of the subsidiaries' pertinent

8    policies, processes, and finances prior to the IPO.

9        43.    Hanson's alter ego relationship with HM Holdings continued subsequent to the

10   1989 Typewriter IPO, and included a series of transactions undertaken in connection with Hanson's

11   1996 "demerger." In those transactions, Hanson again dominated and controlled HM Holdings,

12   forcing HM Holdings to engage again in non-arms-length transactions without vetting by directors,

13   financial advisors, or legal counsel independent of Hanson.

14       44.    As part of the demerger, Hanson caused Millennium Chemicals, Inc. to be

15   formed and caused HM Holdings to become a subsidiary of Millennium Chemicals.

16       45.    To obtain favorable tax treatment from U.K. tax authorities for Hanson and its

17   shareholders, Hanson forced Millennium Chemical to manage and control the HM Holdings chemical

18   business in the U.K. despite the fact that the chemical business was an American corporation with

19   predominantly American and other non-U.K operations.

20       46.    Hanson similarly dictated where Millennium's Board of Directors would

21   function and meet.

22       47.    According to financial statements submitted to the SEC, Hanson obtained

23   benefits worth hundreds of millions of dollars by using Millennium in this fashion, i.e., as an agent,

24   instrumentality and/or alter ego of Hanson's.

25       48.    Neither HM Holdings, which subsequently became known as Millennium

26   Holdings LLC, nor its nominal parent in the Hanson demerger (Millennium Chemical) exercised any

27   corporate mind, will, agency, or existence separate from Hanson. Instead, they functioned during the

28   demerger process as mere agents, instrumentalities, alter egos, and conduits by which Hanson pursued

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                                - 11 -                    COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
                                                                          ENV. CLEANUP COSTS AND RELATED RELIEF

1    Hanson's interests in de-conglomerating itself. The nature, forms, and terms of the transactions

2    entered into by HM Holdings and Millennium Chemical in the Hanson demerger were all controlled

3    by Hanson to serve Hanson's interests. Hanson also dominated Millennium Chemicals' and HM

4    Holdings' policies, processes, and finances controlling them as Hanson saw fit and without the

5    negotiations and documentation that would have occurred if the involved entities had actually been

6    corporations with their own separate minds, wills, agency, and existence.

7         49.    In their dealings with Hanson up to and including the Hanson demerger, HM

8    Holdings and Millennium were not advised by directors, financial advisors, accountants, and/or legal

9    counsel independent from Hanson.

10        50.    All of the actions and transactions alleged above, which give rise to (a)

11   Hanson's alter ego status in relation to SCM-NY, HSCM-20, HM Holdings, and Millennium Holdings

12   in connection with Marchant's liability for the contamination at the Property, and (b) the imputation to

13   Hanson of Marchant's and SCM-NY's contacts with California were freely, voluntarily and

14   purposefully undertaken by Hanson in pursuit of Hanson's own self-interest such that Hanson knew

15   and understood, or in the exercise of reasonable diligence should have known and understood, that it

16   could be subject to litigation in California over the environmental contamination at the Property.

17        51.    Hanson sold itself to a German corporation, Heidelberg Cement, in 2007 and

18   exists today as a non-publicly traded subsidiary of that entity. By the time of that transaction, Hanson

19   owned "a dense network of sand, gravel and hard stone production sites in the United States,"

20   including several in California according to the websites documenting its corporate history and press

21   reports.

22        52.    Hanson holds itself out to the marketplace using various trade names such as

23   Hanson UK and, in the United States, Lehigh-Hanson. Hanson claims a business presence in the

24   Northern District of California dating back to at least 1952.

25        53.    It would be unfair and inequitable to allow Hanson to profit from the shuffling of

26   the Marchant/SCM-NY liabilities, while simultaneously allowing it to disclaim the liabilities it

27   assumed and/or controlled to obtain those gains. This is especially true where, as here, any such

28   disclaimer would shift those liabilities to the tax paying public, as opposed to another willing for-profit

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5          - 12 -          COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

1    market participant.  For example, it would be unfair and inequitable for Hanson to characterize the

2    contamination at the Property as a "Hanson Liability," as it caused its subsidiaries to do in the

3    aforementioned Cross Indemnity Agreement, when doing so served Hanson's purposes in connection

4    with the Typewriter IPO, only to later allow it avoid either the jurisdictional contacts associated with

5    Marchant's mechanical calculator operations at the Property or liability for the environmental cleanup

6    needed to abate the contamination associated with what Hanson freely and voluntarily labeled as a

7    "Hanson Liability."

8                              **SWAGELOK AND LOZICK**

9           54.     Documentary and other evidence also link the hazardous substances and

10   materials at the Property to Swagelok via its operation of Whitney (f/k/a /Whitey) Research and Tool

11   Co.  Those operations included a grease room, hazardous waste area, solvent recovery area, and drum

12   storage areas, among others.  Whitney used and disposed of chlorinated solvents, and specifically TCE

13   in the course of its operations at the Property.

14          55.   · Whitney was founded in or around 1959 as a California Corporation, and

15   changed its name to Whitney from Whitey in or around 1976.  Whitney manufactured valves for gas

16   and fluid systems and those valves were sold under the brand name "Whitey" as a unified product

17   offering by Swagelok.  Whitney/Whitey began manufacturing operations at the Property around 1963

18   and continued such operations until approximately 1999.  Throughout its history, Whitney/Whitey

19   was an integrated component of Swagelok, not a corporation with any true and separate corporate

20   existence, mind, will, or agency.  Swagelok's corporate website lists "Whitey" as a Swagelok's brand

21   that has been "unifie[d]" into Swagelok for many years.

22          56.     Swagelok's domination and control over Whitney was accomplished by and

23   through, among other things, shared executives and stockholders.  Fred A. Lennon, the founder and

24   majority owner Swagelok, was a majority owner of Whitney, and Mr. Lennon's son-in-law, Edward

25   A. Lozick, held executive positions at both Swagelok and Whitney.  At the time Whitney dissolved as

26   a California Corporation, in 1999, Mr. Lozick was identified as the sole director of Whitney.  Francis

27   Joseph Callahan, who at various times held the positions of president, chief executive officer, and

28   chairman of the board of Swagelok also served as president of Whitney.  By these and other means,

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                          - 13 -                COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
                                                               ENV. CLEANUP COSTS AND RELATED RELIEF

1    Swagelok exercised complete control over Whitney's operations, finances, and business policies and

2    practices such that Whitney was merely an agent or instrumentality through which Swagelok

3    conducted one part of Swagelok's business.

4           57.    Swagelok directed and controlled the operations of Whitney, including

5    Whitney's manufacturing and waste-handling and disposal activities at the Property, which have

6    contributed to the releases of hazardous substances at the Property. Upon its dissolution, which

7    Swagelok instigated, Swagelok directed the assets of Whitney be transferred to Swagelok so that the

8    latter could and did continue Whitney's operations without interruption. Thus, Swagelok is the mere

9    continuation of Whitney, and/or the operations of Whitney were merged into Swagelok. Swagelok

10   also assumed, either explicitly or implicitly, all liabilities of Whitney so that the operations associated

11   with Whitney could continue without interruption.

12          58.    During the period when Whitey/Whitney operated there, title to the Property

13   was held in other Swagelok-affiliated companies and entities including Endicott Co., Calbit, Co. and

14   the CLL Trust and/or CLL Revocable Trust #3. Those entities were under common control at all

15   relevant times with Swagelok and/or Fred A. Lennon such that they functioned as additional conduits

16   for Swagelok's control over Whitney.

17          59.    At all relevant times, a unity of interests existed between Swagelok and

18   Whitney such that any individuality and separateness between Swagelok and Whitney ceased, and

19   Whitney existed as a mere alter ego of Swagelok as follows: (a) Whitney was a mere shell,

20   instrumentality and/or conduit through which Swagelok carried on its business; and (b) Whitney was

21   controlled, dominated and/or operated by Swagelok. Adherence to the fiction of the separate

22   existence of Swagelok as an entity distinct from Whitney would permit an abuse of the corporate

23   privilege and would sanction fraud, promote injustice, and lead to an inequitable result in that it would

24   permit Swagelok to escape its obligation to clean up the hazardous substances released at the Property

25   at its behest and leave innocent taxpayers with that obligation.

26          60.    Swagelok continues to maintain a presence in California, maintaining offices

27   and/or division in northern California, Los Angeles, and San Diego and continues to sell and distribute

28   its product in California including, but not limited to, legacy Whitney products.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                          - 14 -                COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
                                                               ENV. CLEANUP COSTS AND RELATED RELIEF

61.     Title to the Property shifted from Calbit, Co. (a Swagelok/Fred A. Lennon controlled entity) to the CLL Trust in 1988, an entity that was under common control with Swagelok and/or Fred A. Lennon. In 1999, the CLL Trust and/or CLL Revocable Trust #3 sold the Property to the Emeryville Redevelopment Agency.  At the time of the sale, the successor trustee of the CLL Trust was Edward Lozick, who was Catherine Lennon Lozick's husband and an officer of both Swagelok and Whitney. During the time the trust owned the Property, operations directed by Swagelok caused additional releases of hazardous chemicals.  Swagelok's executives, including Edward Lozick, were aware of contamination at the Property at the time the Property was sold to the Emeryville Redevelopment Agency.

62.     Catherine Lennon Lozick was the sole beneficiary of the CLL Trust and/or CLL Revocable Trust #3.  In 2003, the assets of the CLL Trust and/or CLL Revocable Trust #3 were distributed to Ms. Lozick.  Those assets are believed to have exceeded $1.5 billion, and included an approximately 65% ownership interest in Swagelok as well as the proceeds of the 1999 sale of the Property.  At some point thereafter, the CLL Trust and/or CLL Revocable Trust #3 was/were dissolved.

## FIRST CLAIM FOR RELIEF

**(CERCLA—By Successor Agency and City against Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3)**

63.     Plaintiffs re-allege paragraph 1 through 62 above and incorporate those paragraphs here by reference.

64.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> * * *
>
> (1) the owner and operator of a vessel or facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [and]
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person, [or] by any other party or entity, at any

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5

- 15 -

COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

facility or incineration vessel owned or operated by another person or entity and containing such hazardous substances,

\* \* \*

shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State, or an Indian Tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan . . . .

42 U.S.C. § 9607(a)(1)–(3), (A) and (B).

65.    The Successor Agency and City are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

66.    Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

67.    The Property constitutes a "facility" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), in that hazardous substances were deposited, stored, disposed of, placed, or came to be located there.

68.    Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust and, CLL Revocable Trust #3 including predecessors, affiliates, and/or subsidiaries for which they are liable, were each owners and/or operators of the Property at the time hazardous substances were disposed of there within the meaning of Section 101(20)(A) of CERCLA, 42 U.S.C. § 9601(20)(A), and Section 107(a)(2) of CERCLA, 42 U.S.C. §§ 9607(a) (2).

69.    Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 including predecessors and/or subsidiaries for which they are liable, each arranged for the treatment or disposal of one or more hazardous substances at the Property within the meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

70.    Some or all of the hazardous substances (including but not limited to TCE) discharged, deposited, disposed, spilled or emitted into the soil and groundwater at the Property

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                                    - 16 -                    COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

1    constitute "hazardous substances" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and in

2    the regulations promulgated under Section 102 of CERCLA, 42 U.S.C. § 9602.

3         71.     There were one or more "releases" of hazardous substances within the meaning

4    of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22). The release(s) at the Property are ongoing.

5         72.     The costs the Successor Agency and City have incurred and/or will incur in

6    responding to the release(s) of hazardous substances at the Property are necessary costs of response

7    that are consistent with the National Contingency Plan.

8         73.     Under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), defendants Hanson,

9    Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 each are strictly and jointly and

10   severally liable to the Successor Agency and City for all response costs the Successor Agency and

11   City have incurred to date and/or will incur in the future.

12        74.     Wherefore Plaintiffs pray for judgment as set forth below.

13   **SECOND CLAIM FOR RELIEF**

14   **(CERCLA Declaratory Relief—By Successor Agency and City against Defendants Hanson,**

15   **Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3)**

16        75.     Plaintiffs re-allege paragraph 1 through 74 above and incorporate those

17   paragraphs here by reference.

18        76.     An actual controversy has arisen and now exists between Plaintiffs on the one

19   hand and the defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust

20   #3 on the other with respect to their respective rights and obligations under CERCLA.

21        77.     Issuance of a declaratory decree pursuant to 28 U.S.C. § 2201 and 42 U.S.C. §

22   9613(g)(2) therefore is necessary and appropriate.

23   **THIRD CLAIM FOR RELIEF**

24   **(RCRA—By Successor Agency and City against Defendants Hanson, Swagelok, and Whitney)**

25        78.     Plaintiffs re-allege paragraph 1 through 62 above and incorporate those

26   paragraphs here by reference.

27

28

LAW OFFICES OF
**COX, CASTLE &
NICHOLSON LLP**
SAN FRANCISCO

070431\8259950v5                              - 17 -                 COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
                                                                    ENV. CLEANUP COSTS AND RELATED RELIEF

79.    Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), provides in pertinent part:

(a) Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

\* \* \*

(1)(B) against any person, . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . .

80.    The Successor Agency and the City are each a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

81.    Defendants Hanson, Swagelok, and Whitney, including predecessors and/or subsidiaries for which they are liable, each are a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

82.    Defendants Hanson, Swagelok, and Whitney, including predecessors and/or subsidiaries for which they are liable, each are a person who has contributed to the past or present handling, "storage," "treatment," or "disposal" of a "solid waste" or "hazardous waste" within the meaning of Sections 1004(3), 1004(5), 1004(6) 1004(27) 1004(33) and 1004(34) of RCRA, 42 U.S.C. § 6903(3), 6903(5), 6903(6), 6903(27), 6903(33) and 6903(34).

83.    The storage, treatment, handling or disposal of solid or hazardous waste contributed to by defendants Hanson, Swagelok, and Whitney, including predecessors and/or subsidiaries for which they are liable, present an imminent and substantial endangerment to health or the environment in and around the Property.

84.    In accordance with Section 7002(b)(2)(A), 42 U.S.C. § 6972(b)(2)(A), and 40 C.F.R. Part 245, the Successor Agency and City provided notice of the endangerment to the Administrator of EPA, the Regional Administrator of EPA Region 9, the Director of California Department of Toxic Substances Control and to the Defendants more than ninety days before commencing this claim.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                                                    - 18 -                                COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

85.     Under Section 7002(a) of RCRA, 42 U.S.C. § 6972(a)(2), this Court has jurisdiction to:

> restrain any person who has contributed to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both . . . and to apply any appropriate civil penalties under section 6928(a) and (g) of this title.

86.     The Plaintiffs are entitled, therefore, to an injunction ordering defendants Hanson, Swagelok, and Whitney to take such action as may be necessary to abate the imminent and substantial endangerment to health and the environment at the Property, i.e., implement the cleanup plan to be approved by the State of California.

## FOURTH CLAIM FOR RELIEF

### (Polanco Act—By Successor Agency against Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3)

87.     The Successor Agency re-alleges paragraphs 1 through 77 above and incorporates those paragraphs here by reference.

88.     The Polanco Redevelopment Act, Section 33459 *et seq.* of the California Health and Safety Code, authorizes redevelopment agencies and their statutorily designated successor agencies to take actions to remedy or remove releases of hazardous substances from property within redevelopment areas, and to recover cleanup costs, interest, and attorneys' fees from responsible parties.

89.     The Property is located within a duly created redevelopment area, and plaintiff Successor Agency enjoys all rights previously held by the Emeryville Redevelopment Agency, including but not limited to right to assert a cause of action under the Polanco Act.

90.     Sections 33459.4(a) and (c) of the California Health and Safety Code provide, in pertinent part:

> [If] a redevelopment agency undertakes action to remedy or remove, or to require others to remedy or remove, including compelling a responsible party through a civil action, to remedy or remove a release of hazardous substance, any responsible party or parties shall be liable to the redevelopment agency for the costs

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                          - 19 -                    COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

incurred in the action . . . includ[ing] the interest on the costs accrued from the date of expenditure and reasonable attorney's fees . . .

\* \* \*

An agency may recover any costs incurred to develop and to implement a cleanup or remedial action plan approved pursuant to Sections 33459.1 and 33459.3, to the same extent the California Environmental Protection Agency, Department of Toxic Substances Control ("DTSC") is authorized to recover those costs. The scope and standard of liability for cost recovery pursuant to this section shall be the scope and standard of liability under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sec. 9601 *et seq.*) [CERCLA] as that act would apply to [DTSC]; provided, however, that any reference to hazardous substance therein shall be deemed to refer to hazardous substance as defined in subdivision (c) of Section 33459.

91.    Under CERCLA Section 107(a), 42 U.S.C. § 9607(a), DTSC is entitled to recover response costs unless the costs were incurred in an arbitrary and capricious fashion.

92.    The costs the Successor Agency has incurred and will incur in connection with investigating and cleaning up hazardous substances at the Property are neither arbitrary nor capricious, and the Successor Agency has complied with all its obligations under Section 33459 *et seq.* and other applicable laws, or its compliance has been waived or excused.

93.    Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 are "responsible parties" as that term is defined in Section 33459(h) of the California Health and Safety Code.

94.    Pursuant to California Health and Safety Code Section 33459.4, defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 are strictly and jointly and severally liable to the Successor Agency for the costs incurred and to be incurred in connection with investigating and cleaning up the hazardous substances on, under and/or emanating to and from the Property, interest on those costs, and the Successor Agency's attorneys' fees.

95.    Wherefore the Successor Agency prays for judgment as hereinafter set forth.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                                    - 20 -                    COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

## FIFTH CLAIM FOR RELIEF

### (Gatto Act (AB440)—By the City against Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3)

96.    The City re-alleges paragraphs 1 through 77 above and incorporates those paragraphs here by reference.

97.    The Gatto Act (AB440), Section 25403 *et seq.* of the California Health and Safety Code, authorizes local agencies such as the City to take actions to remedy or remove releases of hazardous materials from blighted property within a blighted area, and to recover cleanup costs, interest, and attorneys' fees from responsible parties.

98.    On June 16, 2015, the City adopted a resolution that the Property is a "blighted property" as that term is defined in Section 25403(b) of the California Health and Safety Code because of the presence of hazardous materials (particularly TCE) at the Property. The City also determined that the area of the City known as the Horton District (which includes the Property) is a "blighted area" as that term is defined in Section 25403(a) of the California Health and Safety.

99.    Sections 25403.5(a) and (c) of the California Health and Safety Code provide, in pertinent part:

> [I]f a local agency undertakes action to investigate property or clean up, or to require others to investigate or clean up, including compelling a responsible party through a civil injunctive action, a release or hazardous material, the responsible party shall be liable to the local agency for the costs incurred in the action . . . includ[ing] the interest on the costs accrued from the date of expenditure and reasonable attorneys' fees.

> * * *

> A local agency may recover any costs incurred to develop and to implement a cleanup plan approved pursuant to this chapter, to the same extent the department [DTSC] is authorized to recover costs. The scope and standard of liability for cost recovery pursuant to this section shall be the scope and standard of liability under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sec. 9601 *et seq.*) [CERCLA] as that act would apply to the department [DTSC]. However, any reference to hazardous substance in that act shall be deemed to refer to hazardous material as defined in section 25403.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                    - 21 -                    COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

1    100.    Under CERCLA Section 107(a), 42 U.S.C. § 9607(a), DTSC is entitled to

2    recover response costs unless the costs were incurred in an arbitrary and capricious fashion.

3    101.    The costs the City has incurred and/or will incur in connection with

4    investigating and cleaning up hazardous materials at the Property are neither arbitrary nor capricious,

5    and the City has complied with all its obligations under Section 25403 *et seq.* of the California Health

6    and Safety Code and other applicable laws, or its compliance has been waived or excused.

7    102.    Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL

8    Revocable Trust #3 are each a "responsible party" as that term is defined in Section 25403(s) of the

9    California Health and Safety Code.

10   103.    Pursuant to California Health and Safety Code Section 25403.5, Hanson,

11   Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 are strictly and jointly and

12   severally liable to the City for the costs incurred and to be incurred by the City in connection with

13   investigating and cleaning up the hazardous materials on, under and/or emanating from the Property,

14   interest on those costs, and the City's attorneys' fees.

15   104.    Wherefore the City prays for judgment as hereinafter set forth.

16   ### SIXTH CLAIM FOR RELIEF

17   **(Continuing Public Nuisance—By City against Defendants Hanson, Swagelok, Whitney, and**

18   **Lozick, CLL Trust, and CLL Revocable Trust #3)**

19   105.    The City re-alleges paragraphs 1 through 77 and 96 through 104 above and

20   incorporates those paragraphs here by reference.

21   106.    The discharging, depositing, disposing, or releasing of hazardous substances at

22   the Property has resulted in conditions that constitute a public nuisance within the meaning of Section

23   3480 of the California Civil Code.

24   107.    The nuisance is continuing in that the hazardous substances, materials and/or

25   wastes discharged, deposited, disposed of, or released at the Property is actually and practically

26   abatable by reasonable measures and without unreasonable expenses, and in that its impact varies over

27   time.

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5

- 22 -

COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

108.     The discharging, depositing, disposing, or release of hazardous substances violated, among other things, California Fish and Game Code § 5650(a), Water Code § 13304, and California Health & Safety Code § 5411. The conditions thus constitute a nuisance per se.

109.     The City is entitled to maintain this action for public nuisance because it is a public body authorized by law to abate this type of nuisance within the meaning of California Civil Code Section 3494 and Section 731 of the California Code of Civil Procedure.

110.     Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 and the entities for which they are liable, caused the nuisance conditions by discharging, depositing, disposing of, or releasing hazardous substances, materials and/or wastes onto the Property or by allowing other persons or entities subject to their direction and control to engage in such activities.

111.     As a direct and proximate result of the nuisance created and/or maintained by defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3, the City has suffered the damages alleged herein and is entitled to seek abatement as provided by California law.

112.     Wherefore the City prays for judgment as hereinafter set forth.

## SEVENTH CLAIM FOR RELIEF

### (Continuing Private Nuisance—City against Defendants Hanson, Swagelok, Whitney, and Lozick, CLL Trust, and CLL Revocable Trust #3)

113.     The City re-alleges paragraphs 1 through 76 and 96 through 112 above and incorporates those paragraphs here by reference.

114.     The hazardous substances, materials and/or wastes discharged, deposited, disposed of, or released at the Property as a result of the conduct by defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 and/or entities for which they are liable, have resulted, alternatively, in conditions that constitute a continuing private nuisance within the meaning of Section 3479 of the California Civil Code.

115.     The nuisance is continuing in that the hazardous substances, materials and/or wastes discharged, deposited, disposed of, or released at the Property is actually and practically

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                                    - 23 -                    COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

1    abatable by reasonable measures and without unreasonable expenses, and in that its impact varies over

2    time.

3        116.    The discharging, depositing, disposing, or release of hazardous substances

4    violated, among other things, California Fish and Game Code § 5650(a), Water Code § 13304, and

5    California Health & Safety Code § 5411. The conditions thus constitute a nuisance per se.

6        117.    Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL

7    Revocable Trust #3 and/or entities for which they are liable, caused the nuisance conditions by

8    discharging, depositing, disposing of, or releasing hazardous substances, materials and/or wastes at the

9    Property or by allowing other persons or entities subject to their direction and control to engage in

10    these activities.

11        118.    The nuisance has interfered with and continues to interfere with the City's use

12    and enjoyment the Property.

13        119.    As a direct and proximate result of this nuisance, the City has suffered the

14    damages alleged herein.

15        120.    Wherefore the City prays for judgment as hereinafter set forth.

16    **EIGHTH CLAIM FOR RELIEF**

17    **(Continuing Trespass—City against Defendants Hanson, Swagelok, Whitney, Lozick, CLL**

18    **Trust, and CLL Revocable Trust #3)**

19        121.    The City re-alleges paragraphs 1 through 76 and 96 through 120 above and

20    incorporates those paragraphs here by reference.

21        122.    Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL

22    Revocable Trust #3 and/or entities for which they are liable, have committed trespass against the

23    City's property interests because defendants have discharged, deposited, disposed of, or released

24    hazardous substances, materials and/or wastes onto the Property without the City's consent and/or by

25    failing to remove such hazardous substances, materials and/or wastes from the Property, or by

26    permitting other persons or entities subject to the defendants' direction or control to engage in these

27    activities.

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                    - 24 -                    COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

123. The trespass is continuing in that the hazardous substances, materials and/or wastes discharged, deposited, disposed of, or released onto the Property are actually and practically abatable by reasonable measures and without unreasonable expenses.

124. As a direct and proximate result of the trespass the City has suffered the damages alleged herein.

125. Wherefore the City prays for judgment as hereinafter set forth.

### NINTH CLAIM FOR RELIEF

**(Equitable Indemnity—Successor Agency and City against Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3)**

126. The Successor Agency re-alleges paragraphs 1 through 76 and 86 through 95 above and incorporates those paragraphs here by reference. The City re-alleges paragraphs 1 through 76 and 96 through 125 above and incorporates those paragraphs here by reference.

127. The contamination at the Property was caused by the wrongful conduct of defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 and/or entities for which they are liable as alleged herein. Plaintiffs are without fault in connection with the contamination at and emanating from the Property.

128. As a direct and proximate result of the wrongful conduct of these defendants, Plaintiffs have incurred and will continue to incur costs, expenses, and damages.

129. Plaintiffs are entitled to full equitable indemnity for such costs, damages, and expenses from defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3.

130. Wherefore Plaintiffs prays for judgment as hereinafter set forth.

### TENTH CLAIM FOR RELIEF

**(Declaratory Relief—Successor Agency and City against**

**Defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3)**

131. The Successor Agency re-alleges paragraphs 1 through 76, 86 through 95 and 126 through 130 above and incorporates those paragraphs here by reference. The City re-alleges

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                - 25 -                COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

paragraphs 1 through 76 and 96 through 130 above and incorporates those paragraphs here by reference.

132.    An actual controversy exists between Plaintiffs and defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 with respect to their rights and obligations under state law, and Plaintiffs seek a judicial determination of the respective rights and duties of the parties with respect to the rights, claims and damages alleged herein.

133.    The requested declaration is necessary and appropriate at this time.

134.    Wherefore Plaintiffs pray for judgment as hereinafter set forth.

## **PRAYER FOR RELIEF**

Wherefore, the Successor Agency and City pray for relief as follows:

1.    On the first claim for relief, for recovery of all response costs incurred or to be incurred by the Successor Agency and/or the City in connection with the Property consistent with the National Contingency Plan, including statutory interest;

2.    On the second claim for relief, for a judicial declaration that defendants Hanson, Swagelok, Whitney, Lozick, CLL Trust, and CLL Revocable Trust #3 are jointly and severally liable for all Response Costs incurred and to be incurred by the Successor Agency and/or the City in connection with the Property consistent with the National Contingency Plan;

3.    On the third claim for relief, for an injunction ordering the Defendants to abate the imminent and substantial endangerment to health and the environment;

4.    On the fourth claim for relief, for recovery of all response costs incurred or to be incurred by the Successor Agency in connection with the Property, including attorneys' fees and statutory interest;

5.    On the fifth claim for relief, for recovery of all response costs incurred or to be incurred by the City in connection with the Property, including attorneys' fees and statutory interest;

6.    On the sixth claim for relief, for recovery by the City for compensatory damages and abatement in amount to be determined at trial;

7.    On the seventh claim for relief, for recovery by the City for compensatory damages in amount to be determined at trial;

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                - 26 -                COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
ENV. CLEANUP COSTS AND RELATED RELIEF

8.      On the eighth claim for relief, for recovery by the City for compensatory damages in amount to be determined at trial;

9.      On the ninth claim for relief, for recovery by the Successor Agency and City for compensatory damages in amount to be determined at trial;

10.     On the tenth claims for relief, for entry of declaratory judgment on the Successor Agency's and City's state law claims;

11.     As to all claims for relief, for all costs, attorneys' fees, interest and expenses, to the fullest extent provided by law; and

12.     For such other and further relief as the Court may deem just and proper.

January 20, 2017                              COX, CASTLE & NICHOLSON LLP

                                             By: */s/ Robert P. Doty*
                                             _____
                                             Robert P. Doty
                                             Peter M. Morrisette
                                             Attorneys for Plaintiffs
                                             The Successor Agency to the former Emeryville
                                             Redevelopment Agency and The City of Emeryville

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\8259950v5                          - 27 -          COMPLAINT UNDER CERCLA & STATE LAW TO RECOVER
                                                          ENV. CLEANUP COSTS AND RELATED RELIEF