1  Robert P. Doty (SBN 148069)
   rdoty@coxcastle.com
2  Ali P. Hamidi (SBN 191198)
   ahamidi@coxcastle.com
3  Christopher W. Gribble (SBN 285337)
   cgribble@coxcastle.com
4  COX, CASTLE & NICHOLSON LLP
   50 California Street, Suite 3200
5  San Francisco, CA  94111
   Telephone:  (415) 262-5100
6  Facsimile:   (415) 262-5199

7  Attorneys for plaintiffs
   The Successor Agency to the former Emeryville Redevelopment
8  Agency and The City of Emeryville

9

10                  **UNITED STATES DISTRICT COURT**

11                  **NORTHERN DISTRICT OF CALIFORNIA**

12  THE SUCCESSOR AGENCY TO THE              Case No. 17-cv-00308-WHO
    FORMER EMERYVILLE
13  REDEVELOPMENT AGENCY AND THE
    CITY OF EMERYVILLE,                      **SECOND AMENDED COMPLAINT UNDER**
14                                           **CERCLA, 42 U.S.C. SECTION 9601 *ET SEQ.*,**
                  Plaintiffs,                **RCRA, 42 U.S.C. SECTION 6901 *ET SEQ.*,**
15                                           **AND STATE LAW TO RECOVER**
            vs.                              **ENVIRONMENTAL CLEANUP COSTS**
16                                           **AND RELATED RELIEF**
    SWAGELOK COMPANY, an Ohio corporation;
17  WHITNEY RESEARCH TOOL CO.,
    a dissolved California corporation; HANSON
18  BUILDING MATERIALS LIMITED, a British
    Corporation; and CATHERINE LENNON
19  LOZICK, an individual residing in Ohio,

20                  Defendants.

21

22

23

24

25

26

27

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

1       Plaintiffs, Successor Agency to the former Emeryville Redevelopment Agency

2   ("Successor Agency") and the City of Emeryville ("City"), hereby allege against: Hanson Building

3   Materials Limited; Swagelok Company; Whitney Research Tool Co.; and Catherine Lennon Lozick

4   (collectively "Defendants") as follows and based on Plaintiffs' investigation thus far of publicly

5   available documents, knowledgeable individuals, and other information and belief:

6                       **NATURE OF THIS ACTION**

7       1.    This is an action to recover environmental cleanup costs and damages caused

8   by, and to obtain injunctive and declaratory relief against, Defendants.

9       2.    The action arises out of polluted groundwater and real property located on

10   Horton Street in the City of Emeryville, Alameda County, California (the "Property"). The impacted

11   groundwater is beneath and down gradient from (i.e., to the west of) the Property. The contamination

12   was caused by industrial activities that occurred at the Property in the 1900s, and it is continuing and

13   spreading to this day. Defendants are legally responsible for the contamination under federal statutes,

14   California statutes that were derived from and largely mirror those federal statutes, and California

15   common law.

16       3.    The industrial operations in question occurred from approximately 1910 until

17   the late 1990s. From approximately 1910 to approximately 1959, the Property was owned by the

18   Marchant Calculating Machine Company, a California corporation ("Marchant"), which used the site

19   to manufacture mechanical calculating machines. In the late 1950s, Marchant merged with and into a

20   company incorporated in the state of New York and famous, primarily, for typewriters—Smith-

21   Corona. Smith-Corona was the surviving corporation in that merger. After the merger, Smith-Corona

22   changed its name to Smith-Corona-Marchant, and the mechanical calculator business operated as the

23   Marchant Division. Smith-Corona-Marchant subsequently shortened its name to SCM (hereafter,

24   "SCM-NY"). SCM-NY owned and operated the Property for a time and eventually conveyed it to a

25   third party by grant deed recorded in approximately 1959 as part of shifting the Marchant calculator

26   division operations to a different but nearby location straddling the Emeryville-Berkeley border.

27   SCM-NY's operations at the new property also contaminated that property with various hazardous

28   substances. Both before and after its merger with Marchant, SCM-NY regularly conducted business

LAW OFFICES OF
**COX, CASTLE &**
**NICHOLSON LLP**
SAN FRANCISCO

070431\9075316

- 1 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

1   in California, including but not limited to acquiring the Marchant Corporation in a merger transaction,

2   and operating the Marchant mechanical calculator business as a division within SCM-NY.

3           4.      From approximately the mid-1960s to the late 1990s, the Property was owned

4   by affiliates of Defendant Swagelok Company ("Swagelok") and operated, nominally, by Whitney

5   Research and Tool Company ("Whitney")—an entity controlled and dominated by Swagelok to such

6   an extent that it had no true separateness from Swagelok and was instead merely an agent,

7   instrumentality, and alter ego through which Swagelok conducted its own integrated business.  At

8   Swagelok's behest, Whitney produced machine valves and/or parts for such valves at the Property.

9   Swagelok continues to have a presence in California and conducts business in California.

10           5.      Marchant, as an independent company, SCM-NY through its Marchant

11   Division, and Swagelok through its control and management of Whitney used chlorinated solvent

12   compounds and petroleum-based compounds, among other chemicals, in their operations. The soil and

13   soil vapor at the Property, and the groundwater at and down gradient from the Property, are

14   contaminated primarily with chlorinated solvents (all such chemicals being commonly, and hereafter,

15   referred to as "CVOCs").  The Property is also contaminated with petroleum-based compounds.  The

16   list of "contaminants of concern" also includes certain metals.  The "contaminants of concern" are

17   intermingled, in varying combinations at various locations at and down gradient from the Property.

18   All of the contaminants of concern are traceable to the operations of Marchant, SCM-NY's Marchant

19   division, and Whitney/Swagelok, but on account of their intermingled nature they cannot be allocated

20   or apportioned among the historic owners or operators of the Property, except by arbitrary means.

21           6.      In addition to the severe impact on groundwater at and down gradient from the

22   Property, the contamination has rendered the approximately 47,000 square foot building located on the

23   Property unsafe for use by the City employees who worked in the building until 2012.  The

24   contamination is thus causing ongoing loss of use damage to the City.  Those damages are similarly

25   incapable of apportionment, except by arbitrary means.

26           7.      Plaintiffs therefore seek the imposition of joint and several liability among the

27   Defendants.

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316

- 2 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

1         8.     Consistent with federal guidance documents followed by the State of California,

2    the cost of the cleanup work needed to meet applicable state and federal standards has been estimated

3    in a range from $35 million to $65 million, with $42 million listed on Plaintiff Successor Agency's

4    most recent accounting of anticipated expenditures.  Approximately $7.6 million of site investigation

5    and remedial evaluation work has been conducted through the end of 2016.  The Successor Agency, in

6    cooperation with the City, has been implementing the necessary investigation and remedial planning

7    work under regulatory oversight provided by the California Environmental Protection Agency's

8    Department of Toxic Substances Control ("DTSC").  Notices pursuant to various statutes have been

9    sent to the Defendants advising them that they could take responsibility for the remediation.  None of

10   the Defendants has indicated a willingness to conduct the necessary cleanup work.

11   **SUBJECT MATTER JURISDICTION**

12        9.     This Court has subject matter jurisdiction over this action and the parties

13   pursuant to section 113(b) of the Comprehensive Environmental Response, Compensation, and

14   Liability Act ("CERCLA"), 42 U.S.C. § 9613(b); 42 U.S.C. § 6972(a) (a portion of the Solid Waste

15   Disposal Act commonly referred to as the Resource Conservation and Recovery Act ("RCRA")); and

16   28 U.S.C. § 1331 (federal question jurisdiction). This Court has jurisdiction over the related state law

17   claims pursuant to 28 U.S.C. § 1367(a) (supplemental jurisdiction).

18   **VENUE**

19        10.     Venue is appropriate in this District under CERCLA because the release of

20   hazardous substances which gives rise to this action occurred within the District, and venue is

21   appropriate under RCRA because the endangerment to health and the environment alleged here is

22   occurring within the District.

23   **THE PARTIES**

24        11.     Plaintiff Successor Agency is a public entity, located and operating in Alameda

25   County, possessing its own name and legal capacity, authorized to sue and be sued in its own name,

26   and created by the State of California to serve as the successor to the former Emeryville

27   Redevelopment Agency, which was a public entity created pursuant to California's Community

28   Redevelopment Law, section 33000 *et seq.* of the California Health and Safety Code. The former

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316

- 3 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

1    Redevelopment Agency was authorized, among other things, to undertake certain environmental

2    cleanup projects such as the one ongoing at the Property and to recover its cleanup costs and

3    attorneys' fees from those parties made liable for the cleanup by CERCLA and its California

4    analogues.  All of the former Redevelopment Agency's rights, powers, duties and obligations are, by

5    statute, now vested in the Successor Agency. Among its other duties, Plaintiff Successor Agency is

6    responsible for enforcing all of the former Redevelopment Agency's rights that may benefit public

7    agencies within California that share in property tax revenues.  The Former Redevelopment Agency

8    purchased all but a small fraction of the Property in 1999.

9           12.    Plaintiff City is a municipal corporation and a public body, corporate and

10   politic, located in Alameda County, California.  In connection with extending Horton Street, and

11   through the exercise of eminent domain authority, the City acquired a factional interest in one parcel

12   within the Property.  On those and other grounds the City is not legally responsible for the

13   contamination or any of the cleanup costs as a property owner.  The City brings this action on its own

14   behalf, as one of the land owners, and on behalf of the People of the State of California as authorized

15   by § 731 of the California Code of Civil Procedure.

16          13.    Defendant Swagelok Company is an Ohio Corporation, with its principal place

17   of business in Solon, Ohio. Swagelok manufactures, distributes, and sells precision valves and other

18   components of gas and fluid control systems.

19          14.    Defendant Whitney Research Tool Co., which for a time used the name Whitey

20   Research Tool Company, is a dissolved California Corporation and its principal place of business was

21   in Emeryville, California.

22          15.    Defendant Hanson Building Materials Limited ("Hanson") is a British

23   Corporation with its principal place of business in Maidenhead, Berkshire, United Kingdom. Hanson

24   has at various times been known by other names, most prominently "Hanson PLC."  Hanson was

25   originally incorporated in or about 1950 as C. Wiles, Limited, and its "company number" with the

26   Registrar of Companies for England Wales is 488067.

27          16.    Defendant Catherine Lennon Lozick ("Lozick") is an individual who resides in

28   Ohio, and she was the sole beneficiary of the Catherine Lennon Lozick Trust, which was an Ohio trust

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                          - 4 -          SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                        TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                                         CASE NO. 17-CV-00308-WHO

1  ("CLL Trust"), and the Revocable Trust Agreement #3 f/b/o Catherine L. Lozick (also known or

2  sometimes referred to as the Inter Vivos Revocable Trust Agreement #3 f/b/o Catherine L. Lozick u/a

3  dated 10/1/86), which is an Ohio trust ("CLL Revocable Trust #3"), which was/were the former

4  owner(s) of the Property.

## THE PROPERTY AND THE CONTAMINATION

6         17.    The Property is located at 5679 Horton Street, Emeryville, Alameda County,

7  California, and it is identified by Alameda County Assessor's ***Parcel Numbers 49-1552-1 and 49-***

8  ***1319-1-20***. The Property is approximately 1.75 acres in size and is generally bounded by Union

9  Pacific railroad tracks to the west, commercial/industrial properties to the north, Horton Street to the

10 east, and Stanford Avenue and a former rail spur to the southeast/south.  A map generally depicting

11 the Property, its location in Emeryville, and the plume of contaminated groundwater emanating from it

12 is attached to this Complaint as Exhibit A.

13         18.    Samples of soil, soil gas, and indoor air at the Property, and groundwater at and

14 down gradient from the Property, confirm that the soil, soil gas, and indoor air at the Property, and

15 groundwater at and down gradient from the Property are polluted with varying combinations of

16 CVOCs including trichloroethene ("TCE"), tetrachloroethene ("PCE"), cis-1,2-dichloroethene

17 ("cDCE"), trans-1,2-dichloroethene ("1,2-DCE"), vinyl chloride, 1,1- dichloroethane ("1,1-DCA"),

18 1,2- dichloroethane ("1,2-DCA"), 1,1,2-trichloroethane ("1,1,2-TCA"), chloroform, bromomethane,

19 chlorobenzene, and methylene chloride.  Each of the those chemicals is a "hazardous substance"

20 within the meaning of federal law (i.e., CERCLA Section 101(14)) and within the corresponding

21 definitions in the California statutes that are modeled after CERCLA and designed to enable local

22 government to bring about the cleanup of contaminated properties—e.g., Health and Safety Section

23 33459(c) (the definition of "hazardous substance" applicable to the Successor Agency's claim under

24 the Polanco Act) and Health and Safety Code Section 25403(i) (the definition of "hazardous material"

25 applicable to the City's claim under the Gatto Act, which extended cleanup authority similar to the

26 Polanco Act to cities and other public agencies within California).  Other hazardous chemicals

27 meeting one or more of the foregoing statutory definitions have also been identified in the sampling

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                          - 5 -                    SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                                TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                                CASE NO. 17-CV-00308-WHO

1    data, including cadmium, lead, and various petroleum hydrocarbons.  The various chemicals are

2    intermixed to varying degrees in varying locations.

3            19.    The contamination at the Property has been evaluated using protocols approved

4    by federal and state regulatory agencies, and the results of that analysis have been presented in, among

5    other things, a Remedial Investigation and a Health Risk Assessment submitted to and approved by

6    the State of California's DTSC, the lead regulatory agency for the site.  The analysis presented in the

7    risk assessment demonstrates unacceptable levels of ongoing risk to human health and the

8    environment from material that is "solid waste" within the meaning of 42 U.S.C. ' 6903(27), thus

9    establishing that conditions at the Property present an "imminent and substantial endangerment to

10   health or the environment" within the meaning of RCRA, i.e., 42 U.S.C. § 6972(a)(1)(B).

11          20.    The investigation and cleanup work at the Property is being carried out in the

12   public interest to reduce blight and alleviate nuisance conditions at and in the vicinity of the Property.

13                         **HANSON'S CONNECTION TO THE CONTAMINATION**

14          21.    Documentary and other evidence link hazardous substances at the Property to,

15   among other things, the production of Marchant calculating machines.  That operation included, but

16   was not limited to, nickel-plating and enameling operations; grinding, hardening, and assembly

17   operations; and associated functions. Marchant used various oils, chlorinated solvents, and other

18   chemicals in its manufacturing operations at the Property; generated a variety of wastes in the course

19   of its operations; and through those operations and waste-generating activities contributed to the

20   CVOC and other contamination at the Property.

21          22.    Responsibility for the Marchant's operations and contamination at and near the

22   Property flowed first to SCM-NY, via the merger referenced above in Paragraph 3, and subsequently

23   to Defendant Hanson through later transactions, beginning in the mid-1980s.  As of the mid-1980s,

24   Hanson (then known as Hanson Trust Public Limited Company and then simply Hanson PLC) was,

25   among other things, one of the foremost corporate raider/asset strippers of the era.

26          23.    Using hostile takeover tactics, including one or more tender offers to SCM-NY

27   shareholders, some of whom were California residents, Hanson acquired control over SCM-NY, and

28   SCM-NY became an indirect subsidiary of Hanson.  Hanson acquired control over SCM-NY with the

LAW OFFICES OF
**COX, CASTLE &
NICHOLSON LLP**
SAN FRANCISCO

070431\9075316                              - 6 -                SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                                TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                                CASE NO. 17-CV-00308-WHO

1  intention of dissecting SCM-NY and transferring the resulting pieces of SCM-NY into various

2  Hanson-controlled subsidiaries, which Hanson would then liquidate at opportune times. Hanson

3  anticipated earning huge profits as the raider that captured the so-called break-up premium inherent in

4  conglomerates like SCM-NY.

5         24.     Consistent with Hanson's plan, and in the summer of 1985 as Hanson was

6  commencing a tender offer for SCM-NY, Hanson caused approximately 23 new Delaware

7  corporations to be formed as indirect Hanson subsidiaries. The vast majority were given names

8  beginning with "HSCM," "H" corresponding to Hanson and "SCM" corresponding to the target to be

9  dissected. As a group they have been referred to as the "fan" companies.

10         25.     Shortly after winning its hostile tender offer battle for control over SCM-NY,

11  Hanson orchestrated a series of transactions among SCM-NY and Hanson's fan companies. This

12  "plan of liquidation" represented a single, unified business purpose—maximizing the benefit to

13  Hanson from dismembering or de-conglomerating SCM-NY.

14         26.     Pursuant to Hanson's plan of liquidation for SCM-NY, Hanson caused specific

15  assets and liabilities corresponding to specific business units within SCM-NY to be parceled out

16  among HSCM-1 through HSCM-19. In each case, the "fan" company obtained the assets identified

17  by Hanson by relinquishing SCM-NY shares that Hanson had caused to be allocated to the fan

18  company. The fan companies then went on, as direct by Hanson, to liquidate SCM-NY in pieces.

19  HSCM-6, for example, became the vehicle by which Hanson caused SCM-NY's Glidden paint

20  business to be sold to a third party. HSCM-10, which would be renamed "Smith Corona Corporation,"

21  and another subsidiary dominated and controlled by Hanson, HM Holdings, Inc., were the conduits

22  through which Hanson liquidated a majority stake in SCM-NY's historic typewriter/word processor

23  business.

24         27.     As part of its unsuccessful takeover defense against Hanson, SCM-NY had

25  created a subsidiary into which SCM-NY placed its chemical business. Hanson decided that chemical

26  business would reside in HSCM-20, and Hanson accomplished that transition by causing SCM-NY to

27  merge into HSCM-20 in late 1986, with HSCM-20 as the surviving entity. By employing a statutory

28  merger of SCM-NY into HSCM-20 for this element of its dissection of SCM-NY, Hanson caused the

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316

- 7 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

1  Marchant contamination liability at the Property to flow into HSCM-20 from SCM-NY (where it had

2  been located since the late 1950s when the Marchant entity was merged into the pre-Hanson SCM-NY).

3    28.    The merger of SCM-NY into HSCM-20 also caused Marchant's jurisdictional

4  contacts with California to pass into HSCM-20. That merger similarly caused SCM-NY's contacts

5  with California, which arose from SCM-NY's operation of its Marchant Division at the Property, and

6  at other locations in California, to flow into HSCM-20.

7    29.    In 1988, Hanson caused HSCM-20 to merge into yet another indirect, wholly

8  owned, and Hanson-dominated subsidiary, HSCM Holdings Inc.  Hanson then caused HSCM

9  Holdings Inc. to merge into yet another indirect, wholly owned, and Hanson-dominated subsidiary,

10  HM Holdings, Inc. The surviving entity at the end of that series of mergers was HM Holdings, Inc.

11  ("HM Holdings").  HM Holdings thus inherited Marchant's liability for contamination at the Property,

12  and SCM-NY's liability for contamination at the Property, as a result of being a tool and

13  instrumentality by which Hanson accomplished Hanson's goal of de-conglomerating SCM-NY.

14    30.    The transactions referred to in Paragraphs 26 to 31 above, and by which Hanson

15  shifted SCM-NY's business units into to various Hanson subsidiaries, and caused Marchant liabilities

16  to flow into HM Holdings, were not conducted at arms' length.  The nature, forms, and terms of the

17  transactions entered into by the various Hanson subsidiaries, through which Hanson implemented its

18  plan to dismantle and selectively liquidate SCM-NY's businesses, were completely controlled by

19  Hanson, to serve Hanson's interests.  None of the Hanson subsidiaries participating in these

20  transactions exercised any separate corporate minds, wills, agency, or existence in connection with

21  these transactions.  None of them was governed by a board of directors independent of Hanson.  None

22  of them was guided by a subset of board members independent of Hanson.  None of them was advised

23  by accountants, investment bankers, attorneys, and/or other professionals independent of Hanson.

24  Instead, through overlapping boards of directors and officers as well as other means, each and all of

25  them functioned simply as the agents, instrumentalities, conduits and alter egos by which Hanson

26  pursued Hanson's business—the dismemberment and gradual liquidation of SCM-NY.

27    31.    There was at all relevant times a complete unity of interests among Hanson and

28  the subsidiaries it used in pursuing the dismemberment of SCM-NY as evidenced by Hanson's

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                          - 8 -          SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                        TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                        CASE NO. 17-CV-00308-WHO

1   domination of the subsidiaries' pertinent policies, processes, and finances with the subsidiaries' cash

2   accounts managed on a centralized basis such that Hanson could and did shift hundreds of millions of

3   dollars back and forth without the negotiations and documentation that would have occurred if the

4   involved entities had actually been separate corporations exercising their own separate corporate

5   minds, wills, existence, and agency with their own professional advisors and agents.

6          32.     Hanson's plenary control over the dissection and selective liquidation of SCM-

7   NY is well demonstrated by, among other things, Hanson's actions with respect to SCM-NY's well

8   known typewriter and word processor business, which Hanson monetized via a 1989 initial public

9   stock offering (the " Typewriter IPO") that was marketed in California, among other places.

10         33.     Prior to and throughout the Typewriter IPO, Hanson dominated the entity that

11  would be sold off in the public offering, HSCM-10.  For example, Hanson caused HSCM-10 to change

12  its name to Smith Corona Corporation so that the subsidiary could take advantage of that well-known

13  name.  According to public records prepared in connection with the Typewriter IPO, Hanson extracted

14  $121 million of net cash payments from Smith Corona Corporation before the offering commenced.

15  The Typewriter IPO prospectus indicates that sum was in addition to "approximately $386 million in

16  dividend and other net payments to be made to Hanson in connection with the Reorganization and the

17  Offerings."

18         34.     The transfers of those funds occurred without the negotiations and

19  documentation that would have occurred if Smith Corona Corporation or its nominal parent entity

20  (HM Holdings) had actually been corporations exercising corporate minds, wills, agency, or existence

21  separate from Hanson's.

22         35.     Hanson also caused Smith Corona Corporation, HM Holdings, and various

23  other entities controlled by Hanson to enter into a series of transactions referred to (in the 1989

24  prospectus for the Typewriter IPO) as the "Reorganization." The 1989 prospectus explains that the

25  Reorganization transactions were not conducted at arms' length.

26         36.     In the Reorganization and preparation for the Typewriter IPO, Hanson

27  addressed, among other things, SCM-NY's legacy liabilities—i.e., liabilities associated with SCM-

28  NY's past businesses, operations, and properties such as the Marchant mechanical calculator business

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                         - 9 -            SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                       TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                       CASE NO. 17-CV-00308-WHO

1    and the Property.  To facilitate the IPO, so that Hanson could profit from it, Hanson caused two of its

2    subsidiaries (Smith Corona Corporation and HM Holdings) to enter into a "Cross Indemnity

3    Agreement."  Through that agreement, Hanson assured prospective buyers of the Typewriter IPO

4    shares that the company they would be investing in was protected from all "Hanson Liabilities."

5    Hanson caused that term to be defined to include any and all liabilities associated with any and all of

6    SCM-NY's non-typewriter businesses including their (1) past use of property for manufacturing or

7    industrial purposes; (2) releases of hazardous substances; and (3) "nuisances of whatever kind" arising

8    from those past, non-typewriter operations and/or properties.

9            37.    Hanson thus explicitly and implicitly adopted as its own, assumed, and

10   inherited Marchant's environmental liability at the Property, Marchant's contacts as a California

11   corporation with its headquarters in California, and SCM-NY's liabilities and contacts associated with

12   the mechanical calculator business conducted at the Property.

13           38.    Hanson reaped hundreds of millions of dollars of benefits from this process as

14   follows.  The assets and liabilities placed in Smith Corona Corporation prior to the IPO were valued

15   by Hanson at approximately $82 million.  The IPO generated net "proceeds" on the order of $290

16   million, and the 1989 prospectus explained that Hanson was the sole beneficiary of those net proceeds.

17           39.    Neither Smith Corona Corporation, the issuing company, nor HM Holdings, the

18   ostensible parent of Smith Corona, obtained any substantial proceeds from the Typewriter IPO

19   according to the prospectus issued in connection with that offering.

20           40.    In connection with the Reorganization, the Cross-Indemnity Agreement, and the

21   Typewriter IPO, neither Smith Corona Corporation nor its nominal parent, HM Holdings, had or

22   exercised any separate corporate mind, will, agency, or existence.  Neither had independent director

23   vet the terms of the transactions instigated by Hanson.  Neither of them engaged financial advisors,

24   accountants or lawyers independent of Hanson to advise them on the transactions instigated by

25   Hanson.  Instead, throughout the process culminating in the sale of Typewriter IPO shares to the

26   public, and through overlapping boards of directors and officers and other means, Smith Corona and

27   HM Holdings functioned as mere agents, instrumentalities, conduits, and alter egos of Hanson by and

28   through which Hanson continued to pursue its business objective—the systematic dismantling and

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                    - 10 -          SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                  TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                  CASE NO. 17-CV-00308-WHO

1    liquidation of SCM-NY.  There was at all relevant times a complete unity of interests among Hanson,

2    Smith Corona and HM Holdings as evidenced by Hanson's domination of the subsidiaries' pertinent

3    policies, processes, and finances prior to the IPO.

4         41.    Hanson's alter ego relationship with HM Holdings continued subsequent to the

5    1989 Typewriter IPO, and included a series of transactions undertaken in connection with Hanson's

6    1996 "demerger." In those transactions, Hanson again dominated and controlled HM Holdings,

7    forcing HM Holdings to engage again in non-arms-length transactions without vetting by directors,

8    financial advisors, or legal counsel independent of Hanson.

9         42.    As part of the demerger, Hanson caused Millennium Chemicals, Inc. to be

10   formed and caused HM Holdings to become a subsidiary of Millennium Chemicals.

11        43.    To obtain favorable tax treatment from U.K. tax authorities for Hanson and its

12   shareholders, Hanson forced Millennium Chemicals to manage and control the HM Holdings chemical

13   business in the U.K. despite the fact that the chemical business was an American corporation with

14   predominantly American and other non-U.K operations.

15        44.    Hanson similarly dictated where Millennium's Board of Directors would

16   function and meet.

17        45.    According to financial statements submitted to the SEC, Hanson obtained

18   benefits worth hundreds of millions of dollars by using Millennium in this fashion, i.e., as an agent,

19   instrumentality and/or alter ego of Hanson's.

20        46.    Neither HM Holdings, which subsequently became known as Millennium

21   Holdings LLC, nor its nominal parent in the Hanson demerger (Millennium Chemical) exercised any

22   corporate mind, will, agency, or existence separate from Hanson.  Instead, they functioned during the

23   demerger process as mere agents, instrumentalities, alter egos, and conduits by which Hanson pursued

24   Hanson's interests in de-conglomerating itself.  The nature, forms, and terms of the transactions

25   entered into by HM Holdings and Millennium Chemical in the Hanson demerger were all controlled

26   by Hanson to serve Hanson's interests.  Hanson also dominated Millennium Chemicals' and HM

27   Holdings' policies, processes, and finances controlling them as Hanson saw fit and without the

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316          - 11 -          SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                        TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                        CASE NO. 17-CV-00308-WHO

1   negotiations and documentation that would have occurred if the involved entities had actually been

2   corporations with their own separate minds, wills, agency, and existence.

3          47.    In their dealings with Hanson up to and including the Hanson demerger, HM

4   Holdings and Millennium were not advised by directors, financial advisors, accountants, and/or legal

5   counsel independent from Hanson.

6          48.    All of the actions and transactions alleged above, which give rise to (a)

7   Hanson's alter ego status in relation to SCM-NY, HSCM-20, HM Holdings, and Millennium Holdings

8   in connection with Marchant's liability for the contamination at the Property, and (b) the imputation to

9   Hanson of Marchant's and SCM-NY's contacts with California were freely, voluntarily and

10  purposefully undertaken by Hanson in pursuit of Hanson's own self-interest such that Hanson knew

11  and understood, or in the exercise of reasonable diligence should have known and understood, that it

12  could be subject to litigation in California over the environmental contamination at the Property.

13         49.    Hanson sold itself to a German corporation, Heidelberg Cement, in 2007 and

14  exists today as a non-publicly traded subsidiary of that entity. By the time of that transaction, Hanson

15  owned "a dense network of sand, gravel and hard stone production sites in the United States,"

16  including several in California according to the websites documenting its corporate history and press

17  reports.

18         50.    Hanson holds itself out to the marketplace using various names such as Hanson

19  UK and, in the United States, Lehigh-Hanson. Hanson claims a business presence in the Northern

20  District of California dating back to at least 1952.

21         51.    It would be unfair and inequitable to allow Hanson to profit from the shuffling of

22  the Marchant/SCM-NY liabilities, while simultaneously allowing it to disclaim the liabilities it

23  assumed and/or controlled to obtain those gains. This is especially true where, as here, any such

24  disclaimer would shift those liabilities to the tax paying public, as opposed to another willing for-profit

25  market participant. For example, it would be unfair and inequitable for Hanson to characterize the

26  contamination at the Property as a "Hanson Liability," as it caused its subsidiaries to do in the

27  aforementioned Cross Indemnity Agreement, when doing so served Hanson's purposes in connection

28  with the Typewriter IPO, only to later allow it avoid either the jurisdictional contacts associated with

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                          - 12 -                  SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                               TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                               CASE NO. 17-CV-00308-WHO

1    Marchant's mechanical calculator operations at the Property or liability for the environmental cleanup

2    needed to abate the contamination associated with what Hanson freely and voluntarily labeled as a

3    "Hanson Liability."

4                                    **SWAGELOK AND LOZICK**

5           52.      Documentary and other evidence also link the hazardous substances and

6    materials at the Property to Swagelok via its operation of Whitney (f/k/a /Whitey) Research and Tool

7    Co.  Those operations included a grease room, hazardous waste area, solvent recovery area, and drum

8    storage areas, among others.  Whitney used and disposed of chlorinated solvents, and specifically TCE

9    in the course of its operations at the Property.

10          53.      Whitney was founded in or around 1959 as a California Corporation, and

11   changed its name to Whitney from Whitey in or around 1976.  Whitney manufactured valves for gas

12   and fluid systems and those valves were sold under the brand name "Whitey" as a unified product

13   offering by Swagelok.  Whitney/Whitey began manufacturing operations at the Property around 1963

14   and continued such operations until approximately 1999.  Throughout its history, Whitney/Whitey

15   was an integrated component of Swagelok, not a corporation with any true and separate corporate

16   existence, mind, will, or agency.  Swagelok's corporate website lists "Whitey" as a Swagelok brand

17   that has been "unifie[d]" into Swagelok for many years.

18          54.      Swagelok's domination and control over Whitney was accomplished by and

19   through, among other things, shared executives and stockholders.  Fred A. Lennon, the founder and

20   majority owner Swagelok, was a majority owner of Whitney, and Mr. Lennon's son-in-law, Edward

21   A. Lozick, held executive positions at both Swagelok and Whitney.  At the time Whitney dissolved as

22   a California Corporation, in 1999, Mr. Lozick was identified as the sole director of Whitney.  Francis

23   Joseph Callahan, who at various times held the positions of president, chief executive officer, and

24   chairman of the board of Swagelok also served as president of Whitney.  By these and other means,

25   Swagelok exercised complete control over Whitney's operations, finances, and business policies and

26   practices such that Whitney was merely an agent or instrumentality through which Swagelok

27   conducted one part of Swagelok's business.

28

LAW OFFICES OF
**COX, CASTLE &**
**NICHOLSON LLP**
SAN FRANCISCO

070431\9075316

- 13 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

55.     Swagelok directed and controlled the operations of Whitney, including Whitney's manufacturing and waste-handling and disposal activities at the Property, which have contributed to the releases of hazardous substances at the Property.  Upon its dissolution, which Swagelok instigated, Swagelok directed the assets of Whitney be transferred to Swagelok so that the latter could and did continue Whitney's operations without interruption.  Thus, Swagelok is the mere continuation of Whitney, and/or the operations of Whitney were merged into Swagelok. Swagelok also assumed, either explicitly or implicitly, all liabilities of Whitney so that the operations associated with Whitney could continue without interruption.

56.     During the period when Whitey/Whitney operated there, title to the Property was held in other Swagelok-affiliated companies and entities including Endicott Co., Calbit, Co. and the CLL Trust and/or CLL Revocable Trust #3. Those entities were under common control at all relevant times with Swagelok and/or Fred A. Lennon such that they functioned as additional conduits for Swagelok's control over Whitney.

57.     At all relevant times, a unity of interests existed between Swagelok and Whitney such that any individuality and separateness between Swagelok and Whitney ceased, and Whitney existed as a mere alter ego of Swagelok as follows: (a) Whitney was a mere shell, instrumentality and/or conduit through which Swagelok carried on its business; and (b) Whitney was controlled, dominated and/or operated by Swagelok.  Adherence to the fiction of the separate existence of Whitney as an entity distinct from Swagelok would permit an abuse of the corporate privilege and would sanction fraud, promote injustice, and lead to an inequitable result in that it would permit Swagelok to escape its obligation to clean up the hazardous substances released at the Property at its behest and leave innocent taxpayers with that obligation.

58.     Swagelok continues to maintain a presence in California, maintaining offices and/or division in northern California, Los Angeles, and San Diego and continues to sell and distribute its product in California including, but not limited to, legacy Whitney products.

59.     Title to the Property shifted from Calbit, Co. (a Swagelok/Fred A. Lennon controlled entity) to the CLL Trust in 1988, an entity that was under common control with Swagelok and/or Fred A. Lennon. In 1999, the CLL Trust and/or CLL Revocable Trust #3 sold the Property to

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316

- 14 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

1    the Emeryville Redevelopment Agency.  At the time of the sale, the successor trustee of the CLL

2    Trust was Edward Lozick, who was Catherine Lennon Lozick's husband and an officer of both

3    Swagelok and Whitney. During the time the trust owned the Property, operations directed by

4    Swagelok caused additional releases of hazardous chemicals.  Swagelok's executives, including

5    Edward Lozick, were aware of contamination at the Property at the time the Property was sold to the

6    Emeryville Redevelopment Agency.

7         60.    Catherine Lennon Lozick was the sole beneficiary of the CLL Trust and/or CLL

8    Revocable Trust #3.  In 2003, the assets of the CLL Trust and/or CLL Revocable Trust #3 were

9    distributed to Ms. Lozick.  Those assets are believed to have exceeded $1.5 billion, and included an

10    approximately 65% ownership interest in Swagelok as well as the proceeds of the 1999 sale of the

11    Property.  At some point thereafter, the CLL Trust and/or CLL Revocable Trust #3 was/were

12    dissolved.

13                                **FIRST CLAIM FOR RELIEF**

14            **(CERCLA—By Successor Agency and City against Defendants**

15                   **Hanson, Swagelok, Whitney, and Lozick)**

16         61.    Plaintiffs re-allege paragraph 1 through 60 above and incorporate those

17    paragraphs here by reference.

18         62.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

19               Notwithstanding any other provision or rule of law, and subject

20               only to the defenses set forth in subsection (b) of this section—

                                     * * *

21               (1) the owner and operator of a vessel or facility,

22               (2) any person who at the time of disposal of any hazardous

23               substance owned or operated any facility at which such hazardous
                  substances were disposed of, [and]

24               (3) any person who by contract, agreement, or otherwise arranged
                  for disposal or treatment . . . of hazardous substances owned or

25               possessed by such person, [or] by any other party or entity, at any
                  facility or incineration vessel owned or operated by another person

26               or entity and containing such hazardous substances,

27                                 * * *

28               shall be liable for—

LAW OFFICES OF
**COX, CASTLE &**
**NICHOLSON LLP**
SAN FRANCISCO

070431\9075316

- 15 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

(A) all costs of removal or remedial action incurred by the United States Government or a State, or an Indian Tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan . . . .

42 U.S.C. § 9607(a)(1)–(3), (A) and (B).

63.     The Successor Agency and City are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

64.     Defendants Hanson, Swagelok, Whitney, and Lozick are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

65.     The Property constitutes a "facility" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), in that hazardous substances were deposited, stored, disposed of, placed, or came to be located there.

66.     Defendants Hanson, Swagelok, Whitney, and Lozick including predecessors, affiliates, and/or subsidiaries for which they are liable, were each owners and/or operators of the Property at the time hazardous substances were disposed of there within the meaning of Section 101(20)(A) of CERCLA, 42 U.S.C. § 9601(20)(A), and Section 107(a)(2) of CERCLA, 42 U.S.C. §§ 9607(a) (2).

67.     Defendants Hanson, Swagelok, Whitney, and Lozick including predecessors and/or subsidiaries for which they are liable, each arranged for the treatment or disposal of one or more hazardous substances at the Property within the meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

68.     Some or all of the hazardous substances (including but not limited to TCE) discharged, deposited, disposed, spilled or emitted into the soil and groundwater at the Property constitute "hazardous substances" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and in the regulations promulgated under Section 102 of CERCLA, 42 U.S.C. § 9602.

69.     There were one or more "releases" of hazardous substances within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22). The release(s) at the Property are ongoing.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                          - 16 -                SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                              TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                              CASE NO. 17-CV-00308-WHO

70.     The costs the Successor Agency and City have incurred and/or will incur in responding to the release(s) of hazardous substances at the Property are necessary costs of response that are consistent with the National Contingency Plan.

71.     Under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), defendants Hanson, Swagelok, Whitney, and Lozick each are strictly and jointly and severally liable to the Successor Agency and City for all response costs the Successor Agency and City have incurred to date and/or will incur in the future.

72.     Wherefore Plaintiffs pray for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### (CERCLA Declaratory Relief—By Successor Agency and City against Defendants Hanson, Swagelok, Whitney, and Lozick)

73.     Plaintiffs re-allege paragraph 1 through 72 above and incorporate those paragraphs here by reference.

74.     An actual controversy has arisen and now exists between Plaintiffs on the one hand and the defendants Hanson, Swagelok, Whitney, and Lozick on the other with respect to their respective rights and obligations under CERCLA.

75.     Issuance of a declaratory decree pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2) therefore is necessary and appropriate.

## THIRD CLAIM FOR RELIEF

### (RCRA—By Successor Agency and City against Defendants Hanson, Swagelok, and Whitney)

76.     Plaintiffs re-allege paragraph 1 through 60 above and incorporate those paragraphs here by reference.

77.     Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), provides in pertinent part:

(a) Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

* * *

(1)(B) against any person, . . . who has contributed or who is contributing to the past or present handling, storage, treatment,

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316

- 17 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

1

2

> transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . .

3    78.    The Successor Agency and the City are each a "person" within the meaning of

4    Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

5    79.    Defendants Hanson, Swagelok, and Whitney, including predecessors and/or

6    subsidiaries for which they are liable, each are a "person" within the meaning of Section 1004(15) of

7    RCRA, 42 U.S.C. § 6903(15).

8    80.    Defendants Hanson, Swagelok, and Whitney, including predecessors and/or

9    subsidiaries for which they are liable, each are a person who has contributed to the past or present

10    handling, "storage," "treatment," or "disposal" of a "solid waste" or "hazardous waste" within the

11    meaning of Sections 1004(3), 1004(5), 1004(6) 1004(27) 1004(33) and 1004(34) of RCRA, 42 U.S.C.

12    § 6903(3), 6903(5), 6903(6), 6903(27), 6903(33) and 6903(34).

13    81.    The storage, treatment, handling or disposal of solid or hazardous waste

14    contributed to by defendants Hanson, Swagelok, and Whitney, including predecessors and/or

15    subsidiaries for which they are liable, present an imminent and substantial endangerment to health or

16    the environment in and around the Property.

17    82.    In accordance with Section 7002(b)(2)(A), 42 U.S.C. § 6972(b)(2)(A), and 40

18    C.F.R. Part 245, the Successor Agency and City provided notice of the endangerment to the

19    Administrator of EPA, the Regional Administrator of EPA Region 9, the Director of California

20    Department of Toxic Substances Control and to the Defendants more than ninety days before

21    commencing this action.

22    83.    Under Section 7002(a) of RCRA, 42 U.S.C. § 6972(a)(2), this Court has

23    jurisdiction to:

24

25

26

> restrain any person who has contributed to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both . . . and to apply any appropriate civil penalties under section 6928(a) and (g) of this title.

27

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316

- 18 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

84.     The Plaintiffs are entitled, therefore, to an injunction ordering defendants Hanson, Swagelok, and Whitney to take such action as may be necessary to abate the imminent and substantial endangerment to health and the environment at the Property, i.e., implement the cleanup plan to be approved by the State of California.

## FOURTH CLAIM FOR RELIEF

### (Polanco Act—By Successor Agency against Defendants Hanson, Swagelok, Whitney, and Lozick)

85.     The Successor Agency re-alleges paragraphs 1 through 75 above and incorporates those paragraphs here by reference.

86.     The Polanco Redevelopment Act, Section 33459 *et seq.* of the California Health and Safety Code, authorizes redevelopment agencies and their statutorily designated successor agencies to take actions to remedy or remove releases of hazardous substances from property within redevelopment areas, and to recover cleanup costs, interest, and attorneys' fees from responsible parties.

87.     The Property is located within a duly created redevelopment area, and plaintiff Successor Agency enjoys all rights previously held by the Emeryville Redevelopment Agency, including but not limited to right to assert a cause of action under the Polanco Act.

88.     Sections 33459.4(a) and (c) of the California Health and Safety Code provide, in pertinent part:

> [If] a redevelopment agency undertakes action to remedy or remove, or to require others to remedy or remove, including compelling a responsible party through a civil action, to remedy or remove a release of hazardous substance, any responsible party or parties shall be liable to the redevelopment agency for the costs incurred in the action . . . includ[ing] the interest on the costs accrued from the date of expenditure and reasonable attorney's fees . . .

> \*   \*   \*

> An agency may recover any costs incurred to develop and to implement a cleanup or remedial action plan approved pursuant to Sections 33459.1 and 33459.3, to the same extent the California Environmental Protection Agency, Department of Toxic Substances Control ("DTSC") is authorized to recover those costs.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                          - 19 -                SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                             TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                             CASE NO. 17-CV-00308-WHO

> The scope and standard of liability for cost recovery pursuant to this section shall be the scope and standard of liability under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sec. 9601 *et seq.*) [CERCLA] as that act would apply to [DTSC]; provided, however, that any reference to hazardous substance therein shall be deemed to refer to hazardous substance as defined in subdivision (c) of Section 33459.

89. Under CERCLA Section 107(a), 42 U.S.C. § 9607(a), DTSC is entitled to recover response costs unless the costs were incurred in an arbitrary and capricious fashion.

90. The costs the Successor Agency has incurred and will incur in connection with investigating and cleaning up hazardous substances at the Property are neither arbitrary nor capricious, and the Successor Agency has complied with all its obligations under Section 33459 et seq. and other applicable laws, or its compliance has been waived or excused.

91. Defendants Hanson, Swagelok, Whitney, and Lozick are "responsible parties" as that term is defined in Section 33459(h) of the California Health and Safety Code.

92. Pursuant to California Health and Safety Code Section 33459.4, defendants Hanson, Swagelok, Whitney, and Lozick are strictly and jointly and severally liable to the Successor Agency for the costs incurred and to be incurred in connection with investigating and cleaning up the hazardous substances on, under and/or emanating to and from the Property, interest on those costs, and the Successor Agency's attorneys' fees.

93. Wherefore the Successor Agency prays for judgment as hereinafter set forth.

### FIFTH CLAIM FOR RELIEF

### (Gatto Act (AB440)—By the City against Defendants
### Hanson, Swagelok, Whitney, and Lozick)

94. The City re-alleges paragraphs 1 through 75 above and incorporates those paragraphs here by reference.

95. The Gatto Act (AB440), Section 25403 et seq. of the California Health and Safety Code, authorizes local agencies such as the City to take actions to remedy or remove releases of

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316

- 20 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

1   hazardous materials from blighted property within a blighted area, and to recover cleanup costs,

2   interest, and attorneys' fees from responsible parties.

3          96.     On June 16, 2015, the City adopted a resolution that the Property is a "blighted

4   property" as that term is defined in Section 25403(b) of the California Health and Safety Code because

5   of the presence of hazardous materials (particularly TCE) at the Property. The City also determined

6   that the area of the City known as the Horton District (which includes the Property) is a "blighted

7   area" as that term is defined in Section 25403(a) of the California Health and Safety.

8          97.     Sections 25403.5(a) and (c) of the California Health and Safety Code provide,

9   in pertinent part:

> [I]f a local agency undertakes action to investigate property or
> clean up, or to require others to investigate or clean up, including
> compelling a responsible party through a civil injunctive action, a
> release or hazardous material, the responsible party shall be liable
> to the local agency for the costs incurred in the action . . .
> includ[ing] the interest on the costs accrued from the date of
> expenditure and reasonable attorneys' fees.
>
>                        * * *
>
> A local agency may recover any costs incurred to develop and to
> implement a cleanup plan approved pursuant to this chapter, to the
> same extent the department [DTSC] is authorized to recover costs.
> The scope and standard of liability for cost recovery pursuant to
> this section shall be the scope and standard of liability under the
> federal Comprehensive Environmental Response, Compensation,
> and Liability Act of 1980, as amended (42 U.S.C. Sec. 9601 *et
> seq.*) [CERCLA] as that act would apply to the department
> [DTSC]. However, any reference to hazardous substance in that act
> shall be deemed to refer to hazardous material as defined in section
> 25403.

20         98.     Under CERCLA Section 107(a), 42 U.S.C. § 9607(a), DTSC is entitled to

21  recover response costs unless the costs were incurred in an arbitrary and capricious fashion.

22         99.     The costs the City has incurred and/or will incur in connection with

23  investigating and cleaning up hazardous materials at the Property are neither arbitrary nor capricious,

24  and the City has complied with all its obligations under Section 25403 et seq. of the California Health

25  and Safety Code and other applicable laws, or its compliance has been waived or excused.

26         100.    Defendants Hanson, Swagelok, Whitney, and Lozick are each a "responsible

27  party" as that term is defined in Section 25403(s) of the California Health and Safety Code.

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                    - 21 -         SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                 TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                 CASE NO. 17-CV-00308-WHO

1        101.    Pursuant to California Health and Safety Code Section 25403.5, Hanson,

2   Swagelok, Whitney, and Lozick are strictly and jointly and severally liable to the City for the costs

3   incurred and to be incurred by the City in connection with investigating and cleaning up the hazardous

4   materials on, under and/or emanating from the Property, interest on those costs, and the City's

5   attorneys' fees.

6        102.    Wherefore the City prays for judgment as hereinafter set forth.

7   **SIXTH CLAIM FOR RELIEF**

8   **(Continuing Public Nuisance—By City against Defendants**

9   **Hanson, Swagelok, Whitney, and Lozick)**

10        103.    The City re-alleges paragraphs 1 through 75 and 94 through 102 above and

11   incorporates those paragraphs here by reference.

12        104.    The discharging, depositing, disposing, or releasing of hazardous substances at

13   the Property has resulted in conditions that constitute a public nuisance within the meaning of Section

14   3480 of the California Civil Code.

15        105.    The nuisance is continuing in that the hazardous substances, materials and/or

16   wastes discharged, deposited, disposed of, or released at the Property is actually and practically

17   abatable by reasonable measures and without unreasonable expenses, and in that its impact varies over

18   time.

19        106.    The discharging, depositing, disposing, or release of hazardous substances

20   violated, among other things, California Fish and Game Code § 5650(a), Water Code § 13304, and

21   California Health & Safety Code § 5411. The conditions thus constitute a nuisance per se.

22        107.    The City is entitled to maintain this action for public nuisance because it is a

23   public body authorized by law to abate this type of nuisance within the meaning of California Civil

24   Code Section 3494 and Section 731 of the California Code of Civil Procedure.

25        108.    Defendants Hanson, Swagelok, Whitney, Lozick and the entities for which they

26   are liable, caused the nuisance conditions by discharging, depositing, disposing of, or releasing

27   hazardous substances, materials and/or wastes onto the Property or by allowing other persons or

28   entities subject to their direction and control to engage in such activities.

LAW OFFICES OF
**COX, CASTLE &**
**NICHOLSON LLP.**
SAN FRANCISCO
070431\9075316
- 22 -
SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

109.   As a direct and proximate result of the nuisance created and/or maintained by defendants Hanson, Swagelok, Whitney, and Lozick, the City has suffered the damages alleged herein and is entitled to seek abatement as provided by California law.

110.   Wherefore the City prays for judgment as hereinafter set forth.

## SEVENTH CLAIM FOR RELIEF

### (Continuing Private Nuisance—Successor Agency and City against Defendants Hanson, Swagelok, Whitney, and Lozick)

111.   Plaintiffs re-allege paragraphs 1 through 75 and 85 through 110 above and incorporate those paragraphs here by reference.

112.   The hazardous substances, materials and/or wastes discharged, deposited, disposed of, or released at the Property as a result of the conduct by defendants Hanson, Swagelok, Whitney, Lozick, and/or entities for which they are liable, have resulted, alternatively, in conditions that constitute a continuing private nuisance within the meaning of Section 3479 of the California Civil Code.

113.   The nuisance is continuing in that the hazardous substances, materials and/or wastes discharged, deposited, disposed of, or released at the Property is actually and practically abatable by reasonable measures and without unreasonable expenses, and in that its impact varies over time.

114.   The discharging, depositing, disposing, or release of hazardous substances violated, among other things, California Fish and Game Code § 5650(a), Water Code § 13304, and California Health & Safety Code § 5411. The conditions thus constitute a nuisance per se.

115.   Defendants Hanson, Swagelok, Whitney, Lozick and/or entities for which they are liable, caused the nuisance conditions by discharging, depositing, disposing of, or releasing hazardous substances, materials and/or wastes at the Property or by allowing other persons or entities subject to their direction and control to engage in these activities.

116.   The nuisance has interfered with and continues to interfere with the City's use and enjoyment the Property.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316

- 23 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

117.    As a direct and proximate result of this nuisance, Plaintiffs have suffered the damages alleged herein.

118.    Wherefore Plaintiffs pray for judgment as hereinafter set forth.

## EIGHTH CLAIM FOR RELIEF

### (Continuing Trespass—Successor Agency and City against Defendants Hanson, Swagelok, Whitney, and Lozick)

119.    Plaintiffs re-allege paragraphs 1 through 75 and 85 through 118 above and incorporates those paragraphs here by reference.

120.    Defendants Hanson, Swagelok, Whitney, Lozick and/or entities for which they are liable, have committed trespass against Successor Agency's and the City's property interests because Defendants have discharged, deposited, disposed of, or released hazardous substances, materials and/or wastes onto the Property without Plaintiffs' consent and/or by failing to remove such hazardous substances, materials and/or wastes from the Property, or by permitting other persons or entities subject to the Defendants' direction or control to engage in these activities.

121.    The trespass is continuing in that the hazardous substances, materials and/or wastes discharged, deposited, disposed of, or released onto the Property are actually and practically abatable by reasonable measures and without unreasonable expenses.

122.    As a direct and proximate result of the trespass Plaintiffs have suffered the damages alleged herein.

123.    Wherefore Plaintiffs pray for judgment as hereinafter set forth.

## NINTH CLAIM FOR RELIEF

### (Equitable Indemnity—Successor Agency and City against Defendants Hanson, Swagelok, Whitney, and Lozick)

124.    The Successor Agency re-alleges paragraphs 1 through 123 (except paragraphs 76 through 84 and 94 through 110) and incorporates those paragraphs here by reference.  The City re-

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                     - 24 -                     SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

1    alleges paragraphs 1 through 123 (except paragraphs 76 through 93) and incorporates those

2    paragraphs here by reference.

3         125.    The contamination at the Property was caused by the wrongful conduct of

4    defendants Hanson, Swagelok, Whitney, Lozick and/or entities for which they are liable as alleged

5    herein.  Plaintiffs are without fault in connection with the contamination at and emanating from the

6    Property.

7         126.    As a direct and proximate result of the wrongful conduct of these Defendants,

8    Plaintiffs have incurred and will continue to incur costs, expenses, and damages.

9         127.    Plaintiffs are entitled to full equitable indemnity for such costs, damages, and

10   expenses from defendants Hanson, Swagelok, Whitney, and Lozick.

11        128.    Therefore Plaintiffs pray for judgment as hereinafter set forth.

12                          **TENTH CLAIM FOR RELIEF**

13          **(Declaratory Relief—Successor Agency and City against Defendants**

14                   **Hanson, Swagelok, Whitney, and Lozick)**

15        129.    The Successor Agency re-alleges paragraphs 1 through 128 (except paragraphs

16   76 through 84 and 94 through110) and incorporates those paragraphs here by reference.  The City re-

17   alleges paragraphs 1 through 128 (except paragraphs 76 through 93) and incorporates those

18   paragraphs here by reference.

19        130.    An actual controversy exists between Plaintiffs and defendants Hanson,

20   Swagelok, Whitney, and Lozick with respect to their rights and obligations under state law, and

21   Plaintiffs seek a judicial determination of the respective rights and duties of the parties with respect to

22   the rights, claims and damages alleged herein.

23        131.    The requested declaration is necessary and appropriate at this time.

24        132.    Wherefore Plaintiffs pray for judgment as hereinafter set forth.

25                          **PRAYER FOR RELIEF**

26   Wherefore, the Successor Agency and City pray for relief as follows:

27

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316                          - 25 -          SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
                                                        TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
                                                        CASE NO. 17-CV-00308-WHO

1.      On the first claim for relief, for recovery of all response costs incurred or to be incurred by the Successor Agency and/or the City in connection with the Property consistent with the National Contingency Plan, including statutory interest;

2.      On the second claim for relief, for a judicial declaration that defendants Hanson, Swagelok, Whitney, and Lozick are jointly and severally liable for all response costs incurred and to be incurred by the Successor Agency and/or the City in connection with the Property consistent with the National Contingency Plan;

3.      On the third claim for relief, for an injunction ordering the Defendants to abate the imminent and substantial endangerment to health and the environment;

4.      On the fourth claim for relief, for recovery of all response costs incurred or to be incurred by the Successor Agency in connection with the Property, including attorneys' fees and statutory interest;

5.      On the fifth claim for relief, for recovery of all response costs incurred or to be incurred by the City in connection with the Property, including attorneys' fees and statutory interest;

6.      On the sixth claim for relief, for recovery by the City for compensatory damages and abatement in amount to be determined at trial;

7.      On the seventh claim for relief, for recovery by the Successor Agency and the City for compensatory damages in amount to be determined at trial;

8.      On the eighth claim for relief, for recovery by the Successor Agency and the City for compensatory damages in amount to be determined at trial;

9.      On the ninth claim for relief, for recovery by the Successor Agency and City for compensatory damages in amount to be determined at trial;

10.     On the tenth claims for relief, for entry of declaratory judgment on the Successor Agency's and City's state law claims;

11.     As to all claims for relief, for all costs, attorneys' fees, interest and expenses, to the fullest extent provided by law; and

/ / /

/ / /

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

070431\9075316

- 26 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO

1    12.    For such other and further relief as the Court may deem just and proper.

2

3    October 5, 2017                    COX, CASTLE & NICHOLSON LLP

4                                       By: */s/ Robert P. Doty*
                                            _____
5                                           Robert P. Doty
                                            Ali P. Hamidi
6                                           Christopher W. Gribble
                                            Attorneys for Plaintiffs
7                                           The Successor Agency to the former Emeryville
                                            Redevelopment Agency and The City of Emeryville

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
**COX, CASTLE &**
**NICHOLSON LLP**
SAN FRANCISCO

070431\9075316

- 27 -

SECOND AMENDED COMPLAINT UNDER CERCLA/STATE LAW
TO RECOVER ENV. CLEANUP COSTS AND RELATED RELIEF
CASE NO. 17-CV-00308-WHO