UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE SUCCESSOR AGENCY TO THE FORMER EMERYVILLE REDEVELOPMENT AGENCY AND THE CITY OF EMERYVILLE,<br><br>Plaintiff,<br><br>v.<br><br>SWAGELOK COMPANY, et al.,<br><br>Defendants. | Case No. 17-cv-00308-WHO<br><br>**ORDER DENYING HANSON BUILDING MATERIALS LIMITIED'S MOTION TO DISMISS SECOND AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION**<br><br>Re: Dkt. No. 82 |

**INTRODUCTION**

In this case concerning environmental contamination on a property in Emeryville, California, defendant Hanson Building Materials Limited ("HBML"), which is located in the United Kingdom, moves to dismiss the second amended complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. However, plaintiffs have made a prima facie showing that HBML has had contacts with the state of California, plaintiffs' CERCLA claim arises out of HBML's successor liability, and it is not unreasonable to exercise jurisdiction over HBML. Swagelok and Whitney, as cross-claimants, have alternatively made a prima facie showing of alter ego liability. Accordingly, HBML's motion to dismiss is DENIED.

**BACKGROUND**

**I. CONTAMINATION OF THE PROPERTY**

The plaintiffs, Successor Agency to the former Emeryville Redevelopment Agency ("Successor Agency") and the City of Emeryville ("City"), bring ten claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Resource Conservation and Recovery Act ("RCRA"), and various California laws, to recover

environmental cleanup costs and related relief from plaintiffs' investigation of contamination on a property in Emeryville, California. Defendants HBML, Swagelok Company ("Swagelok"), Whitney Research and Tool Co. ("Whitney"), and Catherine Lennon Lozick ("Lozick"), are allegedly responsible for the contamination caused by industrial activities that began approximately in 1910 on 5679 Horton Street in the City of Emeryville, California ("the Property"). *See* Second Amended Complaint ("SAC") ¶ 2.

From approximately 1910 to 1959, the Property was owned by the Marchant Calculating Machine Company ("Marchant"), a California company that manufactured mechanical calculating machines. SAC ¶ 3. Marchant's operations used various oils, chlorinated solvents, and other chemicals that have been found in the soil at the Property, in groundwater on and down gradient from the Property, and in vapors inside large buildings located on the Property. SAC ¶¶ 5, 21.

In 1958, Marchant was consolidated via merger with Smith-Corona Inc., a New York corporation and Marchant was renamed Smith-Corona Marchant Inc. ("SCM"). SAC ¶ 3; Bookspan Decl. ¶ 9. The following year, SCM moved operations to a different location along the border of the cities of Oakland and Berkeley. *Id.* SCM regularly conducted business in California and continued operating the Marchant business as a division within SCM. *Id.* By 1963, SCM renamed itself SCM Corporation. It continued to operate in California until it closed the Marchant division in approximately 1972. *Id.* ¶ 9.

Affiliates of defendant Swagelok purchased the Property in the mid-1960s and owned it until the late-1990s. SAC ¶¶ 4, 11. Swagelok is an Ohio corporation with its principal place of business in Solon, Ohio. *Id.* The Property was technically operated by defendant Whitney, which was controlled and dominated by Swagelok. *Id.* Whitney was founded in 1959 as a California corporation and is now dissolved. SAC ¶ 53. Whitney produced machine valves and associated valve parts on the Property. *Id.* It also allegedly contaminated the Property through its operations, including in the grease room, hazardous waste area, solvent recovery area, and drum storage areas. SAC ¶ 52.

The Property changed hands once again in 1999 when the former Redevelopment Agency, a public entity formed under California law and authorized to undertake environmental cleanup

projects, purchased most of it from a Swagelok controlled entity.  SAC ¶ 11.  The proceeds of that sale, assets worth in excess of $1.5 billion, and approximately 65% ownership interest in Swagelok, all went to defendant Catherine Lozick as the sole beneficiary of the CLL Trust, in 2003.  SAC ¶ 60.  Since that time, the former Redevelopment Agency's rights, powers, and obligations have vested by statute in plaintiff Successor Agency, a separate public entity located and operating in Alameda County, California.  *Id*.

## II.     INVESTIGATION INTO SUBSEQUENT MERGERS AND OWNERSHIP

The Successor Agency investigated the contamination when it acquired the Property.  SAC ¶ 20.  Successor Agency identified a series of mergers that also linked Marchant and SCM's alleged contamination on the Property to defendant HBML via a series of transactions in the mid-1980s.  SAC ¶ 22.

HBML was incorporated in 1950 under the name C. Wiles Limited, as a limited company organized and existing under the laws of England and Wales.  *See* Rogers Decl. ¶ 2.  Its sole current office and headquarters, which is its registered principal place of business, is in Berkshire, England.  *Id*.  HBML has operated under several different names, including Wiles Group Limited, Hanson Limited, Hanson PLC, and Hanson Trust PLC.  HBML is the same entity originally formed in 1950 though it has gone by different names since its incorporation.[1]

HBML first acquired control over SCM through hostile takeover tactics, including tender offers to shareholders.  SAC ¶ 23.  Then, intent on liquidating the SCM conglomerate for profits, HBML formed several new Delaware corporations in 1985 as indirect subsidiaries with names beginning with "HSCM," (i.e., HSCM-1 to -20), referred to as "fan companies."  SAC ¶ 24; Hempstead Decl. ¶ 7.  One of those fan companies, HSCM-20, eventually was merged into SCM in 1986, with HSCM-20 as the surviving entity with residual assets and legacy liabilities.  SAC ¶¶ 27, 28; Hempstead Decl. ¶ 12.  HBML then caused HSCM-20 to merge into another subsidiary, HSCM Holdings Inc., which then merged again into HBML subsidiary HM holdings, Inc. ("HM

---

[1] This Order refers to defendant as HBML regardless of its name at the time.  To the extent this Order refers to former company names interchangeably, such as Hanson Trust PLC, it is undisputed that HBML is the same entity that went by these former names at different stages of its existence since 1950.

3

Holdings"). SAC ¶ 29; Hempstead Decl. ¶¶ 13-15. Plaintiffs' theory of the case is that these mergers ultimately caused Marchant's contamination liability for the Property, and its jurisdictional contacts with California, to flow into HSCM-20, which was controlled by HBML. SAC ¶¶ 27-28. HBML's theory in defense is that the relevant transactional activities occurred under the control of its United States counterparts, particularly Hanson Industries, which was distinct from HBML in the United Kingdom.

Plaintiffs nonetheless allege that HBML's control over these mergers and the liquidation of SCM is demonstrated by a 1989 initial public offering for a typewriter business that was marketed in California and other places. SAC ¶ 32; Hamidi Decl. ¶ 8, Ex. D. During the IPO, HBML changed the name of HSCM-10 to Smith Corona Corporation and then dominated and controlled the transactions. SAC ¶¶ 32-34; Hamidi Decl. ¶ 8, Ex. D at 5 (HBML 2968). Smith Corona Corporation, HM Holdings, and other entities that HBML controlled entered transactions referred to in the 1989 IPO prospectus as the "Reorganization." SAC ¶ 35. In the Reorganization, Smith Corona Corporation and HM Holdings entered a Cross Indemnity Agreement in which HBML assured prospective buyers that the company was protected from all "Hanson Liabilities," defined as SCM non-typewriter businesses, past use of property, release of hazardous substances, and nuisances from non-typewriter operations or properties. SAC ¶ 36.

Following the investigation, plaintiffs plead that the presence of contaminants on the Property can be traced to the operations of Marchant, SCM's Marchant division, and Swagelok and Whitney. SAC ¶ 5.

## III. PROCEDURAL HISTORY

Successor Agency and the City filed this lawsuit on January 20, 2017 and amended the complaint on June 30, 2017. Dkt. Nos. 1, 42. Swagelok and Lozick separately answered and filed crossclaims against HBML and counterclaims against plaintiffs. Dkt. Nos. 46, 50.

In October 2017, I issued an Order granting the parties' proposed stipulation to amend the pleading to properly identify HBML as the named party, for Whitney to bring crossclaims against HBML, and for the parties to conduct jurisdictional discovery. Dkt. No. 66. That discovery led to the production of thousands of pages of documents, hundreds of emails between counsel, several

30(b)(6) depositions, and four written discovery disputes brought to the court's attention. Noma Decl. ¶¶ 6-10. Stopping short of raising additional disputes, Lozick maintains that HBML engaged in certain jurisdictional discovery abuses and seeks to reserve the right to extend jurisdictional discovery if needed.

Plaintiffs filed the operative second amended complaint on October 5, 2017. Dkt. No. 67. On December 4, 2017, HBML moved to dismiss for lack of personal jurisdiction. Dkt. No. 82.

## LEGAL STANDARD

A court's jurisdiction to render judgment against a person depends on the court's having personal jurisdiction against that person. *See Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945). "For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Boschetto v. Hansing*, 539 F.3d 1011, 1015–16 (9th Cir. 2008) (internal quotations and citations omitted).

A court may exercise general or specific jurisdiction. *Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir.1986). General jurisdiction exists when a defendant engages in "continuous and systematic general business contacts" with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). In determining whether specific jurisdiction exists, courts employ a three-factor test:

(i) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(ii) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(iii) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Boschetto*, 539 F.3d at 1016 (internal quotations and citations omitted). The plaintiff bears the initial burden of establishing that personal jurisdiction is proper when a defendant moves to dismiss for lack of personal jurisdiction. *Id.* at 1015.

The first factor may be satisfied by "purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). A "purposeful availment" analysis is used in contract cases whereas "purposeful direction" analysis is applied in tort cases. *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 577 (9th Cir. 2018) (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). In determining whether a contract creates sufficient contacts with the forum, courts look to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985). To determine whether activities directed at a forum are sufficient, courts require facts indicating the defendant: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo!*, 433 F.3d at 1206 (internal quotation and citations omitted).

The second factor of the test—that the claim must arise out of or relate to the defendant's forum-related activities—is a "but for" test. *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000). "Under this test, a defendant cannot be haled into court for activities unrelated to the cause of action in the absence of a showing of substantial and continuous contacts sufficient to establish general jurisdiction." *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1990) *rev'd sub nom. on other grounds Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991). "The 'but for' test preserves the requirement that there be some nexus between the cause of action and the defendant's activities in the forum." *Id*.

The plaintiff bears the burden of satisfying the first two factors of the test. *Schwarzenegger*, 374 F.3d at 802. If the plaintiff fails to satisfy either of these factors, personal jurisdiction is not established in the forum state. *Id.* If the plaintiff succeeds in satisfying the first two factors, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Id.* "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014).

Where, as in this case, the motion to dismiss is based on written materials, rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdiction. *Schwarzenegger*, 374 F.3d at 800. A plaintiff makes a prima facie showing by producing admissible evidence which, if believed, would be sufficient to establish the existence of personal jurisdiction. *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). A court must accept as true the uncontroverted allegations in the complaint and resolve conflicts between facts contained in the parties' affidavits in the plaintiff's favor. *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

## DISCUSSION

### I.      PERSONAL JURISDICTION

HBML argues that there is no general or specific jurisdiction in California. The City and Successor Agency filed an opposition asserting that the court has specific jurisdiction over HBML arising from its direct contacts and its successor liability. Additionally, cross-claimants Swagelok/Whitney and Lozick filed separate oppositions arguing for specific jurisdiction premised on an alter ego theory. Therefore, I will only address specific jurisdiction and determine whether plaintiffs and cross-claimants have made out a prima facie case based on HBML's direct contacts, successor liability, or an alter ego theory.

#### A.      HBML's Direct Contact with California

In a single paragraph in its motion, HBML dismisses how plaintiffs could "possibly establish that HBML purposefully availed itself of California's laws in connection with Claimants claims" because it did not cause the contamination itself or owned or operated the Property. Mot. at 15:1-12. Related to the second factor, it repeats the undisputed fact that SCM's Marchant division did not become an indirect subsidiary of HBML prior to 1986, decades after Marchant ceased to own or operate on the Property. SAC ¶¶ 3, 22-24; *see also* Hempstead Decl. ¶ 6.

In response, plaintiffs argue for specific jurisdiction premised on HBML's nationwide tender offer to acquire SCM in 1985, use of the national financial press to accomplish this task, the eventual merger agreement with SCM that transferred their liability for the Property to HBML, a post-acquisition ad campaign that ran in states including California, and contemporaneous

7

documents showing HBML was in control of SCM activities when it was operating in California. Plaintiffs successfully make out a prima facie case of specific personal jurisdiction based on this combination of HBML's direct contacts with California and the contacts of its predecessor SCM. I analyze each of the factors that show specific jurisdiction below.

### 1. Purposeful Availment and Purposeful Direction

The first factor is satisfied "by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Yahoo!*, 433 F.3d at 1206. Recently in a CERCLA liability case, the Ninth Circuit applied the purposeful direction test because the statute sounded in tort more so than contract. *See Pakootas*, 905 F.3d at 577 ("The *Calder* test plainly applies here. Claims for recovery of response costs and natural resource damages are "more akin to a tort claim than a contract claim.").

Here, HBML's alleged involvement revolves around its transactional contacts as a successor to the allegedly tortious conduct of its predecessor. The first factor is not difficult for plaintiffs to establish given the evidence surrounding HBML's hostile takeover of SCM, the subsequent liquidation of SCM, and SCM's contacts imputed to HBML as its successor (which I address more comprehensively in the analysis of the second factor). SAC ¶ 23; Bookspan Decl. ¶ 21.

Plaintiffs produce evidence that HBML's Financial Director and member of its Board of Directors in 1985, Brian Hellings, testified that he may have initiated discussion on the prospect of selling SCM's typewriter business at an August 21, 1985 meeting preceding any press release that HBML would announce a tender offer. *See* Request for Judicial Notice ("Plaintiff RJN") Ex. A at 251:14-252:15 (Dkt. No. 115-2); Bookspan Decl. ¶¶ 11-14 (discussing HBML's corporate raider reputation). When the takeover efforts began, HBML announced that the tender offer would be "advertised nationally by use of the national financial press and by the interstate mail." Hamidi Decl. ¶ 6, Ex. B at 4-5 (HBML 7736-37). The national campaign involved numerous press releases to investors and was sent from "the Hanson Trust," the name of HBML at the time, between August 21 to October 10, 1985. *See* Hamidi Decl. ¶ 16, Ex. J (HBML 15572, -15574, -

15576, -15580, -15581, -15585).[2]

Plaintiffs provide evidence that the national press strategy continued after HBML made a final tender offer as well. *See id.* (HBML 8828-29, 8797, 15549, 15551-53). From 1986 to 1993, HBML ran advertisements in California, at times through the Los Angeles Times. *See* Bookspan Decl., Ex. C. The ads were for HBML products, provided background on HBML, and one announced that HBML was sponsoring a gala with a local public television station. *Id.* ¶ 12, Ex. I; ¶ 32, Ex. C. From 1985 to 1996, HBML also periodically filed SEC documents involved in the tender offer and liquidation of SCM. *See* Hamidi Decl. ¶ 4, Ex. A at 83:17-84:18, 178:13-179:3.

HBML's reliance on *Callaway Golf Corp. v. Royal Canadian Golf Ass'n*, 125 F. Supp. 2d 1194, 1198 (C.D. Cal. 2000) to discredit the materiality of press releases directed to California is distinguishable. In *Callaway*, the district court found that a nationwide press release was not sufficient to establish purposeful availment because "[n]one of the four U.S. media publications…[were] located in California, nor did defendant send press releases to any entity or person with a California address." *Callaway*, 125 F. Supp. 2d at 1198–1200. Here, the press releases were nationwide, but there is the additional evidence of advertising directed towards California specifically. Given HBML's direct involvement in the nationwide press coverage of its tender offer, and subsequent ads in California, it purposefully availed itself of California. S*ee Farmers Ins. Exchange v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911 (9th Cir. 1990) (finding that the decision to provide a nationwide press coverage permitted jurisdiction in Montana where the claims happened to be filed).

Finally, plaintiffs have provided evidence that both Lord Hanson and Sir Gordon White, who were partners managing HBML, lived part-time in California and conducted business there. *See* Bookspan ¶ 33. Lord Hanson, who was known to operate the business "wherever he [was]," according to HBML's own 30(b)(6) designee, went so far as to maintain a secretary in California and to meet with HBML executives there. Plaintiff RJN Ex. A at 237:17-238:16. HBML claims

---

[2] Plaintiffs also include evidence of correspondence dated May 30, 1986 between HM Anglo-American Ltd., an HBML subsidiary that shared HBML's London office space, and Security Pacific National Bank in Los Angeles, suggesting that at least part of the eventual financing for the tender offer of SCM came from a California bank. *See* Doty Decl. ¶ 15, Ex. K.

that Lord Hanson and Sir Gordon White's part-time residence in California is irrelevant, but it does not dispute the work alleged to have been conducted in California. These contacts are not irrelevant for purposes of the establishing personal jurisdiction. *See Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952) (finding it would not violate due process to exercise jurisdiction over a foreign company when the president maintained an office in Ohio where he conducted personal and business tasks on behalf of the company).

Plaintiffs have produced evidence and sufficiently alleged that HBML, primarily through its transactions in the 1980s, "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Sinatra v. National Enquirer*, 854 F.2d 1191, 1195 (9th Cir. 1988). They sufficiently allege that HBML was involved in the acquisition of SCM, which took on the Property contamination liability of Marchant.

### 2. Plaintiffs' CERCLA Claims Arise Out of HBML Predecessor Contacts

The second factor is that "the claim must be one which arises out of or relates to" HBML's contacts. *Boschetto*, 539 F.3d at 1016. There must be a "nexus between the cause of action and the defendant's activities in the forum." *Shute*, 897 F.2d at 385. Plaintiffs establish this factor through their successor liability theory.

HBML's acquisition of SCM is the but for cause of its alleged CERCLA liability, creating the nexus between its activities in California and the cause of action. Plaintiffs allege that the industrial operations-based contamination occurred on the Property because of Marchant's operations from approximately 1910 to 1958, SCM's Marchant division after it acquired Marchant between 1958 to 1959, and Swagelok and Whitney from the mid-1960s to the late 1990s. SAC ¶¶ 3-4. HBML's involvement arises through the series of mergers and acquisitions transactions detailed above; namely, SCM's consolidation of Marchant in 1958 and HBML's consolidation of SCM "beginning in the mid-1980s." SAC ¶ 22. Thus, plaintiffs rely on *Shute* to argue that HBML's successor liability makes it responsible for the "but for" cause of the injury—Marchant and SCM's contamination of the Property—and brings it within the "striking distance" allowed in the Ninth Circuit. 897 F.2d at 386. I find that plaintiffs' claim arises out of HBML's contacts with California to the extent HBML was plausibly the successor of SCM.

A court has personal jurisdiction over an alleged successor company, here HBML, if: (i) "the court would have had personal jurisdiction over the predecessor" and (ii) "the successor company effectively assumed the subject liabilities of the predecessor." *Lefkowtiz v. Scytl USA*, No. 15-CV-05005-JSC, 2016 WL 537952, at *3 (N.D. Cal. Feb. 11, 2016) (internal quotation marks and citation omitted). The parties do not dispute that I would have personal jurisdiction over SCM, as the alleged predecessor of HBML's successor liability, because it was a New York company that regularly conducted business in California before and after "acquiring the Marchant Corporation in a merger transaction." FAC ¶ 3. So the question is whether HBML assumed SCM's liabilities.

Under federal common law and California law, asset purchasers[3] are not liable as successor companies unless: (i) "The purchasing corporation expressly or impliedly agrees to assume the liability;" (ii) "The transaction amounts to a 'de-facto' consolidation or merger;" (iii) "The purchasing corporation is merely a continuation of the selling corporation;" or (iv) "The transaction was fraudulently entered into in order to escape liability." *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 362–64 (9th Cir. 1997); *see also Ray v. Alad Corp.*, 19 Cal.3d 22, 28 (Cal. 1977) (applying similar analysis under California law). Plaintiffs' FAC and opposition explicitly invokes only the first basis for successor liability. FAC ¶¶ 37, 51; Emeryville Oppo. at 13:21-24.

Plaintiffs state that HBML "explicitly and implicitly adopted as its own, assumed, and inherited Marchant's environmental liability at the Property…and [SCM's] liabilities and contacts." SAC ¶ 37; *CenterPoint Energy, Inc. v. Superior Court*, 157 Cal.App.4th 1101, 1120 (Cal. Ct. App. 2007) (applying the first exception to successor liability). Their evidence in support of successor liability includes the same events that it cites for purposeful availment and purposeful direction—the tender offer for SCM, the nationwide press releases it used to acquire SCM, and

---

[3] As an initial requirement, successor liability according to California law "requires the purchase of *assets*, not merely the purchase of stock." *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. 05-cv-0553-MHP, 2007 WL 2462142, at *6 (N.D. Cal. Aug. 29, 2007). There is no dispute that the acquisition of SCM involved assets. *See* Hempstead Decl. ¶ 7 ("Following the acquisition, in 1986, SCM's assets and liabilities were liquidated…").

ads directed to California.

Plaintiffs' contend that HBML was essentially the ultimate parent company that dominated and controlled the pertinent events involving SCM. They emphasize that there was a January 1986 merger agreement from SCM to HSCM Industries Inc. and Hanson Trust PLC, which was sent to the attention of Sir Gordon White. Hamidi Decl. ¶ 7, Ex. C. The second paragraph of the agreement, Section 1, states that "Hanson," defined in the letter as collectively HSCM Industries Inc., Hanson Holdings Netherlands B.V. and Hanson Trust PLC, "agrees to effect as promptly as practicable a merger with" SCM. *Id*. at 1 (HBML 24750). There is no dispute Hanson Trust PLC is the same entity as HBML. Section 12 then declares the contract to be binding on the parties in the letter, again including HBML. *Id*. at 6. (HBML 24755) ("This contract shall be binding upon and inure to the benefit of the parties hereto, [and] the persons and entities referred to herein."). Plaintiffs observe that the letter does not include Hanson Industries, the United States counterpart to HBML.

Moreover, they point to the testimony of an HBML Rule 30(b)(6) witness, Graham Dransfield, who was an HBML employee in the legal department starting in 1982, former Legal Director of HBML from 1993 to 2003, and Legal Director of Hanson Limited from 2003 to 2009. *See* Dransfield Decl. ¶ 1. Dransfield testified that Hanson Industries (a division of an HBML subsidiary named Tillotson Commercial Motor Company in the United States) was not involved in making the tender offer for SCM. *See* Doty Decl. ¶ 7 Ex. D at 381:2-6 ("As I see it [the merger agreement was] signed by the people who were making the tender offer."). When asked about HSCM Industries Inc. and Hanson Building Holdings Netherlands B.V., Dransfield did not know if they even had the resources (employees, bank accounts, phone and fax numbers) to perform the merger with SCM independent of HBML. *Id.*, Ex. D at 378:11-380:24. All of these facts, along with the press releases and ads from HBML during the time of the transactions, give rise to a prima facie showing of successor liability.

HBML "does not dispute that the company formerly known as SCM was ultimately merged into HM Holdings," another subsidiary of HBML. Mot. to Dismiss at 4 n.3; *see also* Hempstead Decl. ¶¶ 5-15 (explaining the various corporate transactions and noting that "the

1  surviving company from the above-described mergers [referring to the twenty fan companies after

2  the 1986 SCM corporate restructuring] ultimately was merged into another U.S. company and an

3  indirect subsidiary of HBML, known as HM Holdings, Inc.").  But it argues that its United States

4  subsidiaries were in control.  HBML contends that management of its United States businesses

5  reported directly to Hanson Industries, and that as a result HBML is not the successor to SCM.

6      In 1986, SCM was acquired by the indirect subsidiaries of HBML, Hanson Holdings

7  Netherlands B.V. and HSCM Industries Inc.  *See* Hempstead Decl. ¶ 6; Swagelok Oppo., Berle

8  Decl. Ex. D (HBML 604-607); Reck Decl. Ex. C at 68:5-11; 69:2-6.  HBML points to its own

9  1986 Chronology of the Acquisition and Restructuring of SCM, which states that on March 31,

10 1986 the merger occurred, "resulting in ownership by HSCM Industries of 8,040,000 shares of

11 SCM (80.4%) and by [Hanson Holdings Netherlands B.V.] of 1,960,000 shares (19.6%) of SCM."

12 Berle Decl. Ex. D (HBML 605).

13     But the observation that the actual purchase was through subsidiaries or that they reported

14 to Hanson Industries as entirely separate from HBML is unpersuasive given evidence that HBML

15 (Hanson Trust PLC at the time) was in control.  In the 1986 HBML annual report, Sir Gordon

16 White explained the two entities of HBML and Hanson Industries as "constituting a single

17 corporate entity and sharing a common business strategy," though operating as two separate

18 companies.  Hamidi Decl., ¶ 17, Ex. K (HBML 6517-6525); Doty Decl., ¶ 14, Ex. J at 17 (HBML

19 15572).

20     Consistent with this outlook, on August 22, 1985, meeting minutes from HBML in London

21 show that its directors determined a cash tender offer announcement was necessary following a

22 rise in the share prices the day before.  *See* Doty Decl. Ex. L at 1.  The minutes also "resolved"

23 that the announcement "on behalf of the Company," HBML, was approved and a committee of the

24 board consisting of HBML directors were appointed to "facilitate the proposed cash tender offer."

25 *Id*.  HSCM Industries was formed by HBML in 1985 for the purpose of purchasing SCM and did

26 not own other asserts or conduct other activities.  *See* Berle Decl. Ex. A at 65:4-17; Ex. G (HBML

27 7462).  Hanson Netherlands spent money for the acquisition it received from loans directly by

28 HBML.  *See* Berle Decl., Ex. G (HBML 7462-63); Ex. E (HBML 25531).  Again, this is

consistent with Sir Gordon White's single corporate entity statement, and the meeting minutes of directors discussing HBML's intent to "facilitate the proposed cash tender offer." Doty Decl. Ex. L at 1.

Through the tender offer and acquisition process, HBML then made clear that "as soon as practicable, Hanson Trust intends to seek to influence the management of the Company, to seek majority representation on the Company's Board of Directors and to seek to effect a business combination between the Company and Hanson Trust or an affiliate of Hanson Trust…" Berle Decl., Ex. G (HBML 7450, 7469). HBML's involvement in the open market transactions for SCM obligated it to file a Schedule 13D with the SEC as a result of its beneficial ownership of more than 5% of the voting class. *See* Request for Judicial Notice ("Swagelok RJN") Ex. TT at 18495 (Dkt. No. 113-5). Moreover, HBML was part of the group Schedule 13D along with its subsidiaries HSCM Industries, Hanson Netherlands, and HMAC Investments Inc., which would not have been filed but for these entities acting together for the purpose of acquiring SCM. *See* 17 C.F.R. 240.13d-5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership…").

HBML's attempt in this litigation to separate itself from the tender offer and acquisition of SCM is also unsuccessful, at least at this stage, in light of certain holes in Hempstead's testimony. He states that he was an Associate Director of HBML from 1990 to 1996, but that this was only an "honorary title" with his only role being "to sign certain disclosures for the company to be filed with U.S. regulatory authorities." Hempstead Decl. ¶ 3. From 1976 to 1978, and then from 1982 through 1996, he says that he was employed by Hanson Industries. *Id.* ¶ 1. Yet Hempstead is the signatory for HBML and Hanson Netherlands on the 1986 merger agreement, which did not include any mention of Hanson Industries. *See* Hamidi Decl., Ex. C (HBML 24756). Hanson Industries, according to plaintiffs, is a division of Tillotson Commercial Motors, but the company's director's report for 1985 to 1987 does not mention any SCM-related activities. *See* Doty Decl. ¶ 18, Ex. N at 1.

HBML attempts to push successor liability onto another entity, Millennium Chemicals,

Inc. ("Millennium"). It asserts that after the acquisition in 1986, SCM's assets and liabilities were restructured by Hanson Industries and its general counsel. Hempstead Decl. ¶¶ 5-15. After the SCM businesses were distributed to the fan companies, SCM was merged into HSCM-20. *Id.* ¶¶ 7, 13. HSCM-20 merged again into a direct parent company, HSCM Holdings, Inc., and the surviving corporation was renamed SCM once again. Hempstead Decl. ¶ 14, Ex. C. SCM then merged into another HBML subsidiary, HM Holdings, Inc. in October 1988. *Id.* at ¶ 15. Finally, HBML argues that in 1996, Millennium, "a newly formed Delaware company," acquired HM Holdings, Inc. as part of a "demerger" and became the successor. *Id.* ¶¶ 26-28.[4] Millennium merged into Lyondell Chemical Co. in 2004, which filed for bankruptcy in 2009. *See* Request for Judicial Notice ("HBML RJN") Ex. D at 20 (Dkt. No. 82-2).

HBML's reliance on the spinoff of liabilities onto Millennium in 1988 for purposes of personal jurisdiction is irrelevant. It does not refute or negate evidence of HBML's earlier control of the SCM acquisition or its ownership of SCM while SCM allegedly contributed to the contamination of the Property.[5] For these reasons, I find that plaintiffs' successor liability theory meets the second factor of personal jurisdiction.

### 3.     Exercising Jurisdiction Over HBML Would be Reasonable

Once plaintiffs satisfy the first two factors of the specific personal jurisdiction test, the burden shifts to the defendant, HBML, to show why jurisdiction would not be reasonable. *Schwarzenegger*, 374 F.3d at 802. The Ninth Circuit examines seven factors to determine whether jurisdiction is reasonable: (i) "existence of an alternative forum;" (ii) "burden on the defendant;" (iii) "convenience and effectiveness of relief for the plaintiff;" (iv) "most efficient judicial resolution of the dispute;" (v) "conflict with sovereignty of the defendant's state;" (vi) "extent of

---

[4] Hempstead apparently left Hanson Industries to join Millennium as its Senior Vice President, Secretary, and General Counsel simultaneously. Hempstead Decl. ¶ 1.

[5] Lozick's opposition disputes the lack of jurisdictional discovery provided, particularly related to documents in Millennium's custody that it asserts HBML has control over and was obligated to produce. Lozick Oppo. at 14, 17-18. Plaintiffs have provided sufficient evidence of successor liability, for jurisdictional purposes, making these concerns perhaps less significant. If discovery disputes persist, Lozick should follow the procedures outlined in my Civil Standing Order for discovery disputes.

purposeful interjection;" and (vii) "the forum state's interest in the suit." *Brand v. Menlove Dodge*, 796 F.2d 1070, 1075 (9th Cir. 1986). HBML asserts that the second and sixth factors make jurisdiction unreasonable. Its arguments are unpersuasive.

HBML argues that it is overly burdensome to require it, a London-based corporation, to litigate in California. It highlights that three of four depositions have already taken place in London, relevant employees are outside the United States, those same relevant employees may not be able to participate given health issues, they would not be able to travel to California to testify in defense of HBML, and HBML's document repository is located outside the United States. But a similar burden would apply to plaintiffs and cross-claimants if they had to litigate in the United Kingdom. Moreover, as the Ninth Circuit stated in *Sinatra* in 1988, "modern advances in communications and transportation have significantly reduced the burden of litigating in another country." 854 F.2d 1191, 1199. HBML's witnesses may testify by video deposition if they are unable to travel. It would not be overly burdensome to hale HBML into federal court in California.

HBML also argues that any interjection it has made in California was not on purpose. It says that it has not operated any business in California, has no facilities in California, and has had no contacts of any kind—including subsidiaries—since 2005. Rogers Decl. ¶¶ 3-4. I disposed of this argument above and found that HBML purposefully directed its activities toward California when it acquired SCM, and that SCM's conduct on the Property could be imputed to HBML through a successor liability theory. *See Corp. Inv. Bus. Brokers v. Melcher*, 824 F.2d 786, 790 (9th Cir. 1987) ("Ninth Circuit cases give the purposeful interjectment factor no weight once it is shown that the defendant purposefully directed its activities to the forum state.").

I do not find that HBML's burden to litigate in this forum, nor its extent of purposeful interjection, weighs against the otherwise reasonable exercise of jurisdiction in this forum. Accordingly, plaintiffs have made a prima facie showing of personal jurisdiction.

## B.     Alter Ego Theory

Given my findings on personal jurisdiction, it is not necessary to address a second avenue for personal jurisdiction that relies on cross-claimants' theory, joined by plaintiffs, that HBML

16

(including Hanson PLC, Hanson Trust PLC, and Hanson Limited) and Hanson entities in the United States are alter egos. I will do so, however, as it provides an alternative reason to assert jurisdiction over HBML.

California recognizes a prima facie showing of an alter ego liability theory where two conditions are met: (i) "there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased;" and (ii) "adherence to the fiction of the separate existence of the corporation would…sanction a fraud or promote injustice." *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010).[6]

Many factors may suggest an alter ego relationship: (i) "commingling of funds and other assets," (ii) "identical equitable ownership in the two entities," (iii) "failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities," (iv) "use of the same office or business location; the employment of the same employees and/or attorney," (v) "identification of the directors and officers of the two entities in the responsible supervision and management," (vi) "sole ownership of all of the stock in a corporation by one individual or the members of a family," (vii) "failure to adequately capitalize a corporation," (viii) "failure to maintain arm's length relationships among related entities," (ix) "use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation," and (x) "manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another." *Associated Vendors, Inc. v. Oakland Meat Co., Inc.*, 26 Cal. Rptr. 806, 813–15 (1962) (internal citations omitted). Because no one factor governs the analysis, courts "should look at all the circumstances to determine whether the alter ego doctrine applies." *Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022, 1067 (N.D. Cal. 2007) (citing *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 539 (2000)).

---

[6] HBML and Swagelok/Whitney dispute as an initial matter whether Delaware or California law applies to the forthcoming analysis of an alter ego theory for purposes of personal jurisdiction. The Ninth Circuit has clarified that where "there is no applicable federal statute governing personal jurisdiction, the law of the state in which the district court sits applies." *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003). Thus, I analyze the issues under California law.

### 1.  There is a Unity of Interest and Ownership

#### a.  Acquisition Conduct

Swagelok discusses several pieces of evidence both before and after the acquisition of SCM to demonstrate a unity of interests between HBML and its subsidiaries.  To start, it is undisputed that HBML incorporated the twenty entities, HSCM-1 through HSCM-20, in anticipation of the takeover and that it organized these entities as subsidiaries of HM Anglo-American Ltd. ("HM Anglo"), another wholly owned subsidiary of HBML sharing its executive offices with HBML in London, England.  *See* Berle Decl., Ex. I (HBML 15566-67); Ex. A 49:4-20.

On August 21, 1985, a press release was sent from HBML stating that "Hanson Trust PLC (either directly or through one or more of its affiliates) intends to commence a tender offer for any and all outstanding shares of common stock of SCM Corporation."  Berle Decl. Ex. G (HBML 7468).  HBML notes that the letter began with "Sir Gordon White, Chairman of Hanson Trust PLC's North American interests, announced today…"  *Id*.  It also asserts that London Stock Exchange rules required HBML to inform its own shareholders and the market generally of the transaction.  *See* Notice of Foreign Law, LSE Listing Rules (Jan. 1999) §§ 10.1(a), 10.37 (requiring "an explanatory circular must be dispatched to the company's shareholders" for "a transaction by any subsidiary undertaking of the listed company.").  This does not make the initial representation that HBML was the entity "intend[ing] to commence a tender offer" any less significant.  Berle Decl. Ex. G (HBML 7468).

HBML issued several other press releases taking apparent credit for the SCM takeover as well.  *See* Berle Decl., Ex. S (announcing "SCM is now part of Hanson Trust," "Hanson Gains Control of SCM," "Hanson Extends SCM Offer," "Hanson to Purchase SCM shares," and "Hanson Wins SCM Appeal.").  HBML does not respond to the particular statements in the releases, except to repeat that they were sent by HBML's United States entities or by Sir Gordon White on behalf of North American interests.  *See* Reply to Swagelok Oppo. at 5 n.10.  The communications still tend to show that HBML shared a unity of interest with the subsidiary vehicles used to acquire SCM.

In addition, Swagelok and Lozick present the HBML directors meeting minutes from August 22, 1985, which I discussed above in analyzing the successor liability theory. The meeting minutes show that HBML considered the tender offer announcement "on behalf of the Company" to "facilitate the proposed cash tender offer" and that one director discussed "the background to the Company's interest in SCM Corporation." Doty Decl. Ex. L at 1. HBML argues that the board was required to approve the transaction by the London Stock Exchange because it was considered a material transaction by an indirect subsidiary. *See* Notice of Foreign Law, LSE Listing Rules (Jan. 1999) §§ 10.1(a), 10.37. However, as with the SEC filings, those obligations do not diminish the evidence of HBML's involvement and control over the effort to acquire and liquidate SCM.

Next, Swagelok contends that the August 26, 1985 tender offer was made by HBML through two wholly owned subsidiaries which it controlled, HSCM Industries, Inc. and Hanson Holdings Netherlands B.V. *See* Berle Decl., Ex. G (HBML 7462-63). Hanson Netherlands received the money for the acquisition from loans directly by HBML. *Id.* at Ex. E (HBML 25531). In the tender offer, HBML made clear that "as soon as practicable, Hanson Trust intends to seek to influence the management of the Company, to seek majority representation on the Company's Board of Directors and to seek to effect a business combination between the Company and Hanson Trust or an affiliate of Hanson Trust…" *Id.* at Ex. G (HBML 7450, 7469). HBML's response to this evidence is that the tender offer was made by HSCM Industries Inc. and Hanson Holdings Netherlands B.V. as indirect wholly owned subsidiaries of HBML. *Id.* (HBML 7448, 7450). The tender offer, press releases, and meeting minutes evidence suggest that HBML was the power behind the acquisition of SCM, which was accomplished through its control of the subsidiaries.

        **b.**       **Lawsuits Reflecting HBML Control Over the SCM Acquisition**

Swagelok also asserts that litigation filed by HBML concerning SCM shows its control over the acquisition. In August 1985, HBML filed two lawsuits against SCM for attempting to utilize the New York Securities Takeover Disclosure Act to prevent the takeover. *See* Berle Decl., Ex. J; Ex. K; Ex. V. Swagelok argues that HBML used the court system to its benefit and in the

United States District Court
Northern District of California

1    process claimed that it was the real party in interest.  This is additional evidence of HBML's

2    control over the acquisition, according to Swagelok.

3         HBML disagrees.  It contends that its role in the litigation was "merely incidental to its

4    status as the beneficial owner" and that the legal fees were paid by Hanson Industries and

5    managed by George Hempstead, not HBML counsel.  *See* Hempstead Dep. Tr. 81:19-81:23.  As

6    noted earlier, it is not clear that the fact of Hempstead's management absolves HBML of control:

7    from 1982 to 1996, which includes the time of the lawsuits, he signed the 1986 merger agreement

8    with SCM on behalf of HBML and Hanson Netherlands.  *See* Hamidi Decl., Ex. C (HBML

9    24756).  Hempstead additionally served as a Director of HSCM Industries and as Vice President

10   of all the fan companies when he signed the consent to liquidate HSCM Industries and SCM in

11   1986.  *See* Berle Decl., Ex. P-Q.  HBML's participation in the litigation to acquire SCM tends to

12   support a unity of interest with its subsidiaries, regardless of Hempstead's official role.

13                    **c.    Undercapitalizing HBML-20**

14        Swagelok next argues that the HBML-20 entity, formed to house the Marchant liability,

15   was not adequately capitalized because HBML did not conduct any valuation of the assets and

16   liabilities deposited into HSCM-20.  The Ninth Circuit has found that inadequate capitalization

17   alone can serve as a basis for alter ego liability against a parent corporation.  *Slottow v. Am. Cas.*

18   *Co. of Reading, Pa.*, 10 F.3d 1355, 1360 (9th Cir. 1993) ("[I]nadequate capitalization of a

19   subsidiary may alone be a basis for holding the parent corporation liable for acts of the

20   subsidiary.").

21        During liquidation, SCM's operating businesses were distributed to the fan companies

22   HSCM-1 through HSCM-19.  *See* Berle Decl., Ex. N, Hempstead Decl. ¶¶ 11-12.  SCM was left

23   with "residual assets and contingent/legacy liabilities associated with [SCM's] former defunct

24   businesses" that were merged into HSCM-20.  *Id.* ¶ 11; *see also* Ex. X (Memorandum of

25   Distribution in Liquidation).  None of the businesses distributed into HSCM-20 were operating

26   businesses.  *Id.*, Ex. N; Ex. B at 228:17-230:11, 238:2-10.

27        HBML contends it did value the HSCM-20 assets and liabilities in a balance sheet.  *See*

28   Berle Decl. Ex. AA at HBML0026899 (showing assets equal to liabilities with Kalamazoo

Reserves at $0). The valuation was performed by Hellings and other HBML employees. *See* Reck Decl. Ex. E (Hempstead Dep. Tr.) at 418:13-15. Hempstead testified generally that he believed HSCM-20 was properly capitalized in 1986 because they "were not aware of any significant pending liabilities or contingent liabilities at the time." *Id*. at 401:23-402:18. But when he was asked if he knew the residual assets and contingent liabilities were valued at $150 million (the amount of debt allocated to HSCM-20) Hempstead stated he did not know. *Id*. at 299:2-9. Dransfield also testified, again as HBML's 30(b)(6) witness, that he was not aware that the assets or liabilities deposited into HSCM-20 were valued to determine adequate capitalization. Berle Decl., Ex. C at 219:12-221:9, 281:16-292:21.

To show that HSCM-20 was undercapitalized, Swagelok focuses on Marchant's liabilities and liabilities from the Kalamazoo Mill, an entity distributed to HSCM-20 that was not valued in the acquisition. It had been part of the former Allied Paper Division of SCM. The Kalamazoo Mill, also referred to as the Kalamazoo Site by the parties, was placed on the Environmental Protection Agency National Priorities List in 1989 as one of the most polluted areas in the country. *See* Swagelok RJN Ex. UU at 1-2 (discussing the Kalamazoo River Cleanup in 2002 and Allied Paper's operations there since 1925) (Dkt. No. 113-5); Berle Decl., Ex. BB (letter from Allied Paper to the Michigan Department of Natural Resources regarding PCB levels tested in Kalamazoo River). The SCM acquisition occurred in 1986, three years prior.

Swagelok suggests that the Allied Paper Division of SCM would have known, or had reason to know, about the contamination at the Kalamazoo Site in 1986 during the time of the merger. Prior to the SCM acquisition in 1986, HBML also acknowledged in a Form 20-F that SCM was in negotiations with "pollution control agencies" on steps to be taken for compliance with applicable regulations. Berle Decl., Ex. M (HBML 8514); Ex. B, Hempstead Dep. Tr. at 235:10-237:5.

In its reply, HBML re-asserts that liabilities like the Marchant and Kalamazoo Site were not part of the valuation because they were unknown at the time. This is consistent with Dransfield's 30(b)(6) testimony on September 14, 2018, explaining why the entity was not valued. *See* Berle Decl., Ex. C at 220:11-12 ("…they wouldn't put a value to it. And you can't put a value

1  to things that are unknown.").  But it leaves unrebutted the likelihood that SCM, and HBML

2  through the acquisition process, would have known about the significant pollution at the

3  Kalamazoo Site.

4        HBML also argues as a legal matter that it did not have to include an assessment of the

5  Marchant or Kalamazoo Site liabilities for the capitalization of HSCM-20 when there was only a

6  claim for liability rather than a judgment.  *See In re Packaged Seafood Prods. Antitrust Litig.*,

7  2018 U.S. Dist. LEXIS 151394, at *102 (S.D. Cal. 2018) (finding the relevant inquiry for

8  capitalization was "whether [defendant's capital was sufficient to operate its normal business.");

9  *see also Sheppard v. River Valley Fitness One, L.P.*, No. CIV.00-111-M, 2002 WL 197976, at *12

10  (D.N.H. Jan. 24, 2002) ("the proper measure of the sufficiency of a corporate entity's

11  capitalization is not whether it can pay a potential judgment in a lawsuit but, rather, whether it had

12  sufficient assets to meet the obligations incurred by conducting ordinary business...").  However,

13  California law still concerns itself with "prospective liabilities" and inequitable "risk of loss" to

14  shareholders. *Remme v. Herzog*, 222 Cal. App. 2d 863, 868 (Ct. App. 1963) ("shareholders should

15  in good faith put at the risk of the business [unencumbered] capital reasonably adequate for its

16  prospective liabilities.  If the capital is illusory or trifling compared with the business to be done

17  and the risks of loss, this is a ground for denying the separate entity privilege.").  If the liabilities

18  from Marchant, the Kalamazoo Site, and other entities were known but not yet incurred, adequate

19  capitalization requirements suggest at least that a valuation occur to consider those risks and

20  prospective liabilities.

21        HBML argues that because HBML-20 had no active operations it required no assets, and

22  that in any event it had assets such as a lease of a building at 299 Park Avenue and others.  *See*

23  Reck Decl. Ex. K (HBML 627-29) (listing assets in HSCM-20).  But Swagelok disputes

24  Hempstead's account that the proceeds of selling two properties were received by HSCM-20 and

25  that, if they were, they would be enough to capitalize it.  *See* Berle Decl., Ex. B at 229:15-231:23.

26  On this record it appears that HSCM-20 did not have its assets or liabilities valued during the

27  SCM transactions, even while HBML had reason to know the fan company faced prospective

28  liabilities from its SCM distributions.  At a minimum, there remains a question whether HSCM-20

22

was undercapitalized.

### d. Sharing the Same Officers and Directors in Subsidiaries

Finally, Swagelok discusses HBML's use of the same officers for the restructuring and liquidation of SCM as another factor weighing in favor of alter ego liability. *See Slottow*, 10 F.3d at 1360 (finding a unity of interests where, in part, a parent company owned nearly all shares of a subsidiary, and all the subsidiary's officers were officers of the parent company). In *Slottow*, the Ninth Circuit found relevant that the companies used the same business location, same lawyers, failed to make arms-length transactions, and the parent represented it would cover the subsidiary's debts. *Id*. In this case, Swagelok contends Hempstead served as an officer or director on both sides of several transactions, including May 7, 1986 liquidations of SCM and HSCM Industries Inc., memorandums of distribution in liquidation between SCM and HSCM-20, a 1988 merger agreement between SCM and HM Holdings Inc., and a 1986 subscription agreement. *See* Berle Decl., Exs. P-R, X, CC, PP.

As HBML asserts, this is insufficient to weigh in favor of a unity of interest or ownership. Swagelok does not identify any directors of HBML in 1986 who were concurrently directors of HSCM-20. *See* Berle Decl., Ex. NN at 710 (HBML 10818). According to HBML, of all twenty-six directors, associate directors, and officers of HBML and HSCM-20, there was only one in common between the two companies. *See* Dransfield Dep. Tr. at 5-9, 203:2-204:3, 204:21-205:20. That said, sufficient evidence supports a finding that a unity of interest and ownership exists.

### 2. Injustice Will Result if the Corporate Veil is Not Pierced

The second requirement for alter ego liability is that there must be "an inequitable result if the acts in question are treated as those of the corporation alone." *Wehlage v. EmpRes Healthcare, Inc.*, 791 F. Supp. 2d 774, 782 (N.D. Cal. 2011) (internal citation omitted). Plaintiffs are required to "plead facts sufficient to demonstrate that conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form." *Prod. & Ventures Int'l v. Axus Stationary (Shanghai) Ltd.*, No. 16-CV-00669-YGR, 2017 WL 201703, at *8 (N.D. Cal. Jan. 18, 2017) (internal quotation marks and citation omitted).

23

Swagelok repeats its earlier assertions that HBML intentionally targeted SCM for a hostile takeover and liquidation, was directing the shell game involving Marchant's environmental liability, and acquired a company that retained the alleged environmental liabilities while operating on the Property. *See* Berle Decl., Ex. N ¶¶ 11-12. Swagelok's allegations are consistent with plaintiffs' in terms of demonstrating HBML's control over the tender offer, acquisition, liquidation of SCM, and the post-acquisition restructuring of its liabilities. Because I found that plaintiffs stated a claim for successor liability against HBML, similar considerations would lead to an inequitable result if the corporate veil were not pierced. Alter ego liability is a second, alternative reason to find jurisdiction over HBML.

## II.     REQUESTS FOR JUDICIAL NOTICE AND EVIDENTIARY DISPUTES

HBML, plaintiffs, and Swagelok filed requests for judicial notice. HBML then filed separate oppositions to plaintiffs' and Swagelok's requests. Additionally, Swagelok filed evidentiary objections to HBML's Hempstead declaration in support of its motion, HBML moved to exclude Dr. Bookspan's testimony in its reply, and objects to specific paragraphs and exhibits in the Berle, Doty, and Hamidi declarations. My findings on these issues are explained below.

### A.     Requests for Judicial Notice

#### 1.     HBML Request for Judicial Notice

HBML requests judicial notice of documents in support of its motion, including a certificate of merger of Millennium Holdings Inc. to MHI 2, LLC (Exhibit A), a Form 8-K filed by Lyondell Chemical Co. in 2004 (Exhibit B), excerpts from Lyondell's Form 10-K filed in 2007 (Exhibit C), excerpts from Millennium's voluntary petitions for Chapter 11 bankruptcy (Exhibit D), an Order in the 2007 case *Walter Van Doren v. Coe Press Equipment Corp.,* Case No. 2:06-cv-02835-LDD (Exhibit E), and excerpts from the Phase I site assessment the City prepared for Powell Street properties (Exhibit F). *See* HBML RJN at 1-2.

Courts may judicially notice documents in the public record to show the document was filed or that a proceeding occurred. *See United Tactical Sys., LLC v. Real Action Paintball, Inc.,* 2017 WL 713135, at *6 (N.D. Cal. Feb. 23, 2017) (taking judicial notice of documents that were filed with the secretary of state). The ability to take judicial notice of court filings extends to

24

documents filed in federal bankruptcy court actions as well. *See Richard & Sheila J. McKnight 2000 Family Tr. v. Barkett*, 675 F. App'x 715, 716 (9th Cir. 2017) (taking judicial notice of federal bankruptcy and district court documents). Other court decisions are also susceptible to judicial notice, as are records that are generally publicly available. *See, e.g., Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of 'matters of public record'").

Exhibits A through F are appropriate for judicial notice because they are publicly available filed documents, and their existence cannot be reasonably questioned. Accordingly, I GRANT HBML's request for judicial notice of Exhibits A through F.

### 2. Plaintiffs Request for Judicial Notice

Plaintiffs request judicial notice of documents like a transcript of Hellings's deposition in a 1985 case between HBML and SCM in the United States District Court for the Southern District of California (Exhibit A) and a copy of HBML's Memorandum of Contentions of Fact and Law filed in another case in the United States District Court for the Central District of California (Exhibit B). *See* Plaintiff RJN at 1. Judicial notice is possible for records filed in another case. *See First Mercury Ins. Co. v. Kinsale Ins. Co.*, 2018 WL 3995836 at n.2. (N.D. Cal. Aug. 21, 2018) (judicially noticing deposition transcripts and filed documents in the case). It is appropriate to notice that the deposition occurred and was filed in another case, but I do not adopt Hellings's underlying testimony as undisputed fact. Because I did not need to rely on Exhibit B in rendering a decision, I decline to take judicial notice of it. I GRANT plaintiffs' request to take judicial notice of Exhibit A and DENY AS MOOT judicial notice of Exhibit B.

### 3. Swagelok Request for Judicial Notice

Swagelok/Whitney requests judicial notice of Exhibits SS to EEE in its compendium of evidence in support of its opposition to the motion to dismiss. Swagelok RJN at 2, 6. Of these requests for judicial notice, I relied on Exhibits TT and UU in this Order, which are a beneficial ownership disclosure statute in effect in 1985 when HBML filed a Schedule 13D and an EPA 2002 Fact Sheet regarding the Kalamazoo River Cleanup and the EPA 1993 Fact Sheet regarding the proposed addition of sites to the National Priorities List, respectively. The existence of these

documents are judicially noticeable as publicly available documents whose existence cannot reasonably be questioned.  Therefore, I GRANT the request to judicially notice Exhibits TT and UU, and the remaining exhibits I decline to judicially notice at this time are DENIED AS MOOT.

### B.    Evidentiary Objections

#### 1.    Swagelok and Lozick Evidentiary Objections

Swagelok brings nine evidentiary objections to portions of HBML's Hempstead declaration.  *See* Evidentiary Objections (Dkt. No. 113-6).  All of Swagelok's objections are based on a lack of personal knowledge or lack of foundation under Federal Rule of Evidence 602, and inadmissible hearsay grounds under Rules 801(c) and 802.  Some objections are lodged on relevance grounds under Rule 401.  Lozick also challenges the relevance of two prior lawsuits involving HBML.  *See* Lozick Oppo. at 18-19.  Because I find there is personal jurisdiction in favor of plaintiffs, Swagelok, and Lozick, these various objections are moot at this stage.

#### 2.    HBML Evidentiary Objections

HBML seeks rulings on evidentiary objections that it leveled in its reply to plaintiffs and Swagelok's oppositions, as well as at the hearing on their motion to dismiss.  HBML first seeks to exclude the testimony of plaintiffs' historian, Dr. Bookspan.  *See* Reply to Emeryville at 13-15 (Dkt. No. 126).  HBML argues that it is inadmissible under Rule 702, which allows for testimony based on sufficient facts, the product of reliable methods, and which applies those reliable methods to the facts.  Specifically, HBML contends that Dr. Bookspan is unqualified to offer her opinion that HBML and its United States counterpart Hanson Industries were indistinguishable entities in the way they were financed and managed.  *See* Bookspan Decl. ¶ 40.  It also argues that her entire testimony on the content of the materials referenced in her declaration is not helpful because of her lack of experience in corporate legal structures or finance; and that her testimony on HBML's California contacts should be excluded as irrelevant.  *Id*. ¶¶ 31-39.

I do not agree that Bookspan lacks the expertise to offer an opinion on HBML's activities from the 1980s to 2000 that are relevant to the alleged environmental contamination.  Bookspan Decl. ¶ 2 ("I have 34 years of experience in conducting corporate history research for clients involved in environmental cleanup liability issues as well as for internal corporate purposes.").

Her testimony is relevant and her interpretation of the contents of historical materials referenced in her declaration would be helpful to a factfinder. Therefore, HBML's objection to Bookspan's declaration is OVERRULED.

Next, HBML objects to exhibits attached to the Doty declaration, portions of the Hamidi declaration, and the entire Hellings's deposition transcript. Starting with the Hamidi declaration, HBML objects to paragraphs 8, 9, and 11 on hearsay grounds and the best evidence rule with respect to how it summarizes Hempstead's testimony. I do not rely on Hamidi's declaration for its statements on Hempstead's testimony, making this objection moot.

HBML then objects to Hellings's deposition on grounds that it is hearsay, an unsigned copy of the transcript, and because plaintiffs apparently failed to produce it in advance of the Rule 30(b)(6) deposition of HBML. As I discussed above, the Hellings deposition transcript was found suitable for judicial notice as a public record filed in another case whose existence cannot reasonably be questioned. The objection is OVERRULED.

As for the Doty declaration, HBML's objections are brought on the grounds of a lack of authentication and lack of personal knowledge for both Exhibit I, an ad from the Los Angeles Times, and Exhibit N, a Tillotson Director's Report. HBML raises these technical objections without giving cause for concern about authenticity, even though each was raised in depositions taken in jurisdictional discovery. At this stage, it is clear from the exhibits themselves that they are what they purport to be. *See* Fed. R. Evid. 901(b)(4) (a document's "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" is evidence enough to satisfy the authentication requirement). There is no indication from HBML or otherwise that plaintiffs would be unable to authenticate the exhibits in trial. *See Faulks v. Wells Fargo & Co.*, 231 F.Supp.3d 387, 397-98 (N.D. Cal. 2017) (overruling objections to admissibility because "it is possible that the facts underlying [the exhibit] could be admissible at trial."). These objections are OVERRULED.

Finally, with respect to HBML's reply to Swagelok's opposition, HBML objects to the Berle declaration and several of its attached exhibits. *See* Reply to Swagelok Opposition at (Dkt. No. 127). HBML objects to paragraph 23 to the extent it summarizes Lyondell bankruptcy

documents. I do not rely on Berle's summary of the Lyondell bankruptcy, so this objection is moot. HBML also objects to Berle declaration paragraphs 15 and 32, but since I do not rely on these paragraphs in the Order these objections are moot as well.

HBML then objects to Exhibits L and BB for lack of authentication and lack of personal knowledge to authenticate the documents. In addition, HBML objects to Exhibit BB for lack of foundation. Exhibit L, a copy of HBML meeting minutes, was produced by HBML in jurisdictional discovery. *See* Doty Decl. ¶ 16, Ex. L (explaining that the meeting minutes were produced by Dransfield in his capacity as HBML's Rule 30(b)(6) witness). Exhibit BB, a 1976 letter from Allied Paper to the Department of Natural Resources, was introduced by Berle citing the ancient document exception to hearsay.

Like cases at summary judgment, here the authenticity and lack of personal knowledge objections are not well-taken because there is no suggestion the evidence would not be admissible at trial. *See Faulks*, 231 F.Supp.3d at 397-98. Moreover, courts tend not to exclude evidence before trial based on objections to form—such as a lacks foundation challenge—as opposed to whether its contents are admissible. *Ochoa v. Santa Clara Cty. Office of Educ.*, No. 16-CV-03283-HRL, 2017 WL 2423183, at *5 (N.D. Cal. June 5, 2017) ("courts at the summary judgment stage focus not on the form of the evidence submitted by the parties but on the admissibility of its contents."). The objections to Exhibit L and BB are OVERRULED.

### CONCLUSION

For the reasons stated above, HBML's motion to dismiss for lack of jurisdiction is DENIED. It shall answer the SAC within fourteen days of the date below.

**IT IS SO ORDERED.**

Dated: January 30, 2019

William H. Orrick
United States District Judge