**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE SUCCESSOR AGENCY TO THE FORMER EMERYVILLE REDEVELOPMENT AGENCY and THE CITY OF EMERYVILLE,<br><br>　　　　　Plaintiffs,<br><br>　vs.<br><br>SWAGELOK COMPANY, an Ohio corporation; WHITNEY RESEARCH TOOL CO., a dissolved California corporation; HANSON BUILDING MATERIALS LIMITED, a British Corporation; and CATHERINE LENNON LOZICK, an individual residing in Ohio,<br><br>　　　　　Defendants.<br><br>*AND RELATED COUNTERCLAIMS AND CROSSCLAIMS* | Case No. 3:17-cv-00308-WHO<br><br>**ORDER GRANTING THE MOTION FOR DETERMINATION OF GOOD FAITH SETTLEMENT AND CONTRIBUTION PROTECTION** |

**ORDER**

The Court has considered Plaintiffs' Motion for Determination of Good Faith Settlement, the declarations and memoranda of points and authorities submitted in support of the motion, the "partial" opposition submitted by non-settling defendant Hanson Building Materials Limited ("HBML"), the arguments of counsel during a videoconference hearing on September 21, 2022, and the supplemental, post-hearing memoranda submitted by Plaintiffs in response to the Court's post-hearing Minute Order, Dkt. 224. The Court has also considered non-settling defendant HBML's opposition/response to the settling parties' supplemental brief, Dkt. 226, and the settling parties' reply to the opposition, Dkt. 227. Based on the Court's consideration of the foregoing, the Court now FINDS, DECLARES, AND ADJUDGES AS FOLLOWS:

1. The "Settling Parties" are Plaintiffs, on the one hand, and the "WSL Parties" on the other. The WSL Parties are defendants Whitney Research Tool Co. ("WRTC"), Swagelok Company ("Swagelok"), and Catherine Lennon Lozick ("Lozick"). The WSL Parties are affiliated with one another, covered by the same insurance policies, and at least for purposes of the pending motion have acted in concert with each other.

2. Plaintiffs' operative (second amended) complaint is summarized in this Court's decision reported at 364 F. Supp. 3d 1061 (Jan. 30, 2019). In brief, Plaintiffs seek to recover environmental investigation and cleanup costs, related litigation expenses and prejudgment interest, as well as other relief pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, ("CERCLA"), the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.,* ("RCRC"), two CERCLA-like California statutes (the "Polanco" and "Gatto" Acts, which are codified as Sections 33459-33459.8 and 25403-25403.8, respectively, of the California Health and Safety Code), and certain common law theories. The cleanup costs at issue relate to real property located in Emeryville, California, which is referred to by the parties as the "FMW Site," as well as two locations generally west of and downgradient from the FMW Site (called Site A and Site B by the parties). FMW is the parties' shorthand for "Former Marchant/Whitney," with "Marchant" and "Whitney" (aka WRTC) being the parties' shorthand for two separate and distinct historic industrial operations that are alleged to be responsible for the soil, soil vapor, and

groundwater contamination in question. Dkt. 214-1 at 4:5-7 (noting that no expert engaged by any defendant has opined that there is a substantial non-Marchant, non-WRTC source for the hazardous substances found on site – a point HBML does not seem to dispute based on its "partial" opposition).

3. Since the operative complaint was filed in 2017, the parties have engaged in motion practice, *see, e.g.*, HBML's motion to dismiss for lack of person jurisdiction, 364 F. Supp. 3d 1061; extensive written and document discovery (i.e., multiple sets of interrogatories and production of over 1 million pages of documentary information); more than 40 percipient witness depositions; disclosure of more than a dozen expert witness reports and rebuttal reports; multiple full-day mediation sessions; and follow-up settlement negotiations. *See* Dkt. 214-2 ¶¶ 45-48; Dkt. 214-1 at 11:11-23.

4. In May of this year, shortly after completing their fourth full day of mediation, the "Settling Parties" reached an agreement that provides for two forms of consideration to Plaintiffs: a cash payment of $33 million by the WSL Parties and an assignment by the WSL Parties of their contribution rights against HBML. The assigned contribution rights arise primarily under CERCLA section 113, 42 U.S.C. § 9613(f)(1). The Court hereafter refers to the Settling Parties' agreement as the "Emeryville-WSL Settlement."

5. As explained in declarations submitted with the pending motion, the Emeryville-WSL Settlement has three conditions precedent: approval by a county-level agency that provides oversight to plaintiff "Successor Agency"; approval by the State of California's Department of Finance, which also exercises supervisory authority over Plaintiff Successor Agency; and approval by this Court. Dkt. 214-2 ¶ 50. Plaintiff Successor Agency obtained the necessary county- and state-level approvals in July and August. Dkt. 214-2 ¶ 50 and related exhibits. This Court's approval as specified in Section III of the Emeryville-WSL Settlement, Dkt. 214-3 at 16-17/434, is therefore the lone remaining condition precedent that must be satisfied before the WSL Parties make their $33 million payment. Under the terms of the settlement, those funds will be held in a segregated account and dedicated to cleanup work called for in an Imminent and Substantial Endangerment Order issued by the State of California in 2020. Dkt. 214-3 at 10-11/434 (Sections II.B and II.C of the Emeryville-WSL Settlement).

6. Consistent with a "cooperation" provision in Section VII.C of the Emeryville-WSL Settlement, Dkt. 214-3 at 23-25/434, Plaintiff Successor Agency has taken the laboring oars on the pending motion. Plaintiffs supported the pending motion with an opening memorandum of points and authorities setting out the statutory and case law background for their claims, and with supporting declarations from counsel for the Settling Parties. *See* Dkt. 214-1 (memorandum), 214-2 (declaration by Plaintiffs' counsel), 214-3 (exhibits to the declaration), and 214-4 (declaration by counsel for Lozick and effectively on behalf of all the WSL Parties). The motion relies on CERCLA's contribution protection mechanism, Section 113(f)(2), 42 U.S.C. § 9613(f)(2), California's good faith settlement determination statute, and the case law applying those mechanisms. The key provisions of California's statute are codified as California Code of Civil Procedure Sections 877 and 877.6.

7. HBML filed a "partial" opposition. Dkt. 220. HBML's "partial" opposition does not challenge the adequacy of the WSL Parties' $33 million payment, nor does HBML dispute the overall good faith of the Emeryville-WSL Settlement. Further, Plaintiffs point to a report submitted by one of HBML's experts, Mr. Vandeven, to support the conclusion that the WSL Parties have agreed to pay more than their fair share of the cleanup costs. Dkt. 222 at 10:26-11:6. Plaintiffs speculate that the WSL Parties are willing to pay that amount in order to avoid the prospect of a much worse outcome at trial—i.e., strict, retroactive, and potentially joint and several liability for more than $100 million of cleanup costs, litigation expenses, and prejudgment interest. Dkt. 214-4 ¶ 30 (declaration by WSL counsel Embleton); *see also* Dkt. 214-1 at 13-17 (Plaintiffs' discussion of the CERCLA/Polanco/Gatto liability framework); *id.* at 21:1-12 (discussion of the difficult litigation prospects faced by defendants in actions like this one); *id.* at 15:21-16:2 (discussing CERCLA's "carrot and stick" incentive structure, which authorizes the imposition of disproportionate liability).

8. HBML's opposition focuses on a narrow issue—the credit it will receive going forward on the claims alleged in Plaintiffs' operative complaint and more specifically the amount of credit for, i.e., the valuation of, the WSL Parties' contribution claims that HBML will also face at trial. Dkt. 220. According to the Settling Parties, the assigned contribution claims have a maximum theoretical upside in excess of $20 million, more than $7 million of which could, theoretically, flow to Plaintiff

Successor Agency (with the balance flowing to the WSL Parties). HBML's opposition thus requested a total settlement credit in excess of $40 million ($33 million for the WSL Parties' cash payment and more than $7 million for the assigned contribution claims).

9. Plaintiffs filed a reply and supporting supplemental declarations from lead counsel for the Settling Parties (Dkt. 222, Dkt. 222-1, and Dkt. 222-2) addressing the settlement credit issue. Consistent with the "cooperation" provision in Section VII.C of the Emeryville-WSL Settlement, the Successor Agency again took the laboring oars. Dkt. 222-1 ¶¶ 2-4 (declaration on Plaintiffs' behalf); Dkt. 222-2 (declaration on the WSL Parties' behalf). In sum, the Settling Parties' reply papers argued for a "nominal" valuation for the assigned claims. Dkt. 222 (reply memorandum); Dkt. 222-1 (supplemental declaration by Plaintiffs' counsel); Dkt. 222-2 (confirmatory supplemental declaration by Lozick's counsel effectively on behalf of all the WSL Parties).

10. The Court heard argument by videoconference on September 21, 2022. After the hearing, the Court issued a Minute Order indicating that the settlement appeared to be in good faith. Dkt. 224. The Court's Minute Order identified the controlling case authority supporting its tentative assessment. *See United States v. Montrose Chem. Corp*, 50 F.3d 741, 747-48 (9th Cir. 1995) (summarizing the applicable framework for approving CERCLA settlements and requiring the settling parties to provide the trial court with sufficient information that it could independently assess whether the settlement is fair, reasonable and consistent with CERCLA's purposes); *Abbott Ford, Inc. v. Superior Ct.*, 43 Cal. 3d 858, 879-80 (1987) (applying California's *Tech-Bilt* good faith settlement approval framework to a sliding scale settlement agreement and generally requiring settling parties to submit a joint valuation for any contingent consideration). The *Tech-Bilt* "ballpark of reasonableness" standard referred to in *Abbott Ford* was articulated in the earlier decision, *Tech-Bilt, Inc. v. Woodward-Clyde & Associates*, 38 Cal. 3d 488, 499-500 (1985). The Court's Minute Order directed the Settling Parties to "agree to a non-nominal value for the assigned contribution claims" and to "clearly explain how the proposed valuation was calculated, including the factors they considered." Dkt. 224.

11. Plaintiffs thereafter submitted a Supplemental, Post-Hearing Memorandum In Support Of Motion For Determination Of Good Faith Settlement, in which the Settling Parties presented a joint valuation of the WSL Parties' contribution claims against HBML. Dkt. 225.

12. The Settling Parties value the assigned contribution claims at $103,428, and the Court agrees that sum is not "nominal." The Settling Parties' valuation reflects five primary considerations. First, per the express terms of the settlement agreement (Sections II.D.2 and II.D.3), the assigned claims have value only if they are tried to judgment, and any such judgment is sustained on appeal and collected upon. Dkt. 214-3 at 13-15/434.[1]

13. HBML's initial opposition ignored Sections II.D.2 and II.D.3 and thus fails to comply with one of the fundamental tenants of contract interpretation. *See, e.g.*, Cal. Civ. Code § 1641 (requiring the "whole" of a contract to be considered, "each clause helping to interpret the other[s]"). In addition, both HBML's initial opposition and its renewed opposition filed in response to the supplemental briefs erroneously characterize Section II.A of the agreement as establishing an agreed up $7 million valuation of the assigned claims. *See* Dkt. 226 at 1, 4. HBML's reading of Section II.A is not supported by the text of that section, nor by reading that provision in the context of the rest of the agreement. When read in context, Section II.A indicates that the assigned claims could, theoretically, lead to a recovery in that amount by the assignees. Theoretical maximums do not, however, establish the value of contingent provisions in a settlement contract. *See, e.g.*, *Abbott Ford*, 43 Cal. 3d at 878-79 (noting that value "is not equal to the maximum amount that the guarantor may possibly be required to pay").

14. The second consideration relied on by the Settling Parties flows from the trial, final judgment, and successful appeal requirements set forth in Sections II.D.2 and II.D.3 of the Emeryville-WSL Settlement. None of those events is a certainty, and the Settling Parties' joint valuation accordingly includes an assessment of the likelihood of those events. As substantiation for the likelihood of those events, the Settling Parties have directed the Court to academic literature analyzing data from the administrative offices of the federal court system and a practitioners' guide to

---

[1] The assigned claim's lack of value for settlement purposes is separately addressed and also supported by substantial evidence. Dkt. 222-1 ¶ 7; Dkt. 225 at 3 n.2.

appeals in the Ninth Circuit. https://judicature.duke.edu/articles/going-going-but-not-quite-gone-trials-continue-to-decline-in-federal-and-state-courts-does-it-matter/#:~:text=Today%2C%20approximately%201%20percent%20of,disposition%20rate%20is%20even%20lower (approximately 1 percent of federal cases go to trial) and https://cdn.ca9.uscourts.gov/datastore/uploads/guides/AppellatePracticeGuide.pdf (approximately 10 percent chance of reversal).  Though HBML makes reasonable arguments to the contrary, the Court accepts these sources as at least good faith bases on which the Settling Parties could reasonably rely during their negotiations over a joint valuation.

15.     As a third consideration supporting their joint valuation, the Settling Parties point to the declarations of experienced counsel, as well the related memoranda of points and authorities, which distill for the Court the available, pertinent documentary evidence as well as the anticipated pertinent percipient and expert testimony.  As the Settling Parties note, that evidence could support a range of outcomes, including outcomes in which the assigned claims have a negative value (if costs are incurred to litigate them but no recovery is obtained on them).  The range of outcomes, and the potential for the claims to prove valueless, is acknowledged in Section II.D.4 of the Emeryville-WSL Settlement.  Dkt. 214-3 at 15:434.  In light of the range of outcomes discussed in Section II.D.4, and inasmuch as HBML vigorously contends that it has no liability whatsoever (as noted in Section II.D.4(g)(i) of the Emeryville-WSL Settlement), HBML's primary contention—that the settlement agreement itself values the assigned claims in excess of $7 million—lacks merit.  HBML's position is equally unavailing by virtue of its own expert, Vandeven, whose report indicates a maximum theoretical value of approximately $3.4 million for the assigned claims.  Dkt. 222 at 10:27-11:6; *id.* n.5.

16.     The Settling Parties' distillation of the pertinent evidence indicates that depending primarily on the evidentiary weight ascribed to (a) the deposition testimony of WRTC's two most knowledgeable former employees (Mr. Sandlin and Mr. Prescott), who provide somewhat conflicting testimony regarding the period during which WRTC may have used the chemical that seems to be driving the cleanup process (a cleaning solvent commonly known as TCE); and (b) competing

analyses presented in expert witness reports exchanged earlier this year, the WSL Parties' share of the cleanup costs could be less than 1 percent, approximately 34 percent (according to HBML's expert, Mr. Vandeven), as much as 42 percent (using a "Preliminary Nonbinding Allocation of Responsibility" prepared by the state regulatory agency supervising the cleanup work), or anywhere in that span. The Settling Parties' joint valuation ultimately rests on a "split the baby" compromise between a 15 percent share proposed by Plaintiffs and tied to the Sandlin deposition testimony and a 9 percent share proposed by the WSL Parties and tied to the Prescott deposition testimony. Dkt. 225. For purposes of satisfying *Abbott Ford*'s joint valuation requirement, the Court accepts the Settling Parties' 12 percent allocation.

17. The fourth consideration relied on by the Settling Parties' joint valuation is the Settling Parties' negotiating process. The Settling Parties have explained to the Court's satisfaction that their 12 percent, split-the-baby resolution reflects the endpoint of nearly two years of mediator-supervised and "at times contentious" settlement negotiations. Those negotiations are summarized in declarations submitted by experienced, able counsel. *See, e.g.*, Dkt. 222-1; Dkt. 222-2. The negotiations resumed in response to the Court's Minute Order, Dkt. 224, and ultimately produced the 12 percent share incorporated into the Settling Parties' joint valuation. Dkt. 225. The record concerning the Settling Parties' negotiations is detailed and more than sufficient to fully dispose of HBML's contention that the valuation of the assigned claims must be the product of adverse negotiations. In this regard, the Court also notes that HBML makes no claim of, and has proffered no evidence of, any fraud, collusion, or tortious conduct of the kind referred to in the final factor of the *Tech-Bilt* standard.

18. The fifth and final consideration supporting the Settling Parties' joint valuation apparently benefits non-settling parties. The Settling Parties' joint valuation makes no deduction for litigation expenses associated with trying the assigned claims against HBML, defending any favorable judgment on those claims in the Ninth Circuit, or collecting on any final judgment from a foreign-domiciled corporation that has demonstrated a considerable willingness to litigate vigorously even where the grounds for doing so are doubtful. *Cf.* 364 F. Supp. 3d 1061 (HBML's claim of insufficient jurisdictional contacts despite extensive documentary evidence of purposeful contacts with California

and specifically relating to the transactions that give rise to Plaintiffs' theories of successor liability). Plaintiffs' forbearance on a reduction to account for litigation costs, Dkt. 225 at 3-4, helps to satisfy the Court that HBML has not established any lack of "fair play" under CERCLA nor any lack of good faith under California law as those concepts are discussed below.

19. In sum, the Settling Parties have provided an appropriate joint valuation consistent with the requirements of *Abbott Ford*. With that agreed-upon valuation of the assigned claims, $103,428, the Emeryville-WSL Settlement totals approximately $33.1 million. That represents an approximately 38 percent share of the total incurred and projected cleanup-related costs, a share that HBML concedes is adequate and in good faith. Accordingly, the *pro tanto* settlement credit going forward will be $33.1 million, provided the Emeryville-WSL Settlement otherwise meets the applicable federal and state standards discussed below.

20. Under CERCLA, this Court must determine whether the Emeryville-WSL Settlement is "procedurally and substantively 'fair, reasonable, and consistent with CERCLA's objectives.'" *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014) (quoting *United States v. Montrose Chem. Corp.*, 50 F.3d 741, 748 (9th Cir. 1995)). To do so, this court must "independently scrutinize the terms of [the agreement]," *id.* at 1008, including by pointing to specific facts in support of each finding, *see id.* at 1013; *see also Montrose*, 50 F.3d at 747 (noting factors that courts consider in assessing good faith settlements). As noted, the California Supreme Court has similar requirements for state law settlements. *See Abbott Ford*, 43 Cal. 3d at 874.

21. In the context of CERCLA settlements, procedural fairness is assessed by looking at the negotiation process to gauge its candor, openness and bargaining balance. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86-87 (1st Cir. 1990) (CERCLA settlements must be "the product of fair play" procedurally); *cf. Arizona ex. rel. Woods v. Nucor Corp.*, 825 F. Supp. 1452, 1456-57 (D. Ariz. 1992) (unsubstantiated allegations of preferential dealing insufficient to prevent settlement approval), *aff'd sub. nom. Arizona v. Components, Inc.*, 66 F.3d 213 (9th Cir. 1995).

22. The Emeryville-WSL Settlement satisfies CERCLA's procedural fairness requirement. *See City of Tuscon*, 761 F.3d at 1012. All parties in the case are and have been represented by able

counsel. All parties have had access to the same extensive discovery materials. All parties have had access to the assistance of an experienced mediator. Finally, HBML has offered no substantial evidence that either the settlement as a whole or the Settling Parties' joint valuation is the product of anything other than "fair play" and good faith bargaining.

23.     Substantive fairness in the context of a CERCLA settlement is assessed based on the evidence available concerning the relative or comparative fault of the settling defendant and the share of the projected costs that will be paid by the settling defendant. *See Montrose*, 50 F.3d at 747 ("[T]he proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of total projected costs to be paid . . . with the proportion of liability attributable to them, and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified." (emphasis omitted) (citing *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1087 (1st Cir. 1994)); *see also City of Tucson*, 761 F.3d at 1012 (noting that fairness (and reasonableness) requires finding that "the agreement is 'based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done" (citation omitted)).

24.     The settlement is substantively fair. *See City of Tucson*, 761 F.3d at 1012. Here, using the agreed upon valuation for the assigned claims, the WSL Parties will be paying a total value of $33.1 million, which as noted represents approximately 38 percent of Plaintiffs' $88.4 million total incurred and anticipated investigation, remediation, litigation, and prejudgment interest costs (as of approximately April 2022). While the joint and several liability authorized by CERCLA and its California analogues could result in the WSL Parties paying 100 percent of the cleanup costs, none of the parties (including HBML) claim that defendant WRTC is responsible for anything approaching 100 percent of the contamination at issue. Nowhere in its opposition, Dkt. 222, does HBML dispute Plaintiffs' observation that HBML's allocation expert (Vandeven) has submitted an expert report assigning a 34.2 percent share to WRTC. As discussed above, Plaintiffs give the WSL Parties a 15 percent share based on the evidence concerning which entities used TCE for how long and in how

many different aspects of their operations.  The WSL Parties acknowledge that their fair share could be as much as 9 percent, but also note that their experts have disclosed an opinion allocating less than 1 percent to the WRTC.  In any event, the WSL Parties clearly are not paying a disproportionately low proportion share of the cleanup costs.  The Emeryville-ESL Settlement therefore satisfies the "substantive fairness" requirement as it has been construed by the Ninth Circuit.  *See Montrose*, 50 F.3d at 747.

25. For CERLCA settlements, a determination of reasonableness requires assessing "the efficacy of the settlement in compensating the public for actual and anticipated remedial and response costs and the relative strength of the parties' litigation positions." *Nucor*, 825 F. Supp. at 1464.

26. The settlement is also reasonable.  *See City of Tuscon*, 761 F.3d at 1012.  Here, the settlement compensates the public entities for a very substantial fraction of their incurred and anticipated cleanup costs.  As the Settling Parties have explained in their declarations and briefs, that reflects a measured balance of litigation risks given the prospect of joint and several liability (to the WSL Parties), and the potential for the Plaintiffs to succeed against only WRTC and consequently be forced into potentially protracted and costly "direct action" lawsuits against various insurance companies (because WRTC is a dissolved corporation with no assets other than historic liability insurance policies).  HBML does not dispute the efficacy of the settlement in compensating the public agency plaintiffs that filed this action, and the Court accordingly finds that CERCLA's reasonableness requirement is satisfied.

27. The final requirement for a CERCLA settlement is consistency with the statute's objectives.  One of CERCLA's primary objectives is protecting taxpayers from paying for cleanup work attributable to private sector polluters.  *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 622 (2009) (CERCLA was intended to place the cleanup burden on "persons whose activities contributed to the contamination rather than on the taxpaying public") (Ginsburg, J. dissenting)); *accord Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1455 (9th Cir. 1986) ("[CERCLA's purpose is] to assure that parties responsible for hazardous substances b[ear] the cost of remedying the conditions they created.").  CERCLA's objectives also include "accountability, the

desirability of an unsullied environment, and promptness of response activities," *Nucor*, 825 F. Supp. at 1464, and holding successor entities to account, *see United States v. Sterling Centrecorp Inc.*, 960 F. Supp. 2d 1025, 1034 (E.D. Cal. 2013) ("[C]ourts have uniformly concluded that successor corporations are within the meaning of 'persons' for purposes of CERCLA liability."), *aff'd* 977 F.3d 750 (9th Cir. 2020).

28.     The settlement is "consistent with the purposes that CERCLA is intended to serve." *Montrose*, 50 F.3d at 747 (citation omitted).  The Emeryville-WSL settlement protects the taxpayer and promotes accountability in at least three respects.  First, it holds the WSL Parties directly accountable by ensuring that the source of their pollution (WRTC's valve-manufacturing business), WRTC's alleged successor and alter ego (Swagelok), their common owner (Lozick), and their insurers (rather than the taxpayers) pay for $33 million of needed cleanup work.  Second, through its reservation of rights against third parties, and its claim assignment mechanism, the settlement facilitates a result—provided appropriate facts are adduced at trial—whereby HBML as a corporate successor to the other apparent source of the contamination (Marchant's calculator-manufacturing operations) will pay the remainder of the cleanup costs consistent with CERCLA's "carrot and stick" incentive structure, which has effectively been adopted by the State of California.  Dkt. 214-1 at 15:21-16:2 (discussion of CERCLA's carrot and stick incentive structure); *id.* at 17:1-18:4 (California's adoption thereof).  Third, the settlement provides prompt, certain funding for the needed cleanup work.  The WSL Parties' cash payment is due within 45 days of the settlement's approval, and Plaintiff Successor Agency must hold those funds in a segregated account and dedicate them to response activities designed to produce a far less sullied, if not unsullied, environment.  Dkt. 214-3 at 10-11/434.

29.     With reference to state law, the Court is guided by three principles articulated by the California Supreme Court.  First, as a general matter, settling parties are required to provide a joint valuation for any contingent portion of a settlement presented for court approval—here, the assigned contribution claims.  *Abbott Ford*, 43 Cal.3d at 879.  Second, HBML is not entitled to a mini-trial on valuation.  *Id.* at 879 n.23 ("[T]he fact [that] a nonsettling defendant may challenge the agreement's

assigned value should not be interpreted as giving such defendant a right to a mini-trial on the valuation issue."). Third, HBML bears the burden of proof to establish the absence of good faith. *Id.* at 879 (noting that non-settling defendants that do not accept the settling parties' valuation "can attempt to prove that the parties' assigned value is too low"); Cal. Code Civ. Pro. § 877.6(d) ("The party asserting the lack of good faith shall have the burden of proof on that issue.").

30. As discussed above, the Court directed the Settling Parties to supplement their evidentiary proffer with a joint valuation of the assigned claims, and they have done so in a four-page submission. Dkt. 225. The Court has conducted a detailed reviewed of that submission and finds that it satisfies *Abbott Ford*. The calculations by which the Settling Parties derived their joint valuation are straightforward, supported by substantial evidence, and more than sufficient to dispose of HBML's contention that a more than $7 million valuation must be adopted. *Cf. Abbott Ford,* 43 Cal. 3d at 878-79 (rejecting an argument analogous to the HBML's claim here that the only permissible valuation of a contingent provision in a settlement agreement is the "maximum amount" a party may benefit from that provision).

31. The Court has also considered the six factors identified in *Tech-Bilt* to determine whether the settlement has been made in good faith. The first two factors—a rough approximation of the total recovery as compared to the settling parties' proportionate liability and the amount paid in settlement—are discussed above. They readily support a good faith determination, and HBML's opposition does not dispute either factor. The third factor, the allocation of settlement proceeds among the plaintiffs, is not applicable. The fourth factor, which recognizes that a settlor should pay less in settlement than if found liable after trial, is satisfied. The WSL Parties are receiving a discount from the joint and several liability they could incur via trial. *Tech-Bilt*'s last two factors are the financial conditions and insurance policy limits of the settling defendants, and the existence of collusion, fraud, or tortious conduct aimed to injure the non-settling defendant. Based on the declarations submitted by counsel, Defendant WRTC (the only direct polluter of the site among the WSL Parties) has no non-insurance assets and the $33 million cash payment represents essentially 100 percent of the available insurance policy limits. Finally, HBML has the burden of proof on the

absence of good faith, and it has presented no evidence whatsoever of collusion, fraud, or tortious conduct by the Settling Parties toward HBML. The Court therefore finds that each of the applicable *Tech-Bilt* factors is fully satisfied, and HBML has failed to meet is burden of proving any lack of good faith as required by Section 877.6(d) of the California Code of Civil Procedure.

32. With regard to the only issue put in dispute by HBML's opposition, the Court finds that the valuation supplied by the Settling Parties represents a reasonable valuation of the assigned claims.

33. The Court further finds that the valuation of the assigned claims is sufficient to find that the Emeryville-WSL settlement as a whole is within the *Tech-Bilt* "ballpark" and thus a good faith settlement under both federal and state law.

34. In light of the discussion above, plaintiffs' motion is GRANTED and the claims asserted in Plaintiffs second amended complaint are subject to a settlement credit in HBML's favor of $33,103,428.

35. Pursuant to federal and state law, including but not limited to 42 U.S.C. § 9613(f)(2) and California Code of Civil Procedure Sections 877 and 877.6, the WSL Parties are entitled to protection from, and are protected from, all claims for contribution and/or comparative equitable indemnity, however styled, arising out of or relating to matters addressed in the Emeryville-WSL Settlement.

36. As set forth in the Emeryville-WSL Settlement, all claims, crossclaims, counterclaims, and/or third-party claims asserted against WSL Parties in this Action are hereby dismissed with prejudice. All claims asserted against the Emeryville Parties by WSL Parties are also hereby dismissed with prejudice.

37. Pursuant to federal and state law, including without limitation, 42 U.S.C. § 9613(f)(2) and California Code of Civil Procedure Section 877(a), the Court finds and determines that Plaintiffs' claims against all other parties in this Action that are not parties to the Settlement Agreement (including without limitation Hanson Building Materials Limited) are reduced *pro tanto*, i.e., by $33,103,428.

38.     The Emeryville-WSL Settlement agreement (Dkt. No. 214-3) is itself made a part of this Order, and as such is approved and adopted as the Judgment of this Court resolving this Action as between the Emeryville Parties and the WSL Parties. This order shall constitute the "Good Faith Settlement Order" under the Emeryville-WSL Settlement.

39.     The Court shall retain jurisdiction over the Settling Parties and jurisdiction over the subject matter of this Action for purposes of (a) resolving any dispute arising under the Settlement Agreement, (b) enforcing the terms of the Settlement Agreement, and (c) granting any further relief as the interests of justice may require.

40.     Except as otherwise provided in the Settlement Agreement, each Settling Party shall bear its own litigation costs and expenses, including attorney fees.

**IT IS SO ORDERED.**

Dated:  November 15, 2022

_____
Honorable William H. Orrick
United States District Court