1

2

3

4                      UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7   THE SUCCESSOR AGENCY TO THE              Case No.  3:17-cv-00308-WHO
    FORMER EMERYVILLE
8   REDEVELOPMENT AGENCY AND THE
    CITY OF EMERYVILLE,                       **ORDER ON MOTION FOR SUMMARY
9                                             JUDGMENT**
                       Plaintiff,
10                                            Re: Dkt. No. 234
             v.
11
    SWAGELOK COMPANY, et al.,
12
                       Defendants.
13

14          Defendant Hanson Building Materials Limited ("HBML") moves for summary judgment

15   on claims brought by the plaintiffs, the Successor Agency to the Former Emeryville

16   Redevelopment Agency and the City of Emeryville (collectively, "Emeryville"), concerning

17   liability under the Comprehensive Environmental Response, Compensation, and Liability Act

18   ("CERCLA").  Because there are disputed facts concerning Emeryville's theory of alter ego

19   liability and its theory of successor liability, and for the following reasons, summary judgment is

20   GRANTED in part and DENIED in part.

21                                    **BACKGROUND**

22   **I.      FACTUAL BACKGROUND**

23          This case arises from a property in Emeryville, California, where the Marchant Calculating

24   Machine Company ("Marchant") operated a calculator manufacturing business from 1917 until

25   about 1958.  Declaration of Robert Doty ("Doty Decl.") [Dkt. No. 214-2] ¶¶ 8, 14.  That site,

26   known as the "former Marchant Whitney" ("FMW") site, is now polluted with many chemicals,

27   the most prevalent of which is trichloroethylene ("TCE").  *Id.* ¶¶ 8, 14, 21, 23.  The evidence is

28   disputed whether Marchant is responsible for the TCE contamination.

United States District Court
Northern District of California

1    In 1958, Marchant merged with the Smith-Corona Corporation to become "SCM." *See*

2    Motion for Summary Judgment ("Mot.") [Dkt. No. 242] 4:9-11 (citing Second Amended

3    Complaint ("SAC") [Dkt. No. 47] ¶¶ 3, 22).  In 1959, SCM sold the FMW site.  *Id.* at 4:11 (citing

4    SAC ¶ 3).  That trail of ownership leads to other defendants in this case, all of which have settled

5    with the plaintiffs.  *See id.*; [Dkt. No. 228].

6    In 1950, Hanson Trust (also known as Hanson Plc and later known as "HBML,"

7    Declaration of Wendy Rogers ("Rogers Decl.") [Dkt. No. 234] ¶ 2), was founded in the United

8    Kingdom in 1950.  Declaration of Ali Hamidi ("Hamidi Decl.") [Dkt. No. 237-2] Ex. 1 (Tender

9    Offer 1) at 30.  In 1973, HBML formed Hanson Industries as a United States based subsidiary.

10   Hamidi Decl. Ex. 4 (Hellings Depo.) at 13:9-13.  In 1975, Hanson Holdings Netherlands ("Hanson

11   Netherlands") was formed, with 70 percent of its stock directly owned by HBML and the

12   remaining 30 percent indirectly owned by HBML.  Hamidi Decl. Ex. 1 at 31, 36; Hamidi Decl.

13   Ex. 15 (Tender Offer 2) at 11-12.  On August 25, 1985, HSCM Industries ("HSCM") was formed

14   as a Delaware-based wholly owned subsidiary of HM Anglo-American Ltd., which was a

15   Delaware-based wholly owned subsidiary of HBML.  Hamidi Decl. Ex. 1 at 31, 36; Hamidi Decl.

16   Ex. 15 at 11-12.

17   On August 26, 1985, the day after HSCM's formation and following months of quietly

18   buying up stock, HBML, HSCM, and Hanson Netherlands publicly filed their first tender offer to

19   purchase SCM.  Hamidi Decl. Ex. 1.  The tender offer explained that HSCM had been formed to

20   purchase and hold SCM stocks, that HBML funded Hanson Netherlands directly and HSCM

21   indirectly to buy SCM stocks, and that the goal of the tender offer was for HBML to acquire and

22   influence SCM.  *Id.* at 18-19, 30-31.  The offer also explained that, among other requirements, the

23   HBML board had to sign off on the final acquisition.  *Id.* at 18-19.

24   SCM resisted the acquisition, including by seeking help from Merrill Lynch.  Hamidi Decl.

25   Ex. 16 at 18-31.  HBML (not HSCM or Hanson Netherlands) sued and was granted an injunction

26   to stop SCM and Merrill Lynch from interfering with the acquisition.  *See id.*; Hamidi Decl. Exs.

27   7, 8.  HBML, HSCM, and Hanson Netherlands continued quietly buying up SCM stock and by

28   October, HBML owned about 40 percent of SCM's shares.  *Id.* at 16.

2

On October 11, 1985, HBML, HSCM, and Hanson Netherlands publicly filed their second tender offer, with much of the same information as the first.  *See generally* Hamidi Decl. Ex. 16. In both, HBML indicated specific plans to sell SCM's typewriter business.  Hamidi Ex. 1 at 21; Hamidi Ex. 16 at 10, 32.

On January 8, 1986, SCM agreed to a "merger" with "Hanson," which referred to HBML. Hamidi Decl. Ex. 20.  The parties dispute whether HBML and SCM ultimately merged.

SCM's businesses were subsequently distributed to twenty "fan companies," though the parties contest who and/or which entity designed and controlled this plan.  Hamidi Decl. Ex. 12; Hamidi Decl. Ex. 33; Declaration of Jason Haycock ("Haycock Decl.") [Dkt. No. 234-1] Ex. 3 (Declaration of George Hempstead ("Hempstead Decl.")).  Many of the fan companies then sold or liquidated the assets.  *Id.* ¶ 7.  The twentieth company, HSCM-20, received most of the rest of the businesses (at the time referred to as the "rump"), including many of SCM's former environmental liabilities.  Hamidi Ex. 41 ("Raos Depo.") at 161:7-19; *see also* Hempstead Decl. Ex. B.  HSCM-20 was merged back into SCM.  Hempstead Decl. ¶ 13 & Ex. B (noting HSCM-20 owned all of SCM's stocks, merged with the remaining SCM corporation, and assumed all of its liabilities).  Its name was changed back to SCM.  *Id.* Ex. C.

In 1988, SCM merged with HM Holdings, which had been formed in 1980 as an American based subsidiary of HM Anglo American, which was an indirect subsidiary of HBML.  *See id.* ¶ 15 & Ex. D; Haycock Decl. Ex. 8 at MCT 1887.  The new company was called HM Holdings. Hempstead Decl. ¶ 15.

It is undisputed that HM Holdings "succeeded to" SCM's Marchant liabilities; that HM Holdings was spun-off in 1996 to become Millennium Holdings; that Millennium was acquired by LyondellBasell which operated until 2009, when it entered bankruptcy; and that Emeryville cannot now collect a judgment against Millennium for any violations of CERCLA.

It is also undisputed that HBML did not know about the FMW site or the specific Marchant liabilities at the time that SCM was acquired.  It is undisputed that no one knew about the TCE contamination until the City of Emeryville began its testing process in the 1990s.

## II.     PROCEDURAL BACKGROUND

Plaintiff Emeryville initiated this lawsuit in 2017, asserting ten causes of action against HBML and several other defendants.  The operative complaint is Emeryville's second amended complaint.  *See* SAC.

I denied HBML's motion to dismiss, finding that I have personal jurisdiction over HBML in part because Emeryville made a prima facie showing that its CERCLA claim arises out of HBML's successor liability.  [Dkt. No. 143].  Subsequently, I granted settling defendants' motion for determination of good faith settlement and contribution protection.  [Dkt. No. 228].

HBML filed a motion for summary judgment, [Dkt. No. 234], and a notice of errata with redline changes, ("Mot.") [Dkt. No. 242].  Emeryville filed an opposition, [Dkt. No. 238], and a correction, ("Oppo.") [Dkt. No. 239].  HBML replied.  ("Repl.") [Dkt. No. 240].  I held a hearing at which counsel for both parties appeared.

### LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See*

United States District Court
Northern District of California

4

1    *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

2                                                    **DISCUSSION**

3    **I.       ALTER EGO THEORY OF LIABILITY**

4            A "general principle of corporate law" is that "a parent corporation . . . is not liable for the

5    acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  But "the corporate

6    veil may be pierced and the shareholder held liable for the corporation's conduct" in certain

7    situations, including under the alter ego doctrine.  *Id.*  "[W]hen (but only when) the corporate veil

8    may be pierced, may a parent corporation be charged with derivative CERCLA liability for its

9    subsidiary's actions."  *Id.* at 63-64 (footnotes omitted).

10           With respect to the alter ego theory of liability, the parties contest which jurisdiction's

11   "choice of choice-of-law" rules apply, which jurisdiction's substantive law applies, and whether

12   there are genuine disputes of material fact given the relevant substantive law.

13           **A.      Choice of Law**

14                    **1.      Choice of Choice-of-Law Analysis**

15           Emeryville says California choice-of-law principles govern.  HBML asserts that federal

16   substantive law should apply.

17           It is not entirely clear which choice-of-law rule applies.  In 1998, the Supreme Court noted

18   that there was "significant disagreement among courts" about whether to borrow state law or apply

19   federal common law to pierce the corporate veil in cases asserting indirect CERCLA liability.

20   *Bestfoods*, 524 U.S. at 56 n.1.  The Ninth Circuit has said that "in federal question (such as this

21   one) and other cases in which our jurisdiction is not grounded in diversity, our decisions have been

22   inconsistent—sometimes we have applied the federal common law to the 'choice of choice-of-law

23   principles,' and in other cases we have applied forum state rules."  *Cal. Dep't of Toxic Substances

24   Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1089 (9th Cir. 2022) (first quoting *Cassirer v.

25   Thyssen-Bornemisza Collection Found.*, ––– U.S. ––––, 142 S. Ct. 1502, 1507 (2022); and then

26   citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 862 (9th Cir. 2022) (Baker, J.,

27   concurring) (collecting cases)).  But relying on recent Supreme Court precedent, the Ninth Circuit

28   held that in federal question cases, federal choice-of-law rules may only displace state-created

United States District Court
Northern District of California

1   choice-of-law rules if "necessary to protect uniquely federal interests." *Id.* (quoting *Cassirer*, 142

2   S. Ct. at 1509).

3       In *Jim Dobbas*, the Ninth Circuit applied California choice-of-law-principles where the

4   question was how to define "interest relating to the property or transaction which is the subject of

5   the action." *Id.* at 1086.  There, the parties agreed that if any legal protection existed, the source

6   was state law.  *Id.* at 1089.  The Ninth Circuit explained, "Where, as here, state law supplies the

7   'the substantive rule of decision,' there is no federal interest in 'supplant[ing] the otherwise

8   applicable choice-of-law rule.'" *Id.*  In the present case, the legal right comes from federal law—

9   CERCLA—but the "substantive rule of decision" seems to be the law of corporations, because the

10  analysis chooses which jurisdiction's *law of corporations* applies.  Accordingly, it seems

11  California choice-of-law applies.

12      HBML cites many cases to explain that federal common law should apply to govern

13  corporate veil-piercing because of the federal interest in uniformity of the application of

14  CERCLA.  Mot. 11:24-12:6.  Each of these cases either came before or relied directly on

15  *Bestfoods*, 524 U.S. at 63 n.9, which specifically declined to address that argument, and none

16  grapple with the standard announced in *Jim Dobbas*.[1]  At any rate, whether I apply California

17  choice-of-law or federal choice-of-law, the result is the same: the substantive law that should be

18  used here is California law.

19

20  _____

21  [1] In the context of successor liability, the Ninth Circuit also noted:

    CERCLA "provides a mechanism for cleaning up hazardous-waste sites . . . and
22  imposes the costs of the cleanup on those responsible for the contamination."
    *There is no evidence that the application of state corporation law will frustrate this*
23  *objective.*  No state provides a haven for liable companies.  Nor is there reason to
    think that states will alter their existing successor liability rules in a "race to the
24  bottom" to attract corporate business.  States have their own interest in ensuring
    that successor corporations do not evade liability—successor liability rules were,
25  after all, developed to address much more than environmental liability.  It is
    unrealistic to think that a state would alter general corporate law principles to
    become a peculiarly hospitable haven for polluters.
26  *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 364 (9th Cir. 1997)
    (emphasis added) (citations omitted).  Here too I find that there is no evidence that application of
27  substantive California law of corporations will frustrate CERCLA's objective of cleaning up
    hazard-waste sites.
28

    United States District Court
    Northern District of California

                                        6

2.      **California Choice-of-Law Analysis**

Emeryville asserts that California substantive law applies because the contaminated site is in California.  HBML argues that federal substantive law applies because of the general federal interest in uniform application of CERCLA, or that Delaware or United Kingdom substantive law should apply as the law of the places of incorporation.

The California choice-of-law standard "analyze[s] the governmental interests of the various jurisdictions involved to select the most appropriate law."  *Jim Dobbas*, 54 F.4th at 1089-90 (quoting *Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 15 P.3d 1071, 1077 (2001)).  This "governmental interest test" involves a three-step inquiry: (1) the court determines whether each jurisdiction's relevant law "is the same or different"; (2) if the laws are different, "the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists"; (3) if there is a true conflict, the court evaluates "the nature of strength" of each jurisdiction's interest in applying its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state," applying "the law of the state whose interest would be the more impaired if its law were not applied."  *Chen v. Los Angeles Truck Centers, LLC*, 7 Cal. 5th 862, 867-68, 444 P.3d 727, 730-31 (2019) (quoting *Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal. 4th 95, 107-108, 137 P.3d 914 (applying the court's "seminal" decision from *Reich v. Purcell*, 67 Cal. 2d 551, 432 P.2d 727 (1967))).

With respect to the first step of the inquiry, I find California law is the same as Delaware law, nearly (if not) the same as federal law, and different from United Kingdom law.  California alter ego doctrine considers two elements: unity of interest and whether "adherence to the fiction of the separate existence of the corporation would . . . sanction a fraud or promote injustice."[2]  *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010) (quoting *Wood v. Elling Corp.*, 20 Cal.3d 353, 572 P.2d 755, 761 n. 9 (1977)).  The elements of Delaware alter ego doctrine are

---

[2] HBML focuses exclusively on the second element of the test in its motion; it does not move for summary judgment on the unity of interest element.

United States District Court
Northern District of California

substantially the same and so application of Delaware law would yield the same analysis. *See Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 470-71 (D. Del. 2010) (considering (1) whether the corporations functioned as a single entity and (2) whether there was fraudulent intent, which the court explained could encompass "an overall element of fraud, injustice, or unfairness" (citation omitted)). Under federal law, the first element—unity of interest—is the same, though for the second element it is not clear whether the Ninth Circuit requires fraud to pierce the corporate veil, or if injustice is sufficient.[3] The law of the United Kingdom differs from California law. *See Rossendale Borough Council v. Hurstwood Props. (A) Ltd.* [2021] UKSC 16 ¶¶ 63-76 (describing the court's doubts about piercing the corporate veil under the "evasion principle," where an entity appeared to take action to evade particular legal obligations); *Prest v. Petrodel Res. Ltd.* [2013] UKSC 34, [2013] 2 AC 415 (explaining the limits of the "evasion principle");

---

[3] *Compare Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 898 (9th Cir. 2021) (establishing, in the context of maritime law, requisite fraudulent intent as necessary element, and relying on other maritime cases) *with Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1021 (9th Cir. 2017) (listing "failure to disregard their separate identifies would result in fraud *or* injustice" as the second element, in the context of piercing the corporate veil for jurisdiction (emphasis added)); *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (same); *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir.), *supplemented*, 95 F.3d 1156 (9th Cir. 1996) (same, in the context of jurisdiction for CERCLA suit). The Ninth Circuit has not spoken as to which rule applies in this context.

The parties cite other cases that aren't directly applicable. HBML first cites *Operating Engineers Pension Trust v. Reed*, 726 F.2d 513, 515 (9th Cir. 1984), but that explained the standard for when the "owner of a corporation will be held personally liable for trust fund contributions" which is not directly on point here. *See* Repl. 13:16-17. It also cites *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1111 (9th Cir. 1979). While that opinion included "fraudulent intent of the incorporators" as one of the "three general factors" relevant for disregarding the corporate entity, it also said one of the "primary elements" to consider was whether "failure to disregard the corporation would result in fraud *or injustice*." *Id.* (emphasis added) (citations omitted). Consequently, it is unclear whether the opinion holds that fraud alone is an element or whether that element can be met through a showing of injustice. For that reason, this case from 1979 does not definitively provide an applicable rule here. And it points to *Bestfoods* as support, but that case merely affirmed that fraud is a notable justification for piercing the corporate veil; it did not purport to hold that injustice was not a reason to do so. 524 U.S. at 52.

Meanwhile, Emeryville cites for support *UA Local 343 United Association of Journeymen v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1475 (9th Cir. 1994). Though that case explicitly reasoned that only fraud *or* injustice is necessary to pierce the corporate veil (notably, citing *Seymour* as support), it also held that "[t]he later ego doctrine as developed in labor law is analytically differ from the traditional veil-piercing doctrine as developed in corporate law," *id.*, and so I find its reasoning inapplicable. It also cites *Nordell International Res. Limited v. Triton Oil*, 97 F.3d 1460 (9th Cir. 1996), which is unpublished and cites to *UA Local 343* for the proposition that fraud *or* injustice is necessary, and so is unpersuasive for the same reason.

1   Mot. Ex. 3 (Decl. of Michael Todd KC).[4]

2          The second step of the inquiry addresses whether there is a "true conflict" between the

3   laws of the different jurisdictions, *see Chen*, 7 Cal. 5th at 867-68, asking whether each jurisdiction

4   "has a legitimate interest in the application of its rule of decision," *Abogados v. AT&T, Inc.*, 223

5   F.3d 932, 934 (9th Cir. 2000) (citation omitted).  Here, each jurisdiction has a legitimate interest.

6   The injurious contamination occurred in California and affected California residents, businesses,

7   and governments, and so the state has a strong interest in application of its laws as the location of

8   the injury and impending clean up efforts.  HBML asserts that there is also a general federal

9   interest in ensuring uniform application of federal laws like CERCLA.  Finally, HBML is

10   incorporated in Delaware and the UK, and so each has a substantial interest in determining

11   whether to pierce the corporate veil of their corporations.  *See Sunnyside Dev. Co., LLC v. Opsys*

12   *Ltd.*, No. C 05-0553 MHP, 2005 WL 1876106, at *3 (N.D. Cal. Aug. 8, 2005) ("*Sunnyside I*")

13   (citing *Schlumberger Logelco Inc. v. Morgan Equip. Co.*, No. C-94-1776 MHP, 1996 WL 251951,

14   at *3 (N.D. Cal. May 3, 1996)).  Because there are true conflicts, I continue to the next step of the

15   choice-of-law inquiry.

16          At the third step, I find that California's interest in application of its own law is stronger

17   and would be more impaired than the interests of other jurisdictions if its law were not applied.

18   *See Chen*, 7 Cal. 5th at 867-68.  California's interest is clear and compelling: the contaminated

19   FMW site is in California and cleaning up that contamination is a guiding purpose of this

20   litigation, as is Emeryville's goal to ensure that the costs are not borne by taxpayers, to the extent

21   permissible legally.  HBML's argument that federal law should apply because of the general

22   federal interest in uniform application of CERCLA was specifically *not* endorsed or rejected by

23   the Supreme Court and so is at most persuasive here.  *See Bestfoods*, 524 U.S. at 63 n.9.  And, as

24   noted, the specific question of alter ego liability concerns state corporate law, which diminishes

---

[4] Emeryville moves to strike the Todd Declaration for failure to apply the law to the facts of the case.  *See* Oppo. At 15 n.11.  Because it is not clear that is an appropriate basis for moving to strike this declaration in these circumstances, and because I do not rely on the substance of the declaration beyond its citations of English law, Emeryville's motion is DENIED without prejudice.

the strength of the federal interest. Further, while each location of incorporation holds important corporate interests, I find, as other courts have found in the environmental context, that the state where the injury occurred has the strongest interest in the litigation.

HBML cites for support *Schlumberger*, 1996 WL 251951, at *3, a case in which the court applied Austrian law to the plaintiffs' alter ego claims as the law of the place of incorporation. There, neither party contended that the law of the forum state (California) should apply to the alter ego theory of liability, but instead argued whether the law of the place of incorporation (Austria) or the law provided for in the contract's choice-of-law provision (England) applied. *Id.* at *1-3. Because the court found "no relationship" between England and the allegedly fraudulent conduct at issue, it noted Austria's "substantial interest in determining whether the pierce the corporate veil of one of its corporations" was controlling. *Id.* at *3. Here, of course, I am not assessing a contractual choice-of-law provision, and I have already found that each jurisdiction has at least *some* interest in and relationship to the issues. The reasoning in *Schlumberger* is inapplicable.

The other two cases that HBML cites rely directly on *Schlumberger*. *See* Mot. 12:17-28. In *Sunnyside I*, 2005 WL 1876106, at *3, the court found that Austrian law should apply to the issue of alter-ego theory where Austria was the state of incorporation. But that order specifically noted that the parties did not brief the issue and so there was "no reason to depart" from its prior analysis in *Schlumberger*. *Id.* at *3. And in *Leitner v. Sadhana Temple of New York, Inc.*, No. CV 13-07902 MMM (EX), 2014 WL 12588643, at *16 (C.D. Cal. Oct. 17, 2014), the court relied on *Sunnyside I* and *Schlumberger* to find that the law of the state of incorporation should apply, and also noted that the parties did not brief the choice-of-law question and so did not provide the court with competing jurisdictional interests. These cases are unpersuasive for the same reasons as *Schlumberger*.

For those reasons, California choice-of-law dictates the application of California substantive law of alter-ego in this case.

### 3.    Federal Choice-of-Law Analysis

Even if federal choice-of-law applied, it would lead to the same result. "Federal common law follows the approach of the Restatement (Second) of Conflict of Laws." *Cassirer v. Thyssen-*

*Bornemisza Collection Found.*, 862 F.3d 951, 961 (9th Cir. 2017), *reversed and remanded on other grounds by Cassirer*, 142 S. Ct. 1502 (quoting *Schoenberg v. Exportadora de Sal*, *S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991)).  Where there is no relevant state statutory directive on choice-of-law, the Restatement looks to seven factors to determine the applicable rule of law; "a court is supposed to apply [these] factors to decide which [jurisdiction] has *the most significant relationship* to the case." *Cassirer*, 862 F.3d at 962.[5]  The factors are:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Rest. (2d) of Conflicts of Laws § 6(2)(1)-(g).  The Restatement also provides:

> (1) Issues involving the rights and liabilities of a corporation . . . are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) The local law of the state of incorporation will be applied to determine such issues, *except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied.*

*Id.* § 302 (emphasis added).  As applied to corporate law, the most important § 6 factors are:

> the needs of the interstate and international systems, certainty, predictability and uniformity of result, protection of the justified expectations of the parties, implementation of the relevant policies of the state with the dominant interest in the decision of the particular issue, and ease in the application of the law to be applied.

*Id.* § 302 cmt. (c).

Here, the needs of the interstate and international systems and the implementation of the policies of the jurisdiction with the dominant interest favor application of California law.  As

---

[5] HBML agrees federal common law follows the Restatement (Second) and then asserts that means the law of the place of incorporation applies, without further analysis. Mot. 12:7-16.  I am not persuaded by this blanket assertion.

United States District Court
Northern District of California

explained, each jurisdiction has a compelling interest in application of its own rules: the federal interest in uniformity of applying federal law, California's interest in protecting its environment and remedying an injury that occurred its jurisdiction, and Delaware's and the UK's interests in applying their laws to their corporations.  But in this case, California has the dominant interest as this state is where the injury occurred, the ongoing harm is felt, and any remedies will be implemented.  These factors favor California law.

To be sure, there is a compelling federal interest in certainty, predictability, and uniformity in CERCLA cases, which favors application of federal law.  But the Supreme Court has specifically *not* held that this interest outweighs the application of state law in this area.  *See Bestfoods*, 524 U.S. at 63 n.9.  Accordingly, whether this outweighs state or international interests is unclear, and so this factor is neutral.

In addition, Emeryville is justified in expecting the application of California law to an injury that occurred in California, that was caused by (at the time) a corporation subject to California laws, and that will be ameliorated in California by the actions of the local governments.  HBML is justified in expecting application of Delaware or UK law given its places of incorporation.  But neither party seems to have a justified expectation in the application of federal common law for the question of piercing the corporate veil in this context.

Finally, the ease of application of the law to be applied is neutral when comparing state and federal law because California and federal laws for alter ego doctrine are very similar, save the possibility that federal law requires fraud.[6]  This factor favors application of California or federal law over UK law.

In sum, though a closer question than the California conflict of laws analysis, these factors show California has the most "significant relationship" to the injuries and facts of this case.  Rest. (2d) of Conflict of Laws § 302.  California substantive law applies.

### B.    Substantive Law

To repeat, California alter ego doctrine considers two elements: unity of interest and

---

[6] *See supra* n.3.

United States District Court
Northern District of California

1  whether "adherence to the fiction of the separate existence of the corporation would . . . sanction a

2  fraud or promote injustice." *In re Schwarzkopf*, 626 F.3d at 1038.  "[B]oth of these requirements

3  must be found to exist before the corporate existence will be disregarded." *Associated Vendors,*

4  *Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 837 (1962).  Determining whether these elements

5  are met is "not a question of law," *id.*, and so a genuine dispute concerning either element

6  precludes granting summary judgment.[7]

7        "California courts emphasize that the alter ego determination is very fact specific."

8  *Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1250 (9th Cir. 2017) (citation omitted).

9  "Finding an 'inequitable result' under the second element of alter ego liability 'generally

10  require[s] some evidence of bad faith conduct on the part of defendants.'" *Id.* (citation omitted).

11  But California law does not *require* bad faith or intentional fraud to meet the second element of

12  the alter ego doctrine and pierce the corporate veil.  *City & Cnty. of San Francisco v. Purdue*

13  *Pharma L.P.*, 491 F. Supp. 3d 610, 635 (N.D. Cal. 2020) (first citing *RRX Indus., Inc. v. Lab-Con,*

14  *Inc.*, 772 F.2d 543, 546 (9th Cir. 1985); and then citing *Pac. Bell Tel. Co. v. 88 Connection Corp.*,

15  15-cv-04554-LB, 2016 WL 3257656, at *3 (N.D. Cal. June 14, 2016)); *see also Associated*

16  *Vendors*, 210 Cal. App. 2d at 838 (noting the alter ego theory "does not depend on the presence of

17  actual fraud" but that "bad faith in one form or another is an underlying consideration" (citations

18  omitted)).  Rather, "[s]o long as there is a unity of interest and ownership, courts will ignore the

19  corporate form and attribute wrongful or inequitable conduct to the organization controlling the

20  corporation." *Purdue Pharma*, 491 F. Supp. 3d at 635 (citing *Pac. Bell*, 2016 WL 3257656, at

21  *3).  Wrongful or inequitable conduct includes "when the corporate form is used to perpetuate a

22  fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose." *Pac.*

23  *Bell*, 2016 WL 3257656, at *3 (quoting *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th

24

25  ――――――――――

26  [7] HBML says that the first element concerning unity of interest "is not at issue" in this motion,
    Repl. at 2 n.2, and Emeryville contends that HBML's failure to contest this element precludes
    summary judgment, *see* Oppo. 16:3-14.  But because both elements are necessary to pierce the
27  corporate veil, *Associated Vendors*, 210 Cal. App. 2d at 837, even assuming this first element
    favors Emeryville, summary judgment would be proper if Emeryville cannot show a genuine
    dispute as to the second element.  For that reason, and because HBML does not contest unity of
28  interest, this section of the order addresses only the disputed second element concerning injustice.

523, 538 (2000)).  At least one court in this circuit denied summary judgment and found an inequitable result where failing to pierce the corporate veil would allow the defendant company "to escape liability for potential violations of CERCLA."  *L.A. Terminals, Inc. v. City of Los Angeles*, No. CV-186754-MWF-RAOX, 2020 WL 8028241, at *7 (C.D. Cal. Dec. 21, 2020).

The question on this motion is whether there is a genuine dispute of fact regarding HBML's use of the corporate form to, as relevant here, circumvent a statute or accomplish another wrongful or inequitable purpose.  *See id.*  Emeryville asserts that there are disputed facts concerning this question.  Oppo. 16:22-20:4.  In particular, Emeryville's theory seems to be that HBML knew of and intentionally avoided its SCM and FMW responsibilities—thus circumventing CERCLA and/or accomplishing another inequitable purpose—by acquiring SCM and profiting from acquisition of its assets, while simultaneously using its corporate structures to continue "kicking the can down the road" (as Emeryville's counsel said at the hearing) on its known or suspected environmental responsibilities.  Emeryville argues that HBML knew it acquired or was willfully blind to acquiring environmental liabilities, including Marchant CERCLA liabilities, but instead of resolving the known issues or providing funds to address them, passed those liabilities through various corporate structures to avoid addressing or funding them, concluding by spinning them off in a non-arms-length transaction with a company that did not benefit from the acquisition.  As explained, Emeryville submitted sufficient (if disputed) evidence for each of these to survive summary judgment.

First, there is evidence that HBML knew of the potential for acquiring environmental superfund liabilities in its takeover of SCM but failed to investigate further.  In August 1985, HBML discussed or planned to discuss with its attorneys the topic of "Environmental investigation—superfund claims and pending lawsuits"[8] as relating to the impending hostile takeover of SCM.  Hamidi Decl. Ex. 52 ¶ 12.  HBML also knew that hostile takeovers risked resulting in unknown environmental liabilities due to their secretive and accelerated processes.  Hamidi Decl. Ex. 41 ("Raos Depo.") 126:15-2.  The purchasing companies—at least one of which

---

[8] "Superfund" litigation refers to suits related to CERCLA.  *See, e.g.*, Bookspan Decl. at 20 & n.128.

was funded by and 70 percent owned directly by HBML, Hamidi Decl. Ex. 1 at 31, 36; Hamidi

Decl. Ex. 15 at 11-12; Hamidi Decl. Ex. 13 at HBML 25531—knew that the transaction involved

acquiring SCM's liabilities.  Hamidi Decl. Ex. 11 (Clarke Depo.) at 40:10-41:3.  HBML also

knew of SCM's connection to Marchant, and publicly available records existed at the time

showing that Marchant was a predecessor to SCM, that it manufactured calculators at the FMW

site, and that there was a substantial risk of that site being subject to a CERCLA suit, Bookspan

Decl. at 20-23.  Emeryville's expert points out that SCM filed a Form 10-K with the SEC in 1984

that specifically noted the possibility of superfund-related clean-up liabilities, *id.* at 20, and

notably, HBML's tender offer states that the information included about SCM was based on

"publicly available documents" including the same Form 10-K from 1984.  Hamidi Decl. Ex. 1 at

23, 25.  Despite the plans, available information, and understanding of its importance and risk,

HBML did not investigate the FMW site further.  Taken together, this suggests that HBML[9] was

aware of, or at least willfully blind to, its potential SCM-related environmental liabilities.

Second, although HBML may not have known about the specific Marchant liability, there

is evidence that it was aware post-takeover that it acquired potentially costly environmental

liabilities from SCM.  *See* Hamidi Decl. Ex. 11 (Clarke Depo.) 169:17-170:3 (showing that

Hanson Netherlands understood that all of SCM's liabilities were included in the acquisition);

Hempstead Decl. ¶ 8 (Hanson Industries acknowledges that SCM's assets came with its

liabilities).  In 1993, HBML Finance Director Brian Hellings circulated a memo regarding his

concerns about the insurance market, specifically pointing out that with the acquisition of SCM

and other organizations, HBML[10] "took over substantial liabilities to clean up toxic sites due to

---

[9] As noted, HBML does not contest the unity of interest element in this motion.  To clarify, though, there is sufficient evidence to suggest that *HBML* was responsible for these actions, not merely a subsidiary: for example, HBML's board of directors approved and ratified the takeover announcement, which was made on HBML's behalf, Hamidi Decl. Ex. 3 at 1, and while the minutes say the offer "would be made by wholly owned subsidiaries of" HBML, *id.*, there is evidence that the purchasing subsidiaries were funded and controlled entirely by HBML, Hamidi Decl. Ex. 6 (noting HBML controlled the purchasing subsidiaries and that HBML directly or indirectly provided the funding to at least one purchasing subsidiary); Hamidi Decl. Ex. 54.  There is also other evidence suggesting that HBML did not have a role in the tender offer.  *See* Hamidi Decl. Ex. 5 ("[Hanson Industries] really had no role in this tender offer.").

[10] The deposition testimony shows a dispute of material fact whether Hellings, the HBML Finance

contamination of ground at chemical sites." Hamidi Decl. Ex. 56; *see also* Hamidi Decl. Ex. 24 at 135:3-22 (confirming Hellings drafted the internal memo). Separately, there is also an indemnity agreement from July 1989 between SCM (which at the time was a "direct, wholly-owned subsidiary of" HM Holdings) and HM Holdings (which at the time was "an indirect, wholly-owned subsidiary of" HBML), created in anticipation of the initial public offering of SCM's typewriter business. Hamidi Decl. Ex. 54 at 1-2; *see also* Hamidi Decl. Ex. 53 (describing HBML's control over the IPO). Emeryville submitted apparently undisputed evidence that the definition of "Hanson Environmental Liabilities" in that agreement included all liabilities related to Marchant,[11] *see* Hamidi Decl. Ex. 24 at 199:22-200:25; *see also* Hamidi Decl. Ex. 54 at 5-8; and that at least HM Holdings knew of its liabilities related to Marchant, *see also* Hamidi Decl. Ex. 11 (Clarke Depo.) at 40:10-41:3 (acknowledging that as of January 1986, HSCM Holdings and Hanson Netherlands knew they would acquire all of SCM's liabilities).

Third, there is evidence that suggests HBML understood that environmental liabilities could not be transferred easily. *See* Hamidi Decl. Ex. 47 at 3 (showing HBML knew that the environmental liabilities acquired via Kalamazoo could not be transferred or disposed of). Though the evidence Emeryville provides shows that HBML knew that environmental liabilities related to a separate site could not be transferred, a factfinder could infer that HBML understood the legal restrictions surrounding transfer of environmental liabilities.

Fourth, evidence shows HBML chose the corporate structure for distributing the SCM assets in order to avoid tax and capital gains liabilities. *See* Hamidi Decl. Ex. 12 (showing the fan company structure distributing SCM's businesses was chosen to avoid certain tax liabilities);

---

Director, meant that *HBML* took over the liabilities when he said "we" took them over, or if he meant that the relevant subsidiary took over the liability. *See* Hamidi Decl. Ex. 24 at 136:3-137:21.

[11] This evidence is apparently undisputed because HBML does not contest it in reply, nor does it seem to submit evidence that disputes this definition. But the indemnity agreement itself says that "Hanson Environmental Liabilities" does not include liabilities related to past, present, or future SCM business. Hamidi Decl. Ex 54 at 5-8. It is not entirely clear if that is limited solely to SCM typewriter business, or if it is limited just to "SCM" as it existed post-acquisition, or something else. But because HBML does not dispute the interpretation provided by Emeryville, which I find reasonable at this stage, I rely on that in this analysis.

United States District Court
Northern District of California

1  Hamidi Decl. Ex. 33 (showing HBML's finance director suggested certain structures and transfers

2  for beneficial tax reasons); Hempstead Decl. ¶ 8 ("The SCM restructuring transactions were

3  largely driven by U.S. tax concerns.").  While these structures are of course not inherently

4  unlawful, and this does not specifically show that HBML used these structures to avoid *CERCLA*

5  liabilities, the evidence could provide context for a factfinder to ascertain HBML's intentions

6  regarding its corporate structure, particularly given its understanding of its possibly significant

7  environmental liabilities.

8      Fifth, HBML transferred SCM's environmental liabilities into Millennium, and there is

9  evidence suggesting that the transfer was not done at arms-length and was not beneficial to

10  Millennium's businesses.  *See* Hamidi Decl. Ex. 54 at 71 (showing the eventual demerger of SCM

11  and HM Holdings as well as the transfer of assets and liabilities to the newly organized

12  Millennium Chemicals corporation was "not . . . the result of arm's length negotiations."); Hamidi

13  Decl. Ex. 58 (Deposition of Robert Lee) 385:17-387:11 (noting Millennium did not receive any

14  business advantage from taking on SCM's legacy environmental liabilities, nor were the liabilities

15  related to other businesses Millennium acquired); Hamidi Decl. Ex. 59 (Deposition of William

16  Landuyt) 101:24-102:3 (same).  From this a factfinder could determine that HBML created

17  Millennium and carried out the transfer strictly to avoid funding its environmental liabilities.

18      Finally, Emeryville's evidence demonstrates that HBML benefitted financially throughout

19  all of these processes.  It profited from the acquisition and IPO of SCM's typewriter business.  *See*

20  *generally* Hamidi Decl. Ex. 53 (repeatedly referencing how "Hanson [Plc] [HBML] acquired

21  SCM," describing HBML's role in the IPO, and explaining the resulting profits).  It avoided

22  certain taxes through the use of the fan companies.  Hamidi Decl. Ex. 12; *see also* Hempstead

23  Decl. ¶ 8.  It knowingly transferred away its environmental liabilities to Millennium without

24  having to pay for them.  *See* Hamidi Decl. Ex. 24 at 199:22-200:25; Hamidi Decl. Ex. 54 at 5-8;

25  Hamidi Decl. Ex. 54 at 71.

26      All of these taken together suggest that HBML was in charge of and profited from these

27  transactions; that it knew generally of its environmental liabilities, at least strongly suspected it

28  had specific and significant SCM liabilities, and could have known about the Marchant liability;

United States District Court
Northern District of California

1    and that it undertook its corporate form—including the initial acquisition form, the fan companies,

2    and the eventual transfer and sell off of Millennium—in order to reap the profitable rewards while

3    "kicking the can down the road" on the environmental liabilities to avoid having to fund them.

4    This is more than sufficient to create a question of fact whether there was "bad faith," *Daewoo*

5    *Elecs.*, 875 F.3d at 1250, or whether HBML's corporate form was "used to . . . circumvent a

6    statute[] or accomplish some other wrongful or inequitable purpose," *Pac. Bell*, 2016 WL

7    3257656, at *3.  And, contrary to HBML's assertions, *see* Mot. 16:8-17, 19:3-21, 19:27-20:3;

8    Repl. 6:16-18, this is enough to suggest a causal connection between Emeryville's alleged

9    injury—the contamination and recovery of CERCLA fees—and the alleged misuse of HBML's

10   corporate structure—chosen to avoid paying for "superfund" responsibilities.

11          Additionally, I am not persuaded by HBML's argument that the inequitable result is

12   difficulty enforcing a judgment against Millennium and that Emeryville sat on its rights for too

13   long.  *See* Mot. 15:12-16:7; Repl. 6:13-16.  Rather, the inequitable result is that a potentially

14   responsible party—HBML—would be able to profit from its acquisition and corporate structuring

15   without being held responsible for its CERCLA liabilities.  Emeryville's evidence points not to

16   mere difficulty collecting on CERCLA liabilities but rather to corporate decisions made in an

17   effort to avoid statutory and legal requirements.

18          HBML's arguments about circumventing unknown liabilities are also unpersuasive.

19   HBML asserts that it could not have circumvented an unknown liability and that it is undisputed

20   that no one knew of the contamination at the FMW site until 1999, so the "issue is whether HBML

21   ever incurred CERCLA liability to begin with."  *See* Repl. 8:3-16.  It also says that it could not

22   have discovered the TCE pollution, that there is no evidence that TCE came from Marchant, and

23   that it cannot show inequitable result because it was never aware of the contamination.  *Id.* 11:15-

24   27; Mot. 14:19-15:10.  But as noted, Emeryville's evidence shows that HBML incurred CERCLA

25   liability because it planned, directed, funded, and profited from the acquisition of SCM,[12] which

26

27   [12] *See* Hamidi Decl. Ex. 13 at HBML 25531 (Hanson Netherlands "obtained all funds for the
     purchase of the 2,446,000 Shares [of SCM] it acquired through loans made to it by Hanson

28   Trust."); *id.* at 25521-23 (showing HBML owned far more shares than Hanson Netherlands or
     HSCM); Hamidi Ex. 2 at 1-3 (letter sent "on behalf of Hanson Trust" on 8/22/85 outlining cash

caused the corporation to take on all of SCM's liabilities, including the environmental ones related to Marchant—regardless of the fact that the specific TCE contamination was unknown until 1999. To the extent that HBML takes issue with that evidence, including whether TCE came from Marchant, it merely creates a dispute of material fact to be resolved at trial.  And HBML did not circumvent an "unknown" liability; rather, Emeryville presents evidence that HBML took on SCM's environmental liabilities, knew there was significant risk that those could include superfund related liabilities like the ones at issue in this litigation, failed to investigate and learn of those specific liabilities despite its plan to do so and the available public information, and then implemented a corporate structure specifically to avoid dealing with the liabilities it was willfully blind to while simultaneously profiting from the acquisition.  From that evidence, a factfinder could find that HBML knowingly circumvented CERCLA liabilities.[13]

For those reasons, there is sufficient evidence for a jury to find that the corporate veil should be pierced under the alter ego doctrine.  HBML's motion is DENIED.[14]

---

and other sources of funds available for tender offer to acquire SCM shares, noting that the depositing subsidiaries were "wholly owned by Hanson Trust"); Hamidi Decl. Ex 1 at 18-19, 20-21, 24 (August tender offer showing Hanson Trust (HBML) offered to purchase all outstanding shares, intended to influence SCM's management, provided suggestions for ultimate corporate structure, expected to file statutorily-required documents and be point of contact for government agencies); *id.* at 35-36 (noting the role HBML played in funding the purchases).

[13] The parties present disputed facts concerning undercapitalization.  I agree there are facts supporting both sides but because undercapitalization alone does not appear to be sufficient to show alter ego, and because I find sufficient evidence to move this question to trial without assessing undercapitalization, I do not address it further here.  *See RRX Indus.*, 772 F.2d at 546 (noting that an "inequitable *may* follow" undercapitalization (emphasis added) (citation omitted)). Relatedly, HBML moves in reply to strike Emeryville's expert declaration related to undercapitalization.  *See* Repl. 10:8-10.  Because I do not rely on that declaration, and because Emeryville has not had the opportunity to respond, the motion is DENIED without prejudice.

[14] Even if federal substantive law applied, and even if federal substantive law required a showing of fraud, the outcome would be the same.  Genuine disputes of material fact preclude summary judgment on a finding of fraud for similar reasons as explained.  HBML argues that it did not know about the FMW site or its acquired liabilities in Emeryville and so could not have had the requisite fraudulent intent.  But while Emeryville does not contest that HBML did not know about the FMW site, it presents evidence that HBML knew it acquired environmental liabilities and could have investigated further to confirm their extent, *see* Hamidi Decl. Ex. 24 at 199:22-200:25; *see also* Hamidi Decl. Ex. 54 at 5-8; Bookspan Decl. at 20-23; Hamidi Decl. Ex. 1 at 23, 25; and that it chose its corporate form to avoid liabilities, *see* Hamidi Decl. Ex. 12.  Together, that implies that HBML was, at minimum, willfully blind to its liabilities, which creates a dispute of material fact as to its fraudulent intent.  Accordingly, even if federal law applies, summary judgment would be improper.

1

## II.     SUCCESSOR LIABILITY

2          Federal law and California law for successor liability are not practically different.

3    *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 362-64 (9th Cir.

4    1997); *see also* Mot. 20 n.10; Oppo. 22 n.14.  Under CERCLA and as relevant to this case, an

5    asset purchaser may be liable as a successor corporation if it "expressly or impliedly agree[d] to

6    assume the liability" or if the relevant transaction constitutes a "'de-facto' consolidation or

7    merger."[15]  *Atchison*, 159 F.3d at 361 (citation omitted).

8          Here, the parties contest whether successor liability must be established through a direct

9    asset purchase transaction or if it can also be shown via a stock takeover and corporate

10   reorganization.  If the latter establishes successor liability, the parties contest whether Emeryville

11   presents evidence showing assumption of liability or de-facto consolidation or merger.

12         ### A.     Successor Liability Standard

13         First, I address whether the transactions here can be treated as asset purchases for the

14   purpose of addressing successor liability.  HBML argues that successor liability can only be

15   established through asset purchases, Mot. 20:19-23:9, though it agrees in reply that cases have

16   found successor liability without formal asset purchases where the company alleged to be the

17   successor succeeded to the assets of the predecessor, Repl. 13:2-13.

18         A stock purchase is different from an asset purchase and so by itself, it does not establish

19   successor liability.  *See Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. C 05 0553 MHP, 2007 WL

20   2462142, at *6 (N.D. Cal. Aug. 29, 2007) ("*Sunnyside II*") (citing *Potlatch Corp. v. Superior Ct.*,

21   154 Cal. App. 3d 1144, 1150-51 (1984)).  However, successor liability can be established without

22   a "straightforward asset purchase."  *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp.

23   1233, 1239 (E.D. Cal. 1997).  In *Iron Mountain*, the question was whether the alleged successor

24   corporation, Stauffer, was a corporate successor to Mountain Copper, the undisputed polluter

25

26   ─────────────────────────

27   [15] There are two other considerations—whether the purchasing corporation is merely a
     continuation of the selling corporation, and where the transaction was fraudulently entered into to

28   escape liability, *Atchison*, 159 F.3d at 361—that I do not address in this Order because they are
     not pleaded or addressed by the parties.

United States District Court
Northern District of California

responsible under CERCLA that had been dissolved decades earlier.  *Id.* at 1234-35.  Stauffer had initially tried to buy from Mountain Copper its stake in a separate company, but when Mountain Copper refused to sell its stake, Stauffer successfully took control of Mountain Copper via two tender offers.  *Id.* at 1236.  Stauffer "became the sole shareholder of Mountain Copper and its wholly owned subsidiaries."  *Id.*  After acquisition, Stauffer sought to dissolve Mountain Copper, in part for a tax deduction.  *Id.*  Through various other transactions, all of Mountain Copper's assets were transferred to Stauffer in exchange for Stauffer assuming all of Mountain Copper's liabilities.  *Id.* at 1236-37.  The court reasoned that while these actions were not a "straightforward asset purchase," they were sufficient to constitute an asset purchase for the purposes of successor liability under CERCLA because "the purpose of the stock buy out was to gain control of a particular asset," Stauffer gained control and ownership of Mountain Copper, and Stauffer subsequently liquidated Mountain Copper and distributed its assets to Stauffer.  *Id.* at 1239 (collecting cases reaching similar results).

Here, HBML says that there is no evidence that any assets were transferred to *HBML* as opposed to a fan company or other subsidiary.  But as explained above, Emeryville presents evidence that HBML controlled and funded the acquisition of SCM despite the purchases being made by nominally separate subsidiaries.  *Supra* n.12; *see also* Hamidi Ex. 1 at 30-31 (noting HSCM Holdings was an indirect subsidiary of HBML created one day before the tender offer as a holding company, and that HBML owned 70 percent of Hanson Netherlands directly and owned the remaining 30 percent indirectly); Hamidi Decl. Ex. 15 at 11-12 (same).  There is also evidence that HBML controlled the distribution of SCM's businesses, including its assets to fan companies, and did so for tax purposes and so that it could profit from the typewriter IPO while channeling liabilities into other fan companies.  *See, e.g.*, Hamidi Decl. Ex. 12 (showing that HBML chose the fan company structure to distribute SCM's businesses to avoid certain tax liabilities); Hamidi Decl. Ex. 1 at 21 (confirming that the planned business structure was HBML's idea); Hamidi Decl. Ex. 33 (showing HBML's finance director suggested certain structures and transfers for beneficial tax reasons); Hamidi Decl. Ex. 53 (describing HBML's role in and control of the IPO);

United States District Court
Northern District of California

1    *but see* Hempstead Decl. ¶¶ 9-10 (stating that HBML had no role in the restructuring of SCM).[16]

2    Taken together, a factfinder could infer that SCM's assets transferred to HBML as opposed to its

3    subsidiaries.

4            That finding would be legally sufficient to establish a purchase of assets for successor

5    liability.  As in *Iron Mountain*, there is evidence suggesting that HBML (via its control and

6    funding of subsidiaries) took over SCM by purchasing stock via tender offers, *see generally*

7    Hamidi Decl. Exs. 1, 16 (tender offers); that the acquisition of SCM was at least in part

8    specifically carried out to control the typewriter business, which yielded a successful initial public

9    offering, Hamidi Decl. Ex. 1 at 38 (specifically referring to typewriter business); Hamidi Decl. Ex.

10   16 at 10, 32 (same); Hamidi Decl. Ex. 53 (IPO); that HBML controlled the structure of SCM and

11   other business decisions, Hamidi Decl. Ex. 33 (HBML's finance director in charge of structure);

12   Hamidi Decl. Ex. 53 (benefits to HBML of structure); and that HBML (via its control and funding

13   of subsidiaries) agreed to acquire all of SCM's liabilities, including the Marchant liability, *see,*

14   *e.g.*, Hamidi Decl. Ex. 24 at 199:22-200:25; *see also* Hamidi Decl. Ex. 54 at 5-8.

15           At this stage, it is clear this case differs significantly from *Potlatch*, on which HBML

16   relies.  There the acquiring-corporation purchased stock but did not acquire any of the target's

17   physical assets, and the target continued its business separate from the acquiring-corporation for

18   eleven years after the stock purchase.  *Potlatch*, 154 Cal. App. 3d at 1150-51.  In contrast, here *all*

19   of SCM's assets were acquired and then distributed to the fan companies, and many of SCM's

20   businesses were liquidated, sold, or fundamentally altered.  *See* Hempstead Decl. ¶¶ 11-12

21   (acknowledging that once SCM's operating businesses were distributed to fan companies, the

22   remaining assets and liabilities were distributed to HSCM-20).  Accordingly, the reasoning in

23   *Potlatch* is not applicable here.

24           HBML also points to *Sunnyside II*, which found that transferring assets "to an 'intervening

25   corporation' is not sufficient for successor liability to attach under California law."  2007 WL

26

27   ───────────────

28   [16] Emeryville also says that in exchange for receiving the assets, the fan companies returned SCM
     stock shares to SCM, which were then cancelled.  Repl. 24:16-18.  But for support it cites
     Hempstead's declaration at ¶ 8, which does not appear to support that proposition.

22

United States District Court
Northern District of California

2462142, at *7.  But as support, the court cited *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1150-51 (9th Cir. 2004), which held that the transfer of assets to an intervening corporation was insufficient to establish the "mere continuation" exception to successor liability, which is not at issue in this case.  Additionally, the *Sunnyside II* court pointed out that there was only "a single relevant transfer of business assets" and that the plaintiff "ma[de] no attempt to pierce the corporate veil between" the parent and subsidiary.  2007 WL 2462142, at *7.  Here, there are many relevant transfers of business assets: the transfers of assets from SCM to the purchasing companies, which were at least partly funded and controlled by HBML, which also came up with the plan and the ultimate corporate structure; the transfer of the assets from the purchasing companies to the fan companies; and the transfer of some of those assets—including the Marchant liability—to Millennium.  Additionally, as explained in the alter ego analysis and unlike in *Sunnyside II*, Emeryville not only attempts to pierce the corporate veil between HBML and its subsidiaries but presents sufficient evidence for a factfinder to determine that the corporate veil should be pierced.  The reasoning in *Sunnyside II* does not control here.

Accordingly, I find that the transactions related to the acquisition of SCM should be treated as an asset purchase for the purposes of successor liability.

**B.      Exceptions to Non-Liability for Asset Transfers**

Asset purchasers are only liable as successor corporations under CERCLA if one of four exceptions apply.  *Atchison*, 159 F.3d at 361.  The relevant exceptions at issue in this case are whether "[t]he purchasing corporation expressly or impliedly agrees to assume the liability" and whether "[t]he transaction amounts to a 'de-facto' consolidation or merger."  *Id.* (citation omitted).

**1.      Express or Implied Assumption of Liability**

In CERCLA cases, "[c]ourts have universally held that 'language transferring "all liabilities" is sufficiently broad to include environmental liabilities.'"  *United States v. Sterling Centrecorp Inc.*, 960 F. Supp. 2d 1025, 1035 (E.D. Cal. 2013), *aff'd*, 977 F.3d 750 (9th Cir. 2020) (collecting cases).  Courts also look beyond written agreements "to consider all relevant circumstances" when assessing whether a contracting party has expressly assumed a seller's liabilities.  *Id.* (citing *Warner Constr. Corp. v. City of Los Angeles,* 2 Cal.3d 285, 296-97, 466 P.2d

United States District Court
Northern District of California

996 (1970)).  Indeed, even where certain liabilities are unknown, a company can assume those liabilities unless the written agreement contains "clear and specific language . . . used to effect the exclusion" of the unknown liabilities.  *Id.* at 1036 (citation omitted).

Here, it is undisputed that "all" of SCM's liabilities were transferred to the fan companies which, given the reasoning from and legal basis cited in *Sterling*, included SCM's environmental liabilities, which in turn included the "unknown" Marchant liability.  *See also* Hempstead Decl. ¶¶ 11-12 (acknowledging the Marchant liabilities were part of SCM's liabilities that were eventually distributed to HSCM-20).  HBML seems to agree that HM Holdings assumed the Marchant liability.  *See* Repl. 14:14:12-22; *see also* Hempstead Decl. ¶¶ 11-15 (acknowledging that the Marchant liability was part of the group of assets and liabilities that eventually merged into HM Holdings).  Accordingly, HBML only contests whether there is evidence that *HBML* assumed (expressly or impliedly) the Marchant liability.

But again, Emeryville presents evidence showing that *HBML* was responsible for planning, executing, and funding the acquisition of SCM, *see supra* n. 12; that HBML characterized the acquisition as a merger between SCM and *HBML*, Hamidi Decl. Ex. 25 at 1; that *HBML* understood that it was assuming SCM's liabilities, Hamidi Decl. Ex. 11 (Clarke Depo.) at 40:10-41:3; that *HBML* controlled and benefitted from the significant and fundamental changes to SCM's business structure, *see, e.g.*, Hamidi Decl. Ex. 33 (showing HBML's finance director suggested certain structures and transfers for beneficial tax reasons); and that *HBML* knew of the potential environmental risk it took on, *see* Hamidi Decl. Ex. 41 ("Raos Depo.") 126:15-2; Hamidi Decl. Ex. 24 at 199:22-200:25; *see also* Hamidi Decl. Ex. 54 at 5-8.  Together, given "all relevant circumstances," *Sterling*, 960 F. Supp. 2d at 1035, a factfinder could find that HBML—as opposed to HM Holdings or another subsidiary—assumed SCM's Marchant liability when it acquired SCM, distributed and liquidated its assets and liabilities, and profited from subsequent actions.

Accordingly, there are genuine disputes whether successor liability can be established via the implied assumption of liability doctrine.  For that reason, HBML's motion is DENIED.

## 2.    De Facto Merger

HBML points out that Emeryville did not assert de facto merger as a theory of liability in

24

its amended complaint.  *See* Dkt. No.

"[A] plaintiff's failure to plead a particular theory may preclude her from asserting that theory for the first time at summary judgment," and "[a] plaintiff may also be precluded from grounding her pleaded theory of liability in facts asserted for the first time at summary judgment." *Lynn v. Invitae Corp.*, 466 F. Supp. 3d 1038, 1041-42 (D. Ariz. 2020) (first citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000); and then citing *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006)).  Those cases address "the prejudice to a defendant who has no notice of the claimed theories or underlying facts until after discovery closes and therefore cannot defend itself."  *Id.* (citing *Coleman*, 232 F.3d at 1292).  But courts may consider a new theory of liability raised for the first time at summary judgment so long as it does not introduce new facts or claims, is based on the facts alleged in the complaint, and defendants were aware of or given notice of the issues.  *Television Events & Mktg., Inc. v. AMCON Distrib., Co.*, 484 F. Supp. 2d 1124, 1139-1140 (D. Haw. 2006) (first citing *Pruitt v. Cheney,* 963 F.2d 1160, 1164 (9th Cir. 1991); then citing *Am. Timber & Trading Co. v. First Nat'l Bank*, 690 F.2d 781, 786 (9th Cir. 1982); and then citing 5B C. Wright & A. Miller, Fed. Prac. & Proc. § 1357, at 676 (2004)).

Here, HBML was not given notice of the de facto merger issue in the complaint, despite sufficient opportunity for Emeryville to do so in its multiple amendments to the complaint and vigorous litigation at the motion to dismiss.  Though the de facto merger analysis rests on some of the same facts and does not raise a new claim, *see Television Events*, 484 F. Supp. 2d at 1140, it requires a separate analysis of certain distinct facts given its different underlying elements, *see* Oppo. 24:4-10.  It would be unfair to allow Emeryville to proceed on this new theory of liability that it presented for the first time in opposition to this motion for summary judgment.  Regardless, as discussed, the claim survives under the implied assumption of liability theory.  For that reason, HBML's motion is GRANTED concerning the de facto merger theory.

United States District Court
Northern District of California

25

**CONCLUSION**

For those reasons, the motion is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Dated: June 1, 2023



William H. Orrick
United States District Judge