UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE SUCCESSOR AGENCY TO THE
FORMER EMERYVILLE
REDEVELOPMENT AGENCY AND THE
CITY OF EMERYVILLE,

        Plaintiff,

    v.

SWAGELOK COMPANY, et al.,

        Defendants.

Case No.  3:17-cv-00308-WHO

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## INTRODUCTION

This lawsuit was brought by plaintiff City of Emeryville on behalf of itself as an owner of

the property known as the FMW Site[1] in Emeryville; as the Successor Agency to the former

Emeryville Redevelopment Agency, which was authorized by statute to undertake certain

environmental cleanup projects such as the one ongoing at the FMW Site and to recover its

cleanup costs and attorneys' fees from those parties liable under federal and state law; and on

behalf of the People of the State of California as authorized by section 731 of the California Code

of Civil Procedure.[2]  After settling with three other parties[3] for a total value of $33.1 million, the

City tried this case against Hanson Building Materials Limited ("HBML"), a British Corporation

with its principal place of business in Maidenhead, Berkshire, United Kingdom.  HBML was

---

[1] The site is so-called because the parties refer to it as the "Former Marchant Whitney Site," in
reference to two of the site's prior occupants.

[2] These plaintiffs will be collectively referred to as "the City."

[3] The settling parties were Swagelok Company ("Swagelok"), Whitney Research and Tool Co.,
and Catherine Lennon Lozick and her trust ("Lozick").

1    previously known as Hanson Trust PLC and Hanson PLC,[4] a United Kingdom entity since 1950.

2    Dkt. No. 266, Undisp. Fact 20.

3        I held a bench trial from October 10, 2023, to November 7, 2023, including 15 days in

4    court.  I heard testimony from 6 live fact witnesses and 10 live expert witnesses.  Some of the

5    critical witnesses are now dead but in 1985 gave testimony in relevant litigation that shed some

6    light on their activities at an important time for this case.  I read deposition designations from that

7    litigation and this one involving 15 witnesses, and I admitted approximately 358 exhibits into

8    evidence.

9        Many important facts were not disputed.  For example, Marchant Calculating Company,

10   owned the FMW Site from 1917 to 1957.  The groundwater at the FMW site was polluted, and

11   that fact was not known by anyone until 1999.  In 1958, Marchant merged with Smith Corona, a

12   conglomerate best known for its typewriter business.  It changed its name to Smith Corona

13   Marchant ("SCM") and assumed Marchant's liabilities.  SCM sold the FMW Site in 1959.

14       Twenty-six years later, in 1985, the English conglomerate Hanson Trust and its North

15   American subsidiary, Hanson Industries, Inc., launched a hostile takeover bid against SCM.  After

16   litigation, they acquired SCM and its 22 operating companies, which were based in five industries:

17   chemicals, coatings and resins, paper and pulp, foods and typewriters.  The parties dispute which

18   Hanson entity was the acquiring party, but there is no dispute that, following the advice of tax

19   advisors, the various companies operated by SCM were split into 20 groups, called fan companies.

20   Fan company 20 was the parent, and it held various assets and liabilities that remained after the

21   other 19 fan companies were sold.  Fan company 20 also held the unknown environmental

22   liabilities of SCM, which included the FMW Site.  It was always part of a corporate structure that

23   was an indirect subsidiary of Hanson Trust.

24       In 1996, Hanson Trust restructured by demerging many of its assets; through this

25   restructuring, the unknown liability from the FMW Site became the responsibility of Millenium

26

27   ───────────────
     [4] To avoid confusion, I refer to HBML as Hanson Trust in this Order for acts occurring prior to
     1996, even though Hanson Trust was also referred to Hanson Trust PLC and changed its name in
28   1987 to Hanson PLC.  There were no material differences in the way Hanson Trust operated
     during that time period despite the name changes.

Capital. Millenium had no corporate relationship with Hanson Trust; public shareholders owned it. Millenium was bought by Lyondell in 2003, which was acquired in 2007 by Basell Polyolefins, becoming Lyondell Basell. Two years later, it declared bankruptcy. The City did not assert these claims against Millenium in the bankruptcy proceedings. HBML, the successor of Hanson Trust, was first notified of the previously unknown liability for the FMW Site in 2015, nineteen years after the demerger and sixteen years after the City first learned of the environmental liability.

Those basic facts are not in dispute. The issue is whether Hanson Trust or HBML acted in such a way that it is responsible for the liability in Emeryville. The City asserts that Hanson Trust was the owner of the liability and that whatever corporate shields existed should be pierced, both because of Hanson Trust's control of its North American interests and because of the inequitable result of the City's inability to recover from Millenium if corporate formalities are respected. HBML maintains that it (as Hanson Trust) never had liability for the unknown liabilities at the FMW Site, and that while its indirect subsidiaries may have, those entities were properly incorporated and had been dissolved long before it was notified of the liability. Millenium was also properly incorporated and capitalized; it was merged out of existence and its successor went bankrupt (as did Millenium). Indeed, HBML contends that there is no jurisdiction over it in this case. I conclude that HBML is correct.

This opinion explains that conclusion. I start by discussing the gateway issue: why there is no jurisdiction to consider this lawsuit. I then go on to describe my findings and conclusions even if there were jurisdiction. I describe the environmental problem that led to the litigation, and why I find that Marchant significantly contributed to it. Next, I discuss the evidence that shows that Hanson Trust's North American interests were managed, controlled, and largely financed by an indirect subsidiary of Hanson Trust, Hanson Industries. While there is no doubt that Hanson Trust supported Hanson Industries at a few critical junctures, it did so properly as a parent corporation without causing the corporate veil to be pierced. I describe the hostile takeover of SCM and the corporate structure created from that date to the 1996 demerger. Following that, I discuss Millenium Chemical and its ultimate demise.

Threaded through this story are the facts that show that the City's theories of HBML's

3

liability did not hold up.  Chief among them were that Hanson Trust was engaged in asset stripping and intentionally put the (unknown) environmental liabilities in an undercapitalized entity, which inevitably led to the City's inability to seek remediation damages.  There is no evidence to support those notions.  The North American subsidiaries of Hanson Trust had responsibility for the unknown liability from the FMW Site, but they were adequately capitalized, and in fact each succeeding entity that held the liability was significantly better capitalized than the previous one.

While there are many issues to untangle, made difficult by the time that has passed, what is clear is that if it was theoretically possible to show a unity of interest between Hanson Trust and its North American subsidiaries, there is no inequity that resulted from HBML's treatment of the unknown FMW Site liability.  Neither Hanson Trust nor any of its subsidiaries was aware of the potential liability (none ever held title to the property), nor was it reasonable to think that any should have become aware at the time.  They were aware of the potential that there were unknown environmental liabilities arising from the hostile takeover of SCM in 1986; critically, those unknown liabilities were held in corporations that were adequately capitalized.  Indeed, the market capitalization of HM Holdings, a predecessor to Millennium, exceeded that of the pre-tender offer to SCM, as well as the book value of HM Holdings, and from 1989 to 1996 its market value ranged from $1.7 billion to $4.5 billion.  Millenium's implied market value at the time of demerger was $1.2 billion; its debt was rated investment grade.  And while I do not blame the City for the decisions it made to delay investigating the FMW Site and the potentially responsible parties, the facts remain that it learned of the pollution in 1999 and did not attempt to notify HBML until 2015, after Millenium's sale in 2003 to a company that ultimately declared bankruptcy in 2009.

At the end of the day, none of the City's theories is meritorious.  As shown below, HBML is entitled to judgment in this matter.

1

# **TABLE OF CONTENTS**

2 **FINDINGS OF FACT**

3 I.    JURISDICTION FACTS ................................................................................. 7

4 II.   The Environmental Liability ......................................................................... 10

5      A.    Site Description and Ownership .......................................................... 10

6           1.    Background .................................................................................. 10

7           2.    Ownership and Current Status of the Site .................................. 11

8      B.    The Contamination ............................................................................. 12

9           1.    TCE ............................................................................................. 13

10          2.    Cadmium, Petroleum, and Other Contaminants ........................ 15

11     C.    Marchant's Use of Chemicals at the FMW Site ................................ 16

12          1.    Marchant's Operations ................................................................ 16

13          2.    Evolution of Marchant's Operations .......................................... 17

14          3.    Marchant's Cadmium Use ........................................................... 18

15          4.    Marchant Used TCE and Other Contaminating Chemicals ........ 19

16     D.    Whitney Is Also Responsible for the Contamination at the Site ....... 23

17          1.    Whitney's Operations .................................................................. 23

18          2.    Whitney's Responsibility ............................................................ 25

19 III.  Hanson Operations Prior to SCM Acquisition ............................................ 26

20     A.    The Hanson/White Partnership and Genesis of Hanson Industries ... 26

21     B.    Hanson Trust and Hanson Industries Were Operationally, Financially and Legally

22          Autonomous ....................................................................................... 31

23          1.    Operational Autonomy ................................................................ 31

24          2.    Financial Autonomy .................................................................... 36

25          3.    Legal Autonomy .......................................................................... 38

26 IV.   SCM ............................................................................................................. 39

27     A.    Acquisition Conduct: Hanson Industries Identified SCM as a Target, Directed and

28          Managed Strategy for the Takeover and Made All Critical Decisions ....... 39

1.     Decision to Acquire ........................................................ 39

2.     Financing ....................................................................... 43

3.     Litigation and Corporate Structuring ............................ 46

4.     Other Acquisition Conduct ............................................ 56

B.   Post Acquisition Financial Investigations ............................ 60

C.   Post Acquisition Restructuring of SCM ............................... 63

D.   Subsequent Structuring of and Mergers with SCM .............. 67

V.    MILLENNIUM CHEMICALS AND THE DEMERGER ................... 70

VI.   THEORIES OF HBML'S LIABILITY ......................................... 76

A.   UNITY OF INTEREST FACTORS ........................................ 76

1.     Commingling of Funds ................................................... 76

2.     Corporate Formalities .................................................... 77

3.     Same Offices and Employees ........................................ 81

4.     Overlapping Officers and Directors ............................... 83

5.     Undercapitalization ....................................................... 85

6.     Failure to Maintain Arms-Length Dealing ..................... 88

7.     Use of Corporate Entity as Mere Shell or Instrumentality ......................................... 92

8.     Asset Stripping .............................................................. 94

B.   SUCCESSOR LIABILITY ................................................... 98

C.   TILLOTSON ....................................................................... 99

D.   KALAMAZOO ................................................................... 101

VII.  Post Bankruptcy History ......................................................... 103

A.   The City's Acquisition of the FMW Site and Knowledge of Contamination ............... 103

B.   The City's Delay in Providing Notice to Whitney and Marchant's Successor ............. 105

C.   Notice to HBML Came Too Late To Assert Indemnity Rights Against Millennium .... 106

CONCLUSIONS OF LAW

I.    This Court Does Not Have Personal Jurisdiction Over HBML ........................ 108

A.   Prong 1:  Purposeful Availment ................................................. 109

United States District Court
Northern District of California

1        1.      The Purposeful Availment and Purposeful Direction Tests ........................................ 109

II.    Even if There Were Personal Jursidiction, The Plaintiffs Failed to Prove Either Theory of

Liability ................................................................................................................................ 115

    A.     Alter Ego Liability ................................................................................................... 115

        1.      Unity of Interest ............................................................................................ 116

        2.      Inequitable Result, Sanctioning Fraud, or Promoting Injustice ................................. 122

    B.     Successor Liability .................................................................................................. 126

        1.      Asset Purchase .............................................................................................. 126

        2.      Express or Implied Assumption ..................................................................... 128

III.   All Claims for Relief Fail ........................................................................................... 130

**FINDINGS OF FACT**

**I.**    **JURISDICTION FACTS**

1.    In 2019 I denied HBML's motion to dismiss for lack of personal jurisdiction.  Dkt. No. 143.  I determined that the City made a prima facie showing that HBML had direct contacts with the State of California, that its CERCLA claim arose out of HBML's successor liability, and that it was reasonable to exercise jurisdiction over HBML.  After trial and the presentation of all the evidence, I reach a contrary conclusion: there is no specific jurisdiction over HBML.  There are two reasons for this conclusion.  First, as explained in depth later in this Order, the City failed to show that it could pierce Hanson Trust's corporate veil, and so could not establish personal jurisdiction through alter ego or successor liability theory.  Second, as discussed in this section, the factual evidence connecting the Hanson entities to California shows at most that Hanson Industries—the American subsidiary—availed itself of the laws of the state.  But the evidence did not prove that Hanson Trust—the British parent—did the same.

2.    The central decisionmakers for the Hanson entities were Lord James Hanson, the Chairman of the Hanson Trust, and Sir Gordon White, the leader of Hanson Industries, the

United States District Court
Northern District of California

name for the business in charge of Hanson Trust's North American interests.[5]

3. Sir Gordon lived and worked from his home in Los Angeles during the relevant time period. During the SCM acquisition in 1985, in which the environmental liability at issue in this case became the responsibility of certain Hanson-related entities, as discussed in great detail later, Sir Gordon orchestrated Hanson Industries' growth-by-takeover strategy from his home offices, one of which was in California. Trial Tr. vol. 11, 1700:5-1701:19 (Clarke).

4. Lord Hanson also spent time in California, both for vacation and work. During the same timeframe as the SCM acquisition, Lord Hanson frequently traveled to New York, and also sometimes operated from his home office in Palm Springs, California, where he also probably employed a secretary. Trial Tr. vol. 11, 1671:7-16 (Clarke); Trial Ex. 959, Hellings Dep. 237:17-238:15, Oct. 1, 1985. It was not clear from trial how much time Lord Hanson spent in California, but it was not his primary workplace. *See* Trial Tr. vol. 11, 1671:7-16 (Clarke).

5. Hanson Trust board meeting minutes from the 1980s and early 1990s show that the company rented and/or owned offices and residences in Palm Springs and Los Angeles, though they neither provide a duration for the lease/ownership nor say how often—if at all—employees worked there. Trial Exs. 303, HELLINGS_0026100; 1107, HELLINGS_0016695; 1108, HELLINGS_0024238; and 458 at 7. In May 1986, one of Hanson Trust's London-based executives sent loan-related correspondence to one of the lenders (Security Pacific National Bank) at its Los Angeles address. Trial Ex. 381.

6. Hanson Industries employees did come to California to conduct business, but mostly for Hanson Industries, and rarely for Hanson Trust. John Raos, Chief Financial Officer ("CFO") of Hanson Industries at the time of the SCM hostile acquisition, testified that he attended business meetings at Sir Gordon's home in Los Angeles, discussing operations, current deals, potential sales, acquisitions, and budgets. Trial Tr. vol. 8, 1273:23-1275:10.

---

[5] I refer to these gentlemen as Lord Hanson and Sir Gordon throughout, although their honorifics varied over time.

United States District Court
Northern District of California

United States District Court
Northern District of California

He also "may" have attended one budget meeting at Lord Hanson's California house. *Id.* 1273:23-25. In his later years with Hanson Industries, David Clarke, its President, would visit Lord Hanson in California "two or three" times a year. Trial Tr. vol. 11, 1674:8-13. During one of those visits, in November 1985, Clarke shared with Lord Hanson a salary system he had developed for a family business. *Id.* 1701:20-1702:12; Trial Ex. 1021. His diaries reflect that at least two business meetings were held in Palm Springs in 1985. Trial Ex. 1109, CLARKE_002093, 002113. Finally, Mark Alexander, Hanson Industries assistant corporate comptroller, traveled to California to meet with Sir Gordon for acquisition-related meetings at least two to four times a year. Trial Ex. 956, Alexander Dep. 74:4–81:11, Oct. 27, 2021. The evidence did not show that these were related to Hanson Trust. *See id.*

7. Sir Gordon also took actions related to the SCM acquisition from California. Shortly before the launch of the hostile acquisition of SCM, Sir Gordon received an updated valuation memo at his home in Los Angeles, and gave directions from there for early purchases of SCM shares. Trial Ex. 279; Trial Tr. vol. 11, 1683:3-17 (Clarke). From Los Angeles, Sir Gordon evaluated SCM as a target for acquisition and instructed Clarke to work on the potential transaction. Trial Tr. vol. 11, 1683:7-17 (Clarke).

8. The two tender offers for SCM affected the United States as a whole, not California specifically. There were California specific advertisements, and Raos traveled to California with Hanson Industries personnel to encourage Californian investment, including through "dog-and-pony shows." Trial Tr. vol. 8, 1230:3-16, 1275:21-1277:24; Trial Ex. 960; George Hempstead Dep. 83:17-84:18; Aug. 30, 2018; Trial Exs. 215 (November 1986 Hanson Trust Los Angeles Times advertisement regarding the stock listing); 240 (Dec. 1987 Hanson Trust Los Angeles Times advertisement discussing its stock results). The evidence proved, however, that the tender offers were made "throughout the entire United States" and were advertised not just in California but "nationally[,] by use of the national financial press and by interstate mail and phone service." Trial Ex. 213, HBML 7736-7737. The press releases were also issued

9

United States District Court
Northern District of California

1    nationwide. *See, e.g.*, Trial Exs. 244; 299; and 1009.

9.    For an entirely separate acquisition, of the California company Kaiser Cement, Hanson Trust released a press release that listed, under a section entitled "inquiries," Sir Gordon's California telephone number. Trial Ex. 1105, HBML0096742; *see also* Trial Ex. 840 (Hanson Trust's press release regarding the acquisition of Kaiser Cement). The evidence did not establish that Hanson Trust controlled this acquisition or had any role other than putting its name on the press release.

10.    This evidence all shows that Hanson Industries was deeply connected to California. It also knew that SCM's businesses were diverse, far flung, with California interests and property, and would include unknown environmental problems. But other than the few disparate and insubstantial contacts with California listed above, there was no other evidence to connect Hanson *Trust*—as opposed to its American subsidiaries—to California directly.

## II.    THE ENVIRONMENTAL LIABILITY

11.    The central issue in this case is whether HBML is responsible for environmental pollution on the FMW Site in Emeryville, CA. The parties disputed whether any pollution was caused by Marchant, a necessary preliminary finding for HBML's ultimate liability. I conclude that Marchant substantially contributed to the pollution at the FMW Site.

### A.    Site Description and Ownership

#### 1.    Background

12.    The "FMW Site" consists of a collection of properties located at 5679 Horton Street, 5677 Horton Street, and 5675 Horton Street, in Emeryville, California. Dkt. No. 266 Undisp. Fact 1. The Site occupies approximately 1.75 acres and consists of two parcels, APN 49-1552-1 (1.58 acres) and 49-1319-1-20 (0.18 acres).

13.    In the area surrounding the FMW Site, current land uses include: (a) industrial / commercial land use immediately to the north and east of the FMW Site, (b) urban residential land use with no exposed soils to the north of the FMW Site at the intersection of Horton Street and Powell Street, (c) a mixture of commercial and urban residential/hotel land use to the west of the FMW Site, (d) and park/open space land use immediately to the

south of the FMW Site.  The southern property boundary of the FMW Site is immediately adjacent to Horton Landing Park ("HLP").  The City has redeveloped the HLP Site as part of the Emeryville Greenway, which is a network of bike paths, walking trails, and parks and open space throughout the city of Emeryville.  Horton Street, in front of the FMW Site, is also a city-designated bike boulevard.  Trial Ex. 1068, 1068.0014.  A property known as "Site A," or alternatively as "South Bayfront," is located to the west of the FMW Site across the Union Pacific railroad tracks.  Trial Ex. 1068 at 122.  A property known as "Site B" is located northeast of the FMW Site across the Union Pacific railroad tracks. Trial Ex. 1068 at 122.

### 2. Ownership and Current Status of the Site

14. The Marchant Calculating Company owned and conducted operations at the FMW Site from approximately 1917 to late 1957.  Dkt. No. 266, Undisp. Fact 12.  In 1958, it merged with Smith Corona, the typewriter company, to form Smith Corona Marchant, Inc. (later shortened to "SCM"), at which point SCM assumed Marchant's liabilities.  *Id.* Fact 13.  By 1959, SCM moved operations to a different location along the border of the cities of Oakland and Berkeley.  *Id.*

15. In 1959, SCM sold the FMW Site to a party not involved in the trial.  *Id.* Undisp. Fact 14. Then, from 1963 to 1999, Whitney Tool Co. manufactured valves at the FMW Site.  *Id.* Undisp. Fact 15.  The FMW Site was subsequently purchased by affiliates of Swagelok in the mid-1960s.  *Id.*  In 1988, it was conveyed to a trust benefitting Lozick.  *Id.*  In 1999, the City of Emeryville and the City of Emeryville Redevelopment Agency ("Redevelopment Agency," now known as the "Successor Agency") acquired the FMW Site.  *Id.* Undisp. Fact 17.

16. The current building at the FMW Site was constructed for, and used by, Whitney, as explained by the City's expert, Earl James.  Trial Tr. vol. 1, 147:9-21 (James).  Prior to construction, the Marchant facilities were demolished down to ground level and a layer of soil was placed on top.  *Id.*  Some of Marchant's facilities, including the building slab, remain under the soil layer and are referred to as the buried Marchant building features

United States District Court
Northern District of California

United States District Court
Northern District of California

("BMBFs"). *Id.* The layer of soil between the current (Whitney) building slab and the BMBFs is referred to as the "Sandwich Layer." *Id.*

**B.     The Contamination**

17.     Understanding the scientific issues requires some background information, which is where I will start. The FMW Site is contaminated with chemicals and materials resulting from the industrial activities that formerly occurred onsite. Dkt. No. 266, Undisp. Fact 5-8. The Parties do not dispute that: (a) the FMW Site is contaminated; (b) there have been "releases" of one or more "hazardous substances" at and from the FMW Site, including within the meaning ascribed to those terms under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and its implementing regulations, 42 U.S.C. § 9601(22); and (c) the FMW Site constitutes a "facility" under CERCLA. *Id.*

18.     Contaminants at the FMW site, including volatile organic compounds ("VOCs"), have impacted groundwater, soil, and soil vapor. Trial Ex. 1068 at 0016. "Soil vapor" is the air between the soil particles above the groundwater table—the top level of the groundwater— and the vapor can migrate up through soil and into the atmosphere unless the site is "capped" to prevent vapor migration. Trial Tr. vol. 1, 105:24-106:10 (James). Soil vapor can rise into and collect within a building if there are cracks or other places where the vapor can find a pathway. *Id.*

19.     Some contaminants at the FMW site are called non-aqueous phase liquids ("NAPLs") which do not become fully soluble when in water, meaning they do not fully dissolve. *Id.* 107:13-15. A light NAPL ("LNAPL") floats on groundwater. *Id.* 107:22-108:4 (James). Dense NAPLs ("DNPAL") are heavier than water and tend to sink through water columns underground. *Id.*

20.     The primary contaminant at the FMW Site is a chlorinated solvent called trichloroethylene ("TCE"). Dkt. No. 266, Undisp. Fact 3. TCE is not naturally occurring at the FMW Site and necessarily came from human activity. *Id.* Undisp. Fact 4. Other contaminants at the FMW Site include other chlorinated solvents, such as tetrachloroethylene ("PCE"),

1    cadmium, and total petroleum hydrocarbons ("TPH").  Trial Ex. 1068 at 17.

2  21.  There were "releases" of one or more "hazardous substances" at and from the FMW Site,

3    including within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).  Dkt.

4    No. 266, Undisp. Fact 6, 8.  Some or all of the hazardous substances (including but not

5    limited to TCE) that were discharged, deposited, disposed, spilled, or emitted into the soil

6    and groundwater at the Property constitute "hazardous substances" under Section 101(14)

7    of CERCLA, 42 U.S.C. § 9601(14), and the regulations promulgated under Section 102 of

8    CERCLA, 42 U.S.C. § 9602.  *Id.* Undisp. Fact 7.

9  22.  The CERCLA releases warrant response actions in the form of investigation and

10    remediation work.  *Id.* Undisp. Fact 9.  The conditions at the FMW Site are such that the

11    Department of Toxic Substances ("DTSC") issued an Imminent and Substantial

12    Endangerment Order to address the contamination.  Dkt. No. 266, Undisp. Fact 10.

13  23.  The VOCs—primarily TCE—that are present in elevated concentrations in groundwater

14    generate a vapor gradient running from underground, up and through the soil, to the

15    surface structure or building if present, and into the atmosphere.  Trial Tr. vol. 1, 146:8-

16    147:8 (James).  In some areas of the FMW Site, TCE in soil vapor is in a range of greater

17    than 23,000 micrograms per cubic meter.  Trial Tr. vol. 2, 213:14-18 (James).  Other

18    VOCs at the site include 1,1,1-trichloroethane ("1,1,1-TCA"), PCE, and TCE breakdown

19    products, such as 1,2-dichloroethylene and vinyl chloride.  Trial Tr. vol. 1, 161:7-12

20    (James).  Vapors that go into a building create a human health risk.  *Id.* 147:6-8 (James).

21  24.  A human health risk assessment ("HHRA") evaluated the health risks associated with

22    TCE, cadmium, petroleum hydrocarbons, and other VOCs detected at the FMW site.  *Id.*

23    160:8-161:12 (James).  An HHRA looks at how humans are exposed to chemicals in soil,

24    water, and air, including through touching, breathing, drinking, or otherwise ingesting the

25    chemicals.  *Id.* 160:12-21 (James).  Such an assessment helps "to create an overall set of

26    goals for cleanup."  *Id.* 160:22-24 (James).  *Id.*

27              **1.  TCE**

28  25.  TCE, if in non-aqueous phase, is a DNAPL that sinks through groundwater because it is

13

United States District Court
Northern District of California

heavier than water, as explained by James and another expert for the City, Peter Mesard.
Trial Tr. vol. 1, 108:5-9 (James); Trial Tr. vol. 3, 444:13 (Mesard).  DNAPL has relatively
low solubility, meaning that it does not dissolve easily into water; what does dissolve in
water results in concentrations of contaminants that are much higher than the drinking
water standard.  *Id.* 444:15-18 (Mesard).  And because DNAPL is less viscous than water,
it flows more freely through soil.  *Id.* 444:14-15 (Mesard).  DNAPLs tend to migrate
because of their viscosity and density characteristics, which drive them downward through
soil.  *Id.* 444:22-445:2 (Mesard).

26.    TCE is volatile, so it evaporates into the vadose zone, which is the name for a particular
       level underground, right above the permanent groundwater.  Trial Tr. vol. 3, 444:3-8
       (Mesard).  When DNAPL TCE leaves the vadose zone, it leaves residual "saturation,"
       known as ganglia.  *Id.* 446:12-16 (Mesard).  The ganglia remain behind in soil particles as
       DNAPL moves through the soil.  *Id.* 446:15-19 (Mesard).

27.    TCE is the most widespread chemical at the FMW Site, and it has impacted the largest area
       on- and off-site.  Trial Tr. vol. 2, 206:5-10 (James).  TCE concentrations at the FMW site
       are far above the "remedial goals"—the cleanup goals for health and safety—approved by
       DTSC.  *Id.* 206:10 (James).  Concentrations of TCE in groundwater exceed 100,000 parts
       per billion, which is approximately 20,000 times higher than the standard for safe drinking
       water.  *Id.* 206:14-21; 211:22-25 (James).

28.    TCE present at greater than 100,000 parts per billion may indicate "free-phase product,"
       which requires aggressive remediation.  *Id.* 216:21-25 (James).  And the highest
       concentrations within the "S10 unit"[6] exceed 100,000 parts per billion.  *Id.* 211:18-25

---

[6] Environmental professionals working at the FMW Site have identified various stratigraphic units
that represent geologic and hydrologic continuity.  Trial Tr. vol. 1, 143:24-144:2 (James).  The
stratigraphic units are identified by reference to mean sea level.  *Id.* 144:6-10 (James).
        The "S10" unit is from the surface to 10 feet below mean sea level, referred to as "sea
level" in these Findings for readability.  Trial Tr. vol. 2, 208:15-16 (James); Trial Tr. vol. 13,
1899:4-10 (Mutch).  The S10 unit is fairly clayey, meaning it consists of primarily fine-grained
material.  Trial Tr. vol. 13, 1899:11-12 (Mutch).  The S10 has scattered lenses of sandy material,
but it is mostly silts and clays.  *Id.* 1899:11-16 (Mutch).  Fine-grained materials have lower
permeability.  *Id.* 13, 1900:17-1901:1 (Mutch).  It is more difficult for groundwater to flow

(James).  The highest concentrations in the S10 unit are located in the northeastern corner of the existing building as depicted on Figure 2-7a of Exhibit 1068.  Trial Ex. 1068 at 132. The TCE contamination in the 1032 Unit also exceeds 100,000 parts per billion, but the contamination is spread more broadly across the layer, and also migrates off-site to the west.  Trial Tr. vol. 2, 216:4-17 (James).  And the deepest interval of high TCE concentration is in the 3243 unit, where concentrations are as high as 1,000 to 10,000 parts per billion.  *Id.* 221:4-11 (James).  Deeper groundwater samples down to 110 feet remain above the maximum contaminant level.  *Id.* 221:15-21 (James).

## 2.  Cadmium, Petroleum, and Other Contaminants

29.   Concentrations of cadmium and total extractable petroleum hydrocarbons are also present at the FMW Site above DTSC screening goals for soil and groundwater.  Trial Tr. vol. 2, 226:1-6 (James).  The area around the northeast corner of the current building is contaminated at least 8.5 feet deep with concentrations of these chemicals above remedial goals.  *Id.* 228:1-8 (James); *see also* Trial Tr. vol. 1, 149:2-11 (James).  The petroleum hydrocarbon contamination, present as LNAPL, has been characterized as a "stable oil," which is a lubricating or cutting oil.  Trial Tr. vol. 1, 108:18-109:5, 149:2-11 (James).

---

through fine-grained materials.  *Id.*  By comparison, coarse-grained sediment layers are primary migration pathways for contaminants because they act as channel features.  Trial Tr. vol. 2, 209:2-7, 219:5-9 (James).

The "1032" unit is located between 10 feet below msl and 32 feet below sea level.  Trial Tr. vol. 2, 208:16-18 (James); Trial Ex. 1068 at 15-16.  The 1032 unit is more granular and contains lenses of sand and some gravels.  Trial Tr. vol. 13, 1899:18-20 (Mutch). Some of the lenses are connected so groundwater can travel through the unit.  *Id.* 1899:21-22 (Mutch).

Other units include the "3243" unit, the "4360" unit, the "6080" unit, and the "80110" unit. Trial Ex. 1068 at 15-16.  The 3243 zone is more clayey.  It consists mostly of silts and clays but has sand lenses scattered in it.  Trial Tr. vol. 13, 1900:7-10 (Mutch).  Beneath the 3243 unit is older Bay mud, consisting of mostly silts and clays, but some scattered sands.  *Id.* 1900:11-13 (Mutch).

Within the stratigraphic units are subunits of coarser-grained sediments that are found as depositional features.  Trial Tr. vol. 2, 208:19-25 (James).  Within the 1032 unit is the "1825" subunit, located between 18 feet below sea level and 25 feet below sea level.  *Id.*  There is also a 2732 subunit.  *Id.*

Groundwater at the FMW Site is at approximately five to seven feet below ground surface. Trial Tr. vol. 1, 149:12-18 (James).

30. Cadmium is found in groundwater up to 8.38 parts per billion. Trial Tr. vol. 2, 284:15-17 (James). The maximum concentration of cadmium in groundwater is above the drinking water standard. *Id.* 228:1-8 (James). Cyanide is also found in groundwater, co-located with cadmium. *Id.* 284:18 (James); Trial Ex. 1124. Cyanide in groundwater appears to be emanating from the former hardening and plating room. Trial Tr. vol. 2, 284:18-19 (James).

### C.   Marchant's Use of Chemicals at the FMW Site

#### 1.   Marchant's Operations

31. Marchant manufactured mechanical calculators at the FMW Site. Dkt. No. 266, Undisp. Fact 12. There was no firsthand testimony from former Marchant employees about operations at the site, given the length of time that has passed since it operated there, so the evidence about that important topic required historical analysis and inference from conditions today.

32. Marchant was producing millions of metal pieces every day in the 1950s. Trial Tr. vol. 2, 276:24-25 (James). The metal parts were covered with oils that required cleaning prior to performing tasks necessary to build the calculating machines, such as painting or plating. *Id.* 276:11-14; 278:9-12 (James).

33. Historical Sanborn fire insurance maps indicate that Marchant's operations included metal-plating and metal-hardening operations. Dkt. No. 266, Undisp. Fact 12. Plating is a process involving coating one metal with another thin layer of a different metal, as noted by HBML's expert, Jay Vandeven. Trial Tr. vol. 9, 1446:13-19 (Vandeven). Hardening is a process of heating the metal up such that the molecular structure changes to become more stable, then quickly quenching the metal to retain stability. *Id.* 1446:4-12 (Vandeven).

34. Photographs from a 1920 salesmen's prospectus confirm that an enameling room existed in Marchant's factory. Trial Tr. vol. 2, 279:5-13 (James). The enameling process included heating the metal parts. *Id.* A furnace room was also identified in the 1920 prospectus. *Id.* 279:19-23 (James).

United States District Court
Northern District of California

35. Marchant performed metal-forming, machining, metal-cleaning, painting, hardening, enameling, spraying, and other activities to manufacture calculating machines. Trial Tr. vol. 2, 192:9-12, 200:13-16, 264:19-265:2 (James). The 1934 Sanborn map identifies a hardening and plating room, enameling and spraying room, and a pressing and cutting room. Trial Tr. vol. 3 456:5-9 (Mesard). Nickel plating is also specifically identified on the 1934 Sanborn map. Trial Tr. vol. 2, 267:23-268:2 (James).

36. A sandblasting room or sandblasting bin was identified on the 1934 Sanborn map. *Id.* 272:18-23 (James). There are no Sanborn maps that identify a sandblasting bin after 1934. Trial Tr. vol. 10, 1625:4-17 (Vandeven). An article in the American Machinist, including a photograph from approximately 1918, confirms that sandblasting occurred before enameling to clean metal parts. Trial Tr. vol. 9, 1442:25-1443:18 (Vandeven). The article does not specify that sandblasting was used to clean oil off the metal parts. Trial Tr. vol. 10, 1622:20-24 (Vandeven).

### 2. Evolution of Marchant's Operations

37. Analysis of Sanborn maps demonstrates that operations at the Marchant facility changed over time. Trial Tr. vol. 2, 269:7-14 (James). For example, the 1934 Sanborn map shows a sandblasting room or sandblasting bin but no nickel-plating or hardening rooms. Trial Tr. vol. 2, 272:18-23 (James). But the sandblasting room/bin is not included in the 1949 map, which instead shows that a new building was constructed at the northeast corner of the current building sometime between the mid-1930s and late 1940s, , and is identified as the hardening and plating room. Trial Tr. 270:8-18, 272:21-23 (James); Trial Tr. vol. 3, 456:10-14 (Mesard). The enameling and spraying room were also enlarged. Trial Tr. vol. 3, 456:10-14 (Mesard).

38. Changes to facility operations are consistent with Marchant's efforts to remain on the cutting edge of technology by being cost efficient and improving production. Trial Tr. vol. 3, 461:2-6, 462:17-25, 463:6-19 (Mesard); Trial Ex. 1075 at 19 (Marchant's 1938 Annual Report); 1076 (Marchant's 1946 Annual Report); Trial Ex. 1077 (Marchant's 1951 Annual Report, emphasizing efficiency, cost-effectiveness, and installing faster and more modern

17

United States District Court
Northern District of California

equipment).  Marchant's 1951 Annual Report, for example, stated that Marchant had implemented "improved cleaning of parts and better plating at reduced cost were effected with new equipment."  Trial Ex. 1077 at 10; Trial Tr. vol. 3, 463:22-24 (Mesard).

39.   By 1949, the hardening and plating room had moved.  It is reasonable to infer that when the operation was moved, Marchant put in new, more state-of-the-art equipment.  Trial Tr. vol. 3, 463:20-464:4 (Mesard).

### 3.   Marchant's Cadmium Use

40.   A September 1955 issue of the Plating Journal of the American Electroplaters Society included an advertisement for the Udylite Corporation. Trial Tr. vol. 15, 2150:11-22 (James); Trial Ex. 1102 (journal advertisement); Trial Ex. 1102a (slide with journal advertisement).  The advertisement touts new equipment that Marchant had installed to do cadmium plating.  *See* Trial Exs. 1102, 1102a.  This electroplating with cadmium is usually done with a cadmium cyanide salt.  Trial Tr. vol. 2, 284:23-24 (James).  Plating is conducted in tanks as parts are dipped into the solution such that the metal in the solution will adhere to the metal placed in the solution.  Trial Tr. vol. 15, 2149:13-18 (James).

41.   Today, cadmium and cyanide are co-located in groundwater.  Trial Tr. vol. 15, 2152:15-20 (James).  There is no other known process on the FMW Site where cyanide would have been used, in part because cyanide is specific to electroplating with cadmium.  *Id.* 2152:16-21 (James).  The primary release of cadmium is from the electroplating process.  *Id*.  And, the same company that provided a machine to Marchant had patents that involved the use of cadmium and cyanide for plating purposes.  *Id.* 2152:21-2153:2 (James).

42.   The coincidence of cadmium, cyanide, and TCE indicates that Marchant's plating room was a source of all three compounds, likely related to cadmium plating and cleaning of metal.  Trial Tr. vol. 15, 2154:19-23 (James).  The maximum cyanide concentrations are found in the same portion of the upper zone where TCE is found at concentrations of 100,000 parts per billion TCE, further supporting this finding.  *Id.* 2154:24-2155:6 (James).

43.   Additionally, the coincidence of both cadmium and cyanide indicates cadmium

electroplating in the area, which is consistent with the historical record.  Trial Tr. vol. 2, 284:25-285:1 (James).  The bulk of the cadmium data is from below the BMBFs, demonstrating that it is more likely related to Marchant operations and not Whitney's. *Id.* 287:1-8 (James).

### 4.   Marchant Used TCE and Other Contaminating Chemicals

44.   The parties dispute whether Marchant ever used TCE for its operations.  There is no direct evidence when or if Marchant ever switched to using TCE as part of its operations at the FMW Site.  Trial Tr. vol. 3, 520:9-12 (Mesard); Trial Tr. vol. 2, 340:3-5, 345:9-14 (James); Trial Tr. vol. 9, 1436:2-10 (Vandeven).  From the record at trial, however, the preponderance of evidence shows that Marchant used TCE on the site and caused other chemicals as well to pollute the groundwater.

45.   TCE first came into use in the 1930s.  Trial Tr. vol. 9, 1439:2-4 (Vandeven).  It was heavily rationed during and just after World War II, between the 1940s and 1950s, for use by Boeing, North American Aviation, and Lockheed, which were mandated by the military to use TCE in their aerospace and plane parts.  *Id.* 1438:23-1439:21 (Vandeven).  It came into more common usage in manufacturing in the 1950s and 1960s.  Trial Tr. vol. 2, 343:13-15 (James); Trial Tr. vol. 3, 455:7-8 (Mesard).

46.   In 1949, a conference paper concluded that older methods of degreasing were inefficient, uneconomical in most cases, and unable to accomplish the high quality of finishes demanded.  Trial Tr. vol. 3, 457:14-19 (Mesard).  The paper opined that the only process that addresses quality and efficiency is degreasing by TCE.  *Id.* 457:20-22 (Mesard).  The production of TCE in the United States started to increase rapidly in 1949.  *Id.* 459:16-18 (Mesard).  TCE was widely accepted for metal degreasing and rapidly replaced other solvents in the late 1950s and early 1960s.  *Id.* 458:17-25 (Mesard).  Industry eventually transitioned from TCE to 1,1,1-TCA in the 1960s and 1970s because it was not as toxic.  Trial Tr. vol. 9, 1441:12-14 (Vandeven).

47.   Marchant is responsible for many of the chemicals that are currently found at the FMW Site.  First, a promotional video shot by Marchant in 1953 "call[s] out the golden oil

lubricant that's being splashed over the [machine] parts to keep it all running properly." Trial Tr. vol. 2, 273:11-14, 277:16-19 (James). The use of golden lubricant is consistent with the TPH identified in the subsurface. *Id.* 277:20-24 (James). Second, the hardening and plating room (first noted on the 1949 Sanborn map located at the northeast corner of the site near and partially within the current building), is the area of the property that is the primary source of contamination and overlies the most intense VOC, TPH, and cadmium contamination, including TCE as DNAPL. *Id.* 270:15-23 (James); Trial Tr. vol. 3, 456:14-17 (Mesard). That is strong evidence that the VOC, TPH, cadmium, and TCE DNAPL came from Marchant.

48. Third, and importantly, TCE releases at the FMW Site correspond to Marchant's operations. Trial Tr. vol. 2, 281:20-23 (James). Free phase TCE was found at the current FMW site in the area of where the Sanborn maps indicate the plating room stood. *Id.* 285:9-14 (James). There is also no documentation of Marchant using other degreasing chemicals, such as alkalide cleaners, Stoddard solvents, or petroleum products. Trial Tr. vol. 3, 467:18-22 (Mesard).

49. And while using sand to clean metal is viable for removing scale and rust, it is not for grease. Trial Tr. vol. 3, 469:15-25 (Mesard). Indeed, the sandblasting bin present on the FMW Site in 1929 was gone by 1949. *Id.* 459:22-25 (Mesard). If Marchant was using sandblasting to clean parts, it had stopped by at least 1949, and it would have needed other degreasing solutions. *Id.* 459:25-460:2 (Mesard). HBML's expert could not think of and did not testify to any site operating in the 1950s that used sandblasting rather than chlorinated solvents to clean metal parts before painting, and only one that used sandblasting prior to plating or enameling. Trial Tr. vol. 10, 1626:13-20 (Vandeven).

50. Sampling data from upgradient of the main source area on the FMW Site shows TCE impacts. Trial Tr. vol. 2, 288:6-289:8 (James). Because those upgradient data points are outside the footprint of the current building, the impacts are more likely from Marchant than Whitney, because Whitney did not use that area besides for parking. *Id.*

51. Proof of Marchant's TCE use also comes from analysis of toxins in the "sandwich layer."

United States District Court
Northern District of California

When Whitney commenced operations at the FMW Site in 1962 or 1963, it demolished the Marchant facilities down to the ground level, put a layer of fill on top of the site and then built the current building foundation and associated infrastructure on top, leaving Marchant's concrete slab in place below everything.  Trial Tr. vol. 1, 174:14-21 (James); Trial Tr. vol. 10, 1525:25-1526:12 (Vandeven).  Whitney added a layer of fill on top of the slabs of the former Marchant buildings, poured a layer of concrete on top of the fill, and built the Whitney building on top of that.  Trial Tr. vol. 1, 147:9-21 (James).  That layer of fill between the two companies' concrete slabs was referred to by experts at trial as the "sandwich layer."  It ranges from one to one-and-a-half feet thick, as explained by HBML's expert Robert Mutch.  Trial Tr. vol. 13, 1941:1-24 (Mutch) (describing investigation of the sandwich layer).

52.   In connection with its redevelopment of the site, Whitney installed 10 columns to hold up the roof around the parameter of the new building, which involved cutting out 12 sections of the Marchant slab to install the footings and other material to support the columns and building infrastructure.  Trial Tr. vol. 13 1954:6-1956:19 (Mutch) (Mutch Slide Ex. Fig. 4-18).  Whitney also excavated trenches through the lower slab to install sewer and other utility lines.  Trial Tr. vol. 2, 350:2-5 (James).  The cutouts in the Marchant slab that were made to install these utilities, as well as the footings for Whitney's structure, created "gaps and holes and trenches and cracks" in the slab, rendering the slab "very permeable."  Trial Ex. 2269.

53.   The sandwich layer, of course, did not exist when Marchant was at the site.  Trial Tr. vol. 3, 443:4-9 (Mesard).  Accordingly, it affords a unique opportunity to evaluate the timing and sources of contamination both within the sandwich layer and beneath it.  *See id*.  Molecules of the same chemical used by both Whitney and by Marchant cannot be differentiated.  Trial Tr. vol. 2, 295:12-16 (James); Trial Tr. vol. 10, 1608:15-17 (Vandeven).  But contaminants found in the sandwich layer would generally be attributable to Whitney, except for vapors, while contaminants below the sandwich layer—below the Marchant slab—would generally be attributable to Marchant.  *See* Trial Tr. vol. 3, 472:4-8

(Mesard).  No free-phase oils or DNAPL were found in the Sandwich Layer.  Trial Tr. vol. 2, 294:19-20 (James).

54. Soil vapor concentrations of TCE are much higher beneath the Marchant slab than they are within the sandwich layer.  Trial Tr. vol. 3, 450:2-4 (Mesard).  Critically, the average concentration of TCE below the Marchant slab is four times higher than in the sandwich layer.  *Id.* 451:4-9 (Mesard).  And the maximum concentration of TCE below the Marchant slab is 12 times higher than the concentration in the sandwich layer.  *Id.* 452:1-3 (Mesard).

55. By comparison, 1,1,1-TCA and Freon 113 were not yet available during the time period when Marchant was at the FMW Site.  Trial Tr. vol. 3, 471:24-472:3 (Mesard).  Those contaminants could only have been released by Whitney.  *Id.*  The concentrations of Freon 113 and 1,1,1-TCA are three times higher and two times higher, respectively, within the Sandwich Layer than below.  *Id.* 449:16-21, 451:7-9 (Mesard).

56. The relative soil vapor concentrations of TCE above and below the Sandwich Layer are opposite of the two "Whitney only" compounds, 1,1,1-TCA and Freon 113.  *Id.* 450:1-6 (Mesard).  This is particularly relevant for 1,1,1-TCA, which has similar characteristics as TCE as so would be expected to move similarly through the soil.  *Id.* 510:4-6 (Mesard).

57. It is likely that TCE from Whitney released into the sandwich layer migrated below the BMBF and Marchant slab.  *Id.* 503:21-25 (Mesard); Trial Tr. vol. 13, 1957:20-1958:5 (Mutch).  But contamination beneath the BMBF cannot be explained by the contaminants found in the sandwich layer.  Trial Tr. vol. 3, 504:13-23 (Mesard).  That is because there are no significant quantities of residual TCE or DNAPL ganglia in the sandwich layer, meaning DNAPL was never present in any significant quantities in the sandwich layer.  *Id.* 447:6-14; 505:4-7 (Mesard).  In other words, Whitney's discharges to the sandwich layer may have included dissolved TCE, but they did not include DNAPL.  *Id.* 505:7-9 (Mesard).  That means that some of the TCE vapor in the sandwich layer comes from Marchant releases, as it migrates naturally into the sandwich layer from below.  *Id.*, 531:17-23 (Mesard); Trial Tr. vol. 10, 1609:1-1610:6 (Vandeven) (explaining that the BMBF is not a barrier to vapor partitioning into the sandwich layer).

United States District Court
Northern District of California

58. In light of this, I conclude that the data from the sandwich layer demonstrates that the significant TCE contamination at the FMW Site cannot be attributable solely to Whitney.

59. In fact, Marchant appears to be the source of the majority of the TCE contamination.[7] TCE was the most effective chemical that could be used for degreasing during the time when Marchant was operating. Trial Tr. vol. 3, 468:14-469:7 (Mesard). Because Marchant tried to operate the facility according to the most efficient methods it could find, *id.*, 468:14-17 (Mesard), and because TCE contamination below the BMBFs in the concentrations found there cannot be explained by anything other than Marchant discharging TCE to the subsurface, I find that Marchant used TCE in its manufacturing operations at the FMW Site, *id.* 441:11-15 (Mesard), and that Marchant released TCE into the subsurface at the site, *id.*, 442:6-12 (Mesard). [8]

**D.   Whitney Is Also Responsible for the Contamination at the Site**

**1.   Whitney's Operations**

60. Whitney manufactured brass and stainless-steel valves. Trial Tr. vol. 9, 1455:15-18

---

[7] HBML also argues that mistakes by Emeryville's environmental consultant EKI exacerbated the contamination because it used long well screens for two of the eight wells it dug. The State (DTSC) warned that long well screens should not be used because they potentially "create a conduit for contaminant transport across hydraulically separated geologic units," particularly where "high concentrations of [chemicals of concern] are confined to relatively thin water-bearing zones and vertical hydraulic gradients are present […], especially where DNAPL is present." Trial Tr. vol. 13, (Mutch), 1966:19-25; 1967:1-10. The State ordered Emeryville to abandon those two wells, and the experts dispute whether and to what extent the two wells that the State required be sealed exacerbated contamination at the Site. But the evidence was so strong that Marchant used TCE, released DNAPL, and heavily contributed to the contamination at the site, that *even if* the well screens increased the DNAPL in particular areas, that does not detract from or affect the finding that Marchant is responsible for the contamination at the site. And because I do not need to apportion liability as a result of my resolution of this case, I will not wade into this issue further.
[8] Use of TCE in two other facilities linked to Marchant also suggests that Marchant used TCE at the FMW site. Marchant had another facility in Berkeley that operated from 1946 to 1972. Trial Tr. vol. 3, 453:10-12 (Mesard). The Marchant Berkeley facility did not begin any manufacturing until after 1958, when Marchant transferred all manufacturing operations from Emeryville to Berkeley. *Id.* 453:13-16 (Mesard). The Berkeley site has DNAPL concentrations with TCE in groundwater and soil gas. *Id.* 453:17-18 (Mesard). In addition, Carl Friden was a former employee of Marchant who moved to San Leandro to start his own factory to make calculators. *Id.* 453:24-454:4 (Mesard). The Friden site operated between 1936 and 1976. *Id.*, 453:19-23 (Mesard). The Friden facility has significant TCE contamination. *Id.*

23

United States District Court
Northern District of California

1    (Vandeven).  It did not perform hardening, metal plating, enameling, or painting.  Trial Tr.

2    vol. 2, 290:13-15, 290:21-23 (James); Trial Tr. vol. 10, 1569:16-1570:4 (Vandeven).

61.  Whitney used a vapor degreaser and TCE during at least part of the time that it operated at

the FMW Site.  Dkt. No. 266, Undisp. Fact 15.  According to HBML's expert, Whitney

used TCE between 1963 and 1978.  Trial Tr. vol. 9, 1457:4-8 (Vandeven).  In addition to

TCE, Whitney used lubricating oils and other chemicals.  Trial Tr. vol. 2, 293:18-21

(James).  After 1978, Whitney switched to Freon 113.  Trial Tr. vol. 9, 1457:4-8

(Vandeven).  Whitney used large volumes of Freon 113.  Trial Tr. vol. 3, 449:13-14

(Mesard).  Whitney also used significant amounts of the chlorinated solvent, 1,1,1-TCA.

Trial Tr. vol. 3, 448:12-13 (Mesard).

62.  The sewer pipe that Whitney installed at the site slopes through the Marchant slab.  Trial

Tr. vol. 13, 1951:1-8 (Mutch).  The Whitney sewer pipe is made of vitrified clay pipe.  *Id.*

1946:1-3 (Mutch).  Vitrified clay pipe wears out over time.  *Id.* 1946:13-14 (Mutch).  Such

pipe is subject to significant amounts of leakage.  *Id.* 1947:23-24 (Mutch).

63.  The evidence showed that Whitney cleaned up various minor spills and releases by

routinely disposing of cleaning fluids down certain drains at the facility.  Trial Tr. vol. 2,

294:2-14 (James); Trial Tr. vol. 9, 1456:3-5 (Vandeven).  The sewers beneath the facility

leaked into the subsurface.  *Id.*  Some of the Whitney sewers become disjointed and

misaligned over time, which can facilitate TCE releases.  Trial Tr. vol. 13, 1948:21-1949:8

(Mutch).  TCE can sink into joints in the sewer and then go through the pipe.  *See id.*

Video evidence demonstrated water impounding behind some of the displaced joints and

seepage coming into the joints.  *Id.* 1949:11-21 (Mutch).  Whitney's sewers were also

located in generally the same portion of the site where Marchant's hardening and plating

operations were located.  Trial Tr. vol. 2, 348:12-15 (James).  That is the most

contaminated area of the FMW Site.  *Id.* 349:3-8 (James).  But Whitney sufficiently diluted

its disposal down the drain that it is not plausible that all of the TCE at the FMW Site is

attributable to Whitney.  Trial Tr. vol. 3, 424:1-8 (James).

64.  Significantly higher concentrations of 1,1,1-TCA and Freon 113 in soil vapor are found

within the Sandwich Layer than the concentrations below the BMBFs.  Trial Tr. vol. 3, 449:2-21 (Mesard).  TCA and Freon 113 identified at the FMW Site could only have been released by Whitney.  *Id.* 471:24-472:3 (Mesard).

65.  Whitney's cleaning activities generated a waste known as "sump cake" or "filter cake," which contained cadmium.  Trial Tr. vol. 9, 1468:6-12 (Vandeven).  They also generated cleaning liquid waste and waste dusts from machining valves, both of which contained cadmium.  *Id.* 1468:13-19 (Vandeven).  Whitney's activities related to cadmium would not result in the same concentration or intensity of release as would liquid solutions associated with cadmium plating for Marchant.  Trial Tr. vol. 15, 2148:21-2149:1 (James).  And Whitney's waste solids containing cadmium and filter cake were generally disposed off-site.  *Id.* 2148:15-20, 2156:2-25.

## 2.  Whitney's Responsibility

66.  There is no doubt that Whitney was a source of contamination at the FMW Site.  Trial Tr. vol. 2, 290:13-14 (James).  Environmental investigations at the site have identified contamination from 1,1,1-TCA and Freon 113, which as discussed, could only be from Whitney.  Trial Tr. vol. 3, 448:17-25, 447:13-16, 449:13-16 (Mesard).

67.  Whitney released large volumes of TCE at the FMW Site, and its concrete floor also developed cracks.  Trial Tr. vol. 9, 1481:10-11 (Vandeven).  Some TCE released into the sandwich layer migrated through into the soil below the Marchant slab.  Trial Tr. vol. 13, 1939:5-1940:25 (Mutch).  The sandwich layer, which consists of sand fill, does not retain TCE.  *Id.* 1939:9-16.  Relatively little TCE was detected in the sandy, sandwich layer, while much higher concentrations are found in the clayey soils below the Marchant slab.  *Id.* 1939:5-1940:25 (Mutch).

68.  I do not need to decide whether Marchant or Whitney was a bigger contributor of TCE; they both were contributors.  It is noteworthy that there was no significant residual TCE in the sandwich layer, Trial Tr. vol. 3, 447:6-10 (Mesard), and that contamination is not symmetrical around Whitney's sewers, *id.* 529:4-9 (Mesard), which does not support a finding that Whitney's sewer line was the sole or primary cause of the high TCE

1   concentration area at the site, *id.*, 529:10-21 (Mesard).[9]

2   **III.    HANSON OPERATIONS PRIOR TO SCM ACQUISITION**

3   69.   Having found that Marchant contributed to the contaminants that need to be remediated, I

4          turn to the factual findings related to whether HBML is liable for it.  HBML's connection

5          to the FMW Site, to the extent it exists, is that Marchant merged with Smith Corona in

6          1959 to become SCM, which had responsibility for the environmental liability at the FMW

7          Site until 1986, when Hanson Trust and Hanson Industries acquired SCM through a hostile

8          takeover.  To understand my conclusion that HBML is not liable, one must follow the very

9          complicated corporate history and practices of Hanson Trust and its North American

10         operations through Hanson Industries to trace the ultimate responsibility for Marchant's

11         environmental liability from the time of the hostile takeover to the present.

12  70.   Today HBML is not widely known.  But during the time frame I am about to address, it (as

13         Hanson Trust) was a corporate colossus.  In North America, its indirect subsidiaries

14         included Kaiser Cement, Glidden Paints, Smith Corona typewriters, Peabody Coal,

15         Durkee's Foods, Allied Steel, and a host of other well-known American companies.  It was

16         the fifth largest corporate entity in North America.  But while its corporate structure was

17         complex, its operating philosophy and decision-making principles were deceptively

18         simple.

19         **A.      The Hanson/White Partnership and Genesis of Hanson Industries**

20  71.   In the 1950s, Lord Hanson and Sir Gordon started a greeting card company in the United

21         Kingdom, according to testimony from the City's expert, Dr. Charles Hill.  Trial Tr. vol. 5,

22         705:8-25 (Dr. Charles Hill).  In 1963, they sold the greeting card company and bought

23         Oswald Tillotson, a U.K.-based vehicle distribution company.  *Id.* 706:1-4 (Hill).

24  72.   In the mid-1960s, Oswald Tillotson was acquired by the Wiles Group, a manufacturer of

25

26   _____

27  [9] The parties debate whether pollutants travelled from the FMW site to Site B.  Because I conclude
    that HBML is not liable for the pollution created by Marchant and this particular issue is not
28  pivotal for understanding the nature of the dispute, I need not and will not make findings regarding
    this issue.

26

United States District Court
Northern District of California

fertilizer and fertilizer sacks.  *Id.* 706:5-7 (Hill).  As part of that transaction, Lord Hanson and Sir Gordon were given significant shares in the Wiles Group, and the two eventually gained management control of it.  *Id.* 706:7-12 (Hill).  The Wiles Group was renamed Hanson Trust.  *Id.* 706:10-13 (Hill).  The company was a "partnership" between Lord Hanson and Sir Gordon, and they merely "chose the name Hanson Trust because they thought Hanson's name had a nicer ring to it than White's."  *Id.* 706:14-19 (Hill).  Lord Hanson became Chairman of Hanson Trust and remained so at all relevant times to this case.  Trial Ex. 948 (L. Hanson Dep.), 5:8; Trial Ex. 261, MCT_00008871; Trial Ex. 226, HBML 0013013.

73.   Between 1969 and 1973, Lord Hanson and Sir Gordon refined their business strategy.  They soon became known for making acquisitions (most of the early acquisitions were "friendly"), and by 1973, Hanson Trust owned 24 small and mid-sized companies, primarily in the U.K.  *Id.* 706:20-707:2 (Hill).

74.   Lord Hanson and Sir Gordon stayed close friends and business partners throughout their lives.  Trial Tr. vol. 5, 707:3-18 (Hill).  In 1973, Sir Gordon moved to New York to acquire and run new U.S. subsidiaries for Hanson Trust while Lord Hanson remained in England to run the U.K. operations.  Trial Ex. 951 (E. Hanson Dep.), 211:17-212:20; Trial Ex. 949 (White Dep.), 4:18-5:5; Trial Ex. 1082, pdf p.2.

75.   On June 24, 1974, Sir Gordon sent a letter of resignation to Hanson Trust confirming his resignation from the boards of Hanson Trust and any subsidiary of which he was a director, as noted by HBML witness Wendy Rogers, who is the current company secretary at HBML.  Trial Ex. 2376; Trial Tr. vol. 14, 2092:11-2093:1 (Wendy Rogers).  Hanson Trust set up Hanson Industries, Inc., a U.S. company, to support Sir Gordon and to execute Hanson Trust's strategy in the U.S.  Trial Tr. vol. 5, 709:16-20 (Hill); *see also* Trial Ex. 1114 at 10.  Hanson Industries Inc. was an indirect subsidiary of Hanson Trust.  Trial Tr. vol. 14, 2075:10-14 (Rogers).

76.   Hanson Industries grew rapidly, and there is no doubt that Hanson Trust was pivotal in its birth.  A 1988 article in Fortune magazine described how Sir Gordon arrived in the U.S.

United States District Court
Northern District of California

1    with only $3,000 ("the most that British currency controls permitted at that time").  But in

2    the course of 15 years, Hanson's U.S. businesses had grown into an "American

3    conglomerate" with a net asset value of more $10 billion, "without touching the company's

4    British parent for a loan."  Trial Ex. 2273.

5    77.   In 1974, Hanson Industries acquired Seacoast, the family business of David Clarke.  Trial

6    Tr. vol. 11, 1640:6-10, 1644:15-21 (Clarke).  Seacoast's sales were about $40 to $50

7    million when it became Hanson Industries' first U.S. business in 1974; Hanson Industries'

8    North American companies had sales about $14 billion when Clarke left in 1995.  *Id.*

9    1646:14-1647:1 (Clarke).  Clarke rose to become President of Hanson Industries in 1978, a

10   position that he retained until he left in 1995.  *Id.* 1640:6-10, 1644:15-21 (Clarke).  He was

11   widely regarded as the second in command to Sir Gordon.  *Id.* 1641:4-1644:4 (Clarke).

12   78.   The City's expert, Dr. Hill, testified that Hanson's success came "primarily" through its

13   "brokerage," making its money by buying and selling businesses.  Trial Tr. vol. 5, 713:11-

14   715:3, 747:21-748:16, 780:12-19 (Hill).  Hill described this strategy "unreservedly" as

15   "quite brilliant."  *Id.* 780:12-19 (Hill).  Witnesses who worked for Hanson Industries made

16   clear, however, that it was not simply a "brokerage."  Although businesses were bought

17   and sold, Hanson Industries also managed, invested heavily in, modernized, and grew the

18   businesses that it retained.  Trial Tr. vol. 8, 1202:5-20 (Raos); Trial Tr. vol. 11, 1646:14-

19   1648:8 (Clarke) ("Well, if that's all you are [a brokerage], how did your sales go from 40

20   million to 14 billion?  I don't know.  You do it by growing the businesses.  We spent a lot

21   of money.").  Clarke stated they were "not bashful to spend money on growing

22   businesses," and he provided examples of investing hundreds of millions of dollars per

23   plant to improve Hanson Industries' titanium dioxide business.  Trial Tr. vol. 11, 1647:2-

24   19 ("Clarke").

25   79.   Hanson Industries utilized Hanson Trust's strategy in the U.S.  Trial Tr. vol. 5, 709:24-

26   710:2 (Hill).  Clarke referred to Sir Gordon's team at Hanson Industries as Hanson Trust's

27   "boots on the ground" in America.  Trial Tr. vol. 11, 1735:1-15 (Clarke).  Lord Hanson

28   stated that it was necessary to have personnel in the U.S. to do certain things: review

budgets, monitor performance, etc.  Trial Tr. vol. 5, 738:16-22 (Hill); Trial Ex. 949, Lord Hanson Dep. 15-21, Oct. 7, 1985.  It was not possible to run all of Hanson Trust's operations in the U.S. out of the London office, due to differences in time, business systems, distance, and accounting systems.  Trial Tr. vol. 5, 738:23-739:1 (Hill).

80.  Critical to this case is the degree to which Hanson Industries and Hanson Trust were separate entities.  It was not always clearly delineated.  Sir Gordon ran, and was the ultimate decisionmaker for, the U.S. operations at all relevant times until he got sick in 1995.  Trial Tr. vol. 8, 1110:20-1111:4; 1114:21-24; 1115:12-14, 1146:4-8 (Raos); Trial Tr. vol. 5, 723:1-4, 775:8-11 (Hill); Trial Ex. 960 (Hempstead Dep.), 210:3-9.  He identified and led acquisitions of companies both in the United States and the U.K., however, and was in constant contact with Lord Hanson.  Trial Tr. vol. 5, 734:17-19 (Hill).  In practice if not legal form, Lord Hanson and Sir Gordon were partners in leading the success of Hanson Trust.

81.  That said, Sir Gordon was never identified as an officer or director of Hanson Trust; he was identified as a director, and in later years as Chairman, of Hanson Industries.  *See, e.g.*, Trial Ex. 1114 (1979 Annual Report), MCT_00003898; Trial Ex. 260 (1986 Annual Report), HBML 00065919 (1986); Trial Ex. 209 (1987 Form 20-F), HBML 0008320.  None of the minutes of meetings of Hanson Trust's Board of Directors indicate that Sir Gordon attended board meetings.  *See, e.g.*, Trial Ex. 249 (discussing announcement of the SCM tender offer), 303 (discussing SCM tender offer); Trial Ex. 383; Trial Ex. 458; Trial Ex. 1107.  Separate pension schemes were created for Hanson Industries and Hanson Trust.  Ex. 952 (Ludlam Dep.), 130:10-17.  When Sir Gordon resigned from Hanson Trust in 1974, a pension scheme letter confirms that his date of withdrawal from the Hanson Trust pension scheme was March 31, 1974, and that he ceased being an employee of Hanson Trust on June 30, 1974.  Trial Ex. 2375, pdf p.4; Trial Tr. vol. 14, 2096:11-2097:3 (Rogers).[10]  Clarke and Professor Robert Glenn Hubbard, an HBML expert, both explained

---

[10] For whatever reason, it took more than eight years for the Hanson Industries Board to recognize pursuant to a Hanson Industries Inc. Action by Unanimous Written Consent of the Board of

1    that Sir Gordon's compensation was based on the performance of the U.S. operations.

2    Trial Tr. vol. 11, 1652:3-20 (Clarke); Trial Tr. vol. 9, 1428:13-20 (Hubbard).[11]

3    82.    In a 1985 SEC proceeding, Sir Gordon was asked who he was employed by; he answered,

4    "Hanson Trust."  Trial Ex. 1093, EMY009367.  He then testified that his position was

5    "chairman of Hanson Industries Inc. in New York," and that "Hanson Trust is the parent

6    company which owns Hanson Industries."  Trial Ex. 1093, EMY009367.  This last

7    statement clarifies his role and that of Hanson Industries.  It is unclear why he answered

8    the initial question "Hanson Trust"; it may have been because Hanson Industries was not a

9    party to the litigation and Hanson Trust was.  His answer is not a basis to conclude that Sir

10    Gordon was a Hanson Trust employee, especially given all the evidence to the contrary.

11    83.    There is a question about how seriously Hanson Trust and Hanson Industries took

12    corporate formalities, and what the effect of that is on the liability of HBML.  In 1984,

13    Hanson Industries Inc. was acquired by Tillotson Commercial Motors, a U.K. subsidiary of

14    Hanson Trust incorporated under the laws of the U.K., perhaps for tax reasons.  Hanson

15    Industries Inc. was dissolved and liquidated.  Trial Tr. vol. 14, 2100:11-15 (Rogers).

16    "Hanson Industries" subsequently became a division of Tillotson Commercial Motors.  *Id.*

17    2103:15-2104:2 (Rogers).  In May 1985, a "Registration of Fictious Name" form was filed

18    in connection with Hanson Industries' operations in New Jersey.  Trial Ex. 1096.  In it,

19    Tillotson Commercial Motors stated that it would use the fictious name of Hanson

20    Industries.  *Id.*  The address listed for Tillotson Commercial Motors was the address for

21    Hanson Trust's headquarters in London.  *Id.* at 3.

22    84.    No one who testified at trial had an explanation for this change in form in 1985, but

23    everyone agreed that there was no substantive difference in the way the businesses in

24    North America were managed.  Trial Tr. vol. 12, 1854:4-1855:1 (Landuyt); Trial Tr. vol.

25

26    Directors that Sir Gordon became an employee of Hanson Industries Inc., effective January 1,

27    1983.  Trial Ex. 2374, MCT_00009327; Trial Tr. vol. 14, 2097:4-24 (Rogers).

28    [11] Curiously, no documents were offered in evidence to show the amount of that compensation or how it was determined.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

11, 1666:2-12, 1725:9-1726:2 (Clarke); Trial Tr. vol. 8, 1128:22-1129:10, 1267:8-12 (Raos); Ex. 956 (Alexander Dep.), 122:19-123:2.  William Landuyt, who was the CFO of Hanson Industries and a Tillotson Commercial Motors board member, and a witness for HBML, testified that Tillotson "was just a payroll vehicle" for the executives of Hanson Industries, and that the company did not have a budget.  Trial Tr. vol. 12, 1854:4-9 (Landuyt).  The Hanson Industries executives also testified that they did not report to or take direction from anyone at Tillotson.  When asked what direction or control anyone from Tillotson exercised over Clarke or Sir Gordon, Clarke testified, "[a]bsolutely none at all."  Trial Tr. vol. 11, 1665:18-22 (Clarke).  George Hempstead, Hanson Industries' General Counsel, "received no direction from Tillotson."  Ex. 960 (Hempstead Dep.), pdf p. 210/331 Trans. p. 2111:17-20.[12]  Terms such as "Hanson North America," "Hanson's U.S. interests," and the like were used synonymously to describe Hanson Industries or the U.S operations generally. *See, e.g.*, Trial Tr. vol. 8, 1115:15-25 (Raos); Trial Ex. 948 (L. Hanson Dep.), 93:15-16.

85.  There was only evidence of one board meeting of Hanson Industries submitted at trial.  It was conducted in London.  Trial Ex. 485.

**B.  Hanson Trust and Hanson Industries Were Operationally, Financially and Legally Autonomous**

**1.  Operational Autonomy**

86.  From 1985 to 1996, Hanson Trust was a publicly listed company with thousands of shareholders.  Trial Tr. vol. 14, 2071:4-5 (Rogers).  Hanson Trust PLC changed its name to Hanson PLC on December 3, 1987 (Tr. Ex. 261, MCT _00008897), and became Hanson Building Materials Limited in 1996.  Trial Tr. vol. 14, 2091:17-18 (Rogers).  Hanson Building Materials Limited is not owned by the same shareholders as it was in the 1985 to

---

[12] Trial Exhibit 960 consists of four volumes of George Hempstead's deposition.  Page numbers 213-14 appear in two volumes of transcripts, which disrupts the consecutive pagination.  The same is true of Trial Exhibit 959, Hellings' deposition, because it includes the 1985 testimony, which results in duplicative page numbers with the deposition transcripts from this case.  Therefore, a citation to the pdf page number (e.g., "pdf p. 212-13/331") is provided followed by the specific number and lines on the transcript page (e.g., "Trans. p. 213:3-9").

1996 timeframe. *Id.* 2070:19-2071:13 (Rogers). It is not presently listed on any stock

exchange. *Id.* 2070:14-18 (Rogers). The ultimate owner of HBML is Heidelberg

Materials AG, a German company listed on various German stock exchanges, which has

an individual shareholder who owns over 25 percent of the company. *Id.* 2070:22-2071:13

(Rogers).

87. At the corporate center of Hanson Trust prior to 1995 were Lord Hanson and Sir Gordon,

who, as partners, made decisions regarding corporate strategy. Trial Tr. vol. 5, 722:23-

723:4 (Hill). Lord Hanson primarily operated in the U.K. and Sir Gordon primarily

operated in the U.S. *Id.* 722:22-723:4 (Hill). That said, Hanson Industries executives—

specific Sir Gordon, the Chairman, and Clarke, the President—managed and controlled the

U.S. companies. Trial Tr. vol. 8, 1114:21-1115:1 (Raos); Trial Ex. 388. They made the

key decisions on the management and strategy for the U.S. companies. Trial Tr. vol. 8,

1138:10-1139:9 (Raos).

88. The 1986 Hanson Trust annual report states "[t]he unique relationship between Hanson

Industries and Hanson Trust continues to be fundamental to our success. While

constituting a single corporate entity and sharing a common business strategy, we operate

as two separate companies on either side of the Atlantic." Trial Tr. vol. 5, 720:17-24

(Hill); Trial Ex. 260. The same report further explained the company's business strategy

by stating that "two small central teams" in the U.S. and in the U.K. managed the acquired

businesses in each country by "exert[ing] effective financial control over [their] subsidiary

companies." Trial Ex. 260 at HBML 0006522; Trial Tr. vol. 5, 719:11-25 (Hill).

89. From the late 1970s through the 1980s, both Hanson Trust and Hanson Industries used "the

same organizational philosophy" and "one unified strategy": growth through acquisitions,

looking to the same key metric of return on capital employed. Trial Tr. vol. 5, 710:6-21,

737:1-14 (Hill). For Hanson Industries' acquisitions, Sir Gordon specifically targeted

large, diversified conglomerates in basic industries that he felt were mismanaged. *See id.*

Following an acquisition in the U.S., Hanson Industries' personnel would conduct due

diligence on the acquired company. Trial Tr. vol. 8, 1180:6-1182:17 (Raos). This

included understanding the newly acquired businesses as well as looking for unrecorded assets and liabilities. *Id.*

90.   Clarke was ultimately in charge of all operational aspects of the U.S. operations, reporting to Sir Gordon.  Trial Tr. vol. 11, 1670:21-1671:3, 1672:4-7 (Clarke); Trial Tr. vol. 8, 1107:25-1108:5, 1116:1-7 (Raos); Trial Ex. 960 (Hempstead Dep.), pdf p. 208-209/331 Trans. p. 209:24-210:2 (Clarke and Raos directed U.S. operations).  Clarke built up the Hanson Industries' infrastructure, including its headquarters and the group executive structure.  Trial Tr. vol. 11, 1645:13-1646:13 (Clarke).  Other Hanson Industries executives reported to Clarke and Sir Gordon.  *Id.* 1675:3-8 (Clarke).

91.   Hanson Industries and its U.S. companies operated autonomously from Hanson Trust with respect to day-to-day operations.  Trial Tr. vol. 5, 767:25-768:7, 768:24-769:9 (Hill).  Hanson Industries oversaw and made personnel decisions for the U.S. companies.  Trial Tr. vol. 8, 1144:11-19 (Raos); Trial Ex. 962 (Lee Dep.), 299:4-24.  Hanson Industries used the same tight controls on capital spending and exercised a common set of levers as Hanson Trust in the U.K. to create incentives for managers at the operating company level to behave in a certain way.  Trial Tr. vol. 5, 737:8-12 (Hill).  But Hanson Trust did not manage U.S. operations.

92.   High-level Hanson Industries employees confirmed that Hanson Trust did not have a role in Hanson Industries' daily operations.  Clarke testified that although he was open to receiving advice from Hanson Trust, he would not allow Hanson Trust to "make decisions for us."  Trial Tr. vol. 11, 1658:11-22 (Clarke).  Similarly, Raos, who began as corporate controller and ultimately became President and Chief Operating Officer ("COO") before leaving in 1995, testified that he was never given direction from Hanson Trust's board on how to conduct business in the U.S.  Trial Tr. vol. 8, 1110:20-1111:9 (Raos).  Hempstead, Hanson Industries' General Counsel, testified that Hanson Trust personnel "did not participate in or direct anything in the United States."  Trial Ex. 960 (Hempstead Dep.), pdf p. 208/331 Trans. p. 209:18-23.  Mark Alexander concurred.  He was the head of Hanson Industries' mergers and acquisitions department and was the lead negotiator for a

United States District Court
Northern District of California

possible buyout of the Kalamazoo Mill by local management, which I discuss later.  Trial Ex. 956 (Alexander Dep.), 12:7-13:3 and 29:8-19.  He testified that the "U.S. ran completely independent of the U.K.," that Hanson Industries was "completely autonomous," and that it had "full autonomy to make all decisions with regard to anything, frankly."  *Id.* 17:10-18:22.

93.    Lord Hanson and Sir Gordon spoke frequently; there is no record of what they said or whether Lord Hanson ever directed Sir Gordon to do anything.  For example, there is no record of Hanson Trust playing a role in identifying companies for acquisition or disposition in the U.S.  Trial Tr. vol. 11, 1672:12-14, 1673:16-22, 1660:16-18 (Clarke) (Lord Hanson had "no involvement" in making decisions to purchase or sell businesses in the U.S.); Trial Tr. vol. 8, 1125:5-15 (Raos) (Hanson Trust personnel had no role in management or control of SCM or HM Holdings or any of HM Holdings' subsidiaries); Trial Ex. 952 (Ludlam Dep.), 111:17-112:2.  There is no evidence of Hanson Trust playing a role in deciding strategy for the U.S. companies.  Trial Tr. vol. 8, 1121:21-23, 1138:10-1139:9 (Raos).  And Hanson Trust played no role in personnel decisions for the U.S. companies.  *Id.* 1144:20-23 (Raos).

94.    In 1980s, Hanson Trust-acquired corporations were diverse in terms of the range of products and services offered.  Trial Tr. vol. 5, 710:13-711:2 (Hill).  Both in the U.S. and the U.K., the acquired corporations were in "unrelated markets," i.e., there was no obvious technological manufacturing or process similarity between the products or services offered by those companies.  *Id.* 710:22-711:2 (Hill).   On behalf of both Hanson Trust and Hanson Industries, Sir Gordon targeted for acquisition businesses that were mature, low tech, and provided basic goods and services.  *Id.* 711:5-8 (Hill).  Sir Gordon would try to identify organizations that were fundamentally sound but that were going through a period of performance shortfall that impacted their stock price.  *Id.* 711:9-17 (Hill).  These acquisitions were primarily debt financed, and the debt was primarily secured on the assets of the target.  *Id.* 711:18-20 (Hill).

95.    As a general practice and corporate strategy, following an acquisition Hanson Trust and

United States District Court
Northern District of California

Hanson Industries would immediately reduce costs through cutting overhead at an acquired company, principally by selling off real estate and dramatically reducing staff. *Id.* 713:4-10 (Hill). They would also sell off major assets to pay down debt. *Id.* 713:11-715:3 (Hill). Hill testified that Hanson Trust could not possibly manage the U.S. from London due to various factors, including differences in financial and accounting systems and regulations, as well as banking regulations. *Id.* 738:9-739:19 (Hill). He testified that the only form of "control" that Hanson Trust exercised over its U.S. subsidiaries was budgetary oversight, incentive structure, and capital allocation. *Id.* 765:23-767:13, 777:12-17 (Hill). He further conceded that this was a normal set of controls for a parent company. *Id.* 777:12-17 (Hill).

96. Hanson Industries decentralized operating decisions. It gave the managers of subsidiary companies autonomy to pursue strategies and actions while making them accountable to the corporate center. *Id.* 715:14-717:12 (Hill). In this way, Hanson Industries held its operating companies to account, set goals and budgets, measured performance, and set behavioral incentives. *Id.* After an acquisition, the lower-level managers of the operating companies were left in place, while Hanson Industries conducted layoffs at an acquired company's corporate levels. *Id.* 730:19-23 (Hill); *see also* Trial Ex. 1082.

97. Although Hanson Industries' operating companies had certain autonomy, they were not independent of Hanson Industries, which provided managers at the operating companies responsibility to make decisions within bounds it set and held the managers to account. Trial Tr. vol. 5, 739:20-740:12 (Hill). There was not much evidence about how Hanson Trust managed its U.K. operating companies, but it appears to have pioneered the management strategy adopted by Hanson Industries.

98. The only Hanson Trust employee who appears to have had any meaningful interactions with the Hanson Industries U.S. operations was Brian Hellings. He acted in an advisory capacity on tax and insurance issues. Trial Tr. vol. 11, 1658:23-1659:7 (Clarke); Trial Tr. vol. 12, 1775:17-23 (Landuyt); Trial Ex. 962 (Lee Dep.), 325:21-326:5. But Hanson Industries maintained its own risk management department and had its own relationships with U.S. insurance brokers. Trial Ex. 962 (Lee Dep.), 301:9-302:12. And even in

United States District Court
Northern District of California

Hellings' role as an advisor, Raos testified that Hellings "was not a decision-maker," and he would have to "convince me, he'd have to convince David Clarke, or he'd have to convince Lord White." Trial Tr. vol. 8, 1234:13-1235:3 (Raos). Hellings played no role in acquisitions, including deciding which companies to purchase and at what price. *Id.* 1122:10-23 (Raos); Trial Tr. vol. 11, 1659:11-13 (Clarke). As will be discussed later, he was involved in the SCM takeover, securing some of the financing and helping devise and implement the corporate restructuring after the takeover succeeded.

### 2. Financial Autonomy

99. Hanson Industries and the U.S. subsidiaries were primarily financially autonomous from Hanson Trust. Hanson Industries was responsible for and controlled the financial aspects of the U.S. companies. Trial Tr. vol. 8, 1135:5-11 (Raos); Trial Ex. 962 (Lee Dep.), 285:17-286:23, 288:2-20, 293:25-294:3. Raos, Landuyt, and Bob Lee were the ranking Hanson Industries financial officers during most of the relevant time period, and they were responsible for financing U.S. operations and acquisitions. Trial Tr. vol. 8, 1132:22-1133:6 (Raos); Trial Tr. vol. 12, 1768:3-16 (Landuyt); Trial Ex. 962 (Lee Dep.), 22:7-15, 294:5-10.

100. Hanson Trust had no involvement in the treasury function of the U.S. subsidiaries, no involvement in the preparation of the U.S. financial accounts, and no involvement in payroll. Trial Tr. vol. 12, 1771:23-25, 1772:1-6, 1776:16-23 (Landuyt); Trial Tr. vol. 8, 1144:24-1145:4 (Raos). Hanson Industries financed the U.S. operations through bank loans and cash flows from the U.S. subsidiaries. Trial Ex. 962 (Lee Dep.), 300:4-10. The cash flows and earnings generated from the U.S. operations were then used to continue growing the U.S. operations. *Id.* 294:16-295:8. Hanson Industries charged management fees to the U.S. subsidiaries to cover its own fees. *Id.* 300:14-301:8. Hanson Trust never guaranteed the loans procured for acquisitions or financing of North American operations and never provided collateral for those loans. Trial Tr. vol. 8 1135:5-1136:25 (Raos).

101. Hanson Industries oversaw the budgeting process of the U.S. companies. *Id.* 1142:6-8 (Raos). Each of the operating companies had its own officers and directors that

participated in developing each company's budget and capital expenditures.  Trial Tr. vol. 12, 1773:4-23 (Landuyt).  Those budgets were reviewed by Hanson Industries' executives as part of creating consolidated budgets for the U.S. operations.  *Id.* 1773:4-1774:21 (Landuyt).  The budgets were then submitted up the chain for consolidation, ultimately to Hanson Trust.  Trial Tr. vol. 8, 1142:9-17 (Raos).  Hanson Trust did not directly oversee the budgeting in the U.S., did not direct or control the process, and did not dictate changes to the U.S. budgets.  *Id.* 1142:9-1143:4 (Raos); Trial Tr. vol. 11, 1678:6-14 (Clarke); Trial Ex. 962 (Lee Dep.), 289:12-18.

102.  Hanson Industries also oversaw and approved capital expenditures for the U.S. companies.  Trial Tr. vol. 8, 1143:10-24 (Raos).  Hanson Trust did not make decisions on capital expenditures in the U.S. Trial Tr.  *Id.* 1144:7-10 (Raos).  And Hanson Industries, not Hanson Trust, funded capital expenditures for the U.S. companies.  Trial Ex. 962 (Lee Dep.), 290:2-291:2.

103.  Hanson Industries managed a sweep account for all U.S. operations.  *Id.* 295:9-24.  Each of the U.S. companies had an individual account in connection with the sweep account and daily records were kept on how much money each company had in their account.  *Id.* 295:9-296:15.  Hanson Trust had no role in and no control over the U.S. sweep account.  *Id.* 296:16-297:20.  Hanson Trust had no control over what funds were deposited in or withdrawn from the U.S. sweep account, and Hanson Trust personnel did not have authority to withdraw funds from the U.S. sweep account.  *Id.* 296:16-297:20.  The banking relationships for the U.S. companies were managed by Hanson Industries, not Hanson Trust.  Trial Tr. vol. 8, 1137:20-1138:4 (Raos); Trial Tr. vol. 12, 1772:25-1773:3, 1779:17-1780:2 (Landuyt); Trial Ex. 962 (Lee Dep.), 279:3-18, 281:4-24, 285:17-286:23, 298:7-12.

104.  Kenneth Ludlam served in various financial positions at Hanson Trust and HBML from 1977 to 2003, including as financial controller, treasurer, and chief accountant.  Trial Ex. 952 (Ludlam Dep.), 26:16-27:16.  His responsibilities included financial management of the U.K. companies, overseeing day-to-day cash flows in the U.K., interfacing with banks,

37

and budgeting for the U.K. companies.  *Id.* 29:8-22, 32:1-12, 113:10-21.  He testified that the U.S. companies were "totally controlled" and "totally managed" by the group of executives at Hanson Industries in the U.S.  *Id.* 102:11-22.  The accounting personnel in the U.S. were "totally independent," and the U.K. accounting personnel played no role in developing financial forecasts, budgeting, accounts payable and receivable, or any other accounting for the U.S. companies.  *Id.* 115:17-116:13, 119:12-15.  The U.K. operated on the basis "that the USA was self-sufficient in that it would borrow locally to support its operations."  *Id.* 105:6-12.

105.   Ludlam also testified that the cash of the U.K. companies was managed separately from the cash of the U.S. companies, and that sales and profits were tracked separately.  *Id.* 101:23-102:6, 127:21-128:9.  He could not recall a time where a U.S. company requested cash from the U.K, nor was such evidence presented at trial.  *Id.* 104:14-19.  Other than coordinating on U.S. GAAP and U.K. GAAP issues for consolidation, Hanson Trust had no role in accounting for the U.S. companies.  *Id.* 114:18-22.

### 3.   Legal Autonomy

106.   Hanson Industries and the U.S. companies had separate legal counsel from Hanson Trust. Hempstead was Hanson Industries' General Counsel from approximately 1982 to 1996. Trial Ex. 960 (Hempstead Dep.), pdf p. 205/331 Trans. p. 206:9-11, pdf p. 206/331 Trans. p. 207:8-13.  His primary duty was to provide legal advice to the U.S. operations and the in-house attorneys at the operating companies.  *Id.* pdf p. 205/331 Trans. p. 206:12-23, pdf p. 207-208/331 Trans. p. 208:8-209:3.  He testified that, other receiving quarterly updates from the U.S., Hanson Trust's legal personnel "had nothing to do" with directing the legal affairs of the U.S. operations.  *Id.* pdf p. 208/331 Trans. p. 209:4-17.

107.   Hempstead reported to Clarke.  *Id.* pdf p. 206/331 Trans. p. 207:22-25, pdf p. 208/331 Trans. p. 209:4-11.  With respect to legal issues that arose in the U.S., Hempstead and Clarke were the decisionmakers.  Trial Ex. 960 (Hempstead Dep.), pdf p. 209/331 Trans. p. 210:10-14.  Alan Hagdrup, Hanson Trust's chief in-house lawyer, stated that he did not direct the legal affairs of the U.S. operations and did not make decisions about litigation

matters:  Hempstead managed the U.S. legal affairs and "he [Hempstead] would make the decisions" on litigation matters.  Trial Ex. 958 (Hagdrup Dep.), 27:10-15, 236:7-8, 258:12-21, 259:2-8.  Hagdrup would be "informed and could make suggestions, but [Hagdrup] didn't manage any at all." *Id.* 259:14-21.  Similarly, Hagdrup was not responsible for transactional legal matters in the United States either; Hempstead was in charge.  *Id.* 262:7-11.

## IV.    SCM

108.    A central question in establishing HBML's liability is Hanson Trust's role in the hostile takeover of SCM in 1985 and 1986 and whether Hanson Trust assumed legal responsibility for the Marchant environmental liability as a result.  As detailed below, Hanson Trust had an important supporting role in acquiring SCM: it provided a comfort letter letting the investment bank know that it stood behind the deal; it provided some of the funding for the acquisition; and, as the parent company, it issued press releases, filed SEC statements, and was a named party in litigation.  That said, the acquisition was planned, executed, and primarily funded by Hanson Industries and its personnel, and the decisions on the structure of the acquired companies, assets, and liabilities were made by Hanson Industries.  Though during the acquisition, the participants often referred to "Hanson" without clarifying the corporate entity involved or explaining the purpose of its involvement, it is clear from the facts that Hanson Trust did not assume real or implied control of SCM or the Marchant environmental liability in the acquisition process.  I will discuss the facts and the inferences the City attempts to draw from them.

### A.    Acquisition Conduct: Hanson Industries Identified SCM as a Target, Directed and Managed Strategy for the Takeover and Made All Critical Decisions

#### 1.    Decision to Acquire

109.    SCM was a large and diversified conglomerate, comprised of twenty-two operating companies based in five industries: chemicals, coatings and resins, paper and pulp, foods, and typewriters.  Trial Ex. 1082; Trial Tr. vol. 5, 712:3-20 (Hill).  Sir Gordon viewed it in 1985 as an attractive target for acquisition for various reasons, including because it was, in

his opinion, poorly managed and had a depressed stock price. *Id.* 712:21-24.  SEC filings show that Hanson affiliates commenced purchasing shares of SCM on July 12, 1985.  Trial Ex. 243, HBML 0015571.

110.  Christian Guntner, an Acquisitions Analyst for Hanson Industries from 1982 through 1985, brought SCM to Sir Gordon's attention.  Trial Ex. 950 (Guntner Dep.), 32:2-15.  Guntner prepared multiple reports about SCM, two of which were admitted into evidence.  Trial Exs 278 and 279.  Both were both addressed to "Sir GW."  No one from Hanson Trust was copied on either report.

111.  Sir Gordon decided to retain Rothschild as an investment advisor following his review of Guntner's updated report.  Trial Ex. 949 (White Dep.), 22:6-27:6.  Lord Hanson played no role in the decision to select or retain Rothschild as an investment advisor.  Trial Ex. 948 (L. Hanson Dep.), 35:24-37:11.  Robert Pirie at Rothschild recommended that Skadden Arps, Slate, Meagher & Flom ("Skadden") be engaged to assist.  Trial Tr. vol. 11, 1686: 1-9 (Clarke).

112.  Clarke met with the Skadden law firm at Rothschild's office on August 6, 1985.  *Id.* 1686:10-15 (Clarke).  Because SCM was not looking to be acquired, Clarke and others discussed doing a unilateral, hostile takeover, something that neither Hanson Trust nor Hanson Industries had done in the United States.  *Id.* 1686:16-25 (Clarke).  The agenda for a meeting the following week identifies the participants by company affiliation: HM Holdings, Rothschild Inc., Skadden.  Trial Ex. 305.  The office address listed for HM Holdings was 100 Wood Avenue South, Iselin, New Jersey, (Trial Ex. 305, MCT_00052216), the same office address as Hanson Industries, Trial Tr. 1149:17-1150: 1.  The Participants' List identified six Hanson Industries employees, seven individuals affiliated with Rothschild, and sixteen individuals affiliated with Skadden.  Trial Ex. 305, MCT_00052216–19.  The meeting concerned a seven-page "Proposed Timetable," which listed "actions to be taken" and the party responsible for taking the actions.  Trial Ex. 305, MCT_00052222-28.  No one from Hanson Trust was involved.

113.  Lord Hanson's knowledge of and involvement in SCM was limited.  Sir Gordon first

United States District Court
Northern District of California

mentioned the name "SCM" to Lord Hanson sometime during July 1985.  Trial Ex. 948 (L. Hanson Dep.), HBML 7:6-13.  That same month, Lord Hanson became aware of internal reports of investments that showed that some purchases of SCM stock had been made.  Trial Ex. 948 (L. Hanson Dep.), 33:9-34:18.  But all he learned was that Sir Gordon had "authorized the purchase of a relatively few shares of SCM."  Trial Ex. 948 (L. Hanson Dep.), 36:5-8.  Prior to launching the hostile acquisition, a Hanson Trust subsidiary acquired 283,400 shares of SCM, as described by the City's expert, Professor Steven Solomon.  Trial Tr. vol. 5, 806:8-11 (Solomon).  Lord Hanson was not advised about the details of the purchases or ultimate plans.  Trial Ex. 948 (L. Hanson Dep.), 34:4-36:8.  No employee or Board member of Hanson Trust, other than Lord Hanson, was advised of the SCM tender offer before it was announced, Trial Ex. 950 (Guntner Dep.), 203:18-205:16, except perhaps Hellings.  Hellings was not involved in any decision making.  Trial Ex. 951 (E. Hanson Dep.), 214: 5-215:16; Trial Tr. vol. 8, 1146:23-25 (Raos).  James "Eric" Hanson (no relation to Lord Hanson, Ex. 3, HBML 0007479), who was a key player in Hanson Industries' team pursuing SCM, was not aware of any involvement by Lord Hanson in the SCM tender offer before or after the August 21 meeting.  Trial Ex. 951 (E. Hanson Dep.), 214:14-215: 25.

114.  On August 20, 1985, Sir Gordon advised Lord Hanson that he was planning to meet with Rothschild the following day (August 21).  Trial Ex. 949, Lord Hanson Dep. 32:13-19, 52:3-24, Oct. 7, 1985.  In a 1985 deposition, Sir Gordon said that he had retained Rothschild "[b]ecause we had no permanent relationship with a bank in the United States.  We have a longstanding relationship with Rothschild in London."  *Id.* 25:22-26:12.  Sir Gordon did not mention SCM during that conversation, but Lord Hanson surmised that the meeting concerned SCM.  Trial Ex. 948 (L. Hanson Dep.), 52:3-24; 59:24-63:25; 70:6-71:7.[13]

---

[13] Prior to this, in June of 1985, Hanson Trust raised 500 million pounds for a rights issue through the Rothschild Inc. bank in London.  Trial Tr. vol. 5, 727:7-728:16 (Hill).  At the time, Lord Hanson stated that Hanson Trust was going to use that money to make acquisitions in the U.S. and not in the U.K.  *Id.*

115. At the meeting the next day, Lord Hanson characterized his role at the meeting as that of an "observer." Trial Ex. 948 (L. Hanson Dep.), 85:15- 86:9. The other attendees from Hanson Industries and its advisors concluded that news of the tender offer had leaked and that an announcement of the tender offer had to be made immediately. Trial Tr. vol. 8, 1152: 20-4 (Raos). Sir Gordon stated his intention to proceed with the tender offer at $60 per share, and Lord Hanson nodded his agreement. Trial Ex. 948 (L. Hanson Dep.), 84:10-88:23. When it came to the decision to attempt to acquire SCM at $60 per share, and later increase that offer, Lord Hanson supported the decision that was being made by "his highly expert group in America, Sir Gordon heading them up," whose judgment he trusted implicitly. Trial Ex. 949, Lord Hanson Dep. 91:12-18, Oct. 7, 1985. Sir Gordon was quoted in a 1988 article in Forbes magazine article as saying that "all of the decisions" were his, and that he had been "careful not to tell [Lord] James [Hanson] what I was up to," and that Lord Hanson was "not involved" in the SCM tender offer. Trial Ex. 2273, p. 3. Lord Hanson also testified that Sir Gordon did not have the authority to go forward with a tender offer at $60 per share over Lord Hanson's objection, Sir Gordon did have the authority to go forward with Lord Hanson's concurrence. *Id.* at 176:14-21 (Lord Hanson).

116. Lord Hanson understood that Sir Gordon was buying shares of SCM. Trial Ex. 949, Lord Hanson Dep. 53:14-56:3, Oct. 7, 1985. Sir Gordon also updated Lord Hanson on "certain developments . . . from time to time" regarding SCM, but did not, for example, keep Lord Hanson abreast of the increased tender offer or negotiations at a higher price. *Id.* 191:2-192:10. There is nothing in Lord Hanson's deposition to indicate that Sir Gordon needed or asked for Lord Hanson's approval in these decisions. Lord Hanson considered Sir Gordon to be as a representative of Hanson Trust during the meetings in which the decision to announce the tender offer was made; Lord Hanson considered himself a director of both Hanson Trust and Hanson Industries during the same period. *Id.* at 74:8-25.

117. A press release issued on August 21 announced, in pertinent part:

> Sir  Gordon  White,  Chairman  of  Hanson  Trust  PLC's  North  American

> interests, announced today that Hanson Trust PLC, directly or through one or more affiliates intends to commence a tender offer for any and all outstanding shares of common stock of SCM Corporation at $60.00 in cash per share net to the seller. The tender offer will be made pursuant to the terms and conditions contained in the definitive tender offer documents which will be filed with the Securities & Exchange Commission as soon as possible.

Trial Ex. 292. As of that date, Lord Hanson had not discussed the possibility of the SCM tender offer with members of Hanson Trust's board of directors. Trial Ex. 948 (L. Hanson Dep.), 81:13-25. The tender offer was announced without consulting the Hanson Trust board of directors in advance. Trial Ex. 948 (L. Hanson Dep.), 83:3-11.

118. That same day, Lord Hanson signed a "bear hug" letter to Paul Elicker, the Chairman of SCM. Trial Ex. 269. It proposed a meeting between Elicker and Sir Gordon, whom the letter referred to as "Chairman of our US interests." *Id.* And the next day, Hanson Trust's board of directors met to discuss it, the first time the Board heard of the offer. *See* Trial Ex. 948 (L. Hanson Dep.), 83:3-86:9. The board was advised that the tender offer would be made by wholly owned subsidiaries of Hanson Trust. Trial Ex. 249. The board approved and ratified the announcement and appointed a four-person committee to enable and facilitate the tender offer. *Id.*

### 2. Financing

119. Financing for the transaction was initially arranged by Clarke and Raos through Chemical Bank. Trial Tr. vol. 8, 1152: 9-19 (Raos). When Chemical Bank had to withdraw because of a conflict, Clarke and Raos arranged for CitiBank to step in. *Id.* 1153:10-1154:12 (Raos). Raos testified that it would normally have been his responsibility to get the financing to purchase SCM's shares, but after the Chemical Bank loan fell through, Hanson Industries needed the money quickly and did not have time to put together a loan for purchases on the open market. *Id.* 171:3-12 (Raos). Raos and his team secured the remaining $775 million through his relationship with Citibank. *Id.* 1153:20-1154:12, 1155:20-1156:2, 1165:21-1166:6-10 (Raos); Trial Ex. 959 (Hellings Dep.), pdf p. 171-172/305 Trans. p. 262:13-263:14; Trial Tr. vol. 11, 1688:15-1689:3 (Clarke); Trial Exs.

2205, 2206; Trial Ex. 962 (Lee Dep.), 282:4-19, 284:9-11, 334:6-16.  Hanson Trust personnel played no role in arranging the financing to be borrowed from those banks. Trial Tr. vol. 11, 1688: 1-3 (Clarke).

120.  HSCM Industries Inc., HHNBV, and Hanson Trust entered into a "Dealer-Management" agreement with Rothschild, Inc. on August 24, 1985.  Trial Ex. 376.  Rothschild acted as the financial advisor to Hanson Trust, HSCM Industries, and HHNBV.  Trial Ex. 280, HBML 0025201.  Raos testified that, as among the three Hanson affiliates, HSCM Industries Inc. was the "lead" for the SCM tender offer.  Trial Tr. vol. 8, 1160:17-1162:2 (Raos).  HSCM Industries Inc. was managed by the U.S. management team from Hanson Industries.  Trial Ex. 466; Trial Tr. vol. 8, 1162:3-1163:4 (Raos).  According to Raos, the reason that Hanson Trust signed the Dealer-Management Agreement was that Hanson Industries did not yet have a firm commitment for financing.  Trial Tr. vol. 8, 1216:9-1218:9 (Raos).  Hanson Trust never paid anything on Rothschild's engagement.  Trial Tr. vol. 11, 1733:11-21 (Clarke).

121.  On September 5, 1985, Raos finalized a term sheet with Citibank for a $721,500,000 loan to finance the initial tender offer.  Trial Ex. 2206.  It reflected that the borrower would be HM Anglo-American Ltd., and that the guarantors would be HSCM Investments, HSCM Holdings, HSCM Industries and any subsidiaries of HM Anglo-American that acquired SCM stock.  *Id.*  HM Anglo-American Ltd. was a "dual resident" company of both the United States and United Kingdom for the sole purpose of enabling a tax deduction for interest expense to be taken in both the United States and United Kingdom.  Trial Tr. vol. 8, 1125:16-1127:3 (Raos).  Raos negotiated the "major things" in the loan, such as the term and the amount, and the rest of his team finalized the negotiations.  *Id.* 1165:1-1166:10 (Raos).  Bob Lee testified that Raos and Landuyt negotiated the "macro of the deal," and Lee negotiated the details, such as the loan covenants.  Trial Ex. 962 (Lee Dep.), 282:4-14. Raos and Lee both testified that no one from Hanson Trust had anything to do with the negotiation of the loan terms.  Trial Tr. vol. 8, 1166:7-10 (Raos); Trial Ex. 962 (Lee Dep.), 48:23-49:8; 282:15-19; 284:9-11.  Hanson Trust also did not provide any collateral for the

1     financing of the SCM acquisition.  Trial Tr. vol. 8, 1136:20-25 (Raos).

2  122.  On September 9, 1985, Citibank issued a commitment letter addressed to Raos at Hanson

3        Industries, though the formal loan agreement was not executed until October 30, 1985.

4        Trial. Ex. 2207.  Alan Hagdrup and Martin Taylor signed on behalf of HM Anglo-

5        American.  *Id.*  Notices to HM Anglo-American were to be given c/o Hanson Trust PLC in

6        London with a copy to Hempstead, Hanson Industries' in-house lawyer.  Trial Ex. 40, p.

7        352, pdf p. 116/127.

8  123.  Later, when it became clear that additional financing would be necessary in a hurry as part

9        of the "street sweep" after the initial tender offer was terminated, Hanson Trust provided it.

10       Trial Ex. 959 (Hellings Dep.), pdf p. 55-56/305 Trans. p. 58:3-59:6; Trial Tr. vol. 8,

11       1170:6-21 (Raos).  Eric Hanson contacted Hellings, the Finance Director of Hanson Trust,

12       to obtain $300 million for share purchases.  Trial Ex. 951 (E. Hanson Dep.), 80:22-82:17.

13       Hellings agreed to provide $180 million, *id.* 83:1-8, by having Hanson Trust borrow the

14       money, and then loan the money to Hanson Holdings Netherlands ("HHNBV"), Trial Ex.

15       280, HBML 0025190-91.  Hellings testified that he made the decision to allocate most of

16       the purchase of shares of SCM—worth $180 million—to HHNBV during Hanson Trust's

17       "open market" purchases in September 1985.  Trial Ex. 959, Hellings Dep. 58:3-59:6, Oct.

18       1, 1985.  The funds for those open market purchases came from three British credit

19       facilities, one of which was Lloyd's International.  Hellings Dep. 97:14-18.  Hellings

20       played no role in making substantive decisions regarding the tender offer, however.  Trial

21       Tr. vol. 8, 1146:23-25 (Raos).

22  124.  Hanson Trust also provided backing by way of what Raos described as "comfort letter."

23       Trial Tr. vol. 8, 1155:5-11 (Raos).  On August 22, 1985, Derek Bonham, the Finance

24       Director of Hanson Trust, wrote a letter to Rothschild, which was expected to act as Dealer

25       Manager for the tender offer.  Trial Ex. 273.  It was written in response to Rothschild's

26       "nervous[ness]" about funding for the tender offer, because "Hanson North America" did

27       not have a firm commitment for financing as of that date.  Trial Tr. vol. 8, 1156: 14-

28       1157:12 (Raos).  Raos described Hanson Trust's role as that of a "backstop" in the event

United States District Court
Northern District of California

that something went wrong with the financing.  *Id.*  The letter advised Rothschild that Hanson Trust had sufficient cash resources and lines of credit to finance the SCM acquisition.  Trial Ex. 273 (written on Hanson Trust letterhead and send by Derek Bonham, a finance director at Hanson Trust); Trial Ex. 376.  Raos testified that he and Hanson Industries "could have gotten" the money without Hanson Trust's backing but could not have done so "that fast" and "[t]here wasn't enough time" for him to do it on his own.  Trial Tr. vol. 8, 1207:15-1208:2.  Besides the money loaned to HHNBV, however, no other Hanson Trust resources were used or ultimately needed to complete the hostile takeover.

### 3.  Litigation and Corporate Structuring

125.  A flurry of litigation and corporate structuring followed the initial tender offer.  Hanson Trust filed a lawsuit on August 22, naming SCM and the New York Attorney General as defendants.  Trial Ex. 213.  The complaint alleged that "Hanson" (which the complaint defined as "Hanson Trust PLC") had announced that, either directly or through one or more affiliates, it intended to commence a cash tender offer for all outstanding shares of common stock of SCM and sought declaratory and injunctive relief against enforcement of New York's state "Takeover Act."  *Id.* HBML 0007733, ¶ 1.

126.  HSCM Industries Inc. was incorporated the following day, August 23, 1985.  Trial Ex. 2054-17.  In the "Action by Unanimous Written Consent of the Board of Directors of HSCM Industries in Lieu of First Meeting of Board of Directors," Clarke and Hempstead—Hanson Industries' President and General Counsel—were listed as the corporation's directors.  Trial Ex. 466, HBML 0000088.  The board of directors appointed officers of HSCM Industries Inc., including Clarke as the President; Raos as a Vice President and the CFO; Hempstead as a Vice President and the Secretary and Treasurer; and Eric Hanson as a Vice President.  *Id.* HBML 0000089.  All of these men were Hanson Industries' employees; as stated above, none were officers or directors of Hanson Trust.  This Action also documented, among other things, that HSCM Industries Inc. was authorized to make a tender offer for SCM; commence litigation relating to the tender

46

1    offer; and execute a Dealer-Manager Agreement with Rothschild, Inc.  Trial Ex. 466,

2    HBML 000093.

3    127.  On August 23, 1985, Hanson Trust filed a second lawsuit in connection with the tender

4    offer, this time against SCM.  Trial Ex. 212.  The complaint sought to enjoin SCM from

5    allegedly falsely disparaging Hanson Trust with respect to the tender offer, and therefore

6    violating federal securities laws.  *Id.*  The complaint alleged that on August 21, "Hanson"

7    had announced its intention to make a tender offer for the shares of SCM, either directly or

8    through one or more affiliates, and the following day SCM commenced making false and

9    misleading statements about the tender offer.  *Id.* HBML 0007754, ¶ 6.   That case was

10   apparently resolved quickly—according to the formal tender offer made on August 26,

11   SCM agreed on August 23 to a temporary restraining order and to not make further

12   statements until after making the required, regulatory filings.  Trial Ex. 3, HBML 0007475.

13   128.  The City makes much of the fact that Hanson Trust, not HSCM Industries Inc. or HHNBV,

14   was the plaintiff in these first two lawsuits, and it argues that Hanson Trust's role as the

15   plaintiff in those actions demonstrates that Hanson Trust dominated, controlled and,

16   ultimately, "made" the tender offer for SCM.  It is correct that Hanson Industries was not

17   included or mentioned in either complaint, and neither was HSCM Industries Inc. or

18   HHNBV, which were the nominal purchasers in the offer.  Trial Tr. vol. 5, 803:22-804:2

19   (Solomon); Trial Tr. vol. 11, 1692:15-20 (Clarke).

20   129.  But the City misunderstands the import of those facts.  For example, HSCM Industries Inc.

21   had not been created as of the date of the first complaint and was created the same day as

22   the second complaint.  *See* Trial Ex. 212.   And the City's portrayal of Hanson Trust as the

23   sole litigant is inconsistent with the published federal court decisions regarding the tender

24   offer litigation, which make clear that the "Purchasers," HSCM Industries Inc. and

25   HHNBV, were either *co-plaintiffs* or *co-defendants* in the litigation.  *See Hanson Trust*

26   *PLC v. SCM Corp.*, 774 F.2d 47, 54 (2d Cir. 1985); *Hanson Trust PLC v. ML SCM*

27   *Acquisition, Inc.*, 781 F.2d 264 (2d Cir. 1986).

28   130.  And, the evidence shows that Hanson Trust did not initiate, manage or control the

United States District Court
Northern District of California

1   litigation with SCM.  Hempstead, Hanson Industries' General Counsel, appeared as

2   counsel for Hanson Trust during the depositions that took place during the 1985 takeover

3   litigation.  Trial Ex. 959, Hellings Dep. 10:24-11:2, Oct. 1, 1985.  In that capacity, he also

4   assisted Lord Hanson in preparing him for his deposition.  Trial Ex. 960, Hempstead Dep.

5   43:17-44:9, Aug. 30, 2018.   Clarke testified that he, Sir Gordon, and Hempstead managed

6   the litigation with SCM, and that no one from Hanson Trust was involved.  Trial Tr. vol.

7   11, 1692:9-20 (Clarke).  Skadden represented the Hanson entities in both lawsuits.  Trial

8   Exs. 212; 213.

9   131.   Hempstead also selected and managed outside counsel who worked on the tender offer and

10   litigation, and Hanson Industries paid the bills.  Trial Ex. 960 (Hempstead Dep.), pdf p.

11   212-213/331 Trans. p. 213:11-214:7.  Skadden was the law firm that, at least initially,

12   worked on the tender offer.  Trial Tr. vol. 8, 1219:6-8.  It is significant that Clarke hired

13   Skadden and was the primary client contact.  It is less telling that an August 26, 1985,

14   letter sent on Skadden letterhead identified the firm's client as "Hanson Trust PLC," Trial

15   Ex. 625, and that the "deal book" for the SCM acquisition stated that Skadden represented

16   "Hanson Trust," and the book has "Hanson Trust PLC" on its cover, Trial Ex. 304,

17   MCT_00034583, MCT_00034594; *see also* Trial Exs. 47; 48 (two volume "deal book" for

18   the SCM restructuring with "Hanson Trust PLC" on its cover).  No evidence was presented

19   explaining why Skadden referred to its client as Hanson Trust PLC instead of the

20   Purchasers.

21   132.   Hempstead handled the incorporation of HSCM Industries Inc., HSCM Holdings, Inc., and

22   HSCM Investments Limited under Delaware law.  Dkt. No. 266, Undisp. Fact 22.  HSCM

23   Industries Inc. was wholly owned by HSCM Holdings, Inc., which in turn was wholly

24   owned by HSCM Investments Limited.  *Id*.  HSCM Investments Limited was wholly

25   owned by HM Anglo-American Ltd., which was a Delaware corporation wholly owned by

26   HBML.  *Id*.  HSCM Industries Inc. was formed for the sole purpose of purchasing SCM

27   shares, and it had no assets other than the stock of SCM.  Trial Exs. 41, HBML25530-

28   25531; 959, Hellings Dep. 332:19-333:11, Sept. 27, 2019; 960, Hempstead Dep. 65:4-7,

United States District Court
Northern District of California

14-17, Aug. 30, 2018; 339, HBML61451.  Raos testified that "HSCM Industries was the alter ego of Hanson Industries."  Trial Tr. vol. 8, 1217:9-10.  And, as relevant for the tender offer, Hanson Trust had previously set up HHNBV, a subsidiary company that served as a vehicle to be used to position (or re-position) Hanson Trust's cash during cross-border transactions.  *Id*.; *see also* Trial Tr. vol. 5, 797:19-24 (Solomon).

133.  The formal tender offer says that Sir Gordon, "Chairman of Hanson Trust PLC's North American interests," announced that Hanson Trust intended to commence the offer.  Trial Ex. 3 at 21.  In pertinent part, the tender offer identified HSCM Industries Inc. and HHNBV as the "Purchasers."  *Id.* at 18.  It described them as "indirect wholly owned subsidiaries of Hanson Trust."  Trial Ex. 3, HBML 0007450.  The tender offer further provided:

- "As soon as practicable, Hanson Trust intends to seek to influence the management of the Company [SCM] . . . to seek to effect a business combination between the Company and Hanson Trust or an affiliate of Hanson Trust."  *Id.*

- The business combination could take the form of a merger of SCM with Hanson Trust or a direct or indirect subsidiary of Hanson Trust, "which could be either of the Purchasers or one or more subsidiaries or affiliates of either of the Purchasers."  *Id.*

- An indirect, wholly owned subsidiary of Hanson Trust had purchased 2.9% of SCM's shares in open market transactions between July 12, 1985 and August 19, 1985.  *Id.* HBML 0007467.

- "Hanson Trust and the Purchasers" intended to borrow all funds necessary to purchase SCM's shares, but Hanson Trust and its subsidiaries had sufficient, available cash to contribute or loan funds to HSCM Industries Inc. or HHNBV to the extent necessary, if other financing could not be arranged.  *Id.* HBML 0007467-68.

- "Hanson Trust" had reviewed publicly available information regarding SCM.  Based on that review, "Hanson Trust" had "considered on a preliminary basis," the

49

possible disposition of SCM's typewriter operations, which had not been profitable.

"Hanson Trust" planned to conduct a further review of SCM if it acquired control.

*Id.* HBML 0007470.

134. Hellings, in his capacity as financial director of Hanson Trust (a position equivalent to a CFO in a U.S. corporation), testified that he made the decision regarding which entities would be the tender offerors and that Hanson Industries "really had no role" in the SCM tender offer. Trial Ex. 959, Hellings Dep. 69:23-70:14, Oct. 1, 1985; Trial Ex. 960, Hempstead Dep. 27:1-15, Dec. 8, 2020. Correspondence to the SEC states that Hanson Trust "controls" both purchasers. Trial Ex. 379. Hempstead executed an affidavit with the SEC stating Hanson Trust's intention to acquire SCM. Trial Ex. 1008.

135. SCM attempted to block the tender offer by employing what was referred to as a "crown jewels" defense, which involved transferring two of SCM's best businesses, the pigments and Durkee's Famous Food businesses, to a Merrill Lynch affiliate at a favorable price to effectively "kill" the tender offer. Trial Tr. vol. 8, 1167:12-1168:10 (Raos). As a result, and after discussions with Robert Pirie at Rothschild, Sir Gordon decided to terminate the tender offer. *Id.* 1167:16-1170:2 (Raos); Trial Ex. 280, HBML 0025193; Trial Ex. 243, HBML 0015576. But on the same day, Sir Gordon decided to purchase shares of SCM through privately negotiated transactions. Trial Ex. 243, HBML 0015576; Trial Ex. 280, HBML 0025193. No one from Hanson Trust was consulted about either the termination of the tender offer or the decision to purchase shares on the open market following termination of the tender offer. Trial Tr. vol. 8, 1169:24-1170:5 (Raos). Those market purchases of shares were referred to by Hanson Industries personnel as the "Street Sweep." Trial Tr. vol. 8, 1170:6-16 (Raos).1169:10-1170:5. Raos testified that the Street Sweep required him to procure approximately $200 million within three to five days to pay for the shares, which is why the additional money from Hanson Trust was needed. *Id.* 1170:6-16 (Raos).

136. A SEC Form 13D prepared as of September 11, 1985 stated that HSCM Industries Inc. had acquired approximately 6.9% of SCM's shares, Trial Ex. 280, HBML 0025197; HHNBV

United States District Court
Northern District of California

had acquired approximately 24.4% of SCM's shares, Trial Ex. 280, HBML 0025198; and HMAC had acquired 2.8% of SCM's shares, Trial Ex. 280, HBML 0025198.  The first page identified Hempstead of Hanson Industries as the person authorized to receive notifications.  Trial Ex. 280, HBML 0025520.  Hempstead was also a vice president and officer of HSCM Industries, Inc.  Ex. 466, HBML 0000089.

137.   Hanson Trust was identified in the Form 13D as a beneficial owner of 34.1% of SCM's shares.  Trial Ex. 280, HBML 0025179.  Its beneficial ownership consisted of the total shares owned by HSCM Industries Inc., HHNBV, and HMAC.  The Schedule 13D states that Hanson Trust obtained the loans to fund the transaction, that those funds were provided to HHNBV to make subsequent share purchases, and that the loans came from Lloyds of London (Hanson Trust's banker).  *Id.*; Trial Tr. vol. 5, 808:1-18 (Solomon).  It also states that Hanson Trust reported sole voting and dispositive power of approximately 3.416 million SCM shares that were purchased on September 11, 1985.  Trial Ex. 41 at 2.[14]

138.   The Street Sweep led to a third and fourth lawsuit, in which HSCM Industries and HHNBV were co-litigants, in contrast to the first two cases where they were not parties.  The third was between SCM, HSCM Industries Inc., HHNBV, and Hanson Trust PLC.  *See Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir. 1985).  The U.S. District Court for the Southern District of New York entered a preliminary injunction barring Hanson Trust PLC, HSCM Industries Inc., and HHNBV from acquiring additional shares or voting of the shares that had been acquired.  *See id.* at 54; *see also* Trial Ex. 243, HBML 0015576-77; Trial Ex. 280, HBML 0025193-94.  Shortly thereafter, Hanson Trust, HSCM Industries Inc. HHNBV and HMAC filed yet another complaint against SCM, its directors and certain officers challenging the "Crown Jewels" defense.  Trial Ex. 2026.  After that, the shareholders of Hanson Trust met in London and adopted a resolution approving the acquisition by Hanson Trust's affiliates on such terms as the directors of Hanson Trust deemed appropriate.  Trial Ex. 243, HBML 0015580.

---

[14] Outside of the Schedule 13D (Trial Ex. 41), there was no other documentation of HBML's loan to HHNBV.  Trial Tr. vol. 5, 810:1-12 (Solomon).

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

139. On September 30, 1985, the Second Circuit Court of Appeals reversed the preliminary injunction. *See Hanson Trust PLC*, 774 F.2d 47. The reversal permitted a new tender offer at a higher price. Trial Ex. 243, HBML 0015580.

140. On October 8, 1985, Hanson Trust announced a second tender offer at $75 per share for all the remaining shares of SCM. Trial Ex. 244. That tender offer, dated October 11, 1985, stated that Hanson Trust or its affiliates intended to seek to influence the management of SCM, a majority representation on SCM's board of directors, and to effectuate a business combination. Trial Ex. 243 at 25; Trial Tr. vol. 5, 814:12-21 (Solomon). The offer went on to say that Hanson Trust would consider the possible disposition of SCM's typewriter operations. Trial Ex. 243.

141. On December 5, 1985, Clarke and Raos attended a meeting of Hanson Trust's Board of Directors, the first time either individual attended one of the Board's meetings. Trial Ex. 303; Trial Tr. vol. 8, 1174:11-16 (Raos). Raos recalled that, at that meeting, Clarke reported on North American operations and the SCM tender offer. Trial Tr. vol. 8, 1173:24-1175:9 (Raos). The Board did not tell Clarke or Raos what to do or give any directions regarding the SCM tender offer. *Id.* The Board ratified the tender offer. *Id.* The minutes also include a board resolution ratifying the execution of the Citibank loan by HM Anglo American Ltd., to be secured by guarantees and pledges of the stock of various of HM Anglo American Ltd.'s subsidiaries. Trial Ex. 303, HELLINGS_0026102.

142. On January 6, 1986, the Second Circuit Court of Appeals issued its decision in *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264 (2d Cir. 1986), which was the action filed by Hanson Trust, HSCM Industries Inc., HHNBV, and HMAC Investments Inc., seeking to enjoin SCM and Merrill Lynch from consummating the "crown jewels" defense. The Second Circuit reversed the district court's denial of a preliminary injunction. *Id.* at 272. That decision effectively decided the tender offer battle in favor of the Hanson entities.

143. The next day, Hanson Trust used its letterhead to issue a press release announcing that "Hanson had . . . accepted for payment approximately four million shares of SCM." Trial

Ex. 455 (noting that "Hanson had again demonstrated that it was one of the few U.K. companies that was able successfully to compete in the world's most sophisticated market").  Sir Gordon commented "that this was a great victory . . . and completely vindicated Hanson's strategy over the past months."  *Id.*

144.  HSCM Industries Inc. and HHNBV entered into a "Transaction Agreement."  Trial Ex. 2054-22.  It recited that those two parties had jointly commenced a tender offer for SCM's shares, the various amendments to the tender offer, and the desire to form a corporation to be called "HSCM Merger Co. Inc." to merge with and into SCM.  Trial Ex. 2054-22, HBML 0000113-14.  HSCM Merger Co. Inc. was incorporated on January 8, 1986.  Trial Ex. 2054-28.  Of HSCM Merger Co.'s 1,000 outstanding shares, HSCM Industries Inc. owned 804 shares and HHNBV owned 196 shares, which corresponded to their proportionate ownership of SCM shares.  Trial Ex. 13, HBML 0000128.

145.  Also on January 8, 1986, SCM, HSCM Industries Inc., HHNBV, and Hanson Trust executed an agreement resolving the litigation and the tender offer.  Trial Exs. 11, 211.  It was executed by Sir Gordon on behalf of HSCM Industries, and by George Hempstead on behalf of both HHNBV and Hanson Trust.[15]  *Id.*

146.  The first paragraph of the January 8 agreement defined all three Hanson entities collectively as "Hanson."  "Hanson" agreed to promptly effect a merger with SCM.  Trial Exs. 11, 211.  HSCM Industries Inc. and HHNBV had already agreed to incorporate a company called HSCM Merger Co. Inc. for the purpose of merging with SCM, and that company was, in fact, incorporated on January 8, 1986.  Trial Exs. 2054-22, 2054-28.  The agreement also provided for mutual dismissals of pending litigation concerning the tender offer.  Trial Exs. 11; 211 at HBML 0024754.  The parties understood at the time that they executed this agreement that the merger discussed in the letter would be a merger between an indirect wholly owned subsidiary of Hanson Trust and SCM, and that the result of the

---

[15] Hanson Trust had given Hempstead its Power of Attorney to execute documents in connection with the SCM tender offer in Trial Exhibit 340.  There is a dispute whether it granted authority to him to sign this agreement.  Trial Tr. vol. 5, 818:11-14 (Solomon).

53

merger would be that SCM would become an indirect wholly owned subsidiary of Hanson Trust.  Trial Ex. 345, MCT 00008527 (Shareholder Circular sent to SCM shareholders explaining that, "The Settlement Agreement provided for the Merger on the terms described" in the circular); Trial Ex. 345, MCT 00008518 ("As a result of the Merger, SCM will become an indirect wholly owned subsidiary of Hanson Trust").  That is what happened.  The January 8, 1986, agreement recited that SCM had elected Sir Gordon, Clarke, Raos, Hempstead and Eric Hanson to the Board of Directors of SCM.  Trial Exs. 11, 211.  No one from Hanson Trust was added to SCM's board.

147.  Hanson Industries was not a party to the settlement agreement.  Nor was it a party to the tender offer or the related litigation.  *See id.*  Clarke pointed out, however, that HSCM Industries Inc. *was* a party, and he and other Hanson Industries personnel were the directors and officers of HSCM Industries Inc.  Trial Tr. vol. 11, 1745:4-1746:16 (Clarke).

148.  In a January 15, 1986 letter to HBML shareholders, Lord Hanson stated that "Hanson Trust, through Hanson Industries, won control of SCM Corporation in the United States." Ex. 271, HBML 0015539.  The letter goes on to say that "[t]he benefits of the acquisition will flow to Hanson Trust shareholders . . . ." *Id.*

149.  On February 21, 1986, HSCM Merger Co. Inc. and SCM executed a "Plan and Agreement of Merger."  Trial Ex. 13.  Clarke executed it in his capacity as President of HSCM Merger Co. Inc., with Hempstead attesting Clarke's signature.  Trial Ex. 13, HBML 000031.  The agreement recited that Hanson Trust indirectly owned all of the outstanding capital stock of HSCM Merger Co. Inc. and, through two indirect wholly owned subsidiaries, beneficially owned approximately 11 million out of approximately 12 million issued and outstanding shares of SCM stock (i.e., 91.6%).  *Id.* at HBML 000028, recitals and Section 1.01(c); Trial Ex. 345 (Circular sent by SCM to its shareholders), MCT 00008533.

150.  The Shareholder Circular sent to SCM shareholders explained that, "As a result of the Merger, the separate corporate existence of Sub [HSCM Merger Co. Inc.] will cease and SCM will continue its business as an indirect wholly owned subsidiary of Hanson Trust." Trial Ex. 345, MCT 00008522.  The shares of owners who had not tendered their shares to

one of the Purchasers were converted into a right to receive $75 per share, *id.* at HBML 000029, Section 2.06, which resulted in the buyout of the SCM shareholders who had not tendered their shares, Trial Ex. 345, MCT 00008522.

151.  The merger of HSCM Merger Co. Inc. and SCM was effected on March 31, 1986.  Trial Ex. 2054-32.  SCM was the surviving corporation in the merger, and the company continued to be named "SCM Corporation.  *Id.* at HBML 0000146.  A Certificate of Merger was filed indicating that SCM was the surviving company in the merger.  At this point, the acquisition of SCM was complete and Marchant's liabilities remained with the merged company, SCM.  Dkt. No. 266, Undisp. Fact 26.  Since SCM was the surviving company, as opposed to Newco, and Hanson Trust is the only other entity referenced in the February Plan and Agreement of Merger, the assumption of SCM's liabilities was necessarily by a Hanson entity other than Newco.  *See* Trial Ex. 13.

152.  At Hanson Trust's February 26th board meeting (held nearly a month before the shareholder vote called for in the Plan and Agreement of Merger), SCM was listed as a "divisional report" to Hanson Trust.  Trial Ex. 306.  Remnants of SCM continued to be listed as "divisional reports" in Hanson Trust board minutes as late as mid-1989.  *See, e.g.*, Trial Ex. 383.

153.  In connection with the merger, SCM sent a March 4, 1986, notice of a special meeting of shareholders to vote on the merger of SCM into the newly created Newco.  Trial Ex. 14 at 2.  Pursuant to SEC requirements, SCM disclosed in the notice that Hanson Trust had "commenced a review of its business operations with a view toward the possible sale of certain operations of SCM . . . ."  Trial Ex. 14 at 8.  This document made no reference to Hanson Industries, though it refers to the "Hanson Affiliates," and states that Hanson Trust is reviewing SCM and "may sell certain operations."  *Id.*  Raos was unsure why the document says Hanson Trust instead of Hanson Industries. Trial Tr. vol. 8, 1213:20-1214:16 (Raos).

154.  An SEC Form 20-F filed by Hanson Trust on July 23, 1986, describes Hanson Trust's role in financing the SCM acquisition.  Trial Ex. 40.  An exhibit to it is the October 30, 1985,

United States District Court
Northern District of California

loan agreement among HM Anglo-American Ltd. and several banks.  Trial Ex. 40 at 2.

Raos testified that Hanson Trust's board of directors ratified the loan agreement.  Trial Tr.

vol. 8, 1175:7-9 (Raos).  The agreement stated that any notices of defaults or other issues

with financing should go directly to Hanson Trust, with a copy also going to Hempstead of

Hanson Industries.  Trial Exs. 40; 701 at 7-8.

### 4.   Other Acquisition Conduct

### a.   Regulatory Filings Concerning the Tender Offer

155.  Hanson Trust's name appeared on Hart-Scott-Rodino Act pre-clearance notification to the

Federal Trade Commission.  Trial Ex. 2015, MCT_00004850.  As Clarke explained,

Hanson Trust had to make the Hart-Scott-Rodino Act pre-merger notification because it

was the ultimate parent of the acquirors.  *Id.*; Trial Tr. vol. 11, 1735:16-1737:14 (Clarke).

Clarke's testimony is consistent with Section 803.2 of the premerger notification

regulations (16 C.F.R. § 803.2) promulgated under the Hart-Scott-Rodino Antitrust

Improvements Act of 1976 (15 U.S.C. section 18a) requires that the "ultimate parent"

entity file the pre-merger notification.

156.  Hanson Trust's name appeared on SEC filings made in connection with the tender offer.

Those included Forms 13D (Trial Ex. 41) and 14D (Trial Ex. 3).  In connection with the

SCM tender offer, Hanson Trust, HHNBV, HSCM Industries Inc., and HMAC

Investments Inc. jointly filed a Schedule 13D with the Securities Exchange Commission

("SEC") on or about September 23, 1985.  Trial Ex. 41.  Only HSCM Industries Inc. and

HHNBV were referred to as the "Purchasers" of SCM's stock in the Schedule 13D.  *Id.*

HBML 0025527.  Hempstead, of Hanson Industries and HSCM Industries Inc., was

identified as the person authorized to receive notices and communications regarding the

Schedule 13D.  *Id.* HBML 0025520.  Hanson Trust was identified as the "beneficial

owner" of 34.1% of SCM's outstanding shares at the time of the Schedule 13D filing. T *Id.*

HBML 0025521; Trial Tr. vol. 5, 847:17-24 (Solomon).   As Professor Solomon

acknowledged, Hanson Trust was required to file the Schedule 13D with the SEC because

it was the "beneficial owner" of more than 5% of SCM's stock.  *Id.* 846:11-21, 847:13-24

(Solomon).

157.  SEC rules also required the filing of a Schedule 14D-1 in connection with the SCM tender offer.  *Id.* 879:21-25 (Solomon).  On or about January 13, 1986, HSCM Industries Inc., HHNBV, and Hanson Trust jointly filed a Schedule 14D-1.  Trial Ex. 2048, MCT_00036234, MCT_00036240.  The "Bidders" and "Purchasers" of SCM's stock were identified as HSCM Industries Inc. and HHNBV.  Trial Ex. 2048, MCT_00036234, MCT_00036238.  Hempstead, of Hanson Industries and HSCM Industries Inc., was identified as the person authorized to receive notices and communications on behalf of the Bidders.  Trial Ex. 2048, MCT_00036234.  Hanson Trust's name appeared in the Schedule 14D-1 as a "beneficial owner" of 80.7% of SCM's shares at the time the Schedule 14D-1 was filed.  Trial Ex. 2048, MCT_00036235.  As discussed in the conclusions of law, the "bidders" (HSCM Industries Inc. and HHNBV) and "beneficial owner" of more than 5% of SCM's stock (Hanson Trust) were required by law to file the Schedule 14D-1 with the SEC in connection with the SCM tender offer.

158.  Hempstead testified that Hanson Trust was identified because "SEC rules required the ultimate parent entity to be disclosed" together with the ultimate parent's financial statements.  Trial Ex. 960 (Hempstead Dep.), pdf p. 213/331 Trans. p. 214:16-20.  As discussed in the conclusions of law, the Williams Act amended the Securities and Exchange Act of 1934 (15 U.S.C. § 78a et seq.) to require mandatory disclosure of information regarding cash tender offers.  Those disclosures are required to be made by any person who would "directly or indirectly" become the "beneficial owner" of more than five percent of the required that Hanson Trust be disclosed in the tender offer documents.  15 U.S.C. § 78m(d)(1); 15 U.S.C. § 78n(d)(1).  The Form 14D and Form 13D both make clear that Hanson Trust indirectly owns the purchasers of SCM's shares, and is, therefore, the beneficial owner of the shares owned by its subsidiaries.  Trial Ex. 3, HBML 0007450, HBML 0007467; Trial Ex. 41, HBML 0025539-40, HBML 0025577.

**b.  Press Releases Concerning the Tender Offer**

159.  Hanson Trust issued numerous press releases regarding the SCM tender offer.  Some of the

57

press releases were issued in the name of Hanson Trust.  *See, e.g.*, Trial Exs.  298, 2339.

Sometimes, press releases discussing the SCM tender offer commenced by stating, "Sir

Gordon White, Chairman of the North American interests of Hanson Trust PLC,

announced today . . . ," *see, e.g.*, Trial Exs.  269, 445, 1094, or "Sir Gordon White,

Chairman of Hanson Trust PLC's North American interests, announced today . . . ," *see*

Trial Ex. 292.  Press releases from November 8, 1985 and November 15, 1985 both stated

that Sir Gordon, "Chairman of the North American interests of Hanson Trust PLC,

announced today that Hanson Trust (through two of its affiliates)" extended the expiration

date for its tender offer.  Trial Exs. 1094; 1111.  Further, a November 4, 1985 letter from

Hempstead to the SEC stated that Hanson Trust controlled the two purchasers of SCM.

Trial Ex. 379.  And on March 31, 1986, SCM issued a press release regarding the merger.

Trial Ex. 307.   It stated that Hanson Trust "completes merger of SCM Corporation" in

which "SCM Corporation has become an indirect wholly owned subsidiary of" Hanson

Trust.  *Id.* at 1.  The press release made no mention of Hanson Industries, SCM's nominal

purchasers, or any other entity affiliated with Hanson Trust.  Trial Ex. 307.

160.   The press releases are not entitled to the weight the City gives them.  Edward Bridges, an

expert in corporate communications for companies listed on the London Stock Exchange,

testified that a listed company was obligated by London Stock Exchange rules (referred to

as "listing rules") to make announcements disclosing "market-sensitive information," and

that the press releases that he reviewed were consistent with the stock exchange's listing

rules.  Trial Tr. vol. 13, 2015:8-2019:9 (Bridges).  He further opined that press releases

about prospective acquisitions by a listed company's subsidiaries often fail to mention the

particular subsidiaries involved in the acquisition since the obligation under the listing

rules lies with the listed company, not the subsidiaries.  *See id.* 2011:5-16, 2018:25-2019:5,

2020:15-2021:6 (Bridges).  That is especially the case where an announcement is made

because of a premature leak of the information, and the acquiring subsidiary has not even

been formed as of the date of the announcement.  *Id.* 2019:16-2021:6 (Bridges).

161.   The tender offer stated that "Hanson Trust" had done, and would do, various things in

United States District Court
Northern District of California

connection with SCM, such as "Hanson Trust has reviewed publicly available information" about SCM.  Trial Ex. 3, HBML 0007470.  Evidence from depositions taken in 1985, as well as this litigation, demonstrate that the review of publicly available information was performed by Hanson Industries personnel in the U.S.  Trial Tr. vol. 8, 1116:12-1117:1 (Raos); Trial Tr. vol. 12, 1781:3-1784:8 (Landuyt).

162. That usage of Hanson Trust is consistent with how the term "Hanson Trust" was used in other SEC filings.  Alan Hagdrup, the head lawyer for Hanson Trust during the period 1985 to 1992, testified that the term "Hanson Trust" in SEC filings describing the tender offer was used to refer "collectively for all the companies in the group."   Trial Ex. 958 (Hagdrup Dep.), 280:2-8.  He said that "Hanson Trust is used both for the company and for the group as a whole, of which Hanson Trust was the parent company"; and that "Hanson Trust" or "Hanson PLC" referred to the company "globally rather than just as an individual company."  Id. 278:1-285:17 (referring to discussion of the tender offer and various business activities in 1986 Form 20-F).

163. It was clear to SCM from the litigation and the documents who the purchasers were.  SCM identified HSCM Industries and HHNBV as the parties making the tender offer.  Trial Ex. 345 (Circular sent by SCM to its shareholders), MCT 00008525 ("On August 26, 1985, HH [HHNBV] and HSCM [Industries] commenced a tender offer"); ("On September 5, 1985, HH and HSCM amended their tender offer"); ("On September 11, 1985, HH and HSCM terminated their amended tender offer"); ("HH and HSCM purchased 3,133,200 shares of Common Stock in six separate transactions."); p. MCT 00008526 ("On October 8, 1985, Hanson Trust announced that HH and HSCM would make a tender offer").

164. Despite the language in the tender offer documents indicating that "Hanson Trust" would be doing certain things, witness testimony demonstrated that Hanson Industries personnel, through their roles as the directors and officers of HSCM Industries Inc., would make and control decisions regarding SCM if the tender offer was successful, and that Hanson Trust played no role in making or controlling decisions regarding SCM other than approving or ratifying decisions already made by Hanson Industries' personnel.  In short, while Hanson

Trust supported and partially financed the tender offer, the hostile takeover had been conceived of, planned, decided on, and announced by Hanson Industries personnel who managed and controlled acquisitions in the United States.

**B.      Post Acquisition Financial Investigations**

165.   One issue in this case was whether Hanson Trust should have learned about the Marchant environmental liability from due diligence investigations.  Hanson Trust's investigations were reasonably thorough and did not disclose the problems at the FMW Site.

166.   With the takeover battle won, Hellings, Raos, Landuyt, and Don Schowenwolf, head of Hanson Industries' insurance department, began evaluating SCM's liability insurance coverage.  Trial Ex. 327; Trial Tr. vol. 8, 1279:11-1280:23 (Raos).  The team concluded that SCM lacked adequate liability insurance in 1986, and that "Hanson will have to self-assume all risk of loss from pollution arising out of exposure in 1986."  Trial Ex. 460.  Seven years later, Hellings circulated a memorandum regarding his concerns about the insurance market, stating that Hanson Trust "took over substantial liabilities to clean up toxic sites due to contamination of ground at chemical sites."  Trial Ex. 450.

167.   Under Generally Accepted Accounting Principles ("GAAP"), liabilities could be added to the acquired company's balance sheet during the first year following the acquisition.  Trial Tr. vol. 8, 1183:20-1184:8; 1185:14-21 (Raos).  That way, later-discovered liabilities would not adversely impact earnings per share.  Trial Tr. vol. 12, 1781:24-1782:11 (Landuyt).  Raos testified that "it behooved us to find and accrue as many of the liabilities as we could" after the acquisition of SCM.  Trial Tr. vol. 8, 1183:20-1184:8 (Raos).  He did "everything I could to basically find as much about the company as I possibly could."  *Id.* 1178:14-1179:1 (Raos).  Several witnesses testified that it was "very important" to investigate SCM following the acquisition in order to discover liabilities that were not already accounted for in its financial statements.  Based on his experience with other major acquisitions, Raos went into the SCM acquisition expecting to find unreported liabilities approximating 10 to 15% of the purchase price.  *Id.* 1179:2-1180:5 (Raos).

168.   The post-acquisition investigation was performed by a group of professionals within

Hanson Industries that referred to themselves as the "ferrets."[16]  Trial Tr. vol. 8, 1180:6-20 (Raos).  The "ferrets" included the acquisition team, accounting team, human resources team, and treasury team, including Raos, Guntner, Eric Hanson, Bill Landuyt and Mark Alexander.  *Id.* 1116:12-1117:1 (Raos); Trial Tr. vol. 12, 1781:3-23 (Landuyt).  All of the "ferrets" were certified public accountants whose jobs were to look for unrecorded liabilities and assets that were overstated so that the financial statements of an acquired company could be corrected, under GAAP, within the one year following the acquisition.  Trial Tr. vol. 8, 1180:6-1181:8 (Raos).  In addition to the internal team from Hanson Industries, the post-acquisition investigation of SCM utilized lawyers from Skadden and Weil Gotshal, Hanson Industries' outside accounting firm, Ernst & Whinney, and SCM's outside auditors, Deloitte, Haskins + Sells ("Deloitte").  *Id.* 1178:14-22 (Raos); Trial Tr. vol. 12, 1782:24-1783:23 (Landuyt).  No one from Hanson Trust participated in the post-acquisition investigation.  Trial Tr. vol. 8, 1180:21-23 (Raos).

169.   The post-acquisition investigation process included interviewing SCM management from all the operations to "get the best information [they] possibly could," including from SCM's divisional controllers.  *Id.* 1181:10-14, 1187:18-1188:6 (Raos); Trial Ex. 336, MCT_00052077.  Raos testified that he involved SCM's outside auditors "[b]ecause they know where all the bodies are hidden," including the things that the auditors had argued with SCM about.  Trial Tr. vol. 8, 1181:10-1182:2-6 (Raos).  Deloitte also prepared at least two memoranda for Hanson Industries.  One was a February 1985 memorandum regarding tax considerations relating to the acquisition, including the use of "fan companies."  The other was a March 31, 1985 letter addressed to Raos at Hanson Industries.  The accompanying, 26-page memorandum prepared by Deloitte concerned due diligence and purchase accounting issues, as well as a detailed discussion of potential adjustments to SCM's balance sheet that Deloitte considered.  Exh. 336.

---

[16] Sir Gordon referred to the group as his "ferrets" in a news article, and the term was adopted as the name Hanson Industries' softball team—the "Ferrets."  Trial Tr. vol. 8, 1118:1-2-1119:9 (Raos); Trial Tr. vol. 12, 1781:3-13 (Landuyt).

United States District Court
Northern District of California

170.   As a result of the fast-moving and adversarial nature of the SCM acquisition, Hanson Trust and Hanson Industries were unable to perform the same due diligence before closing that they would have in a friendly acquisition.  Trial Tr. vol. 5, 762:1-25 (Hill); *see also* Trial Tr. vol. 12, 1871:21-25 (Landuyt) (acknowledging that receiving legacy environmental obligations is a risk of doing a hostile tender offer).  Nonetheless, prior to the launch, the acquisition team at Hanson Industries had identified that it should investigate SCM's environmental liabilities as part of its due diligence.  Trial Ex. 305 at 5.  Agenda item 12 in its to-do list identifies "Environmental investigation – superfund claims and pending lawsuits."  Trial Ex. 305, MCT_00052220.  It was no surprise that Hanson Trust acquired unknown liabilities from SCM, including SCM's legacy environmental liabilities.  Trial Tr. vol. 5, 749:14-751:22 (Hill).  But the investigation noted in Agenda item 12  could not have identified the FMW Site liability, which was unknown by anyone until 1999; it was not a superfund site and there were no pending lawsuits concerning it in 1986.  HBML was not notified about it until 2015.

171.   HBML's expert Jay Vandeven testified regarding the state of the practice regarding environmental due diligence during 1985, when the tender offer for SCM started.  At that time, companies engaged in environmental due diligence about a prospective company focused on involvement in Superfund sites and pending litigation, as indicated by item 12.  Environmental due diligence consistent with the state of the practice in 1985 would not have uncovered a link to the Emeryville site.  Trial Tr. vol. 10, 1576:4-1578:18 (Vandeven).  Any diligence at that time would "absolutely not" have included a search of the entire corporate history of all SCM-related entities to find out if a discontinued business "might" have generated future superfund claims or litigation.[17]  *Id.* 1577:24-

---

[17] Perhaps an investigation in 1985 might have revealed that Marchant operated at the FMW Site from approximately 1917 to 1957.  But invasive sampling would have been required in order to discover that the site was contaminated.  Trial Tr. vol. 10, 1458:16-1459:1 (Vandeven); Trial Ex. 503, EKI0456236 (Stellar's 1999 report for Emeryville stating that "a Phase II subsurface investigation is needed to identify to what degree, if any, subsurface contaminants exist in the soil or groundwater beneath the parcel.").  And if the then-current owner had permitted invasive sampling, and the sampling discovered the TCE contamination, even the City's experts were

1578:18 (Vandeven).  Vandeven opined that Hanson Industries' due diligence practices were at the "front end" of the art for the time and that it was "surprising" that they were identifying "anything environmental in 1985."  *Id.* 1577:24-1578:18 (Vandeven).

172.  Plaintiffs have contended that Hanson Industries did not undertake serious efforts to discover liabilities of SCM following its acquisition.  Landuyt  characterized Emeryville's allegations as "absurd" and "incorrect."  Trial Tr. vol. 12, 1783:24-1784:8 (Landuyt).  Hanson Industries made substantial and serious efforts to understand the liabilities of SCM following the acquisition to the extent that was reasonably possible.  It had an incentive to discover as many unrecorded liabilities as possible.  The identification of previously unrecorded liabilities allowed Hanson Industries to add them to the balance sheet during the first year following the acquisition.  The process led to the discovery of substantial liabilities which SCM had not previously accounted for.  As a result of Hanson Industries' post-acquisition investigation, Hanson Industries added 168.8 million dollars in purchase accounting reserves (approximately 16% of the total purchase price) for liabilities that SCM had not previously accrued.

**C.    Post Acquisition Restructuring of SCM**

173.  On September 6, 1985, ten days following the formal tender offer, HSCM-20, Inc. was incorporated.  Trial Ex. 2054-11. That same day, Hempstead, acting as the sole director of HSCM-20, appointed himself and several other Hanson Industries employees as the officers of HSCM-20: Clarke (President), Raos (Vice President and CFO), Hempstead

---

unable to locate any direct evidence that Marchant had used TCE, the contaminant that is driving the remedy.  It is implausible that Hanson Industries could have learned about the FMW Site, inferred based on circumstantial evidence that Marchant had possibly used TCE, and then gained access from unrelated, later property owners and operators in order to procure soil and groundwater samples at a site without known contamination issues.  And then even if it had, the City presented no evidence on what Hanson Industries could have or should have done with that information in light of the fact that the FMW Site was owned and operated by independent third parties.  For example, the City's accounting expert did not opine that discovery of this information would have triggered reserves or other accounting obligations under GAAP.  There is no evidence that an investigation exceeding the standards of practice in 1985 would have uncovered a link between SCM and contamination at the FMW site.

United States District Court
Northern District of California

United States District Court
Northern District of California

(Vice President and Secretary) and Eric Hanson (Vice President).  Trial Ex. 2054-8.  HSCM-20 was the owner 19 other "fan companies" (HSCM 1 through 19) that were used to restructure SCM following the tender offer.

174.  Two documents drafted during the restructuring process described the purposes of the restructuring.  Both stated that the restructuring had two primary purposes: to set up SCM's subsidiaries as stand-alone, autonomous companies, and to establish a tax basis for the restructured companies by allocating the SCM purchase price among them.  Trial Ex. 461; Trial Ex. 374, MCT 00027594.  Witnesses confirmed that these accurately described the purposes of the restructuring.  Trial Tr. vol. 8, 1198:18-1199:16 (Raos); Trial Ex. 960 (Hempstead Dep.), pdf p. 267/331 Trans. p. 268:21-270:18 (discussing Schedule 4.11 of Trial Ex. 374).  Raos and Landuyt also testified at trial that the restructuring had two additional purposes: (i) to put related businesses (such as food) into separate companies, and (ii) get a "tax step-up" to what was paid, instead of what the book values had been.  Trial Tr. vol. 8, 1197:6-21 (Raos); Trial Tr. vol. 12, 1786:22-1789:2 (Landuyt).

175.  Different witnesses had different recollections about whose idea it was to restructure SCM if the tender offer was successful, and the fan company structure was not unique to Hanson.  Trial Tr. vol. 12, 1791:17-19 (Landuyt).  Hempstead testified that Hanson Industries personnel decided how to restructure SCM.  Trial Ex. 960 (Hempstead Dep.), pdf p. 244-245/331 Trans. p. 245:23-246:13.  Raos first recalled that it was an idea of Brian Hellings and Bill Landuyt, but he also said that the "basic fan structure" came from Ernst & Young or one of two outside law firms.  Trial Tr. vol. 8, 1196:13-1197:5 (Raos).  It was apparently also suggested in the memorandum sent to Raos by SCM's outside auditing firm, Deloitte.  Trial Ex. 334, MCT 00051996-00051997.  Hellings also testified that the fan structure was proposed by Rosen at the Skadden law firm.  Trial Ex. 959 (Hellings Dep.), pdf. p. 151-152/305 trans. p. 217:8-218:19; *see also* Trial Exs. 450; 818; 825.  Additionally, outside counsel Marty Ginsburg was responsible for the tax planning of the restructuring.  Trial Ex. 960 (Hempstead Dep.), pdf p. 245/331 Trans. p. 246:14-17.

176.  Hellings was the only employee of Hanson Trust who had any role in the restructuring of

SCM.  Trial Ex. 960 (Hempstead Dep.), pdf p. 116/331 Trans. p. 401:3-22.  He was in charge of overall tax strategy for the Hanson group, and his role in the restructuring of SCM was limited to the plan to set up a fan structure.  He did not play any role in deciding what company went into which fan company, how to manage the fan companies, or whether to sell or retain fan companies.  Trial Tr. vol. 8, 1199:17-1200:13 (Raos); Trial Ex. 960 (Hempstead Dep.), pdf p. 245/331 Trans. p. 246:14-23.  Those decisions were made by the acquisition team at Hanson Industries, which included Sir Gordon, Eric Hanson, Guntner, and Raos.  Trial Ex. 959 (Hellings Dep.), pdf p. 283/305 Trans. p. 443:11-19.

177.  The fan companies were set up as holding companies.  Trial Tr. vol. 12, 1789:3-11 (Landuyt).   Preexisting subsidiaries of SCM were moved into the fan companies.  There were a few exceptions for assets that were owned by SCM's corporate center and became part of HSCM-20, but "there weren't many of those."  *Id.* 1789:20-1790:4 (Landuyt).  HSCM-20 owned all the other fan companies.  *Id.* 1796:25-1798:11 (Landuyt) (discussing Trial Ex. 43).  It also owned "odds and ends" and the titanium dioxide (TIO2) business, which was the "most valuable piece" of SCM.  *Id.* 1795:1-24 (Landuyt).

178.  Through a series of transactions, SCM's former businesses were distributed to various fan companies and in several instances sold to third parties as 1986 progressed. *Id.*  Those sales generated several hundred million dollars of proceeds.  *See, e.g.*, Trial Tr. vol. 5, 822:17-823:15 (Solomon).  Hellings sent a memorandum to Lord Hanson explaining that the fan companies were used to break up SCM for tax purposes to create a tax benefit to Hanson Trust.  Trial Ex. 818; Trial Tr. vol. 5, 811:16-812:9 (Solomon).  Specifically, Hellings wanted to reduce intercompany dividend taxes, which are typically applied when companies transfer money from an abroad subsidiary to a parent company.  Trial Tr. vol. 5, 812:3-9 (Solomon).   Raos testified that Hellings "was basically our tax guru, our tax genius."  Trial Tr. vol. 8, 1123:1-6 (Raos).  He also testified that Hellings "basically, he oversaw the—basically what we were doing" with respect to the fan structure.  *Id.* 1119:17-22 (Raos).  Raos further testified that he recalled at least two instances where

65

United States District Court
Northern District of California

Hellings recommended that Hanson Trust shift assets outside of North America. *Id.*
1233:4-1234:25 (Raos). One such recommendation was moving the SCM Pigment assets
out of SCM and into foreign ownership for certain tax advantages. Trial Ex. 315.

179. Landuyt was directly involved in the restructuring. He denied that the purpose of the
restructuring was to move valuable assets and leave behind companies without the ability
to pay their liabilities. Trial Tr. vol. 12, 1791:20-1792:2 (Landuyt). He emphasized that it
was important for all of the fan companies to be adequately capitalized in order to have a
valid transaction. *Id.* 1789:12-19 (Landuyt).

180. In the restructuring, liabilities associated with operating companies were aligned with
those operating companies, meaning that they remained with those operating companies.
Hempstead testified to the following example: if money was borrowed to build a new
factory for Glidden (one of SCM's subsidiaries), the debt for that loan went with Glidden
into the fan company to which Glidden was assigned. Trial Ex. 960 (Hempstead Dep.),
pdf p. 247-248/331 Trans. p. 248:4-22.

181. Liabilities that were not related to operating companies' businesses remained with SCM,
and later became liabilities of HSCM-20 when the two companies merged. *Id.* pdf p. 247-
248/331 Trans. p. 248:4-.22. Similarly, Raos agreed that "things that didn't fit" with a
business went into HSCM-20, which was "affectionately" nicknamed "the Rump." Trial
Tr. vol. 8, 1192:24-1193:19, 1203:13-1204:13 (Raos). Raos pointed out that the Rump had
a greater ability to pay liabilities because it owned all of the operating subsidiaries. *Id.* As
an example, Landuyt testified that SCM's assumption of the Kalamazoo Mill liability from
its subsidiary, Allied Paper, as well as subsequent mergers of SCM into HSCM-20,
*increased* the ability to pay for that liability. Trial Tr. vol. 12, 1785:17-1786:10; 1791:20-
1792:2 (Landuyt). Raos testified that entities interested in purchasing Allied Paper, Inc.
did not want to also purchase the environmental liability associated with Kalamazoo Mill,
and that the mill "was a dog." Trial Tr. vol. 8, 1272:23-1273:16 (Raos). The Rump also
received shares of stock for the remaining SCM chemical industry units (e.g., "Pigments")
that had not previously been moved out of U.S.-based ownership. Trial Ex. 43; Trial Tr.

United States District Court
Northern District of California

vol. 6, 903:17-905:1 (Owens).[18]

182. SCM had several businesses that could be sold off to pay down debt.  Trial Tr. vol. 5, 713:19-20 (Hill).  One of those businesses was Glidden Paint, which was sold in August 1986 for approximately $500 million dollars to ICI, a large British chemical company that already possessed a large paint division.  Trial Ex. 374.  By selling Glidden Paint, Hanson Trust and Hanson Industries procured a significant premium performing what was essentially a brokerage function—buying a diversified conglomerate and reselling the parts to entities that did not want the entire conglomerate but valued one part or division of said conglomerate.  Trial Tr. vol. 5, 713:25-714:3 (Hill).  Through the Glidden Paint transaction, along with selling other SCM divisions/parts, Hanson Trust and Hanson Industries were able to recoup the SCM purchase price while still holding on to several other SCM businesses.  *Id.* 714:8-12 (Hill); Trial Tr. vol. 11, 1647:23-1648:8 (Clarke) ("If you can get tomorrow's price today . . . you should sell it").

183. A September 27, 1986 Hanson Industries quarterly report stated that $205 million was remitted to Hanson Trust.  Trial Ex. 365 at 6.  The cash came, at least in large part, from the reorganization and sale of SCM assets, including that of Glidden Paint.  *Id.*  All the documents in evidence that concern the Glidden Paint sale were signed by Hanson Trust and HSCM-20.  *See, e.g.*, Trial Exs. 374, MCT_00027562; 322 at 1; 323 at 4 (containing a provision providing ICI certain rights and insurance contracts).  Hanson Industries was not a signatory to any agreement concerning Glidden Paint.  *See id.*  Raos testified that Hanson Trust, as part of the sale, "did guarantee or give a guarantee for the environmental."  Trial Tr. vol. 8, 1242:8-18 (Raos).  Clarke testified that having Hanson Trust in the transaction allowed it to achieve the desired price.  Trial Tr. vol. 11, 1750:4-1751:4 (Clarke).

**D.    Subsequent Structuring of and Mergers with SCM**

184. A series of corporate moves followed that resulted in the transfer of the Marchant

---

[18] When Allied Paper and other, similar companies were sold, they were sold without certain liabilities.  Trial Tr. vol. 6, 915:10-13 (Owens).  The environmental liabilities were separated from Allied Paper when it was sold.  *Id.*

United States District Court
Northern District of California

1   environmental liability from HSCM-20 ultimately to HM Holdings, which became the

2   primary holding company for Hanson Trust in North America.  First, SCM merged with

3   HSCM Merger Co. Inc. effective March 31, 1986.  Trial Ex. 2054-32.  SCM, as the

4   surviving corporation, retained the name "SCM Corporation."  *Id.*  On May 16, 1986,

5   SCM, by unanimous written consent of its board of directors and shareholders, passed a

6   "Plan of Liquidation and Dissolution."  Trial Ex. 42.  The document was executed by

7   Hempstead on behalf of all signatories.  *Id.*

185.   SCM's typewriter business was placed into HSCM-10, and SCM's headquarters were sold.
       Trial Tr. vol. 5, 822:23-823:1 (Solomon).  Defunct operations and unknown liabilities,
       such as Marchant's operations and liabilities, were not distributed and remained with
       SCM.  Dkt. No. 266, Undisp. Fact 29.  This included the environmental liability for
       Marchant and the Kalamazoo Mill (relating to Allied Paper, Inc., which company was part
       of SCM).  Trial Ex. 451.

186.   Next, SCM merged with HSCM-20, Inc. on November 3, 1986.  Dkt. No. 266, Undisp.
       Fact 30; Trial Ex. 19.  HSCM-20 was the survivor of the merger, and it assumed all of
       SCM's liabilities.  Trial Ex. 19, HBML 0000320.   HSCM-20 was renamed SCM
       Corporation.  Trial Ex. 19, HBML 0000322-23.

187.   SCM Corporation then merged with HSCM Holdings Inc., a Delaware corporation and the
       parent of SCM (formerly named "HSCM-20, Inc.") on November 17, 1986.  Dkt. No. 266,
       Undisp. Fact 31; Trial Ex. 2054-16.  HSCM Holdings Inc. was the survivor of the merger,
       and it assumed all of SCM's liabilities.  Trial Ex. 2054-16, HBML 0000955.  HSCM
       Holdings Inc. was renamed "SCM Corporation."  Trial Ex. 2054-16, HBML 0000957.  As
       part of the merger, HSCM Holdings, Inc. (now named "SCM") assumed Marchant's
       liabilities.  *Id.*

188.   Finally, SCM Corporation then merged with HM Holdings, a Delaware corporation, on
       October 14, 1988.  Dkt. No. 266, Undisp. Fact 32; Trial Ex. 2367.  HM Holdings was the
       surviving corporation.  Trial Ex. 2367, p. MCT 00013084.  As a result of the merger
       between SCM and HM Holdings, the liabilities of SCM became liabilities of HM

United States District Court
Northern District of California

Holdings.  Trial Ex. 960 (Hempstead Dep.), pdf p. 259/331 Trans. p. 260:11-19.

189.  HM Holdings had been incorporated in Delaware on October 28, 1980.  Trial Ex. 2369.  Its corporate offices were located at 100 Wood Avenue, the same address as Hanson Industries' offices.  Trial Tr. vol. 8, 1149:20-1150:1 (Raos).  The directors of HM Holdings were all Hanson Industries personnel: Sir Gordon, Clarke, Raos and Hempstead. Trial Ex. 2373 (unanimous written consent of board of directors approving mergers); Trial Ex. 2372, HBML 0007351, HBML 0007354, HBML 0007358 (listing directors and offers as part of 1993, 1994 and 1995 Delaware tax filings).  Hanson Industries personnel handled the accounting for HM Holdings.  Trial Tr. vol. 12, 1776:16-23 (Landuyt).

190.  HM Holdings was a holding company that was the "top company" or "primary holding company" for Hanson Trust in the United States.  Trial Ex. 956 (Alexander Dep.), 64:7-14; Trial Ex. 962 (Lee Dep.), 71:6-14.  By 1989, it owned almost all of the U.S. subsidiaries, and so almost all U.S. operating companies were direct or second tier subsidiaries.  Trial Ex. 2183, HBML 0072870 ("Note that SCM Corporation was merged into [HM Holdings] on October 14, 1988.  Hanson Trust personnel played no role in the management or decision making of HM Holdings or the companies that it owned.  Trial Tr. vol. 8, 1125:9-15 (Raos).  It was "completely autonomous" from the U.K. business. Trial Ex. 956 (Alexander Dep.), 18:17-19:11.

191.  A July 1991 corporate organization chart shows the companies owed by HM Holdings. Trial Ex. 375.  Raos estimated that, by 1991, the operating profit of HM Holdings was close to a billion dollars.  Trial Tr. vol. 8, 1132:2-15 (Raos).  It was owned, directly and indirectly, by several layers of other corporations.  Trial Ex. 375; Trial Ex. 960 (Hempstead Dep.), pdf p. 116/331 Trans. p. 401:3-22.  HM Investments, Ltd. owned 85.59 percent of HM Holdings and HHNBV owned 14.41 percent.  Trial Ex. 375.  HM Investments, Ltd. was, in turn owned by HM Anglo-American, Ltd.  *Id.*  HM Anglo-American, Inc. was owned by Hanson Overseas Holdings (Ltd.), which was in turn owned by Hanson Holdings (1) Limited.  *Id.*  Hanson Holdings (1) was incorporated in the U.K. Trial Tr. vol. 14, 2090:5-13 (Rogers).  Hanson Holdings (1) Limited was owned by

69

1   Hanson Trust.  Trial Ex. 375.

2   192.  As of July 1991, HM Holdings owned more than 100 corporations, some of which owned

3   so many corporations that they required their own organization charts.  Trial Ex. 375; *see,*

4   *e.g.*, Peabody Holdings' organization charts shown at HELLINGS_0024029-0024030.

5   HM Holdings' subsidiaries included large corporations such as Kaiser Cement, Peabody

6   Coal, and SCM Chemicals, one of the "crown jewels" of SCM.  Trial Tr. vol. 11 16691:13-

7   23 (Clarke) (identifying SCM Chemicals as the "real crown jewel" of SCM).   Raos

8   testified that at the time of the SCM tender offer, the pigments business alone was

9   estimated to have a value of between $300 million to $500 million.  Its operating profits

10   quadrupled following the acquisition from $50 million to $200 million annually, and Raos

11   estimated that business, alone, was worth one billion dollars. Trial Tr. vol. 8, 1200:22-

12   1201:7 (Raos).  Peabody Coal had been purchased for approximately $600 to $625 million.

13   Trial Tr. vol. 11, 1676:16-19 (Clarke).

**V.   MILLENNIUM CHEMICALS AND THE DEMERGER**

15   193.  Hanson Trust's North American interests were primarily demerged in 1996 as a result of

16   Sir Gordon's failing health and Lord Hanson's belief that the company had too much debt

17   and should sell its smaller and mid-sized companies.  Trial Tr. vol. 11, 1697:9-1698:5

18   (Clarke).   Raos, who was on the Board of Directors of Hanson Trust when it decided to

19   break itself up, testified that the share price of Hanson Trust had stopped increasing,

20   although profits continued to increase.  Trial Tr. vol. 8, 1112:3-25 (Raos).  Landuyt, also a

21   Board member at that time, said that Hanson Trust was a conglomerate, and conglomerates

22   had fallen out of favor with the investing public.  Trial Tr. vol. 12, 1817:1-24, 1819:10-12

23   (Landuyt).  The company concluded that investors would prefer companies that were

24   focused on specific business sectors.  *Id.* 1819:13-1820:7 (Landuyt).

25   194.  The demerger was designed to divide Hanson Trust into four separate publicly traded

26   companies with distinct financial, investment, and operating characteristics: a utility and

27   coal company, a U.S. chemical company, a U.K.-based tobacco company, and a U.S.- and

28   U.K.-based building materials businesses.  *Id.* 1819:8-1820:7 (Landuyt).  Hanson Trust

United States District Court
Northern District of California

United States District Court
Northern District of California

1    decided to hang onto the building materials business (which subsequently became HBML)

2    and demerge, or spin off, the rest.  In England, a "demerger" is a tax-free distribution.

3    Trial Ex. 801, MCT 00040200.[19]  The demerger transaction was designed in part to ensure

4    that the debt of each of the businesses would be at least investment grade.  Trial Tr. vol.

5    12, 1822:5-1823:9 (Landuyt).

195.  The City's expert, Dr. Hill, testified that Hanson Trust was the only Hanson entity that could make the decision to effect a demerger because it was the ultimate parent company.  Trial Tr. vol. 5, 779:2-21 (Hill).  He further testified that Hanson Trust was not alone in making that sort of decision during that time period; a number of other companies, such as AT&T, made similar decisions to demerge.  *Id.* 779:22-780:11 (Hill).

196.  On January 30, 1996, Hanson Trust announced that it was "demerging" its chemicals, tobacco and energy businesses.  Trial Ex. 801.  According to the circular describing the demergers that was sent to Hanson Trust's shareholders, a newly created company called Millennium Chemicals ("Millennium") would own and operate Hanson Trust's chemicals businesses.  The chemicals businesses consisted of Quantum Chemical Corporation and two businesses that had been acquired from SCM, SCM Chemicals Inc. and Glidco Inc.

197.  Millenium would be a publicly traded company, and in the year ending December 31, 1995, the businesses comprising Millennium had net sales of approximately $3.8 billion and operating income of $842 million. Trial Ex. 801, MCT 00040202-03.  It was not, as the City implies, designed as an undercapitalized vessel into which the still unknown FMW Site environmental liability could be dumped.

198.  From the start of the demerger process, it was clear that Landuyt would become the chairman and CEO of Millennium.  Trial Tr. vol. 12, 1820:8-10 (Landuyt).  The plans for its senior leadership team, consisting of Landuyt, Bob Lee, Hempstead, and others, were

[19]Before that major demerger occurred, Raos and Clarke left Hanson Industries in 1995 to spin off, or "demerge," a publicly traded company called U.S. Industries.  U.S. Industries consisted of the smaller, North American businesses managed by Hanson Industries—those that had operating profits of less than $50 million.  Trial Tr. vol. 8, 1111:10-1112:2 (Raos).

United States District Court
Northern District of California

publicly announced by May 16, 1996.  Trial Ex. 1115, HBML 0006113.  The "first thing" Landuyt did was to hire independent counsel and independent bankers so that each of the soon-to-be separate public companies had their own set of independent advisers.  Trial Tr. vol. 12, 1820:12-1821:18 (Landuyt).  Millennium's advisors included large and sophisticated investment banks: Goldman Sachs International, PaineWebber Inc. and Merrill Lynch International.  Trial Ex. 1115, HBML 0006114.

199.  Immediately before the demerger, HM Holdings was owed by Hanson America (93.624%), HHNBV (5.6%), and Hanson Holdings (1) Limited (.776%).  Trial Ex. 2131-1.  Hanson Holdings (1) Limited also indirectly owned Hanson America.  *Id.*  Hanson Holdings (1) Limited was a U.K. corporation, which was, in turn, owned by ARC Limited, another U.K. corporation.  *Id.*; Trial Tr. vol. 14, 2089:13-2090:13 (Rogers).  Hanson PLC, a U.K. corporation, owned ARC Limited.

200.  As a result of the demerger, HM Holdings owned the three chemicals businesses, Quantum, SCM Chemicals, and Glidco.  Trial Ex. 2131-2.  HM Holdings was owned by Hanson America, a U.S. corporation.  *Id.*  Hanson America was owned by HM Anglo-American, Inc., a U.S. corporation.  *Id.*  HM Anglo-American, Inc. was owned by Hanson Overseas Holdings, a U.K. corporation.  *Id.*  Millennium, a U.S. corporation resident in the U.K., owned Hanson Overseas Holdings.  *Id.*  Public shareholders owned Millennium.

201.  HM Holdings owned an entity called "HMB Holdings," which in turn owned a number of companies.  *Id.*  Landuyt explained that those were not chemicals businesses and were never intended to be retained by Millennium; however, Millennium had to retain ownership of them until after the Demerger was completed.  Trial Tr. vol. 12, 1825:12-1827:7; 1880:22-1881:7 (Landuyt).

202.  Under the Demerger Agreement, Hanson Trust transferred ownership of Hanson Overseas Holdings to Millennium Chemicals.  Dkt. No. 266, Undisp. Fact 34.   In exchange, Millennium Chemicals issued its then-outstanding common stock to HBML's shareholders as a dividend.  *Id.*  HM Holdings, Inc. merged with Millennium Holdings, Inc. ("Millennium Holdings"), a Delaware company and subsidiary of Millennium Chemicals.

*Id.* Undisp. Fact 35.  HM Holdings, Inc. was the surviving entity but changed its name to "Millennium Holdings, Inc."  *Id.*

203. Landuyt, Lee (the President and later CEO of Millennium), defense witness Suzanne Thompson, and Professor Hubbard all testified that Millennium was adequately capitalized.  Millennium had a market value of more than $1.2 billion.  Trial Tr. vol. 9, 1357:20-1359:25 (Hubbard).  From the time of its formation until Landuyt left in 2003,[20] Millennium always had sufficient capital to pay its liabilities as they came due and to conduct its normal business activities.  Trial Tr. vol. 12, 1828:14-21 (Landuyt); Trial Ex. 962 (Lee Dep.), 303:21-304:18.  Millennium was formed with more than five billion dollars in assets and was comprised of companies that had hundreds of millions in annual operating income.  Trial Ex. 332, HBML 0005078.  The chemical companies had sufficient capital to spend tens of millions annually just on environmental compliance, environmental capital investments, and remediation costs during the three years preceding the demerger. Trial Ex. 332, HBML 0005122; Trial Tr. vol. 12, 1802:21-1804:20 (Landuyt).

204. Landuyt testified that Millennium had the ability to pay the debt allocated to it in the demerger.  Trial Tr. vol. 12, 1827:16-24 (Landuyt).  The amount of debt and the debt-to-equity ratio resulted in Millennium's debt being investment grade.  *Id.* 1827:16-24; 1875:23-1876:11 (Landuyt).  Landuyt explained that this was important because "responsible leverage" like investment grade debt "increases the return on capital for a company."  *Id.* 1875:23-1876:11 (Landuyt).

205. The City's expert, John Owens, testified that Millennium's balance sheet "doesn't necessarily demonstrate its ability to pay liabilities," in part because a substantial portion of Millennium's assets consisted of goodwill.  Trial Tr. vol. 6, 934:5-935:20 (Owens).  But Owens did not dispute that the goodwill  was properly included on Millennium's balance sheet.  *Id.*  He conceded that the financial statements would not have conformed to GAAP

---

[20] Millennium merged with Lyondell Chemical in 2004.  Dkt. No. 266, Undisp. Fact 37.  No evidence regarding capitalization following Landuyt's departure from Millennium in 2003 was introduced at trial.

United States District Court
Northern District of California

had goodwill had been omitted. *Id.* 958:12-16 (Owens). And even if goodwill were ignored, in contravention of GAAP, Millennium still had billions of dollars in other assets. Trial Ex. 332, HBML 0005177. Owens was unwilling to opine that Millennium lacked the ability to pay its liabilities when they came due, and he could not identify any liabilities that Millennium was unable to pay. Trial Tr. vol. 6, 945:9-24 (Owens). None of the City's witnesses testified that Millennium was undercapitalized.

206. Another expert for the City, Professor Solomon, testified that the demerger allocated $2.25 billion in debt to Millennium on a non-arm's length basis, which was detrimental to Millennium and beneficial to Hanson Trust. Trial Tr. vol. 5, 834:4-17, 883:10-20 (Solomon). An Information Statement, which was required by SEC regulations to be filed as part of the demerger, provided information to the new shareholders of Millennium Chemicals. Trial Ex. 242. It discloses transactions between Millennium Chemicals and Hanson Trust and specifically states that a "$2.25 billion debt was allocated to Millennium Chemicals at a non-arm's length basis." *Id*. 71-73. However, Solomon conceded that the shareholders of Hanson Trust and Millennium were the same. Trial Tr. vol. 5, 883:21-884:6 (Solomon). Thus, Hanson Trust had no incentive to allocate "too much" debt to Millennium so that it could benefit the same shareholders of Hanson Trust. *See id.* Solomon did not do any quantitative analysis to show whether the debt allocated to Millennium had any impact on Millennium's ability to pay its debts after the demerger. *Id.* 858:17-859:12 (Solomon).

207. The $2.25 billion debt was clearly disclosed and discussed in the Information Statement for the demerger. Trial Ex. 242. The so-called "Allocated Loan" was a $2.25 billion loan borrowed in conjunction with the acquisition of Quantum, one of the Chemicals Businesses that was becoming part of Millennium. Trial Ex. 242, HBML 0008132 ("In conjunction with the acquisition of Quantum Chemical, a subsidiary of the Company established a long-term financing agreement with Hanson under which $2,250 [million] was borrowed in October 1993."). The Allocated Loan was allocated to Millennium because it "relates directly to the Chemicals Business." Trial Ex. 242, HBML 0008045. It

74

was also paid off immediately prior to the effective date of the demerger in exchange for Millennium's transfer of the non-chemicals businesses.  Trial Ex. 242, HBML 00080030 ("[O]n the day before the Dividend Payment Date [October 1, 1996], Hanson will purchase from a Company Subsidiary certain of the Non-Chemicals Business pursuant to the Pre-Demerger SPAs for cash and all or a portion of the proceeds of such sale, together with cash balances and borrowings under the New Credit Facility, if necessary, will be used to repay the Allocated Loan in the amount of $2.25 billion.").  That debt did not saddle Millennium with unrelated debt and was extinguished as part of the Demerger.

208.  Millennium's independent investment advisor provided a fairness opinion in connection with the terms of the demerger.  Trial Tr. vol. 12, 1827:25-1828:8 (Landuyt).  Landuyt approved the amount of debt because it resulted in Millennium's debt being rated investment grade and because it provided the "optimal structure" and leverage to achieve the investment grade rating.  *Id.* 1823:2-9, 1873:23-1876:11 (Landuyt).  Landuyt, who negotiated the amount of the debt, testified that Millennium had the ability to repay the debt, and that the leverage ratio with that level of debt was appropriate for investment grade rating.  *Id.* 1827:16-24 (Landuyt).

209.  As part of the demerger, Hanson Trust and Millennium entered into a cross-indemnification agreement.  Trial Ex. 32.  Millennium had to indemnify Hanson Trust for liabilities associated with its legacy businesses, and Hanson Trust had to indemnify Millennium for liabilities arising from Hanson Trust's legacy businesses.  *Id.*  Because HM Holdings had succeeded to SCM's liabilities through its 1988 merger, that meant that Millennium had to indemnify HBML for the claims and liabilities arising from the Marchant environmental liability, as noted by the witness Edward Gretton, Legal Director of Hanson Group and Hanson Limited.  Trial Tr. vol. 4, 659:13-664:25 (Gretton).  Landuyt explained why that allocation of liabilities amongst the parties made sense: Millennium was not required to take on liabilities from other businesses, such as Peabody Coal's black lung obligations or Beazer's environmental liabilities that went with other demerged companies.  Trial Tr. vol. 12, 1869:20-1870:11 (Landuyt).

210. While it was no longer a Hanson Trust subsidiary after the demerger in 1996, Millennium was paying on, and continued to pay on, its environmental obligations before and after the demerger.  For example, Millennium's 1996 Form 10 filed with the SEC upon the demerger shows costs and operating expenses relating to environmental matters of $67 million in 1995, $61 million in 1994, and $60 million in 1993.  Trial Ex. 332, HBML_0005122; Trial Tr. vol. 12, 1804:4-10 (Landuyt).  Similarly, capital expenditures for environmental compliance and remediation were $22 million in 1995, $7 million in 1994, and were projected to be approximately $40 million in 1996.  Trial Ex. 332, HBML_0005122; Trial Tr. vol. 12, 1804:11-20 (Landuyt).  And in the three years leading up to Landuyt's departure in 2002, Millennium spent $63 million, $65 million, and $54 million, respectively.  Trial Tr. vol. 12, 1807:1-12 (Landuyt); Trial Ex. 445, HBML_0103791.

211. Following the demerger, Hanson Industries ceased to exist.  Trial Tr. vol. 5, 748:17-749:1 (Hill).

## VI.    THEORIES OF HBML'S LIABILITY

### A.    UNITY OF INTEREST FACTORS

212. To evaluate plaintiffs alter ego theory, I need to evaluate the unity of interest factors.  The critical factors and facts are described in this section.

#### 1.    Commingling of Funds

213. As outlined in Section III.B.2, the evidence establishes that Hanson Industries and the U.S. operations were financially autonomous from Hanson Trust.  The evidence demonstrated that the U.S. funds were kept separate from the U.K.  The U.S. companies had separate bank accounts from Hanson Trust and that there was no commingling of funds.  Trial Tr. vol. 8, 1138:6-9 (Raos); Trial Tr. vol. 12, 1780:3-5 (Landuyt).  The only signatories on the U.S. accounts were the employees from Hanson Industries in the U.S.  Trial Tr. vol. 8, 1291:19-1292:2 (Raos).

214. Hanson Industries managed a sweep account for all of the cash from the U.S. operations.  Trial Ex. 962 (Lee Dep.), 295:9-24.  Hanson Trust had no role in and had no control over

United States District Court
Northern District of California

the U.S. sweep account. *Id.* 296:16-297:20. Hanson Trust had no control over what funds were deposited into or withdrawn from the U.S. sweep account, and Hanson Trust personnel did not have authority to withdraw funds from the U.S. sweep account. *Id.* 296:16-297:20. When asked whether funds of the U.S. companies were commingled with Hanson Trust, Lee testified definitely that "[t]hey weren't. We kept all the funds in the United States." *Id.* 293:20-24. Hill testified that it was "highly unlikely" that U.S. funds would have been swept into the U.K. due to regulatory controls in place during the 1985-1996 time period. Trial Tr. vol. 5, 778:18-779:1 (Hill).

215. The City has argued that there was commingling of funds based on a statement in the July 28, 1989, prospectus for the Smith Corona Corporation IPO. Trial Tr. vol. 8, 1292:3-14 (Raos). The prospectus states that surplus cash from SCC's operations "has been remitted to Hanson," and "Hanson" in that document is defined as "Hanson PLC." *Id.* 1292:3-14 (Raos); Trial Ex. 21, HBML_0002981. Notwithstanding the definition of "Hanson" in the prospectus, the overall evidence regarding the financial autonomy of the U.S. operations suggests that it was unlikely that cash was ever remitted directly to Hanson Trust. There was no other evidence or analysis identifying how much money was purportedly remitted to Hanson Trust, how it was remitted, or when or why it was remitted. The City failed to establish that funds of U.S. subsidiaries were commingled with the funds of its U.K. parent.[21]

## 2. Corporate Formalities

216. Hanson Trust and its relevant U.S. subsidiaries adequately followed corporate formalities. For instance, when Hempstead signed documents as attorney in fact on behalf of Hanson Trust in connection with SEC filings for the tender offer, he did so pursuant to a formal

---

[21] As Raos explained, even if cash was remitted or transferred to Hanson Trust, that would not establish commingling. Trial Tr. vol 8, 1292:8-14 (Raos). The money may have been remitted through a dividend or some other proper transfer of funds. *Id.* Plaintiffs have identified no other evidence demonstrating that Smith Corona Corporation's surplus cash was actually remitted directly to Hanson Trust, or that, if it was, it was done improperly or in a manner that would establish commingling.

United States District Court
Northern District of California

1    power of attorney document.  Trial Ex. 340.  Solomon conceded this fact.  Trial Tr. vol. 5,

2    876:3-877:5 (Solomon).

217.  Landuyt testified that the U.S. subsidiaries, including the holding companies, maintained

their own separate financial books and records.  Trial Tr. vol. 12, 1772:12-22 (Landuyt).

He testified that the U.S. holding companies had boards of directors and that the persons

on those boards "certainly met" and that most corporate actions were done by resolution.

*Id.* 1842:1-10 (Landuyt).

218.  Similarly, Clarke testified that the U.S. operating companies "had all been around for a

long time . . . I'm sure they all had directors," but that he did not attend their meetings.

Trial Tr. vol. 11, 1759:3-21 (Clarke).  For the U.S. holding companies, he explained that

all the directors of those companies were the Hanson Industries executives and that they

met daily.  *Id.* 1759:3-21 (Clarke).  When necessary, or when a decision needed to be

formalized, Hempstead would prepare the minutes or otherwise memorialize on paper what

had been agreed to.  *Id.* 1759:3-21 (Clarke).  Examples of such documentation were

admitted into evidence.  *See, e.g.*, Trial Ex. 2373.

219.  The formalities with respect to the SCM acquisition and restructuring are illustrative of

Landuyt's and Clarke's testimony.  I find that Hanson Industries and the U.S. companies

followed corporate formalities with respect to those transactions.  HBML introduced

documentation regarding the formation documents, board actions, and various transaction

agreements with respect to the companies that acquired SCM and were involved in its

restructuring.  Trial Exhibit 1116 is the index to the deal binder for the SCM acquisition.  It

identifies several hundred documents created in connection with the acquisition.  Trial

Exhibit 47 is the index to the deal binder for the SCM restructuring.  It also identifies

several hundred documents in connection with the restructuring.  Below are examples of

the comprehensive formalities documents in the record:

220.  **HSCM Merger Co.**  Trial Exhibit 2054-22 is the Transaction Agreement between

HSCM Industries Inc. and HHNBV to create a joint venture, HSCM Merger Co.

Inc., to acquire SCM.  Trial Exhibit 2054-28 is the Certificate of Incorporation and

78

United States District Court
Northern District of California

Trial Exhibit 2054-30 is a unanimous written consent of its shareholders authorizing the Plan and Agreement of Merger and merger with SCM.  Trial Exhibit 13 is the Plan and Agreement of Merger between HSCM Merger Co. Inc. and SCM.  Trial Exhibit 2054-32 is the Certificate of Merger between HSCM Merger Co. Inc. and SCM, with the surviving company retaining the name "SCM."

221. **HSCM Industries Inc.**  Trial Exhibit 2054-17 is the Certificate of Incorporation for HSCM Industries Inc. and Trial Exhibit 2054-19 is a certificate of amendment to allow it to issue different amounts of stock.  Trial Exhibit 466 is a unanimous written consent authorizing HSCM Industries Inc. to appoint officers, issue stock, and purchase shares via the tender offer for SCM.  Trial Exhibit 2054-35 is HSCM Industries Inc.'s share certificates for its ownership of SCM shares.  Trial Exhibit 2054-23 is an action by written consent authorizing HSCM Industries Inc. to purchase stock in HSCM Merger Co. Inc.  Trial Exhibit 2054-21 is an action by written consent authorizing HSCM Industries Inc. to accept an offer from HSCM-20 to purchase shares of HSCM Industries Inc.'s common stock.

222. **HSCM Holdings Inc.**  Trial Exhibit 2054-13 is the Certificate of Incorporation for HSCM Holdings Inc.  Trial Exhibit 467 is HSCM Holdings Inc.'s Board of Directors' unanimous written consent authorizing it to appoint officers, issue stock, and purchase shares in HSCM Industries Inc.  Trial Exhibit 10 is a consent of the Board of Directors in adopting resolutions to comply with requirements of the Citibank financing.  Trial Exhibit 2054-16 is the Certificate of Merger, merging SCM (formerly HSCM-20) into HSCM Holdings Inc. with HSCM Holdings as the surviving company and changing its name to SCM.

223. **HSCM-20.**  Trial Exhibit 2054-11 is the Certificate of Incorporation for HSCM-20. Trial Exhibit 7 is an action of unanimous written consent adopting resolutions for HSCM-20 to appoint officers, issue stock, and accept a capital contribution of HSCM Holdings Inc.'s shares.  Trial Exhibit 2054-12 is action by written consent authorizing HSCM-20 to subscribe to shares of HSCM Industries Inc. and Trial

United States District Court
Northern District of California

Exhibit 2054-20 is the executed subscription agreement.  Trial Exhibit 2054-10 is the Certificate of Ownership and Merger, merging SCM into HSCM-20, with HSCM-20 as the surviving company and changing its name to SCM.  Trial Exhibit 2054-44 is the Memorandum of Distribution in Liquidation assigning all property, rights, and assets, and liabilities of SCM to HSCM-20 not previously distributed.

224. **HSCM Investments Limited.**  Trial Exhibit 2054-24 is the Certificate of Incorporation for HSCM Investments Limited.  Trial Exhibit 468 is an action by unanimous written consent authorizing HSCM Investments Limited to appoint officers, issue stock, and purchase shares of HSCM Holdings Inc.

225. **Hanson Holdings Netherlands, B.V.**  Trial Exhibit 2054-1 are the Board minutes authorizing HHNBV. to subscribe to shares in HSCM Merger Co. and the subscription agreement.  Trial Exhibit 2054-2 is an action by written consent authorizing HHNBV to purchase shares in HSCM-20 and Trial Exhibit 2054-4 is the subscription agreement.  Trial Exhibit 2054-5 is the share certificate for HHNBV's shares in HSCM-20.

226. **HM Holdings, Inc.**  Trial Exhibit 2369 is the Certificate of Incorporation of HM Holdings, Inc. Trial Exhibit 2371 are amended and restated bylaws of HM Holdings, Inc. Trial Exhibit 2367 is the Agreement of Merger between SCM and HM Holdings, Inc., merging SCM into HM Holdings, Inc.  Trial Exhibit 2370 is a written consent adopting resolutions fixing the board at four directors and appointing Sir Gordon, David Clarke, John Raos, and George Hempstead as directors until the next annual meeting.  Trial Exhibit 2368 is the Certificate of Merger between Millennium Holdings Inc. and HM Holdings, Inc., merging HM Holdings, Inc. into Millennium Holdings Inc., with HM Holdings, Inc. as the surviving company but changing its name to Millennium Holdings Inc.  Trial Exhibit 2118-1 is the Demerger Agreement demerging Millennium Holdings Inc.'s parent, Millennium Chemicals Inc., from the Hanson group.

227. To be sure, Hanson Industries did not create documents for many intra-Hanson entity

United States District Court
Northern District of California

actions.  There were no contracts between Hanson Industries and the U.S. holding companies like HSCM Holdings and HM Holdings, nor were there contracts for intercompany services provided by Hanson Industries.  Trial Tr. vol. 8, 1255:21-1256:11 (Raos).  Clarke and Landuyt agreed that Hanson Industries likely did not have management contracts with the subsidiary/operating or holding companies, and Landuyt testified that there were no payments for the management services Hanson Industries provided the U.S. holding companies.  Trial Tr. vol. 11, 1742:13-1743:20 (Clarke); Trial Tr. vol. 12, 1842:15-1843:5 (Landuyt).

228.  Landuyt could not "recall any of the holding companies having outside directors." *Id.* 1844:10-13 (Landuyt).  Hempstead testified that Hanson Industries did not have any written contract with Hanson Trust for providing any management services.  Trial Ex. 960, Hempstead Dep. 329:8-11, May 18, 2021.  Nor did Hanson Industries have any management services contracts with any of the fan companies, HSCM Holdings Inc., HM Holdings, or HM Anglo-American.  *Id.* at 329:12-18 (Hempstead).

229.  Clarke testified that Hanson Industries was involved in the day-to-day operations of the U.S. holding companies.  Trial Tr. vol. 11, 1738:8-16 (Clarke).  He also testified that the holding companies "probably" would not have had separate budgets from Hanson Industries, nor did he believe the holding companies had board of director meetings.  *Id.* 1741:17-1742:12 (Clarke).   Landuyt confirmed that the U.S. holding companies did not have budgets like the operating companies did.  Trial Tr. vol. 12, 1841:23-25 (Landuyt).

### 3.  Same Offices and Employees

230.  I find that Hanson Trust and Hanson Industries did not share the same offices, and that Hellings appeared to be the only employee shared by both the U.S. and the U.K.

231.  Hanson Industries' offices were located at 100 Wood Avenue, South, Iselin, New Jersey, and 410 Park Avenue, New York City, New York.  Trial Tr. vol. 11, 1666:18-24 (Clarke); Trial Tr. vol. 8, 1149:20-1150:1 (Raos).  Hanson Trust's offices were located at 180 Brompton Road, London, U.K., and later at 1 Grosvenor Place, London, U.K. Trial Ex. 260, HBML 0006519; Trial Ex. 226, HBML 0013013.

United States District Court
Northern District of California

232. No Hanson Trust employees worked at either Hanson Industries location.  Trial Tr. vol. 11, 1666:25-1667:4 (Clarke); Trial Tr. vol. 8, 1114:10-20 (Raos).  Hanson Industries and Hanson Trust "never" operated out of the same offices.  Trial Tr. vol. 11, 1667:16-18 (Clarke); Trial Tr. vol. 8, 1114:10-20 (Raos).  Lord Hanson visited New York up to 12 times per year, but the evidence did not show he used that office as his own.  *see* Trial Tr. vol. 11, 1671:4-1672:11 (Clarke).  And Clarke visited HBML's London offices a few times per year, but only in later years once he joined the Hanson Trust board.  *Id.* 1649:1-1651:4 (Clarke).

233. With respect to employees, Landuyt is a good example of how Hanson Industries and Hanson Trust employees were separate.  After Landuyt became the financial director of Hanson Trust in 1992, he did not retain any of the responsibilities he had as the CFO at Hanson Industries, and those responsibilities were assumed by other persons at Hanson Industries.  Trial Tr. vol. 12, 1768:14-1769:14 (Landuyt).  In 1995, Landuyt transitioned to President and CEO of Hanson Industries after David Clarke and John Raos left in connection with the demerger of U.S. Industries.  *Id.* 1769:15-177:1 (Landuyt).  He did not retain any of his responsibilities as the financial director of Hanson Trust.  *Id.* 1770:2-5 (Landuyt).  When he was employed at Hanson Industries, his office was in Iselin, New Jersey.  *Id.* 1770:6-8 (Landuyt).  When he was employed by Hanson Trust, his office was in London, England.  *Id.* 17709-11 (Landuyt).  And each time he transitioned, he had to change payrolls.  *Id.* 1770:12-18 (Landuyt).

234. Hellings appears to have provided advisory services on tax and insurance issues for both the U.S. operations and the U.K.  Trial Tr. vol. 11, 1658:23-1659:7 (Clarke).  Notably, however, the Hanson Trust 1986 Annual Report identifies approximately 92,000 employees in the overall Hanson group, of which 54,000 worked in the United Kingdom.  Trial Ex. 260, HBML 0006521; HBML 0006552.  As of September 20, 1987, the overall Hanson group had 88,000 employees, of whom approximately 50,000 were based in the United Kingdom and 34,000 in the United States.  Trial Ex. 209, HBML 0008304.  The shared use of just one employee in this context is insufficient to demonstrate that there

were shared employees between the U.S. and the U.K.  That is further supported by the consistent testimony from the Hanson Industries executives that Hellings was not a decisionmaker for U.S. operations and did not direct or control U.S. operations.  *Supra* Section III.B.1.  Professor Solomon agreed that it is "common in conglomerates for the parent to be involved in tax planning for the entire group, including the subsidiaries."  Trial Tr. vol. 5, 856:6-9 (Solomon).

235.  With respect to attorneys, the evidence establishes that Hanson Trust and the U.S. operations did not share in-house attorneys or in-house legal functions.  *Supra* Section III.B.3.

236.  The parties introduced evidence suggesting that Hanson Trust and the U.S. subsidiaries shared outside counsel in connection with the SCM tender offer and underlying litigation.  Trial Exs. 4, 212, 213, 625, 2026, 2031, 2032.  That said, Hempstead testified that it was ultimately his decision to hire the Skadden law firm and that he later hired Weil Gotshal.  Trial Ex. 960 (Hempstead Dep.), pdf p. 33/331 Trans. p. 81:19-23; pdf p. 212-213/331 Trans. p. 213:21-214:11.  Hempstead managed those lawyers, they submitted their bills to Hempstead, and Hanson Industries paid the bills.  Trial Ex. 960 (Hempstead Dep.), pdf p. 33/331 Trans. p. 81:19-23; pdf p. 212-213/331 Trans. p. 213:21-214:11.

### 4.  Overlapping Officers and Directors

237.  Consistent with my findings in Section III.B, on the operational and financial autonomy of the U.S. operations, I find that any overlap in officers and directors between the relevant U.S. companies and Hanson Trust does not demonstrate that Hanson Trust controlled the U.S. operations.

238.  Some executives at Hanson Industries became directors of Hanson Trust.  Clarke became a director of Hanson Trust during part of the relevant time period.  Trial Tr. vol. 11, 1648:11-1649:7 (Clarke).  He testified that joining the Hanson Trust board did not change how he managed or ran the U.S. operations.  *Id.* 1650:25-1651:4 (Clarke).  He further testified that he "absolutely never" received instruction from the Hanson Trust board about how to run the U.S. operations, and that the board never exercised control over the way he

83

United States District Court
Northern District of California

managed the U.S.  *Id.* 1651:7-11 (Clarke).  After he was appointed "president of the U.S. operations," he went to London at least five times a year; Trial Ex. 303 (listing Clarke as an associate director of HBML as of December 5, 1985).

239.  Similarly, in 1990, Raos joined Hanson Trust's board of directors.  Trial Tr. vol. 8, 1109:4-6 (Raos).  His role was to report on U.S. operations.  *Id.* 1110:15-19 (Raos).  The Hanson Trust board never gave him directions or instructions on how to conduct business in the U.S.  *Id.* 1110:20-1111:9 (Raos).

240.  Hempstead also testified that he was at some point an associate director on the board of Hanson Trust.  Trial Ex. 960 (Hempstead Dep.), pdf p. 210-211/331 Trans. p. 211:21-212:7.  But he explained that "Associate Director" was merely an "honorary" title, that he was not entitled to attend board meetings, that he had no voting rights, and that the primary purpose was to allow him to sign SEC documents for Hanson Trust when necessary.  *Id.* pdf p. 210-211/331 Trans. p. 211:21-212:7.  Hempstead also testified that Hanson Trust "did not participate in or direct anything in the United States."  *Id.* pdf p. 208/331 Trans. p. 209:18-23.

241.  Landuyt testified that he became the financial director of Hanson Trust in 1992.  However, he did not retain any of the responsibilities that he had as CFO at Hanson Industries, and those responsibilities were assumed by other persons at Hanson Industries.  Trial Tr. vol. 12, 1768:14-1769:14 (Landuyt).  In 1995, Landuyt transitioned to back to Hanson Industries as President and CEO after David Clark and John Raos left in connection with the demerger of U.S. Industries.  *Id.* 1769:15-177:1 (Landuyt).  He did not retain any of his responsibilities as the financial director of Hanson Trust.  *Id.* 1770:2-5 (Landuyt).

242.  In addition, numerous executives at Hanson Industries held multiple positions for North American interests.  Trial Tr. vol. 5, 826:18-827:4 (Solomon).  The Hanson Industries personnel were outside the corporate chain of SCM, and they were placed in positions by HBML in part for the acquisition of SCM.  *Id.*  For example, Clarke held at least 17 positions, Raos held 17 positions, and Landuyt held 11 positions, among others.  *Id.*

### 5. Undercapitalization

243. The testimony of HBML's experts Thompson and Hubbard established that the corporate successors of SCM – and specifically those who succeeded to the FMW Site liability – were adequately capitalized. In fact, they were better capitalized than the entire SCM conglomerate was before the tender offer.

244. HBML's forensic accounting expert, Thompson, testified that SCM Corporation and its successor entities were adequately capitalized such that they could carry on their normal business operations, and they were able to meet their obligations as they came due. Trial Tr. vol. 7, 1026:4-12 (Thompson). In reaching this conclusion, Thompson analyzed multiple different metrics on the book value of various entities in the corporate successorship chain at various relevant points: the pre-tender offer SCM conglomerate in 1985; HSCM-20; HSCM Holdings; HM Holdings; and Millennium Chemicals in 1996. *Id.* 991:13-992:12 (Thompson). Her analysis showed that, by a variety of measures, each and every successor to pre-tender offer SCM was better capitalized, from a book-value perspective, than pre-tender offer SCM was.

245. Thompson reached that conclusion as to the following metrics: total assets, *id.* 1002:4-1003:15 (Thompson); Trial Ex. 2185, total current assets, Trial Tr. vol. 7, 1004:19-1005:25 (Thompson); Trial Ex. 2186, total fixed assets, Trial Tr. vol. 7, 1006:12-1007:14 (Thompson); Trial Ex. 2187, shareholders' equity, Trial Tr. vol. 7, 1008:2-1009:10 (Thompson); Trial Ex. 2188, working capital, Trial Tr. vol. 7, 1009:20-1010:23 (Thompson); Trial Ex. 2189, and the ratio of total assets to total liabilities, Trial Tr. vol. 7, 1011:9-1012:8 (Thompson); Trial Ex. 2190.

246. Thompson also compared the book value of SCM and its successors to certain similar conglomerates: General Electric; Kidde; LTV; Berkshire Hathaway; Litton; and ITT. Trial Tr. vol. 7, 1012:19-1013:19 (Thompson). To identify these contemporaneous similar conglomerates, she identified entities present in the United States, that operated during the same time frame, and were publicly traded. *Id.* 1013:20-1014:8 (Thompson). She compared the entities on three measurements: current assets to current liabilities, total

United States District Court
Northern District of California

assets to total liabilities, and long-term debt to equity. *Id.* 1014:14-1015:7 (Thompson). In all but one instance, every successor entity was within the range of the other similar conglomerates on all three metrics, and thus were similarly liquid and similarly capitalized as the other conglomerates. *Id.* 1018:8-12; 1020:11-1023:11 (Thompson).

247. Thompson further relied on the deposition testimony of Hanson personnel in a position to know whether the successors to the FMW Site liability were adequately capitalized. *Id.* 1023:12-15 (Thompson). Six individuals testified that Hanson Industries' holding and operating companies were adequately capitalized. *Id.* 1023:12-1024:14 (Thompson); *see also* Trial Tr. vol. 8, 1209:9-16 (Raos) (Raos testified that there was never a time when U.S. subsidiaries were unable to pay their debts as they came due, or lacked sufficient capital to carry on normal business activities); Trial Tr. vol. 12, 1789:12-19 (Landuyt) (Landuyt testified that in capitalizing the fan companies, it was important to make sure that each one was solvent, or people could claim that there was an invalid transfer); Trial Ex. 960 at 401:23-402:6 (Hempstead testified that HSCM-20 was perceived to be adequately capitalized); Trial Ex. 962 at 303:21-304:18 (Lee testified that Millennium was adequately capitalized).

248. Hubbard, HBML's expert economist, testified that from a market value analysis, SCM's successors had vastly greater resources than the value he estimated from the record of the liabilities. Trial Tr. vol. 9, 1328:10-21 (Hubbard). In augmenting Thompson's various book-value metrics, Hubbard looked at whether SCM's successors had sufficient financial resources at market prices to meet obligations as they come due. *Id.* 1347:21-1348:8 (Hubbard). To do this, Hubbard calculated the market equity capitalization for SCM, HM Holdings, and Millennium, and compared that to what was known or knowable about those entities' environmental liabilities. *Id.* 1350:10-1351:2 (Hubbard). Hubbard testified that the market equity capitalization of HM Holdings, a predecessor to Millennium, exceeded that of pre-tender offer SCM, as well as the book value of HM Holdings, and during the period from 1989 to 1996, the market value of HM Holdings ranged from $1.7 billion to $4.5 billion. *Id.* 1356:6-22, 1364:12-23 (Hubbard). Hubbard further found that

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Millennium at the time of the demerger had an implied market value of $1.2 billion, and its

2  debt was rated investment grade. *Id.* 1357:20-1359:25 (Hubbard).  The implied market

3  value of SCM, HM Holdings, and Millennium at all relevant times vastly exceeded the

4  amount of known and knowable environmental liabilities, which was approximately $150

5  million at most. *Id.* 1367:25-1376:19 (Hubbard); Trial Exs.  445, 470, and 2149.

6  249.  The City's chief witness on capitalization was John Owens, an accountant and auditing

7  expert.  Owens' testimony did not fully reach the issue of capitalization.  He did not opine

8  that SCM's successors were in fact undercapitalized.  Instead, his first opinion was that he

9  did not believe that a balance sheet with positive equity "necessarily" means that that entity

10  is solvent or has adequate capital.  Trial Tr. vol. 6, 902:14-21 (Owens).  That was not an

11  opinion on undercapitalization. *Id.* 905:3-906:10 (Owens).  His second opinion was that

12  HSCM-20's pro forma balance sheet did not necessarily demonstrate the ability to pay

13  HSCM-20's liabilities. *Id.* 911:17-23 (Owens).  That was too equivocal to be helpful.  His

14  third opinion was that "the asset sale starting immediately in 1986, immediately after the

15  acquisition—and those were sales of the operating subsidiaries and then additional sales,

16  generally over the next couple of years, of those subsidiaries—limited the ability of

17  HSCM-20 to pay its liabilities." *Id.* 931:22-932:6 (Owens).  Whether HSCM-20's ability

18  to pay its liabilities was "limited" is not the issue—the issue is undercapitalization.  His

19  fourth opinion was similarly unhelpful because again, it is that Millennium's positive

20  equity does *not necessarily* demonstrate its ability to pay its liabilities. *Id.* 933:15-22

21  (Owens).

22  250.  The core of Owens' opinion was that HSCM-20's pro forma balance sheet did not

23  necessarily demonstrate the ability to pay HSCM-20's liabilities, because HSCM-20 would

24  need to sell certain assets in order for some other entity in the ownership chain to repay

25  certain debt related to the acquisition of SCM, and because the midpoint of potential

26  liability for the Kalamazoo site was $350 million. *Id.* 914:3-928:18 (Owens).  But he

27  admitted that neither of these liabilities needed to be addressed in HSCM-20's financial

28  statements under GAAP, and that the exercise Owens did was not something he would do

87

as an accountant or in order to value the liabilities in HSCM-20.  *Id.* 915:17-916:7; 928:19-930:11 (Owens).  When I asked, "Is that a valuation that you would make as an accountant for a company?",  Owens responded, "Well, no, no[.]"  *Id.* 928:19-930:11 (Owens).  And when I asked, "you're not opining that that's fair value?", Owens responded, "Absolutely, right."  *Id.* 928:19-930:11 (Owens).  He agreed with me that he's "just picking that number" while "not opining that that's a fair value."  *Id.* 928:19-930:11 (Owens).  He had no opinion on whether HSCM-20 or Millennium were able to pay their liabilities, or whether they had ever failed to pay a liability that had come due.  *Id.* 943:9-14; 945:4-24 (Owens).  He did not account for the fact that, ultimately, HSCM-20 merged with a much better-capitalized entity, HM Holdings.  *Id.* 943:22-944:9 (Owens).  Nor did he account for the fact that Millennium had earnings that could be used to pay for the environmental liabilities to which Millennium had succeeded.  *Id.* 958:5-11 (Owens).

251.  The City did not present sufficient evidence or prove that any successor to the FMW Site liability was undercapitalized.

**6.  Failure to Maintain Arms-Length Dealing**

252.  As outlined in Section III.B, Hanson Industries and the U.S. operations were generally autonomous from Hanson Trust, and I find that there was no failure to maintain an arms-length relationship between the U.S. operations and Hanson Trust.  The issue under this factor, and piercing the corporate veil in general, is whether Hanson Trust's corporate veil can be pierced via Hanson Industries/North American interests, not whether the operating companies in the United States could pierce Hanson Industries' corporate veil.

253.  The City makes much of testimony from Clarke that he saw Hanson Trust and Hanson Industries as akin to a family business.  *See, e.g.*, Trial Tr. vol. 11, 1679:1-24 (Clarke).  He was not sure that the Hanson Industries operating companies had boards of directors.  *Id.* With respect to making decisions about large acquisitions, Clarke testified that he did not go "through the whole board structure and agreement" nor were there requirements to obtain fairness opinions.  *Id*.  Landuyt testified that there were no loan documents or contracts associated with loans issued to the U.S. operating companies, nor were the loans

secured.  Trial Tr. vol. 12, 1845:7-1846:3 (Landuyt).  This all relates to how Hanson Industries did its business, not Hanson Trust.

254.  Professor Solomon noted that there was "no indicia of arm's-length bargaining" normally seen in intercompany transactions setting up the fan companies.  Trial Tr. vol. 5, 824:17-19 (Solomon).  There is no evidence that the fan companies had "any will of their own, no evidence that Hempstead was acting with the hat of the fan companies rather than acting at the direction of Mr. Hellings' memo, which was implemented."  *Id.* 824:13-16 (Solomon).  Raos testified, that as to his dealings involving HSCM-20, the transactions were not made at arm's-length, as he was "dealing with himself."  Trial Tr. vol. 8, 1262:15-19 (Raos).  But the alter ego issue is not whether Hanson Industries could be pierced from the operating companies, it is whether Hanson Trust itself could be pierced.

255.  Solomon provided three examples that purport to support his opinions on lack of an arms-length relationship.  First, he opined that the SCM restructuring did not involve arms-length dealing.  Trial Tr. vol. 5, 823:16-22 (Solomon).  But as outlined in Sections IV.B–D, Hanson Industries, not Hanson Trust, controlled and directed the post-acquisition investigation and restructuring of SCM.  The relevant legal issue is whether Hanson Trust failed to engage in arms-length dealing with the relevant U.S. subsidiaries.  Whether Hanson Industries did or did not maintain an arms-length relationship with the various U.S. subsidiaries during the SCM reorganization is unimportant to this analysis.

256.  Solomon based his opinion in part on Trial Exhibit 42, which is a unanimous written consent of the fan companies and SCM to dissolve SCM.  Solomon noted that Hempstead "is signing for everyone here, all of the fan companies" purportedly without evidence that Hempstead was acting on behalf of the fan companies' best interest.  Trial Tr. vol. 5, 824:9-19 (Solomon).  Hempstead was a vice president for each of the fan companies, so he appears to have had proper authority.  Trial Ex. 42, HBML 0000814-816.  This shows the relationship between Hanson Industries and the U.S. fan companies–e.g., it is a Hanson Industries employee signing on behalf of other U.S. companies.  It is not evidence of Hanson Trust failing to maintain arms-length relationships.  And as Landuyt explained, the

type of intergroup mergers involved in the restructuring would not have merited involvement of outside advisors because it involved a series of mergers up into a company that already owned the merged entity.  Trial Tr. vol. 12, 1856:8-1857:11 (Landuyt).

257.  Solomon also opined that there were no indicia of arms-length dealing with the July 14, 1989 Amended and Restated Cross-Indemnification Agreement between Smith Corona Corporation and HM Holdings as part of the Smith Corona Corporation IPO.  Trial Tr. vol. 5, 829:24-832:2 (Solomon).  While acknowledging that "[i]t's not unusual" to have indemnification agreements when "IPO-ing a subsidiary," Professor Solomon said that he did not see any indicia of arms-length dealing because he did not see HM Holdings acting directly, that "this is Hanson that's dictating these transactions," and that "they're also stating specifically they're not on arm's-length basis." *Id.* 831:18-832:2 (Solomon).

258.  I do not agree.  First, HM Holdings did act directly—it entered into and signed a document identifying it as a party to the agreement.  Trial Ex. 26, HBML 0003060.   Hempstead was an officer and director of HM Holdings, along with eleven other officers and directors as of 1989.  Trial Ex. 2372, HBML0007364.  Second, it was not Hanson Trust "dictating" these transactions.  The idea to do an IPO for Smith Corona Corporation came from Smith Corona Corporation's chief executive, Lee Thompson, not someone at Hanson Trust.  Trial Tr. vol. 11, 1695:25-1696:6 (Clarke).  The ultimate decisionmakers on whether do to it were Sir Gordon and David Clarke.  *Id.* 1696:1-6, 1696:13-20 (Clarke).  Hanson Trust played no role in that decision.  *Id.* 1696:7-12, 1696:21-1697:1 (Clarke).  Finally, the document itself does not "stat[e] specifically" it is not an arm's-length agreement.  Trial Ex. 26.   Regardless, the indemnification agreement is at most evidence of the relationship between HM Holdings and Smith Corona Corporation and has no bearing on whether Hanson Trust failed to maintain arms-length relationships.

259.  Finally, Solomon opined that the Millennium demerger was not a non-arm's length transaction.  Trial Tr. vol. 5, 832:21-833:11 (Solomon).  Professor Solomon cited the risk disclosure statement in the August 23, 1996 Millennium Information Statement (Tr. Ex. 242).  Trial Tr. vol. 5, 833:12-834:3 (Solomon).  The disclosure states:

90

> In connection with the Demerger Transactions, the Company and Hanson will enter into several agreements for the purpose of giving effect to the Stock Dividend and defining their ongoing relationship. These agreements will not be the result of arm's-length negotiations, and there can be no assurance that each of such agreements, or that each of the transactions provided for therein, will be effected on terms at least as favorable to the Company or to Hanson as could have been obtained from unaffiliated third parties.

Trial Ex. 242, HBML 0008081.

260.   Solomon used that statement to conclude that a $2.25 billion debt was allocated to Millennium on a non-arm's length basis. Trial Tr. vol. 5, 834:4-17 (Solomon). I find to the contrary. As explained in Section V, the $2.25 billion "Allocated Loan" "relate[d] directly to the Chemicals Business" and arose from the acquisition of Quantum Chemicals, one of the companies that would be demerged with Millennium. Aside from pointing to the general language in the risk disclosure statement, Solomon did not explain why allocating debt to Millennium that was associated with the acquisitions of one Millennium's subsidiaries constitutes a non-arm's length transaction. And Landuyt testified that Millennium hired an independent investment advisor who provided a fairness opinion in connection with the demerger. Trial Tr. vol. 12, 1827:25-1828:8 (Landuyt). Further, Solomon also acknowledged, but inexplicably discounted, that Millennium's shareholders were Hanson Trust shareholders. Trial Tr. vol. 5, 883:17-884:6 (Solomon). That means that Hanson Trust's shareholders held the $2.25 billion debt that was allocated to Millenium, *see id.*, which further undermines Solomon's opinion that this was not an arm's-length transaction.

261.   Finally, the plaintiffs make much of the "typewriter IPO" as evidence of non-arms-length transactions. The tender offer indicated "the possible disposition" of the typewriter business. Trial Ex. 243 at 32. The HBML subsidiary that was created to hold the typewriter business, HSCM-10 or "SCC" (Smith Corona Corporation), was listed on the New York Stock Exchange via an initial public offering ("IPO") in 1989. Dkt. No. 266, Undisp. Fact 33. But the information in the prospectus on the IPO is not evidence of non-arms-length transactions. *See* Trial Ex. 21. Once again, this transaction merely showed a

United States District Court
Northern District of California

standard, non-controlling relationship between a parent and indirect subsidiary.  *See generally id.*; *see also* Trial Ex. 454.  The document also does not say that the money from this transaction was "received" by Hanson Trust, and none of the City's experts provided the analysis necessary to understand where the money went.  *See* Trial Ex. 401, Hellings_0027829; Trial Ex. 952 (Ludlam Dep.), 133:2-135:7..  Finally, the evidence about the cross-indemnity agreement between SCC and HM Holdings says nothing about whether *HBML's* actions were taken at arms-length.  *See* Trial Ex. 26.

### 7.  Use of Corporate Entity as Mere Shell or Instrumentality

262.  I find that Hanson Trust did not use the U.S. companies as mere shells or instrumentalities.  As outlined in Section III and incorporated herein, the evidence establishes that Hanson Industries and the U.S. operations were managerially, operationally, and financially autonomous from Hanson Trust.  They maintained their own independent businesses and, although they were subsidiaries of the ultimate parent company, Hanson Trust, they were not merely shells or instrumentalities.

263.  The City has emphasized that Hanson Trust, as the ultimate parent, nonetheless benefited from all of from the U.S. operations, suggesting that the U.S. operations were therefore merely instruments for Hanson Trust.  But it is normal for a parent company to benefit from a subsidiary.  Trial Tr. vol. 5, 777:18-25 (Hill).  Hill agreed that benefiting the parent company is "essentially the purpose of the subsidiary's existence."  *Id.* 778:1-3 (Hill).

264.  The City also elicited testimony from Hill that from a "strategic, organizational, and management perspective," Hanson Trust and Hanson Industries, including the U.S. operations, were a "single enterprise."  *Id.* 733:21-734:4 (Hill).  But he acknowledged that he was not using that term in a "legal sense."  *Id.* 763:5-12 (Hill).  And he conceded that his definition of "single enterprise" was so broad as to encompass any collection of companies that operate with strategic, operational, and economic cohesion, and that it would include "most conglomerates," and companies such as Microsoft.  *Id.* 763:18-764:25 (Hill).  To the extent that the City contends that this demonstrates the U.S. companies were mere instrumentalities of Hanson Trust, it is wrong.  That definition of a

United States District Court
Northern District of California

1    "single enterprise" is too broad and is inapplicable to the facts and legal questions at issue.

2  265.  Professor Solomon opined that HHNBV and HSCM Industries Inc. were mere "conduits or

3        instrumentalities" used to implement Hanson Trust's tender offer for SCM.  Trial Tr. vol.

4        5, 889:21-890:13 (Solomon).  His opinion was based on his view that "Hanson Trust PLC

5        is making the decisions" for the SCM acquisition and restructuring.  *Id.* 890:1-13

6        (Solomon).  He testified that Hanson Trust was "making the decisions for the acquisition

7        of the shares and otherwise," "engaging the investment banker," "organizing the loans,"

8        and that it created the entity used for the merger.  *Id.* 890:5-11 (Solomon).  He cited

9        Hempstead's involvement, noting that Hempstead did not have a position with HHN and

10       did not otherwise appear to be authorized to act on Hanson Trust's behalf for the

11       restructuring transactions.  *Id.* 890:14-891:6 (Solomon).

12 266.  As I found in Section IV, Hanson Trust was not making the decisions with respect to the

13       SCM acquisition and restructuring—it was Hanson Industries personnel.  Solomon's

14       critique of Hempstead's role does not account for the role of HSCM Industries Inc., the

15       lead purchaser on the SCM acquisition, and Hempstead's role with HSCM Industries Inc.

16       Solomon did not consider the series of August 23, 1985 corporate resolutions for HSCM

17       Industries Inc.  Trial Tr. vol. 5, 892:3-19, 893:1-3 (Solomon); Trial Ex. 466,

18       HBML_0000089, 0000092-93.  They appoint HSCM Industries Inc.'s officers, all of

19       whom were Hanson Industries personnel, not Hanson Trust personnel.  Trial Tr. vol. 5,

20       893:1-3 (Solomon); Trial Ex. 466, HBML_0000089.  They authorize HSCM Industries

21       Inc. to engage in the SCM tender offer and in litigation related to the tender offer.  Trial Tr.

22       vol. 5, 893:7-17 (Solomon); Trial Ex. 466, HBML_0000092-93.  And they authorize

23       HSCM Industries Inc. to execute the dealer-manager agreement with Rothschild Inc.  Trial

24       Tr. vol. 5, 893:18-24 (Solomon); Trial Ex. 466, HBML_0000093.

25 267.  The decisionmakers for HSCM Industries Inc. were Clarke, Raos, Hempstead, and Eric

26       Hanson.  Trial Ex. 960 (Hempstead Dep.), pdf p. 222/331 Trans. p. 223:17-24.  Hanson

27       Trust personnel "had no role at all" with respect to decisions concerning HSCM Industries

28       Inc.  Trial Ex. 960 (Hempstead Dep.), pdf p. 221/331 Trans. p. 222:1-4.

268. Additionally, the engagement letter with Rothschild was not signed only by Hanson Trust. Trial Ex. 376.  It was signed by HSCM Industries Inc., HHNBV, as well as Hanson Trust. Trial Ex. 376.  According to Clarke, Hanson Trust never paid anything on Rothschild's engagement.  Trial Tr. vol. 11, 1733:11-21 (Clarke).

269. Solomon cited that Hanson Trust signed a "backstop" letter, verifying to Rothschild that it had the funds to complete the tender offer as evidence that Hanson Trust was making the decisions.  Trial Tr. vol. 5, 800:25-801:21 (Solomon); Trial Ex. 273.  He acknowledged that he was "not exactly sure" of the reason for this letter.  Trial Tr. vol. 5, 801:7-8 (Solomon).  Raos explained that the reason Hanson Trust signed the backstop letter was that Chemical Bank, which had committed to fund the tender offer, discovered a conflict late in the tender offer process, forcing Raos to seek alternate funding from Citibank.  Trial Tr. vol. 8, 1156:14-1157:12 (Raos).  Since Hanson Industries did not have a firm commitment for financing, Rothschild was "nervous" about going to market with a tender offer without a backstop from Hanson Trust that there were sufficient funds to cover the tender offer.  *Id.* 1156:14-1157:12 (Raos).  It was strictly in case "something goes wrong" with the financing.  *Id.*  Ultimately, Raos did secure the necessary financing and the backstop was never invoked.

### 8.  Asset Stripping

270. I find that there is no evidence that Hanson Trust engaged in asset stripping of any of the U.S. companies.  The City attempted to elicit testimony from Solomon that Hanson Trust engaged in asset stripping.  But I asked him directly, "Are you saying that asset stripping occurred here, or you're saying this gives the potential for it?"  Trial Tr. vol. 5, 825:8-25 (Solomon).  Solomon declined to state that asset stripping had occurred.  He responded that, "I think this is consistent with asset-stripping."  *Id.* 825:8-25 (Solomon).

271. In supporting his opinion that there was conduct "consistent" with asset stripping, Solomon then identified two purported examples.  First, he claimed that "[t]here's a billion dollars in assets being transferred up" to Hanson Trust.  *Id.* 825:8-826:5 (Solomon).  Second, he claimed that there was "also asset stripping" in connection with the Millennium demerger.

United States District Court
Northern District of California

1    *Id.* 825:8-25 (Solomon).  The evidence does not support those opinions and neither

2    example demonstrates asset stripping.

3    272.  Solomon was unable to identify evidence supporting his opinion that $1 billion was

4    transferred to Hanson Trust.  When challenged to identify documents demonstrating this

5    transfer, Solomon could not identify any specific documents showing any transfer of $1

6    billion to Hanson Trust; he instead deferred to his expert report.  *Id.* 844:10-845:18

7    (Solomon).  When given the opportunity to review his report, he merely paraphrased

8    various sections of the written opinions in his report.  *Id.* 870:13-874:3 (Solomon).  But his

9    report is not evidence.  When asked a final time, "[w]here is the evidence that a billion

10   dollars went to Hanson PLC?", he pointed only to a portion of his report that discussed the

11   $180 million used to purchase back the SCM shares HHNBV had purchased as part of the

12   SCM acquisition.  *Id.* 873:15-874:3 (Solomon).  As Raos explained, the SCM shares

13   owned by HHNBV were bought back so that the U.S. operations "would own a hundred

14   percent" of SCM.  Trial Tr. vol. 8, 1202:21-1203:4, 1246:11-1247:2 (Raos).  Additionally,

15   Solomon conceded that the $1 billion in cash proceeds was ultimately used to pay off the

16   debt used to finance the SCM acquisition.  Trial Tr. vol. 5, 875:23-876:2 (Solomon).  He

17   testified that this benefited Hanson Trust because Hanson Trust arranged for $765 million

18   in financing from its banker, Lloyd's of London.  *Id.* 885:20-886:10 (Solomon).  But there

19   is no evidence that Hanson Trust arranged a $765 million loan with Lloyd's to purchase

20   SCM.  Solomon relied on the October 11, 1985 tender offer document, *id.* 885:20-886:4

21   (Solomon), but that document does not mention Lloyd's at all or state that Hanson Trust

22   directly obtained the loan.  Trial Ex. 243, HBML_0015572.  Instead, it states that Hanson

23   Trust's "indirect subsidiary" obtained a commitment from a "U.S. bank" for a loan facility

24   up to $775 million.  Trial Ex. 243, HBML_0015572.  That "U.S. bank" was Citibank, not

25   Lloyd's, and Raos, not Hanson Trust, arranged for and negotiated the terms of that loan.

26   *Supra* Section IV.A.2.  And even if proceeds had been used to pay off debt incurred

27   directly by Hanson Trust, neither the City nor Solomon explained why paying off debt

28   incurred to acquire SCM demonstrates asset stripping or is otherwise improper.  Finally,

United States District Court
Northern District of California

his opinion that $1 billion was transferred to Hanson Trust is inconsistent with the evidence on the financial separateness between the U.S. and the U.K. operations. *Supra* Section III.B; Trial Ex. 962 (Lee Dep.), 294:16-295:8 (the cash flows and earnings generated from the U.S. operations were used to continue growing the U.S. operations.).

273. Solomon also opined that the $2.25 billion debt allocated to Millennium as part of the demerger was also consistent with asset stripping. Trial Tr. vol. 5, 834:4-14, 882:21-883:3, 883:17-20 (Solomon). As explained in Sections V, VI.A.7, he mischaracterizes that debt and failed to take into consideration that the $2.25 billion "Allocated Loan" "relate[d] directly to the Chemicals Business" and arose from the acquisition of Quantum Chemicals, one of the companies that would be demerged with Millennium. He did not otherwise explain why keeping a debt used to acquire Quantum Chemicals with the company, Millennium, that would demerge with and own Quantum Chemicals, is "consistent" with asset stripping.

274. I am persuaded by the testimony of HBML's corporate expert, Hubbard. He testified that asset stripping "would refer to removing assets from a firm and transferring them to the point that you would question the financial viability of the subject firm; in other words, pushing it closer to bankruptcy or insolvency." Trial Tr. vol. 9 1376:20-24 (Hubbard). His analysis "ruled out" that asset stripping occurred because the successors to SCM always had more than enough assets to satisfy the known amounts of liabilities. *Id.* 1328:10-21; 1376:20-1377:15 (Hubbard).

275. Even under Solomon's definition, there was no asset stripping. He described asset stripping as being "about consistently transferring assets to a party while leaving the liabilities behind." Trial Tr. vol. 5, 824:20-825:7 (Solomon). That did not happen in this case. *Supra* Sections V, VI.A.7.

276. As Landuyt testified, as HSCM-20 merged up the chain to eventually merge with HM Holdings, those intercompany mergers "included all of the assets and liabilities of the merged company, not just any specific liability." Trial Tr. vol. 12, 1856:8-1857:3 (Landuyt). There was no transferring out of specific liabilities without the assets. *Id.*

1856:8-1857:3 (Landuyt).  And at the end of the merging up of HSCM-20, the result was a company, HM Holdings, that was more adequately capitalized and better able to pay for liabilities than the original SCM entity at the time of acquisition.

277.  While Solomon did not include it as part of his asset stripping opinion, he referred to a document that "all proceeds flowed to" Hanson Trust.  Trial Tr. vol. 5, 832:3-20 (Solomon).  There is an August 8, 1989 cash report from S. Butler to Lord Hanson, Sir Gordon, and others, that states that "£218mn ($353mn) was received upon the flotation [IPO] of Smith Corona."  Trial Ex. 401, Hellings_0027829.  Based on this, Solomon opines that "Hanson PLC received the benefits of this transaction, which was $353 million," inferring that the $353 million raised on the Smith Corona Corporation IPO was transferred to Hanson Trust.  But on its face the document does not state that the money was "received" by Hanson Trust.  Trial Ex. 401, Hellings_0027829.  Ludlam testified that in order to see where the $353 million went, one would need conduct an analysis of the "cash reports week-on-week to see where that went."  Trial Ex. 952 (Ludlam Dep.), 133:2-135:7.  Neither Solomon nor the City's accounting expert, John Owens, provided that analysis.

278.  The evidence undermines any inference that, despite Hanson Trust not being involved in the IPO, it received the $353 million raised on the IPO.  Solomon's inference is inconsistent with the substantial evidence on the financial autonomy of the U.S. operations.  Lee testified that he could not recall a time the U.S. companies ever sent money to Hanson Trust.  Trial Ex. 962 (Lee Dep.), 294:11-15.  As he explained, the U.S. operations retained the earnings generated in the U.S. to continue growing the U.S. operations.  Trial Ex. 962 (Lee Dep.), 294:16-295:8.  Moreover, as described above, the Smith Corona Corporation IPO was conceived of by Smith Corona Corporation's chief executive, Lee Thompson, not someone at Hanson Trust.  Trial Tr. vol. 11, 1695:25-1696:6 (Clarke).  The ultimate decisionmakers on whether do to it were Sir Gordon and Clarke.  *Id.* 1696:1-6, 1696:13-20 (Clarke).  Hanson Trust played no role in that decision.  *Id.* 1696:7-12, 1696:21-1697:1 (Clarke).

**B.      SUCCESSOR LIABILITY**

279.   The City also argued that Hanson Trust took direct responsibility for the Marchant environmental liability.  This section traces the relevant facts that disprove that contention.

280.   As described in more detail in the Conclusions of Law, I find that the SCM tender offer was a stock transaction, not a purchase of assets.  The City presented no evidence that any assets belonging to SCM or its subsidiaries were ever transferred to Hanson Trust.  Raos testified that Hanson Trust did not assume the liabilities of SCM; HM Holdings ultimately assumed the liability.  Trial Tr. vol. 8, 1106:23-1107:24, 1203:17-1204:8 (Raos).  Clarke also testified that Hanson Trust did not assume SCM's liabilities.  Trial Tr. vol. 11, 1645:15-21, 1693:23-1694:12 (Clarke).

281.   Millennium Holdings was the successor to Marchant's alleged FMW Site liabilities.  To repeat, the line of successorship is well-documented and largely undisputed.  On February 21, 1986, SCM and HSCM Merger Co. Inc. entered into the Plan and Agreement of Merger and on March 31, 1986, they filed a Certificate of Merger in which the surviving entity retained the name "SCM."  Trial Exs. 2054-33, 2054-32.  On November 3, 1986, SCM merged into HSCM-20, at which point HSCM-20 assumed the Marchant liability.  Dkt. No. 266, Undisp. Fact 30.  On November 17, 1986, former HSCM-20 merged into its parent company, HSCM Holdings, Inc., then changed its name to SCM.  As part of the merger, HSCM Holdings, Inc. (now named "SCM") assumed Marchant's liabilities.  Dkt. No. 266, Undisp. Fact 31.  On October 14, 1988, SCM (the former HSCM Holdings, Inc.) was merged into HM Holdings, Inc., which had been formed in approximately 1980 as a Delaware corporation.  Dkt. No. 266, Undisp. Fact 32.  HM Holdings, Inc. assumed Marchant's liabilities as a result of the merger.  Dkt. No. 266, Undisp. Fact 32.  On September 30, 1996, HM Holdings, Inc. merged with Millennium Holdings, Inc. ("Millennium Holdings"), a Delaware company and subsidiary of Millennium.  Dkt. No. 266, Undisp. Fact 35.  HM Holdings, Inc. was the surviving entity but changed its name to "Millennium Holdings, Inc."  Dkt. No. 266, Undisp. Fact 35.  It was the successor to the Marchant liabilities.

United States District Court
Northern District of California

282. The City relies on two internal Hanson Industries memoranda discussing SCM's legacy environmental obligations to argue that Hanson Trust either expressly or impliedly assumed SCM's legacy environmental liabilities.  Trial Exs. 450, 460.  Trial Exhibit 450 is a memorandum authored by Brian Hellings that provides in relevant part that "[w]ith our acquisitions of SCM, Quantum, Kaiser and particularly Beazer we took over substantial liabilities to clean up toxic sites due to contamination of ground at chemical sites."  And Trial Exhibit 460 is a memorandum from Don Schoenwolf, who was Hanson Industries' head of insurance.  The memorandum provides in relevant part that "[i]t therefore appears that Hanson will have to self-assume all risk of loss from pollution arising out of exposure in 1986."  Trial Ex. 460.

283. Neither memorandum identifies that Hanson Trust itself—as opposed to one of its subsidiaries, such as HM Holdings—assumed or would bear the costs of SCM's legacy environmental liabilities.  The witness testimony is consistent that Hellings provided tax and insurance related advice for the entire group of Hanson companies, so it is not unusual that he might use the word "our" or "we."  Neither memorandum is an express agreement that Hanson Trust will assume any liability of SCM, and the City has not introduced any evidence of any such agreement.

284. An assumption of SCM's liabilities by Hanson Trust would be inconsistent with the substantial testimony that the operations finances of the U.S. and U.K. were kept separate.  Equally important, the City has offered no evidence explaining why HBML would have made an exception to its long-standing practice of separating U.S. and U.K. finances in order to assume the liabilities of SCM, when the liabilities had already been assumed by HM Holdings, an entity that had sufficient financial resources to pay for SCM's liabilities.

### C.    TILLOTSON

285. The City identified the transfer of Hanson Industries into Tillotson as a potential way Hanson Trust's corporate form could be pierced.  But the City's accounting expert, John Owens, conceded that he "did not form an opinion at all on whether or not Tillotson Commercial Motors was undercapitalized," which would go to piercing the corporate veil.

United States District Court
Northern District of California

Trial Tr. vol. 6, 946:17-948:8 (Owens).  To the contrary, it appears that Tillotson regularly maintained its corporate books and records and was adequately capitalized to carry on its ordinary business and pay its liabilities when they became due: HBML's accounting expert, Suzanne Thompson, testified that from 1986 to 1993, Tillotson "had millions and millions of British pounds in net current assets, meaning they had more current assets than current liabilities."  Trial Tr. vol. 7, 1036:17-1037:14 (Thompson).  For example, according to Tillotson's financial statements, in 1986 Tillotson had £21,310,611 in net current assets, and in 1993 Tillotson had £35,831,801 in net current assets.  Trial Ex. 418, TCM_0000125; Trial Ex. 219, HBML 0013053.

286.   Rogers, the current company secretary of HBML, testified that from the 1980s to 1990s, Tillotson maintained regular corporate minutes and annual directors' reports and accounts. Trial Tr. vol. 14, 2077:20-2078:4, 2080:4-2081:6, (Rogers); Trial Ex. 2378 (1985-1996 Tillotson corporate minutes); Trial Ex. 2377 (1985-1996 Tillotson annual directors' reports and accounts).  Tillotson's annual directors' reports from 1985 to 1996 include various financial information, such as profit and loss accounts, balance sheets, accounting policies, operating costs, and information concerning amounts falling due after more than one year. *See, e.g.*, Trial Ex. 2377, TCM_0000005-0000012.  Rogers explained that, based on this information from 1985 to 1996, Tillotson had net current assets sufficient to pay its liabilities as they became due.  Trial Tr. vol. 14, 2084:15-2085:15, 2087:18-22 (Rogers). Rogers further testified that Tillotson still exists today and continues to go through annual corporate formalities, such as preparing annual accounts that are audited, having board meetings, and doing an annual return and tax comp every year.  *Id.* 2073:11-2074:2 (Rogers).

287.   In terms of the fundamental accounting concept disclosed in Tillotson's annual directors' reports, *see, e.g.*, Trial Ex. 2377, TCM_0000007, Rogers explained that generally the accounts are prepared under a going concern concept "on the basis that the company will continue as a going concern for the foreseeable future."  Trial Tr. vol. 14, 2087:25-2088:16 (Rogers).  Rogers added that the going concern concept does not have any impact on

1    Tillotson's net working capital, nor does it mean that Tillotson would not be able to meet

2    its obligations within the year without the parent company's financial support. *Id.*

3    2088:17-2089:12 (Rogers).

4    **D.    KALAMAZOO**

5    288.  The City introduced evidence regarding a contaminated Superfund site located in

6    Kalamazoo, Michigan, to support its various theories to pierce the corporate veil regarding

7    the Marchant environmental liabilities: operations from a paper mill owned and operated

8    by one of SCM's subsidiaries, Allied Paper, had contributed to Polychlorinated biphenyls

9    ("PCB") contamination at Allied Paper's mill as well as downstream in Portage Creek and

10   the Kalamazoo River.  HSCM-20 ultimately received SCM's environmental liability for

11   the Kalamazoo Mill during HBML's reorganization of SCM, which ultimately flowed to

12   Millennium Chemicals. *See* Trial Exs. 451, 2007 (SCM receives liabilities), 2054-10

13   (SCM merges with HSCM-20); Trial Tr. vol. 12, 1797:2-1798:11 (Landuyt) (HSCM-20

14   "owned everything" formerly owned by SCM); Dkt. No. 266, Undisp. Facts 30-32

15   (ultimately merged with HM holdings); *see also* Trial Exs. 332, 472, 478 (Millenium held

16   the liability).  The City asserts that HBML knew or should have known during the period

17   when it indirectly owned SCM and its successors (i.e., 1986 to 1996) that the Kalamazoo

18   Mill environmental liability would be valued much higher than it was, close to the

19   approximately $1.1 billion in a 2010 bankruptcy settlement agreement entered into by

20   LyondelBasell, a successor owner, with the U.S. Environmental Protection Agency and

21   other state and federal agencies.

22   289.  In 2004, Lyondell acquired Millennium, and in 2009, Lyondell declared bankruptcy.  Dkt.

23   No. 266, Undisp. Fact 37.  The bankruptcy occurred over a decade after HBML had any

24   potential responsibility for the FMW Site liability following the demerger of Millennium.

25   Lyondell agreed to pay approximately $100 million in cash in relation to the Allied Paper

26   site and allowed claims against its bankruptcy estate totaling more than a billion dollars.

27   *See* Trial Ex. 449 at 13, 16, 23.  No evidence was introduced to explain how the amounts

28   in the settlement were calculated.  None linked the 2010 settlement with the conditions that

United States District Court
Northern District of California

United States District Court
Northern District of California

were known or knowable during the years 1986 to 1996, when Hanson Trust indirectly owned SCM and its successors. Nothing showed what the expected recovery on allowed claims would be, or what was actually recovered as a result of the non-cash, allowed claims. The settlement also addressed claims by other states and their agencies arising other contaminated properties other than the Allied Paper site. *Id.* 3-5 (referring, *inter alia*, to claims arising from nine "Transferred Real Properties") and 9-10 (referring to nineteen "Liquidated Sites").

290. There is no evidence that the Kalamazoo site rendered SCM's successor corporations undercapitalized. *Supra* Section VI.A.5. To the contrary, as with the FMW Site liabilities, the legal entities responsible for it increased in capitalization during the time it was Hanson's responsibility.

291. And there is no evidence that Hanson Trust was involved in any way in decisions regarding the Kalamazoo Mill. Mark Alexander testified that Hanson Trust was not involved in any decisions relating to the Kalamazoo mill. Trial Ex. 956 (Alexander Dep.), 27:7-28:2. DeWitt, outside counsel for the site owner/operator recalled that a company called HM Holdings was involved, but he did not recall its corporate relationship to Allied Paper. (DeWitt Dep.) Trial Ex. 954, 16:16:21. He recalled working primarily with a lawyer named Sam Friedman. *Id.* 15:4-7, 15:22-16:10. Friedman was the in-house counsel for SCM Chemicals, who managed environmental issues. Trial Ex. 960 (Hempstead Dep.), pdf p. 285/331 Trans. p. 286:21-25 (discussing Exhibit 453). DeWitt did not recall ever working with, or reporting to, people having British accents. Trial Ex. 954 (DeWitt Dep.), 17:12-15. The 1988 cost estimates (Tr. Exs. 782 and 783) were sent to Grant Annable and Sam Friedman at Hanson Industries. No one from Hanson Trust was copied.

292. I do not find the Kalamazoo Mill evidence particularly relevant to this case: it does not shed light on whether HBML is liable for the Marchant environmental liabilities. I excluded evidence at trial under Federal Rule of Evidence 403 that the City offered regarding the extent of the pollution but allowed it to offer evidence of how HBML handled the liability and whether it showed undercapitalization in some way. It does not.

1

**VII.   POST BANKRUPTCY HISTORY**

2   293.  HBML argues that the City contributed to the contamination at the FMW site and that its

3   failure to notify potentially responsible parties as soon as the Stellar report (discussed

4   below) disclosed the contamination resulted in the City's inability to obtain damages from

5   the successor to Millennium, which was responsible for the Marchant liability.   I find that

6   Emeryville was not a meaningful contributor (if at all) to the pollution on the Marchant

7   site.   And its timing in addressing the FMW remediation was understandable.   That said, it

8   is undeniable that timely notice of the issue at the FMW site to Millenium or Lyondell or

9   even HBML would have substantially increased the likelihood that the proper party could

10   have provided some relief.

11   **A.      The City's Acquisition of the FMW Site and Knowledge of Contamination**

12   294.  The City, through the Redevelopment Agency of the City of Emeryville (the

13   "Redevelopment Agency"), acquired the FMW Site in 1999 through use of eminent

14   domain authority consistent with California Gov. Code § 7267.7, which directs entities to

15   offer to acquire the entire property if the owner desires.   Although Emeryville acquired the

16   FMW Site through its Redevelopment Agency as part of a negotiated purchase, it did so as

17   the culmination of the eminent domain process as directed by this statute.

18   295.  After the Purchase and Sale Agreement was executed, the City conducted environmental

19   due diligence prior to closing on the property.   An environmental consultant, Stellar

20   Environmental Solutions ("Stellar"), was engaged to conduct a pre-acquisition

21   environmental investigation.   Dkt. No. 266, Undisp. Fact 18.

22   296.  On May 21, 1999, the initial results of environmental due diligence conducted by Stellar

23   were sent to Lozick's trust, as noted by the City's witness, Michael Biddle.   Trial Tr. vol.

24   4, 562:13–563:15 (Biddle).   Subsequently, on May 28, 1999, the First Amendment to the

25   Purchase and Sale Agreement was executed.   *Id.* 563:16–563:25 (Biddle); Trial Ex. 502.

26   The First Amendment acknowledged the presence of contaminants at the FMW Site and

27   stated that the purchase price was for an "as if clean" fair market value.   Dkt. No. 266,

28   Undisp. Fact 19; Trial Tr. vol. 4, 564:1-566:3 (Biddle); Trial Ex. 502 ¶ 9.   Emeryville

United States District Court
Northern District of California

insisted on contract provisions that preserved its rights in order to be able to later seek compensation from Lozick's trust (or the other WSL Parties) for environmental cleanup costs to remediate conditions at the FMW Site.  Dkt. No. 266, Undisp. Fact 19.

297.  In June 1999, Stellar submitted a Phase II Investigation report to the City and the Agency. Trial Ex. 503.  Stellar's report advised the City Redevelopment and the Agency of the following: (1) the FMW Site was contaminated with TCE, including TCE in DNAPL form; (2) using the FMW Site as corporate yard could subject the City or Redevelopment Agency to liability as a responsible party; (3) the City or Redevelopment Agency should conduct further investigations into the source of groundwater contamination; (4) the City or Redevelopment Agency should install three monitoring wells to track the groundwater contamination; (5) the groundwater contamination, include TCE, was migrating and could impact downgradient properties; and (6) the findings and report should be presented to relevant regulatory agencies, including Alameda County Department of Environmental Health and State Regional Water Quality Control Board.  Trial Ex. 503, EKI0456237-EKI0456238; Trial Tr. vol. 4, 620:18-624:10  (Biddle).

298.  The First Amendment expressly acknowledged that the Agency discovered the presence of hazardous chemicals in groundwater, including TCE, pursuant to its on-site environmental investigation.  Trial Ex. 502, CLL000103-CLL000104.  With knowledge of the contamination, the Redevelopment Agency proceeded with purchasing the FMW Site. Trial Tr. vol. 4, 629:14-16 (Biddle); Trial Ex. 502, CLL000103-CLL000104.

299.  The City used the FMW Site for approximately thirteen years, until 2012.  Trial Ex. 530, pdf p. 11/177.  It then vacated the site because remediation of soil, soil vapor, and groundwater was required to protect potential users of the site.  Trial Tr. vol. 2, 232:21-24 (James).  Prior to vacating the site, Emeryville stored hazardous waste and other materials at the site.  Trial Tr. vol. 9, 1475:15-1476:3 (Vandeven).  County inspections noted violations and leaks and releases of material.  Id. 1475:8-11, 1479:5-14 (Vandeven). However, there is no evidence that Emeryville contributed any TCE or petroleum hydrocarbons to the contamination at the FMW Site.  Trial Tr. vol. 10, 1585:20-21;

1586:1-5 (Vandeven).  Similarly, there is no evidence that drums of cuttings, purge water, or paints contributed to contamination at the site.  *Id.* 1586:8-1587:1 (Vandeven).  Waste identified in drums on the site during Emeryville's ownership had been picked up off of city streets and then were due to be hauled away; there is no indication that the drums were not properly hauled away or that the containers, if leaking, contributed to the contamination at the site.  *Id.* 1589:3-1590:3 (Vandeven).

**B.      The City's Delay in Providing Notice to Whitney and Marchant's Successor**

300.   In its 1999 report, Stellar advised the City that the historical operations of Marchant and Whitney were two potential sources of contamination at the FMW Site.  Trial Ex. 503, EKI0456242, EKI0456245, EKI0456257-EKI0456259; Trial Tr. vol. 4, 624:18-625:2 (Biddle).   Biddle confirmed that, although notice letters could have been sent, which would have provided an opportunity to address the contamination, neither the City nor the Agency sent notice letters to either entity or those entities' successors.  Trial Tr. vol. 4, 625:3-11, 646:21-647:2 (Biddle).  He admitted that notice letters under the Polanco Act followed "templates," and that they do not take long to draft.  *Id.* 625:23-626:2 (Biddle).  When asked why notice letters were not sent, Biddle testified that the City "wasn't focused on that at the time."  *Id.* 647:3-4 (Biddle).  Ultimately, the City would not attempt to send the alleged successor of Marchant, HBML, notice letters until 2015, approximately sixteen years later.  *See* Trial Ex. 1052.

301.   Prior to its remediation work on the FMW Site, Emeryville had been engaged on a series of ultimately successful remediations on other nearby sites, including Sites A and B.  Trial Tr. vol. 4, 568:14-572:21 (Biddle).  Emeryville worked with DTSC to clean up sites as resources would allow.  *Id.* 569:13-18 (Biddle).

302.   Emeryville sent proper notices under both the Polanco Act and the Resources Conservation and Recovery Act ("RCRA") in 2015 and again in 2019.  Trial Tr. vol 4., 589:13-590:7, 592:24-593:19, 594:9-597:6; Trial Ex. 1052.  On December 21, 2015, Plaintiffs sent a Notice of Intent to File Citizen suit for the "facility located at 5679 Horton Street in Emeryville, California" under Section 7002(a) of RCRA, 42 U.S.C. 6972(a) to Patrick

United States District Court
Northern District of California

United States District Court
Northern District of California

O'Shea, the then CEO of Hanson U.K., located in the United Kingdom, for an "imminent and substantial endangerment to health or the environment" ("2015 RCRA Notice").  Trial Ex. 1052, 1052.0006 and 1052.0013-15; Trial Tr. vol. 4, 651:21-24 (Gretton).  On December 28, 2015, Plaintiffs, sent a Polanco Act notice letter, also addressed to O'Shea at "Hanson U.K.", pursuant to California Health and Safety Code section 33459.1(b)(2).  Trial Ex. 1052, 1052.0013.  HBML did not respond.

303. Plaintiffs filed this lawsuit on January 20, 2017.  Dkt. No. 1.  On August 5, 2019, Plaintiffs sent a Notice of Intent to Commence RCRA Citizen Suit Litigation along with a Notice of Opportunity to Submit a RAP under the Polanco Act ("2019 RCRA/Polanco Notice") to Ed Gretton, Legal Director of Hanson Group and Hanson Limited, also located in the U.K.  Trial Exs. 1052, 1052.0002.  The 2019 RCRA/Polanco Notice enclosed the 2015 RCRA Notice.  Trial Exs. 1052, 1052.0006; Trial Tr. vol. 4, 652:22-653:2 (Gretton).

**C.      Notice to HBML Came Too Late To Assert Indemnity Rights Against Millennium**

304. HBML did not submit a cleanup plan in response to either notice letter.  Trial Tr. vol. 4, 652:10-17, 653:24-654:6 (Gretton).  Its corporate representative, Gretton, explained that upon first receiving the 2015 notice letters, HBML did not have an understanding about the purported connection between HBML and the FMW Site.  *Id.* 654:17-21 (Gretton).  In response, Gretton had HBML's corporate secretary conduct a multi-week search to ascertain the connection between the 2019 RCRA/Polanco Notice, the 5679 Horton Street address, and any Hanson-related company, but without any success.  *Id.* 654:22-655:10 (Gretton).  Failing to identify any connection, HBML engaged outside counsel in early 2016 for assistance in assessing any possible connection.  *Id.* 655:11-18 (Gretton).  That firm concluded that the 2015 RCRA Notice related to SCM; Gretton did not know what SCM or its corporate history was even after learning of SCM's identity.  *Id.* 655:11-656:6 (Gretton).

305. After discovering that SCM was the entity related to 5679 Horton Street associated with the 2015 notices, HBML again engaged its corporate secretary, as well as two additional

United States District Court
Northern District of California

1  people, to spend multiple weeks searching the corporate records to try to understand the

2  company's relationship to SCM. *Id.* 656:15-657:5 (Gretton).  At the completion of the

3  research, apparently months later, HBML learned that SCM was a company that had been

4  purchased by the "wider" Hanson group in the U.S. in 1986 and then demerged as

5  Millennium in 1996. *Id.* 657:6-19; 660:17-25; 661:4-6 (Gretton).

6  306.  During the search of business records concerning Marchant and SCM, no agreements were

7  located indicating that Hanson Trust had ever assumed the liabilities of SCM; rather,

8  Millennium assumed them. *Id.* 664:10-12 (Gretton).  And during the investigation, HBML

9  learned that Lyondell Chemical Co. acquired Millennium, Basell Polyolefins acquired

10  Lyondell Chemical and became LyondellBasell, and in 2009, LyondellBasell, including

11  Millennium and Millennium Holdings, declared Chapter 11 bankruptcy.  Dkt. No. 266,

12  Undisp. Fact 37.  HBML could not make an indemnity demand against Millennium for the

13  City's claims after receiving the 2015 notice letters because Millennium had gone through

14  Chapter 11 bankruptcy in approximately 2009.  Trial Tr. vol. 4, 660:14-21 (Gretton).

15  **CONCLUSIONS OF LAW[22]**

16  Emeryville asserted claims under CERCLA, RCRA, the California Polanco and Gatto

17  Acts, as well as state law claims for continuing public and private nuisance and continuing

18  trespass.  To prove any of these claims, Emeryville was required to pierce the corporate veil from

19  SCM to HBML, through alter ego or successor liability.  It failed to do so.  Not only did the

20  evidence at trial establish that I do not have personal jurisdiction over HBML, but also even if I

21  did, the evidence shows that its corporate veil may not be pierced under the alter ego doctrine or

22  successor liability.  I address these legal issues in turn.

23

24

---

25  [22] "To the extent that any of the Findings of Facts may be deemed Conclusions of Law, they also shall be considered conclusions.  Likewise, to the extent that any of the Conclusions of Law may be deemed Findings of Fact, they shall be considered findings." *United States v. Sterling*

26  *Centrecorp Inc.*, 960 F. Supp. 2d 1025, 1033 (E.D. Cal. 2013), *aff'd*, 977 F.3d 750 (9th Cir. 2020)

27  (quoting *United States v. Newmont USA Limited and Dawn Mining Co.,* No. CV–05–020–JLQ, 2008 WL 4621566 at *2 n. 1 (E.D. Wash. Oct. 17, 2008)); *see also Miller v. Fenton,* 474 U.S.

28  104, 113–14, (1985) (noting the difficulty, at times, of distinguishing findings of facts from conclusions of law).

**I.      THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER HBML**

"In exercising personal jurisdiction, a federal district court is constrained by the Fourteenth Amendment's Due Process Clause and the long-arm statute of the state in which it sits." *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1086 (9th Cir. 2023), *cert. denied*, No. 23-874, 2024 WL 2262336 (U.S. May 20, 2024) (first citing *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021); and then citing *Burri L. PA v. Skurla*, 35 F.4th 1207, 1212 (9th Cir. 2022)).   Under the Due Process Clause, a court may exercise jurisdiction over a non-resident defendant if the defendant "has sufficient 'minimum contacts' with the forum state 'such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Id.* (first quoting *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022); and then citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)).   Because "California authorizes its courts to exercise jurisdiction 'to the full extent that such exercise comports with due process,' . . . 'the jurisdictional analyses under [California] state law and federal due process are the same.'"  *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (citations omitted); *see also* Cal. Civ. Proc. Code § 410.10.

"Personal jurisdiction can be either general or specific."  *Impossible Foods*, 80 F.4th at 1086.   For a corporate defendant, general exists "when a defendant is 'essentially at home' in the State. . . . [and] is paradigmatically appropriate in the state in which the entity is incorporated or where it maintains its principal place of business."  *Id.* (citations omitted).   The City does not argue that HBML, a British company, is subject to general jurisdiction in California.

"Specific jurisdiction . . . covers defendants less intimately connected with a State, but only as to a narrower class of claims."  *Ford Motor Co.*, 592 U.S. at 359.   "In order for a court to have specific jurisdiction over a defendant, 'the defendant's suit-related conduct must create a substantial connection with the forum State.'"  *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1022–23 (9th Cir. 2017) (citation omitted).   "The relationship between the defendant and the forum state 'must arise out of contacts that the "defendant [itself]" creates with the forum state.'"  *Id.* at 1023 (citation omitted).   In determining whether specific jurisdiction exists, courts employ a three-factor test:

> (1) the defendant must either purposefully direct his activities toward the forum or
> purposefully avail himself of the privileges of conducting activities in the forum;
> (2) the claim must be one which arises out of or relates to the defendant's forum-
> related activities; and (3) the exercise of jurisdiction must comport with fair play
> and substantial justice, i.e. it must be reasonable.

*Impossible Foods*, 80 F.4th at 1086 (quoting *Axiom Foods*, 874 F.3d at 1068).

The plaintiff bears the burden of satisfying the first two factors of the test. *See id.* If the plaintiff succeeds in satisfying the first two factors, the burden then shifts to the defendant to present a "'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (citation omitted).

I previously concluded that the City made a prima facie showing of personal jurisdiction by plausibly alleging personal jurisdiction under the standard analysis and under an alter ego theory of liability. ("MTD Order") [Dkt. No. 143]. Now, because I conclude below that HBML's corporate veil may not be pierced through alter ego or successor liability, any exercise of personal jurisdiction must be through HBML's direct contacts with the forum state. *See Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 590–91 (9th Cir. 1996) (analyzing the parent corporation's "own contacts" with the forum state for personal jurisdiction in a CERCLA case where the plaintiff "failed to [show] that [the polluter] was [the defendant's] alter ego"); *see also Axiom Foods*, 874 F.3d at 1071 n.5. Accordingly, below I analyze HBML's contacts with California.

**A.   Prong 1:  Purposeful Availment**

**1.   The Purposeful Availment and Purposeful Direction Tests**

The first prong of the specific jurisdiction test requires the plaintiff to show that the defendant "purposefully direct[ed] its activities toward the forum state, purposefully avail[ed] itself of the privileges of conducting activities there, or engage[d] in 'some combination thereof.'" *Impossible Foods*, 80 F.4th at 1088 (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (per curiam)). The standards for purposeful availment and purposeful direction are somewhat different. *See id.*

To establish purposeful availment, the plaintiff must show that the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the

benefits and protections of its laws." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  "In return for these 'benefits and protections,' a defendant must—as a quid pro quo—'submit to the burdens of litigation in that forum.'"  *Id.* (quoting *Burger King*, 471 U.S. at 476) (subsequent citations omitted).  This showing "typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there."  *Id.*  A company purposefully avails itself of the benefits of a forum state where it "'has clear notice' of its exposure in that State to suits arising from local [occurrences] . . . [a]nd the company could do something about that exposure," such as affirmatively "sever[] its connection with the State."  *Ford Motor Co.*, 592 U.S. at 363–64.

In comparison, the purposeful direction analysis uses the "effects test," which requires the plaintiff to show that the defendant: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 980 (9th Cir. 2021) (quoting *Axiom Foods*, 874 F.3d at 1069).  This showing "usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere."  *Schwarzenegger*, 374 F.3d at 802 (collecting cases).

The decision to apply the purposeful availment or purposeful direction analysis to the first prong of the personal jurisdiction test "turns on the nature of the underlying claims."  *Impossible Foods*, 80 F.4th at 1088 (quoting *Ayla*, 11 F.4th at 979).  Although purposeful availment "generally provides a more useful frame of analysis for claims sounding in contract, while purposeful direction is often the better approach for analyzing claims in tort," *id.* (quoting *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020)), the Ninth Circuit has repeatedly emphasized that this is not "a hard-and-fast rule" and that there is no "rigid dividing line between these two types of claims," *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023) (quoting *Glob. Commodities*, 972 F.3d at 1107).

"At bottom," these tests "ask whether defendants have voluntarily derived some benefit from their interstate activities such that they 'will not be haled into a jurisdiction solely as a result

110

of "random," "fortuitous," or "attenuated" contacts.'" *Glob. Commodities*, 972 F.3d at 1107

(quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985)).  The objective of these

tests is the same: to "frame [the court's] inquiry into the defendant's 'purposefulness' vis-à-vis the

forum state." *Impossible Foods*, 80 F.4th at 1088 (citing *Glob. Commodities*, 972 F.3d at 1107).

Therefore, "when considering specific jurisdiction," the Ninth Circuit instructs district courts to

"comprehensively evaluate the extent of the defendant's contacts with the forum state and those

contacts' relationship to the plaintiffs' claims—which may mean looking at both purposeful

availment and purposeful direction." *Davis*, 71 F.4th at 1162; *see also Yahoo!, Inc.*, 433 F.3d at

1206 (noting that the first prong on the personal jurisdiction test may be satisfied "by some

combination" of the availment and direction inquiries).

Looking at both the purposeful availment and purposeful direction tests is appropriate here

because of the nature of the claims and the parties.  *See Davis*, 71 F.4th at 1162.  The underlying

CERCLA and state law claims concern pollution and so sound in tort; the purposeful direction test

is the typical path for those claims.  *See Impossible Foods*, 80 F.4th at 1088.  Indeed, in *Pakootas

v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 577 (9th Cir. 2018), the court applied the purposeful

direction analysis to determine personal jurisdiction in a CERCLA case.  But there, the evidence

showed that the defendant itself discharged the pollution, *see id.*, while here, HBML is involved in

this case based on its acquisition activities related to SCM.  Those activities, business

relationships, and transactions sound more in contract.  The purposeful availment analysis is

generally more useful for those types of claims.  *See Impossible Foods*, 80 F.4th at 1088.  Indeed,

this case epitomizes where there is no "hard-and-fast rule" for applying the purposeful direction or

purposeful availment test.  *See Davis*, 71 F.4th at 1162.

Ultimately, these tests are concerned with providing due process, and due process ensures

that a defendant voluntarily benefitted from involvement in the forum state before it can be sued

there.  *See Glob. Commodities*, 972 F.3d at 1107.  Here, a "comprehensive[] evalulat[ion]" of

HBML's contacts with California reveals six facts connecting the company with the forum state:

(1) Lord Hanson had a house in Palm Springs and did work there sometimes; (2) Lord Hanson

probably had a secretary in California; (3) HBML rented an office in California, at least at some

point; (4) Clarke, then-President of Hanson Industries, met with Lord Hanson two or three times per year in Palm Springs, only one meeting of which he specifically recalled, in which they discussed salary structures; (5) HBML ran two advertisements in the Los Angeles Times and "did . . . some dog-and-pony shows" to try to encourage California investors, though also ran advertisements nationally; and (6) the Hanson Trust finance director sent a "comfort letter" to a California bank regarding its monetary backing in the SCM acquisition.  Findings of Fact ("FOF") ¶¶ 4–8, 108.  All other evidence presented to establish jurisdiction and connect HBML to California merely showed that *Hanson Industries*—the American company—and its leader, Sir Gordon, had deep connections with the state.  That is because most of that evidence relates to the acquisition of SCM (though some showed other Hanson Industries activity), and as explained at length below, the evidence at trial proved that Hanson Trust had little to no role in the SCM acquisition.  The City cannot establish Hanson Trust/HBML had its "own contacts" with the state, *see Am. Tel.*, 94 F.3d at 590–91, via business activity in which it had almost no role.

The Ninth Circuit has emphasized that, "where the defendant has operated from within the jurisdiction," the defendant's "entire course of dealing" should inform the personal jurisdiction analysis, not just the conduct giving rise to the claim.  *Impossible Foods*, 80 F.4th at 1090 (quoting *Glob. Commodities*, 972 F.3d at 1108).  For example, the Ninth Circuit held that the plaintiff established a prima facie case of personal jurisdiction—without specifically choosing between the purposeful availment and direction tests—where the defendant was a Honduras-based importer that voluntarily entered multiple multi-year, multimillion dollar contracts with the plaintiff, a California exporter; the contract was paid in California, and the goods were certified for shipment from California.  *Glob. Commodities*, 972 F.3d at 1108.

And in *Impossible Foods*, the Ninth Circuit held that the California court had personal jurisdiction in a trademark infringement action over a Texas LLC that was solely owned and operated by one person, the business was developed and ideas were marketed in San Diego, the mark at issue was created in and registered in San Diego, the owner's LinkedIn listed San Diego as the headquarters and promoted it as the location for his team and meetings, and the LLC was in fact headquartered in San Diego for several years, until the owner began a "nomadic lifestyle,"

United States District Court
Northern District of California

during which time he continued to travel to and from California and tag the state in promotional

posts.  80 F.4th at 1084–86, 1089.  The Ninth Circuit recognized that even though the defendant

eventually moved the LLC to Texas, "it for years operated *based out of California*," and its

contacts with the state were "constant and pervasive" rather than "sporadic."  *Id.* at 1089.  "Under

all these circumstances," it was clear that the defendant deliberately directed activities toward

California to the extent that "the defendant was in fact *based there*."  *Id.* at 1090; *cf.*

*Schwarzenegger*, 374 F.3d at 803 (determining no purposeful availment where nonresident

defendant was sued in California for allegedly publishing photograph in Ohio because of lack of

evidence that defendant received a benefit, privilege, or protection from California).

But applying similar principles in *Davis*, the Ninth Circuit held that an Idaho court did not

have personal jurisdiction over an English corporation, Cranfield, in a products liability case.

There, the plaintiffs sued Cranfield in Idaho federal court after an airplane crash killed their

relatives.  *Davis*, 71 F.4th at 1159–60.  Plaintiffs alleged that Tamarack, an Idaho corporation,

manufactured the plane's "load alleviation system," which was defective and caused the crash.  *Id.*

at 1160.  Tamarack had hired Cranfield to help get FAA certification to install the system on

planes in the U.S., and Cranfield did so successfully, holding the certificate for Tamarack until the

lawsuit.  *Id.*  The Ninth Circuit reasoned that the business contract did not show that Cranfield

intended to avail itself of Idaho's laws because it had no offices or workers in Idaho, it did not

solicit the business from Tamarack, the negotiations occurred remotely, and the contract terms did

not invoke Idaho law, even though Cranfield was compensated from Idaho.  *Id.* at 1163–65.

Though Cranfield employees corresponded with Tamarack's Idaho workers and took two trips to

Idaho to observe the load alleviation system and testing, Cranfield's role was "small" in the

observation and had "no special place" in the performance of the contract as a whole, in part

because Cranfield performed the "bulk" of the contractual work from England.  *Id.* at 1165

(citation omitted).

Here, the facts parallel those in *Davis* and differ from those in *Global Commodities* and

*Impossible Foods*.  HBML's "entire course of dealing" establishes almost no connection with

California.  The "comfort letter" to the California bank was, as explained below, merely a standard

113

action that a parent corporation may take on behalf of its subsidiary.  And while I acknowledge the advertisements and "dog-and-pony shows" sought California investors for Hanson Trust, I also must look beyond this conduct that gave rise to the claims here to consider HBML's "business reality."  *See Glob. Commodities*, 80 F.4th at 1108.  The only evidence showing HBML had any connection to California—after a 15-day bench trial, thousands of pages of deposition transcripts, and hundreds of exhibits—was that Lord Hanson did some work from Palm Springs during winters, he had a secretary in Los Angeles at some point, and Hanson Trust at least briefly rented office space in California.  *See FOF ¶¶ 4–8.  All* other evidence showed that Hanson Trust was based in and made all business decisions from the UK.  In other words, as in *Davis*, the contacts with California here were sporadic and had "no special place" in Hanson Trust's business, the bulk of which occurred in the UK.  *See Davis*, 71 F.4th at 1165.  The contacts are simply different from those in *Global Commodities* and *Impossible Foods* because here the City never showed that Hanson Trust repeatedly or extensively sought California contracts, was paid in California for California products, used California as a home base, or even invented any products in the state.  Instead, the business reality was that Hanson Trust business was based in the UK, and Hanson Trust's brushes with California were merely "attenuated" and "sporadic."  *See Glob. Commodities*, 80 F.4th at 1107.

*American Telephone* is also useful in guiding this inquiry.  There, the plaintiff sued the defendant corporation for CERCLA related harms, where the defendant was a Brussels-based corporation that owned 80 percent of the stock in the California polluting corporation.  *Am. Tel.*, 94 F.3d at 588.  The Ninth Circuit—again without clearly choosing between the purposeful availment and direction analyses—concluded that the defendant's own contacts with California were insufficient to establish personal jurisdiction, citing the lack of business in and direct contacts with the United States, lack of direct involvement in the polluter's California facility, and lack of office in or employees attending meetings in California.  *Id.* at 589–90.  Here, Hanson Trust rented an office at least once in Los Angeles—though no evidence was presented that the office was used—and at least one meeting took place between Lord Hanson and Clarke about salary structures.  FOF ¶ 6.  But in the context of the massive organization that was Hanson Trust

United States District Court
Northern District of California

1    in the 1980s, one (possibly underutilized) office and one meeting hardly differentiate these facts

2    from those in *American Telephone*.

3         At bottom, the evidence does not show that Hanson Trust voluntarily derived any benefits

4    from California.  *See Glob. Commodities*, 972 F.3d at 1107.  Though the City pointed to plenty of

5    evidence that *Hanson Industries* purposefully availed itself of California laws and benefits, the

6    very few facts showing Hanson Trust was connected to California were sporadic and insufficient

7    to establish the first element of the personal jurisdiction test, under both the purposeful availment

8    and direction tests.  And even if I accepted these facts as enough to survive the first prong of the

9    test, the plaintiffs did not show that their CERCLA claim—or even the acquisition of SCM—

10   "arises out of or relates to" Hanson Trust's six contacts with California.  *See Williams*, 851 F.3d at

11   1023 (citation omitted).  The plaintiffs would fail at the second prong of the personal jurisdiction

12   analysis.

13        Accordingly, the plaintiffs failed to prove that I may exercise personal jurisdiction over

14   HBML.

15   **II.    EVEN IF THERE WERE PERSONAL JURSIDICTION, THE PLAINTIFFS**

16          **FAILED TO PROVE EITHER THEORY OF LIABILITY**

17        A "general principle of corporate law" is that "a parent corporation . . . is not liable for the

18   acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  But "the corporate

19   veil may be pierced and the shareholder held liable for the corporation's conduct" in certain

20   situations, including via the alter ego and successor liability doctrines.  *Id.*  "[W]hen (but only

21   when) the corporate veil may be pierced, may a parent corporation be charged with derivative

22   CERCLA liability for its subsidiary's actions."  *Id.* at 63–64 (footnotes omitted).

23        **A.    Alter Ego Liability**

24        California alter ego doctrine applies here.[23]  [Dkt. No. 254] at 5–12.  "California

25

----

26   [23] In their proposed conclusions of law, the parties almost exclusively cited federal law regarding
     the unity of interest elements.  They should have cited California law.  Part of the problem might
27   be that there are few cases that solely apply California law for each factor.  Some cases ostensibly
     apply California law but cite back to federal law on the factors.  Here, I am applying California
     law.  To the extent that I cite cases that apply federal law, it is for their persuasive value because
28   of the limited California cases on any particular factor.

United States District Court
Northern District of California

recognizes alter ego liability where two conditions are met." *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010).  "First, where 'there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased;' and, second, where 'adherence to the fiction of the separate existence of the corporation would . . . sanction a fraud or promote injustice.'" *Id.* (quoting *Wood v. Elling Corp.,* 20 Cal. 3d 353, 572 P.2d 755, 761 n. 9 (1977)).  "[B]oth of these requirements must be found to exist before the corporate existence will be disregarded." *Assoc'd Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 837 (1962). "California courts emphasize that the alter ego determination is very fact specific." *Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1250 (9th Cir. 2017) (citation omitted).  Under California law, "the treating of one corporation as the alter ego or another is an extreme remedy, to be sparingly used and is to be approached with caution." *Davidson v. Seterus, Inc.*, 21 Cal. App. 5th 283, 305–06 (2018) (cleaned up) (citations omitted).

### 1.   Unity of Interest

California courts consider many factors under the unity of interest inquiry: (i) "commingling of funds and other assets," (ii) "identical equitable ownership in the two entities," (iii) "failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities," (iv) "use of the same office or business location; the employment of the same employees and/or attorney," (v) "identification of the directors and officers of the two entities in the responsible supervision and management," (vi) "sole ownership of all of the stock in a corporation by one individual or the members of a family," (vii) "failure to adequately capitalize a corporation," (viii) "failure to maintain arm's length relationships among related entities," (ix) "use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation," and (x) "manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another." *Assoc'd Vendors*, 210 Cal. App. 2d at 838–40 (internal citations omitted).

Because no one factor governs the analysis, courts "look at all the circumstances to determine whether the alter ego doctrine applies." *Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022, 1067 (N.D. Cal. 2007) (citing *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App.

4th 523, 539 (2000)); *see also JPV I L.P. v. Koetting*, 88 Cal. App. 5th 172, 195 (2023), *review denied* (May 17, 2023) ("No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." (quoting *Greenspan v. LADT, LLC*, 191 Cal. App. 4th 486, 513 (2010)). "Because it is founded on equitable principles, application of the alter ego is not made to depend upon prior decisions involving factual situations which appear to be similar. . . . It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case." *JPV I L.P.*, 88 Cal. App. 5th at 195 (internal quotation marks omitted) (quoting *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1248 (1991)).

As noted in the factual findings, the evidence presented at trial regarding the unity of interest considerations favors the defendants for all but—at most—one factor.  FOF Section VI.A. There was no evidence of commingling of funds between Hanson Trust and Hanson Industries; Hanson Trust played no role in controlling Hanson Industries' cash sweep account, and to the extent there may have been cash that remitted from Hanson Industries to Hanson Trust, the plaintiffs failed to produce evidence showing how, when, why, or how much, or that remittance equated to commingling.  *See id.*; FOF Sections III.B.2, VI.A.2; *cf. Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 954–55 (N.D. Cal. 2015) (finding no evidence of commingling where companies used one bank account but kept "records to ensure that each . . . entity" was charged only for its services and liable only for its payments).  The companies' maintenance of separate financial books and records also demonstrated that they followed corporate formalities, as did the extensive documentation of the corporate formalities throughout the SCM acquisition.  *Cf. Sonora Diamond*, 83 Cal. App. 4th at 539 (noting that "lack of segregation of corporation records" could indicate unity of interest).  The occasional use of the other entity's stationary does not change this outcome.  *Cf. In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1147 (S.D. Cal. 2018).  And while Hanson Industries did not create documents for many of the intra-Hanson entity actions, *see* FOF ¶ 227, that evidence did not show that *Hanson Trust* failed to follow corporate formalities with respect to Hanson Industries.

Further, there was no evidence that Hanson Trust and Hanson Industries shared offices,

117

1   employees, or attorneys.  Neither the occasional visit by Lord Hanson to the Hanson Industries'

2   New York office nor the required visits to Hanson Trust's London office by Hanson Industries'

3   representatives for parent/subsidiary updates, *supra* FOF Section VI.A.3, show that the entities

4   *shared* offices, and even if they did, this would be insufficient on its own to show unity of interest.

5   *See In re Packaged Seafood*, 338 F. Supp. 3d at 1146 (citing federal law but applying California

6   law and noting that a shared office "without further evidence of day-to-day control" does not

7   support a finding of unity of interest).  While I found that Hellings was a shared employee, that

8   does not favor finding unity of interest where, at the time, Hanson Trust had between 50 and 54

9   thousand employees and Hanson Industries had 28 to 34 thousand employees.  FOF ¶ 234; *see*

10  *also In re Packaged Seafood Prod.*, 338 F. Supp. 3d at 1146 (citing federal law but applying

11  California law and noting that show some individuals shared roles between organizations was

12  insufficient to establish alter ego liability).  And the evidence that Hellings helped secure

13  financing for Hanson Industries, FOF ¶¶ 123, discussed structuring or transferring some of the

14  businesses, *id.* ¶¶ 175–78, and drafted a memo acknowledging that environmental liabilities are

15  part of acquisitions, *id.* ¶ 166, did not demonstrate that he was employed by Hanson Industries, *cf.*

16  *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1192 (N.D. Cal. 2009) ("A

17  parent corporation contributing funds to a subsidiary is not enough to find alter ego or agency

18  liability." (citing *Sonora Diamond*, 83 Cal. App. 4th at 539)).  Use of the same corporate law firm

19  also does not support this factor, particularly where a Hanson Industries employee—Hempstead—

20  made the decision to hire the firm for Hanson Industries and paid their bills through a Hanson

21  Industries Account.  FOF ¶¶ 131–32.

22      In addition, as laid out in the findings of fact, there was no evidence of undercapitalization

23  presented at trial.  *Id.* Section VI.A.5.  "Under California law, inadequate capitalization of a

24  subsidiary may alone be a basis for holding the parent corporation liable for the acts of its

25  subsidiary."  *In re Hydroxycut Mktg. & Sales Pracs. Litig.*, 810 F. Supp. 2d 1100, 1123 n.11 (S.D.

26  Cal. 2011) (citing *Slottow v. Am. Cas. Co. of Reading, Pa.*, 10 F.3d 1355, 1360 (9th Cir. 1993)).

27  The evidence at trial showed that every corporate success to SCM had "capital reasonably

28  regarded as adequate to enable [the corporation] to operate its business and pay its debts as they

118

mature." *In re Packaged Seafood*, 338 F. Supp. 3d at 1155 (quoting *Laborers Clean-Up Contract Admin. Tr. Fund v. Uriarte Clean-Up Serv., Inc.*, 736 F.2d 516, 524 (9th Cir. 1984)). And not only was every corporate successor able to carry on its normal operations, and able to meet its obligations as they came due, but also every corporate successor from acquisition until the tender offer was better capitalized than SCM was before it was acquired. FOF Section VI.A.5. The plaintiffs did not provide contradictory evidence; their expert did not provide a direct opinion on undercapitalization at all, but rather focused on the pro forma balance sheet of HSCM-20 in a way that did not conform with standard accounting principles and that does not find any support in the law. FOF ¶ 250.

And with respect to Kalamazoo, the evidence did not prove undercapitalization. The Ninth Circuit has held that a corporation was not undercapitalized where it had "always been able to satisfy judgments against it," it maintained almost $2 million in net assets and equity at the relevant time, and it could "meet its *reasonably expected* debts." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 677–78 (9th Cir. 2017) (emphasis added)). In comparison, at trial there was no evidence that the Kalamazoo liability calculations made in 2010 were known or knowable in 1986 through 1996, when Hanson Trust indirectly owned SCM and its successors. FOF Section VI.D. Indeed, Hanson Industries undertook considerable effort to determine the extent of its liabilities, including its environmental ones, and it set aside millions of dollars in reserves to cover the ones it discovered. *Id.* Section VI.B. And even if the evidence showed that the defendants could not satisfy potential "multimillion dollar judgments" resulting from environmental liabilities—which it did not—the City still failed to prove inadequate capitalization because the defendants' "capital was sufficient . . . to operate its normal business." *In re Hydroxycut Mktg.*, 810 F. Supp. 2d at 1122–23 (citations omitted)). At bottom, the Kalamazoo evidence—like the other evidence put on by the plaintiffs—did not prove undercapitalization.

Asset stripping, which is intimately tied to adequate capitalization, also did not occur. This is the process by which assets are stripped "from a previously legitimate corporation in order to avoid satisfying preexisting obligations that the corporation incurred in the ordinary course of business. *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 404

(S.D.N.Y. 2015) (citation and subsequent history omitted).  First, the plaintiffs' expert defined asset stripping as consistently taking the assets from one party and leaving behind only liabilities, FOF ¶ 275, but as explained above in the paragraph about capitalization, that did not happen. Second, that expert did not actually point to evidence of asset stripping, nor did he clearly opine that there was any.  *Id.* ¶¶ 271–73.  Third, HBML demonstrated that there was no transferring of assets without parallel transfers of liabilities.  *Id.* ¶ 276.  Finally, as explained, the Kalamazoo evidence does not support the City's theory.  *Id.* Section VI.D.  Accordingly, the City failed to prove any asset stripping occurred.

There was also no failure to maintain arms-length dealings.  As explained in the factual findings, most of the plaintiffs' evidence related to Hanson Industries' dealings with its subsidiaries, not Hanson Trust's actions.  *See id.* Section III.  And Hanson Industries, not Hanson Trust, controlled and directed the post-acquisition investigation and restructuring of SCM.  *Id.* Sections IV.B–C.  The facts about the typewriter IPO do not show that Hanson Trust played any role in that decision or operation; the "Prospectus" did not lead me conclude otherwise.  *Id.* ¶¶ 215, 261.  Neither do the facts about the Millenium demerger, particularly because an independent investment advisor provided a fairness opinion.  *Id.* ¶ 208.  This factor does not support finding a unity of interest.

Nor was there evidence that Hanson Industries or its subsidiaries were used as mere shells or instrumentalities of Hanson Trust.  *Id.* Section VI.A.6.   This factor considers whether the subsidiary "is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation."  *Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1107 (2013) (citations omitted); *see also Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (noting that under federal law, this factor requires proving the parent's "pervasive control over the subsidiary," including by "dictat[ing] every fact of the subsidiary's business" (citation omitted)); *Inst. of Veterinary Pathology, Inc. v. Cal. Health Lab'ys, Inc.*, 116 Cal. App. 3d 111, 120 (1981) (requiring "direct evidence of specific manipulative conduct to warrant the piercing of the corporate veil").  As a whole, the trial evidence consistently proved that Hanson Industries has operational, financial, and legal autonomy

from Hanson Trust.  *See* FOF Sections III.B.1–3, VI.A.6; *cf. Toho-Towa Co.*, 217 Cal. App. 4th at 1107–08 (considering control of finances, policies, and practices).  Despite Sir Gordon and Lord Hanson pursuing similar business strategies in each country, FOF ¶¶ 73, 87–89, the plaintiffs did not prove—or even suggest—that Hanson Trust dictated every facet of Hanson Industries' operations, sales or acquisitions, or other business choices, *see Ranza*, 793 F.3d at 1073.  Hanson Trust did not direct or control Hanson Industries' "day-to-day operations."  *Doe v. Unocal Corp.*, 248 F.3d 915, 927 (9th Cir. 2001) (per curiam) (finding no alter ego under federal law where there was "no evidence" that the parent was "involved in the day-to-day operations of its subsidiaries"), *abrogated on other grounds by Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017).  And as addressed, Hanson Industries, not Hanson Trust, directed and controlled the SCM acquisition.  FOF Section IV.A.  The so-called "backstop" letter does not change this finding.  This factor does not support finding unity of interest.

Finally, the one factor that could favor the plaintiffs was that there was some overlap between the officers and directors of Hanson Industries and Hanson Trust.[24]  FOF Section IV.A.4; *see Assoc'd Vendors*, 210 Cal. App. 2d at 838–40.  But as discussed throughout this Order, the City did not point to evidence showing that any officer or director used their position in Hanson Trust to control or direct actions in Hanson Industries in accordance with Hanson Trust's wishes.

As a whole, the evidence demonstrated that Hanson Trust and Hanson Industries operated autonomously, in terms of general operations, finances, and management.  Though the overarching strategy was similar between the companies, and some of the officers and directors shared roles in both entities, ultimately no evidence was presented at trial that showed Hanson Trust controlled the day-to-day operations, decisions, or finances of Hanson Industries or its other subsidiaries.  Examining "all the circumstances," and noting that no single factor "is determinative," *JPV I L.P.*,

---

[24] There was also evidence that Hanson Trust filed certain forms with the FTC and SEC regarding the Tender Offer.  FOF ¶¶ 155–58.  It was legally obligated to file the FTC pre-merger notification because it was the "ultimate parent" under the Hart-Scott-Rodino Act.  16 C.F.R. § 803.2; 15 U.S.C. § 18a.  And Hanson Trust was legally required to file a Schedule 13D and 14D-1 because it was a "beneficial owner" of more than 5% of SCM's stock, under the Williams Act.  *See* 15 U.S.C. §§ 78m(d)(1), 78n(d)(1); 17 C.F.R. §§ 240.13d–1(a), 240.13d–3(a), 240.14d-1(g).  All this shows is that Hanson Trust complied with its legal obligations as a parent; it is not evidence of any of the alter ego or successor liability factors.

United States District Court
Northern District of California

88 Cal. App. 5th at 195,  I conclude that the unity of interest factors are not met.  Given the intentional decisions to separately structure, manage, and operate Hanson Industries from Hanson Trust—beginning with Sir Gordon's initial move to America, and including the SCM acquisition, restructuring, and demerger decisions—any other conclusion would be contrary to clear law and policy that allows for piercing of the corporate veil only in the rare and "extreme" cases.  *See Davidson*, 21 Cal. App. 5th at 306.  The first alter ego requirement is not met.  The corporate veil cannot be pierced under this theory.

### 2.    Inequitable Result, Sanctioning Fraud, or Promoting Injustice

Even if I concluded that the plaintiffs proved the unity of interest factors, they failed to prove that not piercing the corporate veil would cause an inequitable result, sanction a fraud, or promote an injustice.

"Finding an 'inequitable result' under the second element of alter ego liability 'generally require[s] some evidence of bad faith conduct on the part of defendants.'"  *Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1250 (9th Cir. 2017) (citation omitted).  But California law does not require bad faith or intentional fraud to meet the second element of the alter ego doctrine and pierce the corporate veil.  *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 635 (N.D. Cal. 2020) (first citing *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985); and then citing *Pac. Bell Tel. Co. v. 88 Connection Corp.*, 15-cv-04554-LB, 2016 WL 3257656, at *3 (N.D. Cal. June 14, 2016)); *JPV I L.P. v. Koetting*, 88 Cal. App. 5th 172, 200 (2023), *review denied* (May 17, 2023) ("An inequitable result does not require a wrongful intent." (citation omitted)); *see also Assoc'd Vendors*, 210 Cal. App. 2d at 838 (noting the alter ego theory "does not depend on the presence of actual fraud" but that "bad faith in one form or another is an underlying consideration" (citations omitted)).

Rather, "[s]o long as there is a unity of interest and ownership, courts will ignore the corporate form and attribute wrongful or inequitable conduct to the organization controlling the corporation."  *Purdue Pharma*, 491 F. Supp. 3d at 635 (citing *Pac. Bell*, 2016 WL 3257656, at *3).  Wrongful or inequitable conduct includes "when the corporate form is used to perpetuate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose."  *Pac.*

United States District Court
Northern District of California

1    *Bell*, 2016 WL 3257656, at *3 (quoting *Sonora Diamond*, 83 Cal. App. 4th at 538).  Some courts

2    consider undercapitalization under the inequitable result analysis.  *See Perfect 10, Inc.*, 847 F.3d at

3    677 (first citing *Laborers Clean-Up Contract Admin. Tr. Fund v. Uriarte Clean-Up Serv., Inc.*,

4    736 F.2d 516, 525 (9th Cir. 1984); and then citing *Automotriz del Golfo de Cal. S.A. de C.V. v.*

5    *Resnick*, 47 Cal. 2d 792, 797, 306 P.2d 1 (1957)).

6            Here, there was no "wrongful or inequitable conduct" by any entity, and the disputed

7    evidence at summary judgment that went to this factor ultimately favored the defendants.  *See*

8    *Purdue Pharma*, 491 F. Supp. 3d at 635.  In advance of trial, I found disputed evidence that

9    Hanson Trust knew of or was willfully blind to the environmental risks and liabilities associated

10   with the SCM acquisition and so wrongfully and unfairly used the corporate form to evade those

11   liabilities.  ("MSJ Order") [Dkt. No. 254] 14–19.  Specifically, I pointed to the disputed evidence

12   that (1) HBML knew of the potential for acquiring environmental liabilities but failed to

13   investigate further; (2) though it did not necessarily know about the FMW site, it knew of

14   potentially costly environmental liabilities from SCM; (3) HBML understood its environmental

15   liabilities could not be easily transferred away; (4) HBML chose the corporate structure to avoid

16   tax liabilities; (5) HBML's transfer of environmental liabilities to Millennium was not done at

17   arms-length; and (6) HBML benefitted throughout the process.  *See id.*

18           But as described in the factual findings, this is not how the evidence played out at trial.

19   Rather, (1) *Hanson Industries* (not Hanson Trust) was in charge of the post-acquisition

20   investigation and thoroughly investigated potential unknown liabilities through its team of

21   "ferrets," CPAs and attorneys who were experienced at finding and accounting for unknown

22   liabilities.  FOF ¶ 168.  (2) The fact that the defendants learned of the Kalamazoo liability and

23   included it in balance sheets and reports, *id.* ¶ 181, strongly discredits the plaintiffs' theory (based

24   on no evidence) that the defendants knew of or were willfully blind to the FMW liability.  (3)

25   Even if Hanson Trust knew of the environmental liability and understood that it could not be

26   easily transferred, there is no evidence that any wrongdoing resulted from that knowledge,

27   particularly where *Hanson Industries* controlled the acquisition and structuring decisions.  *See id.*

28   Section IV.  (4) Hanson Industries chose the corporate structure.  *Id.* ¶¶ 174–76.  (5) The evidence

did not show that the Millenium demerger was not done at arms-length. *Id.* Section VI.A.6. (6) To the extent that Hanson Trust received a financial benefit from the SCM acquisition, it was the standard benefit that parent corporations receive from subsidiaries, as permitted (and encouraged) by corporate law. *Id.* ¶¶ 183, 215; *see also In re Packaged Seafood*, 338 F. Supp. 3d at 1168 ("[E]stablishing a tax efficient structure to acquire a company is a routine business practice and does not [necessarily] establish inequity."). In other words, there was no evidence of any wrongful or inequitable conduct—by Hanson Trust or by Hanson Industries.

These findings also show that Hanson Trust did not use its corporate form to perpetuate fraud, circumvent any statute, or take any action in bad faith. *See Pac. Bell*, 2016 WL 3257656, at *3; *Daewoo Elecs. Am.*, 875 F.3d at 1250. There was no evidence of fraud. To the extent that the plaintiffs argue that the defendants tried to circumvent responsibilities under CERCLA or state law, this was not established at trial. Again, the key findings here are that Hanson Industries carried out the acquisition and structuring of SCM, and Hanson Industries investigated the liabilities and incorporated the knowable ones onto the balance sheets. FOF Section IV. There is no evidence that Hanson Trust directed or controlled those activities, and in fact the evidence shows that Hanson Industries exercised operational and financial autonomy in making those decisions. *See id.* Sections III.B, IV. And even if Hanson Trust somehow played a pivotal role in those decisions, there is no evidence that the structuring of SCM or ultimate demerger were done to evade the FMW liability or other environmental liabilities. *Cf. United States v. Union Corp.*, 259 F. Supp. 2d 356, 389-90 (E.D. Pa. 2003) (finding inequitable result where the parent company made structural and financial decisions on behalf of its subsidiaries in "a deliberate attempt to evade anticipated liability" under CERCLA (citation omitted)). Indeed, as noted, SCM was better capitalized at the time of the demerger than it was at the time of the acquisition, FOF ¶¶ 243–44, strongly suggesting there was no improper redirection of funds or abilities to pay. *Cf. Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1109 (2013) ("[I]t would be inequitable to permit [the parent company] . . . to shift liability to [the subsidiary] after ensuring that [the subsidiary] would have no funds to pay its debts.").

The plaintiffs' reliance on *McLaughlin v. L. Bloom Sons Co.*, 206 Cal. App. 2d 848 (1962),

124

is unconvincing.  There, the defendant owned three stores named "Bloom's" that were unionized and subject to the same collective bargaining agreement for that geographical area, and then it opened a fourth shoe store with the same name in the area covered by the union agreement, but it did so via a separate corporation that was owned, managed, and financed by the defendant.  *Id.* at 850–51.  The court found that failure to disregard the corporate form would lead to an inequitable result because the separate corporation was used only to avoid the contractual obligations with the union, which the defendants would have been bound to if they opened the store directly.  *Id.* at 853.  Here, in contrast, there was no evidence that the defendants used any corporate form to avoid contractual, financial, or statutory obligations, so *McLaughlin* is not dispositive.

And *L.A. Terminals, Inc. v. City of Los Angeles*, No. CV-186754-MWF-RAOX, 2020 WL 8028241, at *7 (C.D. Cal. Dec. 21, 2020), is also unpersuasive.  The court denied summary judgment because there was a dispute of fact as to the unity of interest factors and also because failing to pierce the corporate veil "would lead to an inequitable result, as it would allow [the defendant] to escape liability for potential violations of CERCLA."  *Id.*  The court did not explain its findings on the inequitable result prong, though, so it is not entirely clear what that decision was based on, nor can it be particularly persuasive here.  At any rate, as discussed, there are no facts that HBML *was* liable for CERCLA violations, so my conclusions do not allow it to "escape" liability in any way.

Finally, the thrust of the plaintiffs' argument is that it would be inequitable and unjust to saddle the taxpayers of Emeryville with the responsibility for paying to clean up the FMW site. The City's inability to collect a judgment from the responsible party—Millenium, as the evidence proved—is not by itself a sufficient inequitable result that justifies piercing the corporate veil.  *See JPV I L.P.*, 88 Cal. App. 5th at 200 ("[D]ifficulty in enforcing a judgment or collecting a debt does not, by itself, constitute an inequitable result for purposes of the alter ego doctrine." (citing *Sonora*, 83 Cal. App. 4th at 539)); *see also Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1041 (N.D. Cal. 2014) (same).  Unlike in *JPV I L.P.*, 88 Cal. App. 5th at 200, where the plaintiff "did not solely rely on its inability to collect on the judgment" and instead pointed to evidence of "other factors indicating inequitable uses of the corporate form"—including management of day-to-day

United States District Court
Northern District of California

1   operations, diverting the entities' customers and business opportunities to the defendants, and

2   emptying the entities' bank accounts so that the plaintiff was unable to collect a separate damages

3   award—here, the plaintiffs failed to provide similar evidence.  Rather, the evidence showed that

4   HBML is not legally liable for the FMW site.  And the irony of the equitable claim is that the City

5   knew in 1999 that the FMW Site was polluted, when it was still possible to make a claim against

6   Millenium and recover damages, but the City failed to notify any successor to the Marchant

7   environmental liability until 2015.  It would be plainly inequitable to force HBML to pay for the

8   cleanup.[25]

9       **B.    Successor Liability**

10      As relevant to this case, for successor liability to apply under CERCLA, two requirements

11  must be met: first, the apparent successor corporation must have purchased the assets of another

12  corporation, and second, one of four specific exceptions must be met.  *See Atchison, Topeka &*

13  *Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361–64 (9th Cir. 1997) (outlining the

14  requirements of successor liability and reasoning that federal and California law are not practically

15  different in this area).  The exception at issue here is whether Hanson Trust "expressly or

16  impliedly agree[d] to assume the liability."  *Id.* at 361.  I address each requirement in turn.

17      **1.    Asset Purchase**

18      "A basic tenet of American corporate law is that the corporation and its shareholders are

19  distinct entities."  *United States v. Bennett*, 621 F.3d 1131, 1136 (9th Cir. 2010) (quoting *Dole*

20  *Food Co. v. Patrickson*, 538 U.S. 468, 474-75 (2003)).  "An individual shareholder, by virtue of

21  his ownership of shares, does not own the corporation's assets."  *Id.* (quoting *Dole Food*, 538 U.S.

22  at 474-75).  For that reason, "a parent corporation does not own the assets of its wholly-owned

23  subsidiary by virtue of that relationship alone."  *Id.*  And under California law, "when a

24  corporation acquires only capital stock [in another corporation] rather than assets, it becomes a

25  'sole shareholder' of the acquired company."  *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. C 05

26

27  _____

[25] Because I conclude that the law and facts show that the alter ego test is not met and the
28  corporate veil should not be pierced, I do not need to address the merits of the defendants' laches
defense.

1    0553 MHP, 2007 WL 2462142, at *6 (N.D. Cal. Aug. 29, 2007) (quoting *Potlatch Corp. v.*

2    *Superior Ct.*, 154 Cal. App. 3d 1144, 1150 (1984)). As a shareholder, the purchasing corporation

3    does not own any "of the specific property of [the acquired] corporation." *Id.* (quoting *Potlatch*,

4    154 Cal. App. 3d at 1150). Because it does not own the acquired corporation's property, the

5    stock-purchasing corporation owns neither the assets nor the liabilities—just the stocks. *See id.*

6    Purchasing *stock* therefore does not lead to responsibility for an acquired corporation's

7    liabilities—successor liability. Instead, successor liability "requires the purchase of *assets*." *Id.*

8    (citing *Potlatch*, 154 Cal. App. 3d at 1150-51).

9          Here, HBML acquired SCM's stock, but it never acquired or purchased SCM's assets.

10   Instead, it is undisputed that SCM merged with HSCM Merger Co. to create SCM Corporation,

11   which in turn acquired SCM's assets and liabilities, including the FMW site. FOF ¶¶ 184, 281.

12   HSCM Merger Co. was jointly and wholly owned by HSCM Industries and Hanson Holdings

13   Netherlands. *Id.* ¶ 144. It was also a subsidiary of Hanson Trust, which owned all of HSCM

14   Merger Co.'s capital stock, *id.* ¶ 149. In other words, after HSCM Merger Co.'s merger, Hanson

15   Trust indirectly owned *stock* in SCM Corporation, which in turn held the FMW liability. *Id.*

16   ¶ 150. But acquiring and owning stock is insufficient to show that a purchasing corporation also

17   acquired and became responsible for assets or liabilities. *See Sunnyside Dev. Co.*, 2007 WL

18   2462142, at *6; *Bennett*, 621 F.3d at 1136. And no evidence was presented at trial that Hanson

19   Trust owned or acquired *assets* in SCM Corporation. *See* FOF Section IV.A.3. Because it

20   acquired no assets, logically it purchased no assets—but an asset purchase is required for

21   successor liability. *See Sunnyside Dev. Co.*, 2007 WL 2462142, at *6.

22         I previously declined to grant the defendants' summary judgment based on just this

23   argument, finding a dispute of fact concerning whether Hanson Trust's actions constituted a stock

24   purchase or an asset purchase. MSJ Order 20-23. In part I relied on *United States v. Iron*

25   *Mountain Mines, Inc.*, 987 F. Supp. 1233, 1239 (E.D. Cal. 1997), explaining:

26         In *Iron Mountain*, the question was whether the alleged successor corporation,
         Stauffer, was a corporate successor to Mountain Copper, the undisputed polluter
27         responsible under CERCLA that had been dissolved decades earlier. *Id.* at 1234–
         35. Stauffer had initially tried to buy from Mountain Copper its stake in a separate
28         company, but when Mountain Copper refused to sell its stake, Stauffer successfully

took control of Mountain Copper via two tender offers. *Id.* at 1236. Stauffer "became the sole shareholder of Mountain Copper and its wholly owned subsidiaries." *Id.* After acquisition, Stauffer sought to dissolve Mountain Copper, in part for a tax deduction. *Id.* Through various other transactions, all of Mountain Copper's assets were transferred to Stauffer in exchange for Stauffer assuming all of Mountain Copper's liabilities. *Id.* at 1236–37. The court reasoned that while these actions were not a "straightforward asset purchase," they were sufficient to constitute an asset purchase for the purposes of successor liability under CERCLA because "the purpose of the stock buy out was to gain control of a particular asset," Stauffer gained control and ownership of Mountain Copper, and Stauffer subsequently liquidated Mountain Copper and distributed its assets to Stauffer. *Id.* at 1239 (collecting cases reaching similar results).

MSJ Order 20–21.

At the summary judgment stage, I found that there was disputed evidence that Hanson Trust controlled and funded the acquisition of SCM for the purposes of acquiring the typewriter business and assets, and so a reasonable factfinder could conclude both that the purpose of the stock buyout of SCM was to acquire the typewriter assets, and that the assets were acquired by HBML as opposed to a subsidiary. *See id.* 21–23. I distinguished the case from *Potlatch Corp.*, 154 Cal. App. 3d at 1150–51, and from *Sunnyside Dev. Co.*, 2007 WL 2462142, at \*6–7, for similar reasons. MSJ Order 21–23. But as discussed, the evidence ultimately showed that Hanson Trust did not control the acquisition of SCM. Instead, acquisition decisions—including the role of the typewriter business in the decision to acquire SCM and its ultimate disposition and sale—were made by Hanson Industries. FOF ¶¶ 185, 261. And as discussed, SCM's assets were acquired and held by HSCM Merger Co., a mere subsidiary of Hanson Trust. The evidence at trial ultimately showed that *Iron Mountain* is inapposite.

Accordingly, though the plaintiffs presented sufficient evidence to create disputed facts at summary judgment, after weighing the evidence at trial—particularly the more nuanced and detailed explanations of the corporate foundings and relationships—I now find that Hanson Trust did not acquire any of SCM's assets; it was merely a shareholder. Successor liability therefore does not apply. *See Sunnyside Dev. Co.*, 2007 WL 2462142, at \*6; *Potlatch Corp.*, 154 Cal. App. 3d at 1150–51.

## 2.    Express or Implied Assumption

Even if the evidence somehow showed that Hanson Trust acquired SCM's assets—which

128

United States District Court
Northern District of California

1   it does not—successor liability still does not apply because the plaintiffs failed to prove that

2   Hanson Trust expressly or impliedly assumed SCM's liabilities.

3          Where a "corporation purchas[es] the principal assets of another corporation," under

4   California law the purchasing corporation does not automatically assume the liabilities of the

5   selling corporation.  *Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1327 (2012) (quoting *Ray v.*

6   *Alad Corp.*, 19 Cal. 3d 22, 28, 560 P.2d 3, 7 (1977)).  Instead, the purchasing corporation only

7   assumes the liabilities of the selling corporation where:

> (1) there is an express or implied agreement of assumption, (2), the transaction
> amounts to a consolidation or merger of the two corporations, (3) the purchasing
> corporation is a mere continuation of the seller, or (4) the transfer of assets to the
> purchaser is for the fraudulent purpose of escaping liability for the seller's debts.

8

9

10  *Pool v. F. Hoffman-La Roche, Ltd.*, 386 F. Supp. 3d 1202, 1213 (N.D. Cal. 2019) (quoting

11  *Cleveland*, 209 Cal. 4th at 1327); *see also Ray*, 560 P.2d at 7 (same).

12         Only the first basis for liability is at issue here.[26]  For express assumption of liability,

13  courts begin with the language of the parties' written agreements.  *United States v. Sterling*

14  *Centrecorp Inc.*, 960 F. Supp. 2d 1025, 1035 (E.D. Cal. 2013), *aff'd*, 977 F.3d 750 (9th Cir. 2020)

15  (citations omitted).  For both express and implied assumption of liability, courts also look beyond

16  the language of written agreements "to consider all relevant circumstances" including "the parties'

17  conduct and representations."  *Id.* at 1035, 1038 (citations omitted).  A corporation can assume

18  unknown liabilities where the written agreement does not contain "clear and specific language . . .

19  used to effect the exclusion" of the unknown liabilities.  *Id.* at 1036 (citation omitted).  But the

20  intent of the parties is ultimately the most important to determine whether liabilities were

21  assumed.  *See id.* at 1035, 1038.

22         The parties did not present language in any written agreement that showed HBML

23  assumed the FMW liability.  Rather, as outlined extensively in the Findings of Fact, the

24

25  ────────────────

26  [26] In the City's proposed Conclusions of Law, they appear to argue not only for the first basis of
    liability—express or implied assumption—but also the second basis—de facto merger.  *See* [Dkt.
    No. 327] 43:11–14, 44:11–18, 44:24–45:6, 47:5–7 (asserting that the acquisition of SCM was a
27  merger with HBML).  But I granted summary judgment to the defendants on the de facto merger
    basis.  MSJ Order 24–25.  To the extent that the plaintiffs attempt to reassert these arguments, I
28  consider the arguments about merger only insofar as they inform the express or implied
    assumption theory.

assumption of the FMW liability can be clearly traced:  HSCM-20 assumed the FMW liability

when SCM merged into HSCM-20 on November 3, 1986.  FOF ¶ 281.  HSCM-20 then merged

into HSCM Holdings, changed its name to SCM, merged into HM Holdings, Inc., and finally

merged with Millenium Holdings.  *Id.*  The FMW liability followed from SCM to HSCM-20 to

HSCM Holdings to HM Holdings to Millenium Holdings.  *Id.*  Millenium Holdings was the

successor to the Marchant liabilities.  *See id.*

There is also no evidence that any of the various parties conducted themselves or

represented themselves in such a way to suggest that Hanson Trust expressly or impliedly

assumed the Marchant liability.  *See Sterling*, 960 F. Supp. 3d at 1035, 1038.  While the plaintiffs

cite two Hanson Industries memoranda *about* SCM's legacy environmental liabilities, neither the

Hellings memo nor the Schoenwolf memo states or implies that *Hanson Trust* assumed the cost of

those liabilities.  FOF ¶¶ 282–83.  Neither these memos nor any other evidence suggests that any

party intended HBML to assume the liabilities.  *See id.*; *Sterling*, 960 F. Supp. 3d at 1035, 1038.

Though I found a dispute of fact at the summary judgment stage over whether Hanson Trust and

its fan companies acted in a way that showed they assumed all environmental liabilities, *see* MSJ

Order 21–23, again that is not how the evidence played out at trial, in part because the evidence at

trial demonstrated that Hanson Industries, not Hanson Trust, controlled and directed the SCM

acquisition.  *See* FOF Section IV.A.  This is simply a different case with different facts from those

in *Sterling*.

Accordingly, there was no evidence that Hanson Trust expressly or impliedly assumed

SCM's liabilities, including the FMW liability.  The theory of successor liability fails.

## III.   ALL CLAIMS FOR RELIEF FAIL

The City brought ten claims for relief: two for violation of CERCLA, and one each for

violation of the RCRA,[27] violation of California's Polanco Act, violation of California's Gatto

Act, continuing public nuisance under California Civil Code section 3480, continuing private

nuisance under California Civil Code section 3479, continuing trespass, equitable indemnity, and

---

[27] The Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901 et seq.

United States District Court
Northern District of California

1    declarative relief.  Second Amended Complaint ("SAC") [Dkt. No. 67].

2           Throughout this litigation, the City has only argued two theories of liability for any claim:

3    alter ego and successor liability.  The City has made clear that these are the only theories of

4    liability for its two CERCLA claims.  Because the City failed to prove alter ego or successor

5    liability, HBML is not a responsible party or covered person under CERCLA and therefore not

6    liable.  The two CERCLA claims fail.

7           The Polanco and Gatto Acts employ the same "scope and standard of liability for cost

8    recovery" as CERCLA liability.  Cal. Health & Safety Code § 33459.4(c) (Polanco Act); Cal.

9    Health & Safety Code § 25403.5 (Gatto Act); *see also Emeryville v. Elementis Pigments, Inc.*, No.

10   99-03719, 2001 WL 964230, at *11 (N.D. Cal. Mar. 6, 2001) (same); *Fireman's Fund Ins. Co. v.*

11   *City of Lodi, Cal.*, 302 F.3d 928, 946 (9th Cir. 2002), *as amended* (Oct. 8, 2002) (explaining that

12   CERCLA preempts state and local laws if they create liability that conflicts with CERCLA

13   liability).  Because the City failed to prove liability under CERCLA, for the same reasons the City

14   failed to prove liability under the Polanco and Gatto Acts.

15          For the remaining claims, the City has been less specific about whether HBML might be

16   liable under another theory of liability, such as direct liability.  From the SAC, motion practice,

17   joint pretrial statement, and subsequent arguments, it seems clear that the City's only available

18   path to prove liability for its public and private nuisance and trespass claims is by piercing the

19   corporate veil.  *See, e.g.*, [Dkt. No. 266] 21:11–22:10 (describing HBML's alleged liability for

20   nuisance claims "[b]ecause it is responsible for Marchant's contamination").  The City never

21   argued, for example, that HBML was *directly* liable for the contamination—nor could it, based on

22   the evidence.  To the extent that these claims rely on HBML as the alter ego of or successor to

23   Marchant and the FMW liabilities, they fail for the same reasons above—the evidence did not

24   establish alter ego or successor liability.

25          That these theories of indirect liability are the only ones pursued and available also makes

26   sense given the underlying legal claims.  For public nuisance claims, liability "does not hinge on

27   whether the defendant owns, possesses or controls the property," but the City would have had to

28   prove that HBML "created or assisted in the creation of the nuisance."  *Citizens for Odor*

United States District Court
Northern District of California

131

*Nuisance Abatement v. City of San Diego*, 8 Cal. App. 5th 350, 359 (2017) (emphasis omitted) (quoting *Melton v. Boustred*, 183 Cal. App. 4th 521, 542 (2010)); *see also City & Cnty. of San Francisco v. Purdue Pharma L.P.,* 491 F. Supp. 3d 610, 676 (N.D. Cal. 2020) (stating, for public nuisance claims, that the plaintiff must prove that the defendant's conduct "was a 'substantial factor in bringing about the result'" (quoting *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 101 (2017)). And the City also would have had to prove this for its private nuisance claim, for which the elements "are the same as those for a public nuisance claim," except for one factor not relevant here. *Schaeffer v. Gregory Vill. Partners, L.P.*, 105 F. Supp. 3d 951, 967 (N.D. Cal. 2015). But the City cannot and did not prove that HBML's conduct created or assisted in the creation of the pollution because HBML had no connection to the FMW site until long after the relevant pollution occurred. HBML is therefore not directly liable.

Similarly, for the continuing trespass claim, the City's theory is that the evidence of *Marchant* leaving contaminants at the FMW site proves the claim. [Dkt. No. 327] 57:1–11, [Dkt. No. 266] 23:13–2 ("A continuing trespass exists where 'contaminants have been left on the property by a prior owner. . . .'" (quoting *Newhall Land & Farming Co. v. Superior Ct.*, 19 Cal. App. 4th 334, 345 (1993)); SAC ¶ 120. The City did not assert or argue, nor did it present evidence at trial that proved or implied, that HBML left the contaminants onsite. Any theory of direct liability therefore fails, too.

And for similar reasons, the RCRA claim fails. After failing to prove alter ego or successor liability, the City's only available path would be to prove that HBML is directly liable under the RCRA. But that requires proving that HBML is a:

> past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]

42 U.S.C.A. § 6972(a)(1)(B); *see also Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850–51 (9th Cir. 2011) (explaining this definition). And again, the City did not present evidence that *HBML* generated, transported, owned, or operated the FMW site in such a manner. Any theory of direct

132

1  liability fails, too.[28]

2       Finally, because the City failed to prove that HBML is liable for any of its claims, I

3  conclude that the City is not entitled to equitable indemnity or to declaratory relief.[29]

4                                    **CONCLUSION**

5       In light of the findings of fact and conclusions of law, I find in favor of defendant HBML

6  and against plaintiff City of Emeryville and will enter judgment accordingly.

7       **IT IS SO ORDERED.**

8  Dated: August 27, 2024



William H. Orrick
United States District Judge

United States District Court
Northern District of California

---

[28] Because the City failed to prove alter ego, successor, or direct liability for any of the claims, I need not and do not address the parties' remaining arguments, including about statutes of limitations or joint and several liability.

[29] Because the City failed to succeed on any of its claim, HBML's counterclaims for contribution under CERCLA and the Polanco and Gatto Acts, general contribution, and equitable indemnity are moot.